1  RICHARD T. BAUM
   State Bar No. 80889
2  11500 West Olympic Boulevard
   Suite 400
3  Los Angeles, California  90064-1525
   Tel:    (310) 277-2040
4  Fax:    (310) 286-9525

5  LAWRENCE M. JACOBSON (SBN 100939)
   GLICKFELD, FIELDS & JACOBSON LLP
6  9720 Wilshire Boulevard, Suite 700
   Beverly Hills, California  90212
7  Telephone:  (310) 550-7222
   Facsimile:  (310) 550-6222

8
   Attorneys for Debtor and Debtor-in-Possession
9  LAKELAND DEVELOPMENT COMPANY

10

11                    UNITED STATES BANKRUPTCY COURT

12                    CENTRAL DISTRICT OF CALIFORNIA

13                        LOS ANGELES DIVISION

14

15  In re                            )   Case No. 2:12-bk-25842 RN
                                     )
16                                   )
                                     )   Chapter 11
17  LAKELAND DEVELOPMENT             )
    COMPANY,                         )   **MOTION FOR APPROVAL OF THE**
18                                   )   **ASSUMPTION OF ASSET SALE**
                                     )   **AGREEMENT AND LEASE-OPTION**
19           Debtor.                 )   **AGREEMENT BETWEEN DEBTOR**
                                     )   **AND RIDGELINE ENERGY, INC;**
20                                   )   **MEMORANDUM OF POINTS AND**
                                     )   **AUTHORITIES;  DECLARATION OF**
21                                   )   **VINCENT PAPA**
                                     )
22                                   )   **DATE:        September 20, 2012**
                                     )   **TIME:        3:00 PM**
23  _____ )   **CTRM:        1645**

24

25

26      TO  THE  HONORABLE  RICHARD  NEITER,  UNITED  STATES  BANKRUPTCY

27  JUDGE,  TO  THE  UNITED  STATES  TRUSTEE,  TO  ALL  CREDITORS  AND  ALL

28  INTERESTED PARTIES:

_____
        **MOTION TO APPROVE ASSUMPTION OF ASSET PURCHASE AGREEMENT WITH RIDGELINE**

1    Debtor and Debtor-in-Possession LAKELAND DEVELOPMENT COMPANY

2    ("Debtor") hereby moves the Court for an Order of Assumption of the Asset Purchase

3    Agreement dated April 9, 2012 and thereby enter into the appurtenant Lease and Option

4    Agreement between the Debtor and Ridgeline Energy Services (USA), Inc.

5

6    In support of the motion, the Debtor shows as follows:

7

8    1.   On April 9, 2012, the Debtor and its affiliate Lakeland Processing Company

9    ("LPC") entered into a written Asset Purchase Agreement with Ridgeline Energy Services

10    (USA), Inc. ("Ridgeline") which contemplated the sale of the Debtor's waste water

11    processing facility, the lease of a portion of the Debtor's land to Ridgeline whereat the

12    facility will operate, and the grant of an option to purchase a portion of the Debtor's land.

13    Contemporaneously therewith, the parties entered into a Management Contract whereby

14    Ridgeline assumed operational control of the facility using the Debtor's employees (subject

15    to reimbursement for the expenses in connection with that borrowing) pending

16    consummation of the Asset Purchase Agreement.

17

18    2.   The Asset Purchase Agreement has a number of contingencies which must be

19    satisfied, including the transfer of the Conditional Use Permit issued by the City of Santa

20    Fe Springs, the transfer of the South Coast Air Quality Management District permits, and

21    the County Sanitation District of Los Angeles County permit.   Both the Debtor and

22    Ridgeline believe that these permits will be transferred not long after the hearing of this

23    motion, and both parties believe that the transaction will finalize and close, leading to a

24    sale of the waste water processing facility, and the execution of the Lease and Option

25    Agreement.

26

27    3.   Upon closing of the Asset Purchase Agreement, the Debtor will receive

28    $1,175,000 in cash and stock which is computed as follows: Sellers Lakeland Development

Company (the Debtor herein) and Lakeland Processing Company receive $2,000,000 in cash plus $750,000 worth of Ridgeline common stock, plus an additional $250,000 in cash or stock at sellers' option.  From this sum is deducted amounts previously paid, $250,000 plus $100,000 for four months (assuming the September installment is paid).  That amount is then split equally between the two sellers based on the Allocation Agreement.  The Management Agreement would terminate and the employees who are substantially lent to Ridgeline would most likely be taken by Ridgeline.  It is probable that only one or two non-management employees would remain after the closing.  The Debtor would no longer have income from the operation of the facility, nor would it continue to receive monthly installment of the purchase price of the facility since it would be paid in a lump sum upon closing.

4.  As part of the closing of the Asset Purchase Agreement, the Debtor would execute and deliver to Ridgeline the Lease and Option Agreement whereby Ridgeline would become the lessee of an approximate 17-acre tract encompassing four parcels of the Debtor's land in Santa Fe Springs.  The waste water reclamation facility would continue to operate on this part of the land, though a small lot line adjustment may have to be made regarding remaining 38 acres.  Lakeland receives $2,600,000 cash in a lump sum.  Ridgeline can exercise the option to purchase at any time thereafter and will pay $13,000,000 in cash and stock less amounts advanced under the Management Contract and the $2,600,000 lump sum payment.  All of these funds go to the Debtor.

5.  The Asset Purchase Agreement and the Lease and Option Agreement were amended post-petition by the Debtor and Ridgeline to provide for the payment to the Debtor of more shares of Ridgeline's stock than had been originally agreed.  Under the

1  amended agreement, Ridgeline tenders 10,266,667[1] shares for purchase of the real

2  property.  That tender is expected to be made immediately upon closing of the Asset

3  Purchase Agreement, thereby immediately generating cash and a fund of stock (which can

4  be sold after six months) in order to pay creditors.  In all other respects the original and

5  amended agreements are the same.

6

7        6.  The original Asset Purchase Agreement is attached hereto as Exhibit 1, The

8  amended Asset Purchase Agreement is attached hereto as Exhibit 2, the original Lease

9  and Option Agreement is attached as Exhibit 3.  The amended Asset Purchase Agreement

10 contains the amendment to the Lease and Option Agreement.

11

12       7.  The Debtor exercised its best business judgment in electing to go forward with

13 the transaction because it will monetize an asset of the Debtor, provide a basis upon which

14 a plan of reorganization can be predicated, and provide funds for the continued operation

15 of the Debtor in the reorganization process.  As a result, the Debtor believes that the Asset

16 Purchase Agreement as amended and the Lease and Option Agreement, as amended,

17 should be assumed.

18

19       Debtor submits the attached Declaration of Vincent Papa and the Memorandum of

20 Points and Authorities in support of this motion.

21

22

23

24

25

26

27

28       [1] The number of shares is subject to adjustment if the stock price is less than $0.75 depending upon volume weighted average price at the times of issuance.

1      Wherefore, the Debtor moves the Court to approve its assumption of the Asset

2  Purchase Agreement and Lease and Option Agreement, as amended, with Ridgeline

3  Energy Services (USA), Inc., and for such further relief as the Court deems proper.

4

5  DATED:  August 27, 2012         RICHARD T. BAUM and
                            GLICKFELD, FIELDS & JACOBSON

6

7                                */s/ Richard T. Baum*

8                            RICHARD T. BAUM, Attorneys for
                            Debtor-in-Possession LAKELAND
                            DEVELOPMENT COMPANY

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

### MEMORANDUM OF POINTS AND AUTHORITIES

3       This is a motion of the Debtor-in-Possession to assume the amended Asset

4   Purchase Agreement with Ridgeline Energy Services, Inc. related to the Debtor's waste

5   water processing facility, and the entry into the concomitant amended Lease and Option

6   Agreement which provides a lease upon land upon Ridgeline can operate the facility and

7   gives it an option to later purchase that land.  The land is question is the approximately 17-

8   acre set of parcels of the Debtor's 55-acre tract.[2]

9

10      Shortly before the Petition Date, the Debtor entered into two agreements with

11  Ridgeline related to the waste water reclamation facility owned by the Debtor and operated

12  by its affiliate, Lakeland Processing Company.  The first was the subject Asset Purchase

13  Agreement whereby Ridgeline agreed to buy the facility.  The second was a Management

14  Contract whereby Ridgeline took over operation of the facility pending the closing of the

15  Asset Purchase Agreement.  Ridgeline performed all financial obligations required of it

16  under both agreements to date, and the Debtor performed its obligations under both

17  agreements.

18

19      The Asset Purchase Agreement is conditioned upon satisfaction of several

20  contingencies including the transfer of the Conditional Use Permit issued by the City of

21  Santa Fe Springs, the transfer of the South Coast Air Quality Management District permits,

22  and the transfer of the County Sanitation Districts of Los Angeles County permit.  The

23  parties anticipate that these transfers will occur by the time that this motion is heard, by the

24  time the order is entered, or will be waived so that the closing of the transaction can occur.

25      Upon closing of the Asset Purchase Agreement, the Debtor will receive $1,175,000

26  in cash and stock which is computed as follows: Sellers Lakeland Development Company

27

28      [2]A parcel map delineating the 17 acres is attached as Exhibit 4, and an aerial
photograph of the entire 55 acre parcel is attached as Exhibit 5.

1   (the Debtor herein) and Lake Processing Company received $2,000,000 cash plus

2   $750,000 worth of Ridgeline common stock, plus an additional $250,000 in cash or stock

3   at sellers' option.  From this sum is deducted amounts previously paid, $250,000 plus

4   $100,000 for four months (assuming the September installment is paid).  That amount is

5   then split equally between the two sellers. The Management Contract would terminate and

6   the employees who are substantially lent to Ridgeline would most likely be taken by

7   Ridgeline.  It is probable that only one or two non-management employees would remain

8   after the closing.  The Debtor would no longer have income from the operation of the

9   facility, nor would it continue to receive monthly installment of the purchase price of the

10  facility since it would be paid in a lump sum upon closing.

11

12      As part of the closing of the Asset Purchase Agreement, the Debtor would execute

13  and deliver to Ridgeline the Lease and Option Agreement whereby Ridgeline would

14  become the lessee of a 17-acre tract encompassing four parcels of the Debtor's land in

15  Santa Fe Springs.  The waste water reclamation facility would continue to operate on this

16  part of the land, though a small lot line adjustment may have to be made regarding

17  remaining 38 acres.  Lakeland receives $2,600,000 cash in a lump sum.  Ridgeline can

18  exercise the option to purchase at any time thereafter and will pay $13,000,000 in cash

19  and stock less amounts advanced or set aside. All of these funds go to the Debtor, though

20  a $5,000,000 segregated fund will be created to fund the costs of remediation of the 17

21  acres and a $1,000,000 segregated fund for ground water monitoring under a plan

22  submitted to the California Regional Water Quality Control Board, Los Angeles Region.

23

24      The Debtor and Ridgeline amended the two agreements to provide for a greater

25  number of shares of stock of Ridgeline which would be tendered as part of the purchase

26  price of the land upon closing.  In virtually all other respects, the agreements are the same

27  as had been negotiated pre-petition.  There is a specification that the stock is restricted

28  from sale by Lakeland for six months from issuance.

---

**MOTION TO APPROVE ASSUMPTION OF ASSET PURCHASE AGREEMENT WITH RIDGELINE**

1
2

## THE DEBTOR MAY ASSUME AN EXECUTORY CONTRACT

## WHICH INCLUDES THE LEASE AND OPTION AGREEMENT

3
4

Section 365(a) sets forth the basic power of the trustee to assume or reject

5 executory contracts and unexpired leases.  In a chapter 11 case, a debtor in possession

6 has the right to exercise this power, <u>Bankruptcy Code</u> §1107(a).  The decision to assume

7 or reject a contract or lease must be approved by the court.  <u>Elliot v. Four Seasons Props.</u>

8 <u>(In re Frontier Props., Inc.)</u>, 979 F 2d 1358, (9th Cir 1992) (court approval of stipulation

9 providing for the assumption of a lease satisfies requirement that an assumption or

10 rejection be approved by the court).  In a chapter 7 case, however, a contract or lease is

11 deemed rejected if it has not been timely assumed.

12
13

The statute does not provide a standard to be applied in determining the propriety

14 of the trustee's decision to assume or reject.  Yet the decision may have significant

15 consequences for the estate.  If the contract is rejected, the estate will lose any benefit

16 from the contract and will be liable for  damages for the breach; in this situation, the claim

17 for damages is treated as a prepetition claim.  If the contract is assumed, any liability

18 thereafter will be an expense of administration.  See <u>Nostas Assocs. v. Costich (In re Klein</u>

19 <u>Sleep Prods., Inc.)</u>, 78 F 3d 18, 30 (2d Cir 1996); <u>Collingwood Grain Inc. v. Coast Trading</u>

20 <u>Inc. (In re Coast Trading Co.)</u>, 744 F 3d 686, 692-93, (9th Cir 1984).

21
22

Under the Code, most courts have applied a "business judgment" test to trustees'

23 decisions to assume or reject contracts or leases.  The Ninth Circuit subscribes to the

24 business judgment test. <u>In re Pomona Valley Medical Group, Inc.</u>, 476 F 3d 665 (9th Cir.

25 2007); <u>In re At Home Corp.</u>, 292 BR 195 (ND Cal 2003), aff'd, 392 F 3d 1064 (9th Cir.

26 2004).  The business judgment rule was discussed in <u>Orion Pictures Corp. v. Showtime</u>

27 <u>Networks, Inc. (In re Orion Pictures Corp.)</u>, 4 F 3d 1095, (2d Cir 1993) where the Court of

28 Appeals for the Second Circuit expanded upon its prior decision in <u>In re Minges</u>,  602 F 2d

1   38 (2d Cir 1979) (Act case) and explained the court's role in the assumption/rejection

2   process "as [one of] an overseer of the wisdom with which the bankruptcy estate's property

3   is being managed by the trustee or debtor-in-possession, and not, as it does in other

4   circumstances, as the arbiter of disputes between creditors and the estate." <u>Orion</u> at 1099.

5   The court found that "a bankruptcy court reviewing a trustee's or debtor-in-possession's

6   decision to assume or reject an executory contract should examine [the] contract and the

7   surrounding circumstances and apply its best 'business judgment' to determine if it would

8   be beneficial or burdensome to the estate to assume it." <u>Orion</u> at 1098 The court's

9   business judgment is the type of judgment a business person would make under similar

10  circumstances. A motion to assume or reject is a summary proceeding, "intended to

11  efficiently review the trustee's or debtor's decision to adhere to or reject a particular

12  contract in the course of the swift administration of the bankruptcy estate." <u>In re Orion</u>

13  <u>Pictures Corp.</u>, 4 F.3d 1095, 1098 (2nd Cir 1993).

14

15  One court held that the business judgment test for determining when executory

16  contract may be rejected under Bankruptcy Code emphasizes whether rejection would

17  result in greater benefit for creditors. <u>In re Balco Equities Ltd., Inc.</u>, 323 B.R. 85 (Bankr.

18  S.D. N.Y. 2005).  Analysis here would show that rejection would hurt all creditors as it

19  would deprive the debtor of operations of waste water reclamation plant, and would deprive

20  the estate of several million dollars of cash with which to operate and pay for the clean up

21  of toxic contamination.

22

23  Another expression of the rule is that courts should apply the "business judgment

24  test," which requires a showing that the proposed course of action will be advantageous

25  to the bankruptcy estate and the decision will be based on sound business judgment, to

26  determine whether debtor's decision to assume executory contract or unexpired lease is

27  supported by requisite valid business justifications. <u>In re Idearc Inc.</u>, 423 BR 138 (Bankr.

28  ND Tex 2009).

---

**MOTION TO APPROVE ASSUMPTION OF ASSET PURCHASE AGREEMENT WITH RIDGELINE**

1    *The Debtor Exercised Its Business Judgment Appropriately*.

2    The Ridgeline executory contract is one of the major parts of the Debtor's efforts to

3    reorganize and provide the means by which that reorganization can take place. The

4    Debtor owns a 55-acre tract which was formerly used as a oil refinery and oil storage

5    facility. Actions by local governmental entities resulted in a mandatory injunction to

6    remediate various toxic contaminants in the soil of the property. The Debtor's

7    reorganization is dependent upon obtaining the funds to pay for that remediation work as

8    well as fund the satisfaction of the secured claims against the property. While the major

9    piece of this reorganization is tied up with the pending, executory Western Realco deal

10    presently in its second extension of the due diligence period, the sale of the waste water

11    reclamation facility provides a substantial inflow of cash which will allow the Debtor to

12    continue its operations pending the Western Realco closing. Further, and more

13    importantly, the exercise of the Option provides the Debtor and Ridgeline with the funding

14    necessary to remediate the 17 acres which Ridgeline will lease, occupy and eventually

15    purchase.

16    By assuming and consummating the Ridgeline deal, the Debtor obtains cash

17    proceeds of approximately $3,400,000 ($2,600,000 under the lease and $800 under the

18    Asset Purchase Agreement). This enables it to pay its administrative costs as it moves

19    forward with the Western deal, or such other deal as may replace that transaction, and

20    provides it with funds which are not the cash collateral of any party. It also receives

21    Ridgeline stock that, after six months, can be sold to create a fund for unsecured creditors.

22    It is the opinion of Debtor's management that there are few options for the use and sale

23    of the waste water reclamation facility beyond the opportunity offered by the Ridgeline deal.

24    It would take a substantial period of time to locate third parties and for them to determine

25    if they wished to pursue similar deals. Instead, the Debtor wished to move forward with all

26    deliberate speed to embed the first of several foundational elements of its reorganization.

27    The Ridgeline transaction satisfies that requirement, eliminates one hurdle in the path of

28    reorganization, and allows the Debtor to concentrate upon the requirements of the Western

**MOTION TO APPROVE ASSUMPTION OF ASSET PURCHASE AGREEMENT WITH RIDGELINE**

Realco deal and the significant contingencies which must be met.  When consummated, this deal will provide the Debtor with a source of funding for its operations which will not utilize the cash collateral of any party to this case.  The Ridgeline transaction is in the best interests of the Debtor, the secured creditors of the Debtor since their cash collateral will not be diminished, and the unsecured creditors since funds will be available to pay their claims.

*The Debtor Exercises Its Business Judgment Appropriately in Accepting Payment Partially in Ridgeline Stock.*

There is a degree of risk in the transaction in that a substantial number of shares of Ridgeline's stock is being tendered as part of the purchase price.  The stock is valued at $0.75 per share, and has a present sales price of $0.66 per share.  The amended Lease and Option Agreement provides a floor under the price in that additional shares will be issued to the extent that the stock is valued at less than $0.75 per share.  The mean target price from analysts following the stock is $1.76 in a year's time.  The number of shares in each tranche is almost eight times the average daily volume (reported to be 162,850 shares per Yahoo Finance).  Current year revenue estimates (March 2013) range between $25.9- and $30.1-million, and revenue growth ranges between 166% and 250% over the next year.   Ridgeline has market capitalization of $40.6-million, so this transaction represents one-third of its capital.  This certainly provides a major incentive to make the entire purchase work.

**SINCE THERE ARE NO DEFAULTS UNDER THE EXECUTORY CONTRACTS**

**THE DEBTOR DOES NOT HAVE TO SATISFY SECTION 365(b)(1)**

Where there are defaults under the executory contract or unexpired lease, Section 365(b)(1) provides that the trustee may not assume an executory contract or lease on which there has been a default unless the trustee complies with three requirements.  The

1  trustee must:

2     (a) cure or provide adequate assurance that the default will be cured,

3     (b) compensate or provide adequate assurance that the trustee will compensate the

4  other party for any pecuniary loss to the party resulting from the default, and

5     (c) provide adequate assurance of future performance under the contract or lease.

6  Richmond Leasing Co. v. Capital Bank, N.A., 762 F 2d 1303, 1309-10, (5th Cir 1985).

7     The Debtor does not believe that there are any defaults under the Asset Purchase

8  Agreement which is seeks to assume.  Hence, the provisions of §365(b) do not apply.

9

10                              **CONCLUSION**

11

12     The Debtor has weighed its options and believes that the goals of its reorganization

13  are met by going forward with the Ridgeline deal.  Not only does the deal itself make good

14  business sense, the executory contract's assumption advances both the remediation of the

15  property and permits the Debtor to concentrate its attention on the other major prong of

16  the reorganization, the Western Realco deal.  It makes perfect business sense to go

17  forward.  Ridgeline and the Debtor ask for, and deserve, the Court's approval.

18

19     Wherefore, the Debtor prays that the Court approve the Assumption of the Debtor's

20  executory Asset Purchase Agreement, as amended, with Ridgeline Energy Services, Inc.

21

22  DATED: August 27, 2012             LAW OFFICES OF RICHARD T. BAUM and
                                       GLICKFELD, FIELDS & JACOBSON
23

24                                     */s/ Richard T. Baum*

25                                     _____
                                       RICHARD T. BAUM, Attorneys for
26                                     Debtor-in-Possession LAKELAND
                                       DEVELOPMENT COMPANY

27

28

---

**DECLARATION OF VINCENT PAPA**

I, VINCENT PAPA, declare:

1.   I am the Secretary and General Counsel of the Debtor which is a California corporation. Along with Michael Egner, I am responsible for the management of the Debtor in this Bankruptcy case.   I have personal knowledge of the facts set forth in this Declaration, and if called as a witness I could testify competently thereto.

2.   The Debtor is the owner of contiguous parcels comprising approximately 55 acres in Santa Fe Springs, California 90670.   Presently located on the 17-acre portion of the property is a waste water reclamation facility which is operating under a pre-petition Management Contract by Ridgeline Energy Services, Inc. ("Ridgeline").    A bio-diesel facility which is presently not operating is also located on the 55 acres. Attached as Exhibit 4 is a parcel map showing the 17-acre and 38-acre portions of the property, and attached as Exhibit 5 is an aerial photograph of the whole of the 55 acres. The land had previously been used for an oil refinery and a depository for various oil industry products and by-products.  The land is contaminated with various toxins, and the Debtor, as a successor owner, is under a decree of the Los Angeles Superior Court to remediate the contamination related to the California Regional Water Quality Control Board, Los Angeles Region ("Water Board"), CAO 97-118.

3.   In order to provide the financing for that remediation project, the Debtor entered into a pre-petition Option Agreement with Western Realco for a loan of $19-million to be used to pay the secured claims against the property, provide funding for the remediation of toxic contaminants on the property, and pay its ongoing expenses.  The agreement is presently in its due diligence period.  If consummated, Western acquires, inter alia, an

1   option to purchase the 38-acre portion of the real property for $25.25-million with credit of

2   the $19-million loan plus interest at the time of closing.  Western Realco had until July 31

3   to complete its due diligence. But the period time was just recently extended to August 31,

4   2012.  While there are a number of contingencies to that transaction, a key determinate

5   will be the standards to which the land must be de-contaminated.  That question is

6   presently in the hands of the Water Board which has postponed its determination several

7   times citing the problems of key people being on vacation during this summer period.

8   When decided, the standards will be applied to the Debtor's Remedial Action Plan.  A cost

9   analysis will be done by Western Realco, and a decision will be made to go ahead or not.

10  Meanwhile, the Debtor has received expressions of interest from others who would be

11  interested in taking Western Realco's place if Western Realco elects not to proceed.

12

13      4.  At issue in this motion is the waste water treatment plant which is subject to an

14  Management Contract between Ridgeline, the Debtor and Lakeland Processing Company.

15  Ridgeline agreed to pay $200,000 per month to the Debtor and Lakeland Processing to

16  operate the waste water treatment plant.  If the transactions herein consummate, the

17  Management Contract would terminate, and no further funds would be payable thereunder.

18

19      5.  Shortly before the Petition Date, the Debtor entered into two agreements with

20  Ridgeline related to the waste water reclamation facility owned by the Debtor and operated

21  by its affiliate, Lakeland Processing Company.  The first was the subject Asset Purchase

22  Agreement whereby Ridgeline agreed to buy the facility, a true copy of this agreement is

23  attached as Exhibit 1.  The Asset Purchase Agreement has as one of its exhibits a Lease

24  and Option Agreement which is to be executed and delivered as part of the closing of the

25  Asset Purchase Agreement transaction.  A copy of that Lease and Option Agreement

26  (which is an exhibit to the Asset Purchase Agreement) is attached to this motion as Exhibit

27  2. The second was a Management Contract whereby Ridgeline took over operation of the

28  facility pending the closing of the Asset Purchase Agreement.  Ridgeline performed all

1    financial obligations required of it under both agreements to date, and the Debtor

2    performed its obligations under both agreements.

3

4        6.   The Asset Purchase Agreement is conditioned upon satisfaction of several

5    contingencies including the transfer of the Conditional Use Permit issued by the City of

6    Santa Fe Springs, the transfer of the South Coast Air Quality Management District permit,

7    and the transfer of the County Sanitation Districts of Los Angeles County permits.  The

8    parties anticipate that these transfers will occur by the time that this motion is heard, by the

9    time the order is entered, or will be waived so that the closing of the transaction can occur.

10

11       7.   Upon closing of the Asset Purchase Agreement, the Debtor will receive

12   $1,175,000 in cash ($800,000) and stock ($375,000) which is computed as follows: Sellers

13   Lakeland Development Company (the Debtor herein) and Lake Processing Company

14   received $2,000,000 cash plus $750,000 worth of Ridgeline common stock, plus an

15   additional $250,000 in cash or stock at sellers' option. From this sum is deducted amounts

16   previously paid, $250,000 plus $100,000 for four months (assuming the September

17   installment is paid).  That amount is then split equally between the two sellers.  The

18   management agreement would terminate and the employees who are substantially lent to

19   Ridgeline would most likely be taken by Ridgeline.  It is probable that only one or two non-

20   management employees would remain after the closing.  The Debtor would no longer have

21   income from the operation of the facility, nor would it continue to receive monthly

22   installment of the purchase price of the facility since it would be paid in a lump sum upon

23   closing.

24

25       8.   Originally, as part of the closing of the Asset Purchase Agreement, the Debtor

26   would execute and deliver to Ridgeline the Lease and Option Agreement whereby

27   Ridgeline would become the lessee of a 17-acre tract encompassing four parcels of the

28   Debtor's land in Santa Fe Springs.  The waste water reclamation facility would continue to

operate on this part of the land, though a small lot line adjustment may have to be made regarding remaining 38 acres. Lakeland receives $2,600,000 cash in a lump sum payment the lease and open Agreement. Ridgeline can exercise the option to purchase at any time thereafter and will pay  $13,000,000 in cash and stock less this lump sum and less amounts paid under the Management Contract. All of these funds go to the Debtor though there will be hold backs to fund remediation.

9.  The Debtor and Ridgeline amended the Asset Purchase Agreement to provide in order to provide for an amended Lease and Option Agreement which provides for a greater number of shares of stock of Ridgeline which would be tendered as part of the purchase price upon closing. The Amendment to Asset Purchase Agreement is attached hereto as Exhibit 3.  In virtually all other respects, the agreements are the same as had been negotiated pre-petition. The Amendment clearly contemplates Ridgeline's immediate purchase of the property upon closing of the Asset Purchase Agreement.  By taking more stock, the debtor greatly accelerates its time of receipt of funds.

10.  As presently envisioned, the Debtor's reorganization plan would be required to satisfy several requirements.  First, and most importantly, it would have to provide it with a source of funds by which the property's contamination can be remediated.  The Western Realco deal provides that financing for the 38 acres and the Ridgeline deal provides for remediation of the 17 acres. Second, as a condition of the Western Realco loan, all secured liens against the 38 acres will be paid[3] (though it is undecided if this will include payment upon loan closing of secured property tax interest and penalties – this will depend upon the Remediation Action Plan's costs).  Third, a fund must be created by which unsecured creditors can be paid[4].  The Ridgeline deal provides a source of funding to

---

[3]Estimated at $5,948,210.00

[4]Estimated at $1,431,860.08 based upon the schedules and filed Proofs of Claim.

cover the Debtor's continuing operating costs in the absence of other income, a fund by which remediation costs beyond those funded by Western Realco can be met, and provides a fund out of which future payments to unsecured creditors can be based.

11.   Under the Ridgeline deal, the 17-acres will be remediated at a cost of $5,000,000.  This fund will be created upon the exercise of the option to purchase by the delivery of stock having a value of $5,000,000 into an escrow account.  An additional $1,000,000 in stock will be escrowed for ground water remediation issues.  The stock can be sold for cash, and to the extent that the value in the blocked account exceeds a net of $5,000,000 (value less expenditures for remediation), the Debtor can draw upon the account for the funding of its obligation to pay unsecured creditors.

12.   Since Ridgeline will be paying a portion of the purchase price with its stock, there are several issues which require discussion.  First, no principal, affiliate, officer, director or shareholder of the Debtor owns any shares of Ridgeline.  Ridgeline is based in Calgary, Alberta, and, according to its website, www.ridgelinecanada.com (which statements I verified, "develops remediation and wastewater treatment solutions to treat contaminated water generated by oil and gas producers operating in the western Canadian sedimentary basin. It also offers reclamation and remediation services comprising site remediation, construction and installation, reclamation, and contaminated soil remediation; drilling waste management services consisting of landspray consulting, landspray while drilling solutions, and sump management; and environmental mapping services."  At present, Ridgeline's stock is listed on the Venture stock exchange (symbol RLE.V) and is "bulletin board" listed in the US over-the-counter market.  As of August 24, it closed at C$0.66 per share.

13.   The stock will be delivered in six tranches, the last five of which are in three

month intervals after the initial $3,000,000 is paid[5]. Each tranche will be the equivalent of $1,200,000, which must be held for not less than 6 months from delivery. Valuation of each tranche will be based upon the average closing price for the two weeks prior to issuance. The Debtor will also obtain a "put" enabling it to sell an agreed number of shares back to Ridgeline. Because there is down-side protection built into the transaction, and because it is very much in the debtor's interest to have Ridgeline succeed in the waste water reclamation business, the remediation of the property, and in its overall business, the Debtor decided that taking Ridgeline's stock was a risk worth taking in this transaction.

14. There is a degree of risk in the transaction in that a substantial number of shares of Ridgeline's stock is being tendered as part of the purchase price. I reviewed a number of websites where financial information regarding publicly traded companies is made available. Based upon that review, I found the following information. Under the Lease and Option Agreement, the stock is valued at $0.75 per share, and has a present sales price of $0.66 per share. The amended Lease and Option Agreement provides a floor under the price in that additional shares will be issued to the extent that the stock is valued at less than $0.75 per share. The mean target price from analysts following the stock is $1.76 in a year's time. The number of shares in each tranche is almost eight times the average daily volume (reported to be 162,850 shares). Current year revenue estimates (March 2013) range between $25.9- and $30.1-million, and revenue growth estimates ranges between 166% and 250% over the next year. Ridgeline has market capitalization of $40.6-million, so this transaction represents one-third of its capital. This certainly provides a major incentive to make the entire purchase work. These financial characteristics are indicative of a young company with tremendous growth potential. It has the specialized knowledge to not only operate the waste water reclamation facility, but also to remediate the land properly and economically. This provides a substantial possibility of

---

[5] This tranche is not escrowed, but is available to the Debtor once the six month holding period has elapsed.

1   appreciation in the value of the stock, appreciation which will benefit the creditors.  In short,

2   the stock seems worth the risk.

3

4       15.  It is my opinion that there are few options for the use and sale of the waste

5   water reclamation facility beyond the opportunity offered by the Ridgeline deal.  It would

6   take a substantial period of time to locate third parties and for them to determine if they

7   wished to pursue similar deals.  Instead, the Debtor wished to move forward with all

8   deliberate speed to embed the first of several foundational elements of it reorganization.

9   It is my opinion that the Ridgeline transaction satisfies that requirement, eliminates one

10  hurdle in the path of reorganization, and allows the Debtor to concentrate upon the

11  requirements of the Western Realco deal and the significant contingencies which must be

12  met. When consummated, this deal will provide the Debtor with a source of funding for its

13  operations which will not utilize the cash collateral of any party to this case. The Ridgeline

14  transaction is in the best interests of the Debtor, the secured creditors of the Debtor since

15  their cash collateral will not be diminished, and the unsecured creditors since a fund is

16  created to pay their claims.

17

18       I declare under penalty of perjury under the laws of the United States of America

19  that the foregoing is true and correct. Executed this 27th day of August 2012 at New York,

20  New York.

21

22                                      VINCENT PAPA

23

24

25

26

27

28

---

**MOTION TO APPROVE ASSUMPTION OF ASSET PURCHASE AGREEMENT WITH RIDGELINE**
- 19 -

| | |
|---|---|
| In re:<br><br>**Lakeland Development Company**<br><br>Debtor(s). | CHAPTER 11<br><br>CASE NUMBER :   2:12-bk-25842 RN |

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 11500 West Olympic Boulevard, Suite 400, Los Angeles, California 90064-1525. A true and correct copy of the foregoing document described as MOTION FOR APPROVAL OF THE ASSUMPTION OF ASSET SALE AGREEMENT AND LEASE-OPTION AGREEMENT BETWEEN DEBTOR AND RIDGELINE ENERGY, INC; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF VINCENT PAPA will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On 27 August  2012 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Lorie A Ball     lball@peitzmanweg.com
Richard T Baum     rickbaum@hotmail.com, rickbaum@hotmail.com
Russell Clementson     russell.clementson@usdoj.gov
Joseph Corrigan     Bankruptcy2@ironmountain.com
Lawrence M Jacobson     lmj@gfjlawfirm.com
Lance N Jurich     ljurich@loeb.com, kpresson@loeb.com
United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov
Jeanne C Wanlass     jwanlass@loeb.com, kpresson@loeb.com
Howard J Weg     hweg@peitzmanweg.com     ☐ Service information continued on attached page

**II.   SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On 27 August 2012,  I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.
☒ Service information continued on attached page

**III.   SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served)**:** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on 27 August, 2012  I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

Judge Richard Neiter, bin outside courtroom 1645, 255 East Temple Street, Los Angeles, California 90012 (hand delivered by attorney service)
☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 27 August 2012 | Richard T. Baum | /s/ Richard T. Baum |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.
*January 2009*                                                                                                   **F 9013-3.1**

1

2    <u>Served by US Mail</u>:

3    Matthew H. Kagan, Esq.
     Thrifty Oil Co.
4    13116 Imperial Highway
     Santa Fe Springs, California 90670
5    (Special Notice)

6    <u>Served by email</u>:

7    Karl Fingerhood
     Karl.Fingerhood@usdoj.gov
8

9    Jolish Taly
     jolish.taly@epa.gov
10
     Noah GoldenKrasner
11   noah.goldenkrasner@doj.ca.gov

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28