1  RICHARD T. BAUM
   State Bar No. 80889
2  11500 West Olympic Boulevard
   Suite 400
3  Los Angeles, California  90064-1525
   Tel:    (310) 277-2040
4  Fax:    (310) 286-9525

5  LAWRENCE M. JACOBSON (SBN 100939)
   GLICKFELD, FIELDS & JACOBSON LLP
6  9720 Wilshire Boulevard, Suite 700
   Beverly Hills, California  90212
7  Telephone:  (310) 550-7222
   Facsimile:  (310) 550-6222
8
   Attorneys for Debtor and Debtor-in-Possession
9  LAKELAND DEVELOPMENT COMPANY

10

11              **UNITED STATES BANKRUPTCY COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13                 **LOS ANGELES DIVISION**

14

15  In re                              )   No. 2:12-bk-25842 RN
                                       )
16  LAKELAND DEVELOPMENT               )   Chapter 11
    COMPANY,                           )
17                                     )   **MOTION FOR ORDER APPROVING**
                Debtor.                )   **SETTLEMENT WITH RIDGELINE**
18                                     )   **ENERGY SERVICES (USA), INC;**
                                       )   **DECLARATION OF VINCENT PAPA**
19                                     )
                                       )   [Hearing Not Yet Scheduled – LBR
20                                     )   9013-1(o)(1)]
                                       )
21  _____)

22      **TO THE HONORABLE RICHARD M. NEITER, UNITED STATES BANKRUPTCY**

23  **JUDGE:**

24

25      Debtor and Debtor-in-Possession LAKELAND DEVELOPMENT COMPANY, hereby

26  moves the Court, pursuant to rule 9019 of the <u>Federal Rules of Bankruptcy Procedure</u>, for

27  an Order Approving the Settlement between debtor and debtor-in-possession LAKELAND

28

_____
               **MOTION FOR ORDER APPROVING SETTLEMENT AGREEMENT WITH RIDGELINE**

1 DEVELOPMENT COMPANY ("Lakeland" or "Debtor"), RIDGELINE ENERGY SERVICES

2 (USA), INC., ("Ridgeline") and GOODMAN SANTA FE SPRINGS SPE LLC ("Goodman").

3 These parties have entered into a Settlement Agreement ("Agreement") which contains the

4 following material terms, among others:

5

6 **1. <u>Bankruptcy Court Approval</u>.**

7 The Agreement is not binding unless this settlement is approved by the bankruptcy

8 Court.

9 **2.  <u>Lakeland's Relief from Remediation Obligation and Assumption of</u>**

10 **<u>Remediation Obligation by Ridgeline</u>.**

11 Under the Asset Purchase Agreement whereby Lakeland sold the 17 Acre Parcels

12 of its real property to Ridgeline, Lakeland and Ridgeline entered into a Program

13 Management Agreement whereby Lakeland assumed the obligation to remediate the

14 environmental contamination of the soil, Ridgeline agreed to place into escrow shares of

15 the stock of its parent company which would be sold and the proceeds used to fund

16 Lakeland's remediation efforts, and Lakeland hired Ridgeline to do the remediation.

17 However, Ridgeline divested itself of its environmental group and now is not in the position

18 to do the remediation work. The Agreement relieves the parties of their respective

19 obligations under the Program Management Agreement:  Lakeland is relieved of that

20 remediation obligation, the burden of remediation is placed upon Ridgeline, and Ridgeline

21 and its parent are relieved from the obligation to deposit shares into escrow.  Lakeland

22 gives up the risk or opportunity that it might lose or gain if the remediation costs differ from

23 projections, or if the Ridgeline stock has a different value than as agreed.  Ridgeline

24 undertakes those risks and rewards.

25 3. **<u>Ridgeline's Transfer of Remediation Responsibility to Goodman</u>**.

26 Ridgeline has agreed to sell a significant portion of the 17 Acre Parcels to

27 Goodman, and Goodman will assume the remediation obligation regarding the soil.

28

1  Lakeland retains the liability for any off-site groundwater issues, but Ridgeline will place

2  stock of its parent having a value of $500,000 into escrow for any future offsite

3  groundwater costs.

4

5                4. **Early Pay-Off of Note by Ridgeline**.

6        The Settlement Agreement also provides that the $392,000 note which Ridgeline

7  gave Lakeland as part of the sale transaction will be paid by Ridgeline when its sale

8  transaction with Goodman closes (expected to occur in late May 2014) rather than at the

9  due date in January 2015.

10                5. **Resolution of Expense Reimbursement Dispute**.

11        Finally, the Settlement Agreement resolves an on-going dispute between Ridgeline

12  and Lakeland regarding reimbursements for overhead and other costs.  Ridgeline will pay

13  Lakeland $350,000 on account of those past due amounts.  The sum will be paid weekly

14  over a six month period.  Lakeland believes that it discounted the amount due it by

15  $70,000.

16

17        The Agreement is in the best interest of the bankruptcy estate and its creditors,

18  because (a) it removes potential uncertainty in the future operations of Lakeland since it

19  will have neither the burden of co-ordinating the remediation of the property nor the risks

20  that the costs will exceed its estimates or the stock will decline in value[1], (b) the transfer

21  of the remediation obligation to Goodman places it in the hands of a party which has the

22  experience and financial capability to complete the soil remediation, © it permits Lakeland

23  to be paid earlier than it expected a sum due from Ridgeline, and (d) it resolves an on-

24  _____

25        [1]The Program Management Agreement between Lakeland and Ridgeline has a
    mechanism which permits adjustment for the value of the stock if its value is lower than a
26  certain level during a specific time period.  However, if declines take place after the
    adjustment period, Lakeland will bear the burden of those declines.  On the other hand,
27  Lakeland would reap the benefit if the price of the stock rises.  However, to date, the
    stock's value has remained well below the specified level.
28

1  going dispute regarding the reimbursements due it from Ridgeline for overhead, utilities

2  and other uses of the real property.

3

4       This Motion is based upon the Motion, the attached Memorandum of Points and

5  Authorities, the Declaration of Vincent Papa, and such other and further grounds as may

6  be properly presented to the Court.

7

8       This motion is made pursuant to Local Bankruptcy Rule 9013-1(o)(1), and unless

9  an objection along with a request for a hearing is properly filed and served within fourteen

10  (14) days after the date of this Notice, a proposed order will be lodged by the Debtor

11  approving the proposed Agreement.

12

13  DATED:   April 18, 2014           LAW OFFICES OF RICHARD T. BAUM and
                                GLICKFELD, FIELDS & JACOBSON

14

15                                  /s/ Richard T. Baum

16                                  _____
                                RICHARD T. BAUM, Attorneys for Debtor-in-
Possession LAKELAND DEVELOPMENT

17                                  COMPANY

18

19

20

21

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

3

## I. INTRODUCTION

4

5      The settlement with Ridgeline and Goodman takes substantial risks out of

6   Lakeland's future by relieving it of the primary responsibility for the remediation of the

7   soil contamination of the real property.  Lakeland gains by removing the uncertainties in

8   the cost of the project, eliminating risk in the possible decline in stock values by which

9   the remediation will be financed, cutting back the administrative cost associated with its

10  remediation duties, accelerating the collection of a $392,000 promissory note, and

11  resolving its disputes with Ridgeline regarding reimbursements for overhead and other

12  expenses.  By doing so, Lakeland greatly speeds its reorganization since there will be

13  fewer future risks for which it must account, and it will be in a better position to wholly

14  phase out its operations.

15      The approval of this compromise will also speed the closing of Lakeland's sale of

16  its 38 Acre Parcels to Goodman, thereby providing the estate with the $23,000,000

17  needed to reorganize.

18

19      ## II. STATEMENT OF FACTS

20

21      On May 4, 2012 (the "Petition Date"), the Debtor filed a voluntary petition under

22  Chapter 11 of Title 11 of the United States Code. The Debtor continues to operate its

23  business and manage its affairs as a debtor-in-possession, pursuant to 11 USC §§

24  1107(a) and 1108.  At the time of the filing of the Petition, the Debtor was the owner of

25  55 acres of land located in Santa Fe Springs, California. The land is divided into ten

26  parcels, four of which form a rectangular shape of approximately 17 acres (the "17

27  Acres Parcels"), and six of which form a rectangular shape of approximately 38 acres

28

1    (the "38 Acres Parcels").  Lakeland obtained this court's approval and sold the 17 Acre

2    Parcels to Ridgeline Energy Services (USA) Inc. ("Ridgeline"). The sale was closed on

3    or about April 5, 2013.  In January 2014, the Court entered its order of approval for the

4    sale of the 38 Acre Parcels to Goodman Santa Fe Springs SPE LLC, ("Goodman").

5    The closing of that sale is pending approval of compromises with the REP/Paladin

6    parties and RB International; motions seeking that approval were filed on April 9, 2014.

7    When approved, the *Lis Pendens* which clouds Debtor's title will be withdrawn and the

8    sale can proceed to closing.

9

10         In the 2013 Ridgeline transaction, Lakeland sold the 17 Acre Parcels and

11    entered into a Program Management Agreement whereby Lakeland undertook to

12    remediate the toxic contamination of the soil while Ridgeline agreed to deposit into

13    escrow five tranches of its parent's stock having a value of $5-million which would be

14    sold over time to fund the remediation efforts.  If the costs of remediation proved more

15    than budgeted, the onus fell on Lakeland to fund the difference.  Also, while the stock

16    had certain price variation cushions built into the value of each tranche, declines after a

17    certain time could reduce the cash return on the stock with no correcting mechanism.

18    Lakeland saw this as a risk for its future and a complication for its reorganized

19    existence.  In addition, there was a danger that Ridgeline would fail to deliver the

20    required stock or note, which is in fact what has happened.

21

22         Lakeland received for its own benefit a tranche of stock at closing of the sale and

23    a note which equalized the value between the agreed stock price and the delivered

24    value.  That note was for $392,857.00 which was due in January 2015.  Since the sale,

25    Ridgeline and Lakeland have shared certain expenses related to the property and their

26    respective operations, including overhead, utilities and certain employee expenses.

27    Unfortunately, they disputed each other's allocations and Ridgeline did not make full

28

1   reimbursement to Lakeland.

2

3   Following the approval of Lakeland's sale to Goodman, Ridgeline entered into an

4   agreement to sell most of its 17 acres to Goodman.  This deal is contingent upon the

5   closing of Goodman's purchase of Lakeland's land.  Their agreement calls for

6   Goodman to perform the remediation on all of Ridgeline's land.

7

8   In order to simplify everyone's responsibilities, the parties negotiated and

9   entered into the Settlement Agreement herein.  As noted above, Lakeland is freed from

10  the onus of remediating the property, escapes the risks of the remediation costs,

11  eliminates the stock price risk, gains payment of the $392,000 note several months

12  ahead of time, and resolves its dispute with Ridgeline over shared expenses.  Lakeland

13  calculated that, in exchange for these benefits, it is giving up approximately $70,000 of

14  what it claims is due from Ridgeline.

15

16  In reaching the settlement with Ridgeline, Lakeland and its management exercised

17  their business judgment that the settlement is in the best interest of Lakeland and its estate

18  on the merits of the deal.  Also, it permits the sale to Goodman to close, which will provide

19  Lakeland with $23,000,000 to fund its reorganization, relieves it of some future liabilities,

20  increases the size of the estate and resolves a serious dispute.

21

22  **III. THE AGREEMENT IS IN THE BEST INTEREST OF THE DEBTOR'S**

23  **ESTATE AND ITS UNSECURED CREDITORS AND, THEREFORE, SHOULD**

24  **BE APPROVED**

25

26  **1. Standards for Approval of Compromises of Claims.**

27  Federal Rule of Bankruptcy Procedure 9019(a) provides that on the trustee's motion

28

1    and after a hearing on notice to creditors, the debtor and indenture trustees, as provided

2    in Rule 2002(a), and such other entities as the Court may designate, the Court may

3    approve a compromise or settlement.

4

5        The Supreme Court in <u>Protective Committee for Independent Stock Holders of TNT</u>

6    <u>Trailer Fairy, Inc. v. Anderson</u>, 390 US 414, 425 (1968), held that a bankruptcy court, in

7    considering whether to approve a compromise, should apprise itself of all facts necessary

8    for an intelligent and objective opinion of the probabilities of ultimate success should the

9    claim be litigated. It also explained that the court should form an educated estimate of the

10    complexity, expense and likely duration of such litigation, the possibility of collection on any

11    judgement that might be obtained, and all other factors relevant to a full and fair

12    assessment of the wisdom of the proposed compromise. See also <u>In re A&C Properties</u>,

13    784 F 2d 1377, 1380-84 (9th Cir. 1986), cert. denied, 479 S Ct, 854 (1986). The Court need

14    not, however, conduct an exhaustive investigation into the validity of the claims to be

15    compromised nor is the Court is expected to conduct a mini-trial on the merits. <u>In re Walsh</u>

16    <u>Construction, Inc.</u>, 669 F 2d 1325, 1328 (9th Cir 1982).

17

18        The purpose of any compromise agreement is to allow the trustee and the creditors

19    to avoid the expenses and burdens associated with litigating sharply contested and

20    dubious claims. <u>In re Walsh Construction, Inc.</u>, 669 F 2d 1325, 1328 (9th Cir. 1982) (citing

21    <u>In re California Associated Products</u>, 183 F 2d 946, 949-50 (9th Cir. 1950)). The law favors

22    compromise and not litigation for its own sake. <u>In re Blair</u>, 538 F2d 849, 851 (9th Cir. 1976).

23

24        Consistent with these Bankruptcy Act cases, the Ninth Circuit in <u>In re A&C</u>

25    <u>Properties</u>, 784 F2d 1377, 1381 (9th Cir. 1986) reiterated that in determining the fairness,

26    reasonableness and adequacy of a proposed settlement agreement, a court should

27    consider: (1) the probability of success in litigation, (2) the difficulties, if any, to be

28

1    encountered in the matter of collection, (3) the complexity of the litigation involved and the

2    expense, inconvenience and delay necessarily attending it, and (4) the paramount interest

3    of the creditors and the proper deference to their reasonable views.  Consideration of these

4    factors does not require the Court to decide questions of law and fact in the parties'

5    dispute, or to determine that the settlement is the best possible resolution; instead the

6    Court needs only determine whether the settlement falls below the lowest point of the

7    range of reasonableness. In re Schmitt, 215 BR 417, 423 (Bankr 9th Cir. 1997).

8

9    **2.  The Agreement Should Be Approved Under Bankruptcy Rule 9019**

10

11    Applying the above standards to the circumstances herein, the Agreement

12    should be approved.

13

14    a) The Probability of Success in Litigation

15    The only litigation contemplated relates to the expense reimbursement and

16    Ridgeline's failure to deliver additional stock and notes, as required by the original

17    agreement.  Lakeland feels that its records are well kept, and the allocations of individual

18    expenses that it made are reasonable and accurate and Ridgeline's obligations under the

19    original agreement are clear.  It has not seen material from Ridgeline which convinces it

20    that Ridgeline has made similar reasonable allocations.  Lakeland gives itself an 80% -

21    90% chance of success in litigation.

22

23    b) The Probability of Collection

24    The agreement regarding remediation is seen as an even trade-off such that

25    collection is not an issue.  The existing promissory note is secured by a deed of trust such

26    that the probability of collection is high, but it could entail significant costs and delay for

27    foreclosure and/or litigation.  However, under the new Agreement, this note is being paid

28

1   in full earlier than when due.  The expense reimbursement portion is not an obligation

2   secured by the deed of trust and may be the subject of collection efforts.  The availability

3   of Ridgeline's assets at the time of judgment may be questionable.

4

5               c) The Need to Avoid Expensive, Inconvenient and Protracted Litigation.

6               Any litigation with Ridgeline over the expenses and other obligations can be

7   mired in a multitude of entries, expenses and allocations.  The legal fees will be a

8   substantial cost.  Further, the discount given by Lakeland, approximately $70,000, is

9   only 16.66% of the amount which Lakeland believes as due, and is within the range of

10  the probabilities of success in litigation.

11

12              d) The Agreement Benefits The Paramount Interests of Creditors

13              The Agreement permits the Goodman deal to close more quickly, adds $392,000

14  in cash into the estate, provides a stream of payments of almost $60,000 per month,

15  relieves Lakeland of substantial risks associated with the remediation process, and cuts

16  back on the administrative costs associated therewith.  This means that more money

17  can be distributed more quickly to creditors when the reorganization plan is approved.

18

19  **3. CONCLUSION**

20              For the foregoing reasons, the Debtor respectfully requests that the Court approve

21  the proposed Settlement Agreement as a proper compromise under FRBP Rule 9019, and

22  grant such further relief as the Court deems just and proper.

23

24  DATED:   April 18, 2014                    LAW OFFICES OF RICHARD T. BAUM and
                                               GLICKFELD, FIELDS & JACOBSON
25
                                               /s/ Richard T. Baum
26
                                               _____
27                                             RICHARD T. BAUM, Attorneys for Debtor-in-
                                               Possession LAKELAND DEVELOPMENT
                                               COMPANY
28

1

## DECLARATION OF VINCENT PAPA

2

3        I, VINCENT PAPA, declare:

4

5        1. I am the Secretary and General Counsel of the Debtor ("Lakeland") which is a

6   Delaware corporation. Along with Michael Egner and Siegfried Hodapp, I am responsible

7   for the management of the Debtor in this Bankruptcy case. I am also the Senior Vice-

8   President of Energy Merchant Corp., the Debtor's ultimate parent corporation. I have

9   personal knowledge of the facts set forth in this Declaration, and if called as a witness I

10  could testify competently thereto.

11

12       2. In April 2013, Lakeland closed the Asset Purchase Agreement, as amended, with

13  Ridgeline Energy Services (USA) Inc. ("Ridgeline") whereby it sold its 17 Acre Parcels on

14  which were located a waste water reclamation facility.  As part of that transaction, Lakeland

15  entered into a Program Management Agreement ("PMA") with Ridgeline under which

16  Lakeland would be responsible for the remediation of the soil contamination of the 17 Acre

17  Parcels.    Lakeland hired Ridgeline to perform the remediation work, but Ridgeline

18  subsequently divested itself of its environmental division and now can't do the work.  Under

19  the PMA, Ridgeline would deliver five tranches of the stock of its corporate parent having

20  a value of $5-million into escrow. That stock would be sold by Lakeland and the proceeds

21  used to fund the remediation work on the property.  The agreement had built-in floors for

22  the value of the shares and if the stock price declined, Ridgeline would deposit its

23  promissory note for the difference.  This same arrangement applied to the stock which was

24  given at the time of the closing as part of the purchase price and led to the delivery of a

25  promissory note in the amount of $392,857.00.

26

27       3. Lakeland became concerned that Ridgeline's stock would decline in value before

28

it could be liquidated so that those proceeds would not be sufficient to fund the remediation.  There was substantial worry that the costs of remediation would be greater than expected, which would redound to Lakeland's detriment.  Ridgeline, through Dennis Danzik, its president, raised questions with me about Lakeland's ability to manage the remediation process, including its financial abilities.

4.   In addition, we had a number of discussions about the allocation of expenses which Lakeland claimed was due it from Ridgeline under the terms of the pre-sale Management Agreement  which survived the closing.  Ridgeline repeatedly disputed the allocations, and meanwhile did not make a number of expense reimbursement payments. I was able to get Ridgeline to make certain payments, the last of which was of $50,000 in February 2014.  Ridgeline also failed to give Lakeland several tranches of its parent's stock and promissory notes, as required by the original agreement.

5.   On December 13, 2013, the Court granted Lakeland's motion for approval of the sale of its 38 Acre Parcels to Goodman Santa Fe Springs SPE LLC ("Goodman") and the Court entered its order on January 13, 2014.   Under that transaction, Goodman would escrow $8-million to fund the remediation of the contamination of the land.   In light of Goodman's purchase of the property, Ridgeline and Goodman negotiated an agreement whereby Goodman would purchase approximately 15 of Ridgeline's 17 acres.  Lakeland entered into discussions with Ridgeline and Goodman to coordinate our respective positions and obligations.  Since Ridgeline filed a Remedial Action Plan dated January 6, 2014 with the California Regional Water Quality Control Board for the 17 Acre Parcels, and since Goodman filed its Remedial Action Plan for its property in September 2013, it seemed appropriate to design an arrangement whereby Goodman undertook the task of remediation.  This would absolve Lakeland of that responsibility.

6.  To that end, we negotiated the Settlement Agreement which is attached hereto as Exhibit 1, which provides for the following in its terms:

- The Settlement Agreement eliminates the requirement that Ridgeline place stock and notes into escrow for soil remediation and eliminates the requirement that Lakeland pay for the soil remediation. So Ridgeline does not issue stock and notes to Lakeland to be held in escrow for soil remediation and Lakeland does not have to monitor the progress and cost of the soil remediation over the time period remediation is estimated to occur.  (¶ 1.1)

- The Settlement Agreement allows Ridgeline to sell a portion of the land purchased from Lakeland to Goodman (in a separate transaction), the buyer of the land from Lakeland.  So Goodman ends up with 53 of the 55 acres and conducts the remediation for the site. (¶ 8.2).

- The Settlement Agreement confirms that Ridgeline will pay Lakeland the $392,000 note owed to Lakeland under the Purchase Agreement at the Ridgeline Goodman Closing . This results in Lakeland being paid at least a year earlier than anticipated. (¶ 2.4©).

- The Settlement Agreement provides that Ridgeline pays Lakeland $350,000 in past overhead and other amounts due, weekly , over a 6 month period. This amount has been in dispute and provides for payments earlier than would have been paid otherwise. Lakeland believes it has given Ridgeline a discount of $70,000 but again Lakeland is paid earlier than if the Settlement Agreement had not been signed. (¶ 2.4(d)).

- Ridgeline maintains its continuing obligation to clean certain tanks on Lakeland property as previously set forth in the Purchase and Asset

1    Agreement.

2    •    Lakeland, as before and as with the Goodman transaction, maintains
3        responsibility for future off site groundwater issues. (¶ 3.4). So far
4        insurance has paid all costs relating to offsite ground water issues.

5    •    This Agreement will be assumed by Goodman which takes on responsibility
6        for soil remediation. (¶ 8.2).

7    •    As with Goodman if any of the soil remediation is covered by
8        insurance the reimbursement goes to Lakeland. (¶ 2.3).

9    •    Ridgeline also places $500,000 of its parent's stock in escrow for
10       future offsite ground water related costs. (¶ 2.2)

11

12    7.  I had discussions with Siegfried Hodapp and Michael Egner, the other officers

13   of Lakeland, in which we evaluated these benefits and risks that the current situation

14   presented and those that the settlement presented.  We evaluated the risks and rewards

15   which were inherent in the remediation costs, in the stock price fluctuations, in the

16   administrative costs of conducting the remediation, as well as the likelihood of prevailing

17   in our dispute with Ridgeline over the expense reimbursement.  We evaluated the quality

18   of the records we kept, and factored in the possibility that even the best cases can be lost.

19   We saw that this was a fact intensive inquiry, and that we would incur substantial attorneys'

20   fees to prosecute it.  We discussed the proposal from Ridgeline which would shift the risks

21   of remediation to them, and reduce our future administrative costs.  We discussed the

22   advantages of having Goodman be the party responsible for the clean-up once they

23   purchased most of Ridgeline's land.  We determined that Ridgeline's offer to pay $350,000

24   for the expense reimbursement in weekly installments over six months represented about

25   a $70,000 discount off what we believed we were owed, but we balanced that against the

26   costs of litigation, and the possibility that Ridgeline would muddy the waters enough that

27   we would not prevail for the full amount.  We also liked the idea that we would receive

28

1    payment on the $392,000 note early, rather than waiting until next year. All summed up,

2    we, on behalf of Lakeland, used our best business judgment and decided that the

3    compromise offered by the Ridgeline transaction was in the best interests of Lakeland. We

4    believed it was also in the best interest of Lakeland's creditors because it minimized future

5    risk, reduced administrative expense, and brought cash in more quickly to the estate.

6

7        I declare under penalty of perjury under the laws of the United States of America

8    that the foregoing is true and correct. Executed this 18 day of April 2014 at New York,

9    New York.

10

11    _____
      VINCENT PAPA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this "Agreement") is made as of the 14th day of April, 2014, by and among Lakeland Development Company ("LDC"), Ridgeline Energy Services (USA), Inc. ("Ridgeline") and Goodman Santa Fe Springs SPE LLC ("Goodman"). Capitalized terms used herein but not defined herein shall have the meanings given to such terms in the Purchase Agreement (as defined below) or the Program Management Agreement (as defined below).

## RECITALS

WHEREAS LDC is currently a Debtor and Debtor-in-Possession in Central District of California Bankruptcy Case No. 2:12-bk-25842-RN ("the LDC Bankruptcy"), which was commenced by LDC's filing of a voluntary petition for relief pursuant to Chapter 11 of the United States Bankruptcy Code on May 4, 2012;

WHEREAS LDC, Lakeland Processing Company, LLC ("LPC") and Ridgeline have entered into an Asset Purchase Agreement, as amended, dated April 9, 2012 (the "Asset Agreement");

WHEREAS the Asset Agreement contemplated the lease or purchase of a certain portion of LDC's land (the "Land") including the improvements located thereon (collectively, the "Property") which resulted in entering into the Purchase Agreement, dated as of January 25, 2013, as amended (the "Purchase Agreement"), providing for Ridgeline's purchase of the Property, which closed on April 5, 2013;

WHEREAS the Asset Purchase Agreement and the Purchase Agreement contemplated that the parties would enter into a Program Management Agreement, which Program Management Agreement was entered into as of April 5, 2013 ("Program Management Agreement"), and which Program Management Agreement provided for Ridgeline to complete certain remediation and monitoring activities (the "Activities") with respect to the Land on behalf of LDC;

WHEREAS pursuant to the Purchase Agreement and the Program Management Agreement, Ridgeline and LDC agreed that a portion of the Purchase Price would be allocated to the Activities, and that such portion of the Purchase Price would be put into an escrow account that could be used for funding of the Remediation (as defined in Paragraph 3.1); and

WHEREAS LDC and Ridgeline desire to (1) terminate the Program Management Agreement, and (2) modify the post-closing covenants of each party set forth in the Purchase Agreement, all as set forth below.

## AGREEMENT

The Parties hereby agree as follows, subject to Final Bankruptcy Court Approval (as defined in paragraph 8.8 of this Agreement) and the closing of the Goodman Transaction (as defined in paragraph 8.9 of this Agreement):

## ARTICLE I.

### TERMINATION OF PROGRAM MANAGEMENT AGREEMENT

1.1    Effective as of the later of (a) the date of Final Bankruptcy Court Approval, (b) the closing of the Goodman Transaction and (c) the full performance by Ridgeline of its obligations under paragraphs 2.1(b), 2.2 and the assignment to Goodman as contemplated in paragraph 8.2 of this Agreement ("the Effective Date"), the Program Management Agreement is terminated and is of no further force and effect.

### ARTICLE II.
### PAYMENT OBLIGATIONS AND CLAIMS ON INSURANCE

2.1    (a) Effective as of the Effective Date, all post-closing obligations of Ridgeline to pay LDC consideration set forth in the Purchase Agreement or to issue shares of common stock of Ridgeline's parent as set forth in Schedule I, paragraph a.vi. through paragraph a.vii, inclusive, of the Purchase Agreement, relating to the issuance of stock or notes intended to be placed into escrow to be used to pay for the remediation of the Land, are hereby terminated and of no further force and effect. For the avoidance of doubt, effective as of the Effective Date, Ridgeline will have no further obligations to pay any consideration to LDC relating to the issues set forth in the Purchase Agreement except as set forth herein, including (without limitation) as set forth in Paragraph 2.4 of this Agreement.

(b) Upon execution of this Agreement, Ridgeline shall promptly place into Escrow (as hereinafter defined) the shares of Ridgeline's parent company and notes that were to be delivered to LDC pursuant to the Purchase Agreement in July 2013, October 2013, January 2013 and April 2014. These shares will be released from Escrow to Ridgeline on the Effective Date. LDC agrees that Ridgeline may votes these shares that are held in Escrow and it hereby gives Ridgeline proxy to vote these shares, to the extent permitted under applicable law; provided, however, that Ridgeline will not have the right to vote these shares if such shares are held in Escrow after the later of (1) May 31, 2014, or (2) the date that it is determined that the Goodman Transaction will not be consummated.

2.2    In order to fund a five hundred thousand dollar escrow for future groundwater remediation and/or monitoring for Off Property Impacts, as described in Paragraph 3.4 below, Ridgeline shall issue to LDC $500,000 of common stock of Ridgeline's parent, which shall be priced at the volume weighted average price of common stock of Ridgeline's parent for the 10 trading days prior to the date of this Agreement. Such shares shall be promptly issued and held in Escrow by Arizona Escrow & Financial Corporation ("Arizona") pursuant to an Escrow Agreement with Arizona (the "Escrow"). Said Escrow Agreement shall provide that the shares can be sold by LDC to fund groundwater remediation and/or monitoring (subject to compliance with all applicable securities laws) and any remaining shares or cash shall be released to LDC upon receipt of an NFA (as defined in Paragraph 3.1 of this Agreement) covering LDC's groundwater obligation for Off Property Impacts, or evidence that an NFA is no longer required.

2.3    Ridgeline acknowledges and agrees that Ridgeline has no claim, right or other interest in or to any insurance proceeds payable under the ACE Policies (as hereinafter

2

D2

AR

defined), except as specifically provided in this Agreement. In the event Ridgeline receives any proceeds from the ACE Policies and/or proceeds paid under the ACE Policies are used to pay for any remediation costs with respect to remediation performed on the Land, Ridgeline will immediately pay, assign and forward all such amounts to LDC (or an affiliate of LDC, if so requested by LDC and approved by the bankruptcy court, if necessary). Notwithstanding the foregoing, in no event shall Ridgeline be responsible for paying, assigning or forwarding to LDC any amounts paid under the ACE Policies to the extent that such amounts are used for Off-Property Impacts.

2.4    (a) Nothing herein is intended to terminate or release Ridgeline from any obligations to pay or reimburse LDC amounts due under the Promissory Note dated April 5, 2013 in the amount of $392,857.

(b) Ridgeline will pay LDC $350,000 in full satisfaction of past or future (i) movie shoots, (ii) sales of wastewater equipment which is to be split between the parties, (iii) overhead reimbursement obligations pursuant to Section 7 or Section 8 of that certain Management Contract, dated as of April 8, 2012, as amended, that survived the termination of such Management Contract, (iv) the $156,000 relating to an alleged mechanics lien filed by IRG Assumptions, which is no longer on title due to improper filing and (v) any other claims LDC or its affiliates may have against Ridgeline or its affiliates. Notwithstanding anything to the contrary herein, Ridgeline will still owe LDC for any payments or other obligations existing under current written agreements between Ridgeline and LDC that are not mentioned in this Agreement or that are not related to agreements mentioned in this Agreement.

(c) The amounts due LDC described above in Section 2.4(a) shall be paid to LDC, in cash, on or before the closing of the Goodman Transaction.

(d) The amounts due LDC described in Section 2.4(b) shall be paid to LDC in cash, in equal weekly installments, over six months, beginning on the Effective Date.

## ARTICLE III.
## REMEDIATION OBLIGATIONS

3.1    As consideration for the foregoing, and except as otherwise provided in Paragraph 3.4 below, Ridgeline shall be responsible for all costs to remediate hazardous materials (the "Remediation") existing in, on, and under the Land (the "Environmental Condition") as necessary to obtain "no further action" status (or the equivalent) ("NFA") from the California Regional Water Quality Control Board, Los Angeles Region ("RWQCB") and other applicable governmental agencies.

3.2    The Remediation shall be performed pursuant to the Remedial Action Plan, dated January 6, 2014 (the "RAP") (or as modified by requirement or agreement by the RWQCB), which is designed to address the Environmental Condition only. The RAP will not address hazardous substances impacts existing in soil, soil vapor or groundwater on or beneath properties other than the Land, or any portion of the 55 acres originally owned by LDC ("Off-Property Impacts"). Upon issuance of the NFA, Ridgeline's obligation to perform the Remediation will be automatically discharged.

3

3.3    If requested by LDC, Ridgeline (and Goodman, upon the closing of the Goodman Transaction), on a quarterly basis, agrees to provide LDC with a statement documenting the Remediation costs along with copies of invoices for such Remediation costs, which LDC or an affiliate of LDC, Powerine Oil Company, may present to its insurers under the ACE Policies for reimbursement.  Ridgeline acknowledges that Powerine Oil Company is currently in litigation with certain insurance carriers regarding existing environmental insurance policies ("the ACE Policies") for coverage with respect to soil and groundwater remediation of the Land. Nothing herein is intended to reduce, eliminate or otherwise affect any obligation that Powerine Oil Company may have relating to the remediation of the Land under the terms of the California Regional Water Quality Board Clean Up and Abatement Order 97-118.

3.4    LDC will be responsible for and will exercise diligent efforts to obtain NFA status from the RWQCB (and any other governmental agency exercising jurisdiction over the environmental condition of the Land) relating to the Off-Property Impacts emanating from the Land. Ridgeline acknowledges that such remediation will likely occur through a regional response involving multiple third parties whose historic operations contributed to the Off Property Impacts.  LDC shall be responsible for performing the remediation, or causing the performance of the remediation required for achieving NFA status according to standards imposed by the governing authorities (including without limitation, the RWQCB) pursuant to a RWQCB approved remedial action plan for such Off Property Impacts ("GW RAP").  In addition, if required, LDC will be responsible for ongoing groundwater monitoring activities or any other testing or monitoring required by governmental authorities (including, without limitation, RWQCB) and/or as provided in the GW RAP, and will conduct or cause to be conducted such monitoring activities in a manner consistent with RWQCB requirements and industry standards.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF RIDGELINE

Ridgeline represents and warrants as follows:

4.1    Ridgeline is a validly existing corporation, duly organized and validly existing in its state of formation.

4.2    Ridgeline has all requisite power, authority and legal right to execute and deliver this Agreement and to consummate the transactions and perform its obligations hereunder.

4.3    This Agreement has been duly executed and delivered by Ridgeline and is the legal, valid and binding obligation of Ridgeline, enforceable against Ridgeline in accordance with its terms and provisions, subject to Bankruptcy Court Approval.

4.4    Ridgeline is currently solvent, the fair market value of its assets exceeds the sum of its liabilities, and it can pay and is paying its debts as they come due.

4



## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES OF LDC

LDC represents and warrants that:

5.1    LDC is a validly existing corporation, duly organized and validly existing in its state of formation

5.2    LDC has all requisite power, authority and legal right to execute and deliver this Agreement and to consummate the transactions and perform its obligations hereunder.

5.3    The execution, delivery and performance by LDC have been duly authorized by all necessary action on the part of LDC.

5.4    This Agreement has been duly executed and delivered by LDC and is the legal, valid and binding obligation of LDC, enforceable against LDC in accordance with its terms and provisions, subject to Bankruptcy Court Approval.

5.5    Based upon the environmental studies performed to date, there is no evidence that the soil on the Land may be considered "hazardous" under Resource Conservation Recovery Act (RCRA).

## ARTICLE VI.
## COVENANTS

6.1    Further Assurances.  Each party hereto agrees to perform all acts and to execute and deliver any documents that may reasonably be necessary to carry out the provisions of this Agreement.

## ARTICLE VII.
## RELEASE

7.1    To the fullest extent permitted by law, each party hereto shall release and hold harmless each other party and each other party's contractors, subcontractors, agents and related companies, and the officers, directors, partners, members, insurers, attorneys, shareholders, board members, employees, and agents of each and any of them, against and from any and all claims and liability arising under, by reason of, related, or incidental to the failure of a party hereto to perform any remediation required to be performed by such party herein, to the extent not caused by the negligence or willful misconduct of the part(ies) with respect to the performance of such remediation work.  The foregoing release shall not apply to each party's obligations pursuant to this Agreement. In addition, notwithstanding anything to the contrary herein, Ridgeline will still owe LDC for any payments or other obligations existing under current written agreements between Ridgeline and LDC that are not mentioned in this Agreement or that are not related to agreements mentioned in this Agreement

5

## ARTICLE VIII.
### MISCELLANEOUS

8.1    The warranties, representations and covenants of the parties contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement.

8.2    Ridgeline may assign its rights and obligations hereunder to one of its affiliates that can satisfy the obligations of paragraphs 4.1 and 4.4 of this Agreement, but, except as set forth below, Ridgeline shall not be relieved of liability for the obligations in this Agreement without the express written and signed consent of LDC. Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party, other than the parties hereto or their respective successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Notwithstanding anything to the contrary herein, Ridgeline shall assign its rights and obligations hereunder to Goodman, or to an affiliate of Goodman (as specified by Goodman), at the closing of the Goodman Transaction. LDC, hereby consents to such assignment by its execution of this Agreement. Except for the obligations set forth in Article II of this Agreement and in this paragraph 8.2, which are exclusively the obligation of Ridgeline (except as otherwise provided in agreements entered into between Ridgeline and Goodman subsequent to and separate from this Agreement), Goodman hereby agrees that it is liable and obligated to perform all obligations of Ridgeline under this Agreement upon closing of the Goodman Transaction.

8.3    This Agreement shall be governed by and construed under the laws of the State of California.

8.4    All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified, (ii) when sent by confirmed facsimile or e-mail if sent during normal business hours of the recipient, if not, then on the next business day; (iii) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) one day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the address as set forth on the signature page hereof or at such other address as such party may designate by ten days advance written notice to the other parties hereto.

8.5    Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of LDC and Ridgeline (or Goodman, as applicable).

8.6    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

6

8.7    Except as hereby modified by this Agreement, all of the terms of the Purchase Agreement and the representations and warranties contained therein that are expressly stated as surviving closing thereunder shall continue to survive and remain in full force and effect.

8.8    The parties agree to execute a stipulation seeking approval of this Agreement by the Bankruptcy Court in the LDC Bankruptcy. This Agreement is not effective unless and until approved by an order of the Bankruptcy Court in the LDC Bankruptcy ("the Approval Order"), which has become final in that (a) the period for appeal of the Approval Order has expired without any appeal having been filed, (b) a ruling affirming the Approval Order has been entered on appeal and is no longer subject to challenge or further appeal or (c) the dismissal of all appeals of the Approval Order after the appeal period has expired. The finality of the Approval Order, as set forth in the preceding sentence, is referred to in this Agreement as the "Final Bankruptcy Court Approval."

8.9    The parties agree that this Agreement is not effective unless and until the sale transaction contemplated by that certain Agreement of Purchase and Sale and Joint Escrow Instructions between Ridgeline, as Seller, and Goodman, as Buyer, dated as of February 10, 2014, is consummated (the "Goodman Transaction"). In the event that the Goodman Transaction is not consummated on or before June 30, 2014 (the "Termination Date"), this Agreement will terminate and be of no further force and effect; provided, however, that if the Goodman Transaction is not consummated on or before the Termination Date primarily as a result of Goodman, Ridgeline and LDC shall negotiate in good faith for an extension of the Termination Date.

8.10    This Agreement shall be binding upon the assigns, representatives and successors of the parties hereto, including without limitation, Goodman. This Agreement shall insure to the assigns, representatives and successors of the parties hereto, including without limitation, Goodman.

8.11    If any provision of this Agreement shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein. One or more waivers of any term, condition or other provisions of this Agreement by either Ridgeline (or Goodman, as applicable) or LDC shall not be construed as a waiver of any other provision.

[SIGNATURE PAGE FOLLOWS]



IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above-written.

**RIDGELINE ENERGY SERVICES (USA), INC.**

By: *Dennis M. Danzik*

Its: Chief Executive Officer

Notice:

RDX Technologies Corporation
Ridgeline Energy Services (USA), Inc.
14555 N 82nd Street
Scottsdale, AZ 85260
Attention: Kevin M. Bridges (CFO)
Facsimile: (602) 845-8935
Email: bridges@rdxh2o.com

With copy to:
Dorsey & Whitney LLP
50 South Sixth Street Suite 1500
Minneapolis, MN 55402-1498
Attention: Michele J. Thurnblom
Facsimile: (612) 340-2644
Email: thurnblom.michele@dorsey.com

**LAKELAND DEVELOPMENT COMPANY**

By: *Vincent Papa*

Its: *Secretary & General Counsel*

Notice:

_____

_____

_____

**GOODMAN SANTA FE SPRINGS SPE LLC**

By: _____  ALAN COCKBURN

Its: Secretary

Notice:

18201 Von Karman Avenue, Suite 1170
Irvine, CA 92612
Attention: Alan Cockburn, Esq. and Lang Cottrell

8

Facsimile:   (949) 502-5505
Email:   Alan.Cockburn@Goodman.com;
Lang.Cottrell@Goodman.com

With copy to:
Cox, Castle & Nicholson LLP
19800 MacArthur Boulevard, Suite 500
Irvine, CA  92612
Attention:  John W. Kittleson, Esq.
Facsimile:   (949) 476-0256
Email:  jkittleson@coxcastle.com

9

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  11500 West Olympic Boulevard, Suite 400, Los Angeles, California 90064-1525.  A true and correct copy of the foregoing document described as MOTION FOR ORDER APPROVING SETTLEMENT WITH RB INTERNATIONAL.; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF LAWRENCE M. JACOBSON AND VINCENT PAPA will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.    **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On April 18, 2014 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

•Lorie A Ball     lball@peitzmanweg.com
•Richard T Baum     rickbaum@hotmail.com, rickbaum@ecf.inforuptcy.com
•Joseph Corrigan     Bankruptcy2@ironmountain.com
•Scott D Friedberg     sfriedberg@theseaportgroup.com, sdfriedberg@gmail.com
•Barry S Glaser     bglaser@swesq.com
•Matthew A Gold     courts@argopartners.net
•Noah M Golden-Krasner     noah.goldenkrasner@doj.ca.gov, gwen.blanchard@doj.ca.gov
•Lawrence M Jacobson     lmj@gfjlawfirm.com
•Lance N Jurich     ljurich@loeb.com, karnote@loeb.com;ladocket@loeb.com
•John G McCarthy     jmccarthy@sgrlaw.com, nyoecf@sgrlaw.com
•Randy P Orlik     rorlik@coxcastle.com
•Ronald E Ostrin     ron@ostrinlaw.com
• United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov
•Jeanne C Wanlass     jwanlass@loeb.com, karnote@loeb.com;ladocket@loeb.com
•Howard J Weg     hweg@peitzmanweg.com
•Christopher F Wilson     cfw.cwanda@gmail.com, cindy.c.wilson@gmail.com
•Stephen Wong     swong@spcclaw.com
•Hatty K Yip     hatty.yip@usdoj.gov               ☐ Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On April 18, 2014, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.
       ☒ Service information continued on attached page

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on April 18, 2014 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

Judge Richard Neiter, bin outside courtroom 1645, 255 East Temple Street, Los Angeles, California 90012 (hand delivered by attorney service)
☐ Service information continued on attached page
I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.
April 18, 2014                  Richard T. Baum                  /s/ Richard T. Baum

_____ | _____ | _____
*Date*                  *Type Name*                  *Signature*

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.
*January 2009*                                                                      **F 9013-3.1**

**20 Largest Unsecured Creditors**
Served by US Mail

City of SFS-Legal(Planning)
11710 E. Telegraph Road
Santa Fe Springs, CA  90670

Loeb &Loeb, LLP
10100 Santa Monica Blvd, Suite 2200
Los Angeles, CA  90067-4164

Brownstein Hyatt Farber & Schreck
Steven M. Sommers, Esq
410 Seventeenth St, Ste 2200
Denver, CO  80202-4432

White O'Connor Fink&Brenner
10100 Santa Monica Blvd
Los Angeles, CA  90067

Morse & Associates, Inc
12127 SW Grenoble St.
Wilsonville, OR 97070

American Express
PO Box 0001
Los Angeles, CA  90096-0001

Aetna Health California
PO Box 894920
Los Angeles, CA  90189-4920

Ken Spiker Jr/OC Office
605 Frankfort Ave
Huntington Beach, CA  92648

MGM
3930-B Cherry Avenue
Long Beach, CA  90807

City of SFS-Planning &Develpmt
11710 E. Telegraph Road
Santa Fe Springs, CA  90670

City of SFS-Fire Department
11300 Greenstone Ave
Santa Fe Springs, CA  90670

Iron Mountain
 PO Box 27128
 New York, NY  10087-7128

Reuters America LLC
 GPO Box 10410

Newark, NJ  07193-0410

 PDQ Rental Center
 10826 Shoemaker
 Santa Fe Springs, CA  90670

Robertson Charitable Remainder Unitrust
c/o Louis Isakoff
977 Centerville Turnpike, SHB 202
Virginia Beach, Virginia 23463

Argo Partners
12 West 37th Street, 9th Floor
New York, NY 10018

Special Notice:

Rafael Bernardino
Hobson Bernardino + Davis LLP
725 S Figueroa St
Ste 3230
Los Angeles, CA 90017

H. Henry Eshraghian
Expert Accounting & Tax Firm
112 W 9th St Ste 325
Los Angeles, CA 90015

The Seaport Group LLC Profit Sharing Plan
c/o The Seaport Group LLC
Attn: Scott Friedberg
360 Madison Ave 22nd Fl
New York, NY 10017

Matthew H. Kagan
Thrifty Oil Co.
13116 Imperial Highway
Santa Fe Springs, CA 90670

Kevin Bridges (CFO)
RDX Technologies Corporation
Ridgeline Energy Services (USA)
14555 N 82nd Street
Scottsdale, AZ 85260

Michele J. Thurnblom
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402-1498