1   RICHARD T. BAUM
    State Bar No. 80889
2   11500 West Olympic Boulevard
    Suite 400
3   Los Angeles, California  90064-1525
    Tel:    (310) 277-2040
4   Fax:    (310) 286-9525

5   LAWRENCE M. JACOBSON (SBN 100939)
    GLICKFELD, FIELDS & JACOBSON LLP
6   9720 Wilshire Boulevard, Suite 700
    Beverly Hills, California  90212
7   Telephone:  (310) 550-7222
    Facsimile:  (310) 550-6222

8

    Attorneys for Debtor and Debtor-in-Possession
9   LAKELAND DEVELOPMENT COMPANY

10

11            **UNITED STATES BANKRUPTCY COURT**

12             **CENTRAL DISTRICT OF CALIFORNIA**

13               **LOS ANGELES DIVISION**

14

| | | |
|---|---|---|
| 15 | In re                       ) | No. 2:12-bk-25842 RN |
| 16 | LAKELAND DEVELOPMENT  ) <br> COMPANY,                ) | Chapter 11 |
| 17 |                          ) <br>        Debtor.          ) | **MOTION FOR ORDER APPROVING SETTLEMENT WITH RIDGELINE** |
| 18 |                          ) | **ENERGY SERVICES (USA), INC; DECLARATIONS OF VINCENT PAPA** |
| 19 |                          ) | **AND LAWRENCE M. JACOBSON** |
| 20 |                          ) | [Hearing Not Yet Scheduled – LBR |
| 21 | _____) | 9013-1(o)(1)] |

22        **TO THE HONORABLE RICHARD M. NEITER, UNITED STATES BANKRUPTCY**

23   **JUDGE:**

24

25         Debtor and Debtor-in-Possession LAKELAND DEVELOPMENT COMPANY, hereby

26   moves the Court, pursuant to rule 9019 of the <u>Federal Rules of Bankruptcy Procedure</u>, for

27   an Order Approving the Settlement  between debtor and debtor-in-possession LAKELAND

28

---

**MOTION FOR ORDER APPROVING SETTLEMENT AGREEMENT WITH RIDGELINE**

DEVELOPMENT COMPANY ("Lakeland" or "Debtor"), and   RIDGELINE ENERGY SERVICES (USA), INC., ("Ridgeline").   These parties have entered into a Settlement Agreement ("Agreement") which contains the following material terms, among others:

## 1. **Bankruptcy Court Approval**.

The Agreement is not binding unless this settlement is approved by the bankruptcy Court.

## 2.   **Lakeland's Exchange of its Judgment Against Ridgeline for RDX Stock**.

In exchange for $750,000 worth of stock issued by Ridgeline's corporate parent, RDX Technologies Corporation ("RDX") and Ridgeline's undertaking to remove and process water, fats, oils grease and other material contained in several of the tanks located on the property which Lakeland sold to Goodman Santa Fe Springs SPE LLC ("Goodman"), Lakeland agrees to file and  record a full satisfaction of judgment in the Adversary Proceeding in which it obtained a $662,998.33 judgment against Ridgeline. The parties agree to release each other from claims related to the judgment, the facts upon which it is based, and claims related to costs incurred in demolishing tanks and removing other above-ground materials which each contends were the responsibility of the other.

## 3. **Ridgeline Agrees to Process Water, Fats and Grease, and to Proceed with Plans before the AQMD**.

Ridgeline will remove the water, fats, grease, and sludge which are in certain tanks on the property, so that Lakeland can then remove those tanks from the property. Ridgeline's waste water reclamation facility is expected to be used to process the water. Ridgeline also agrees to use its best efforts to expedite review and approval by the Southern California Air Quality Management District ("AQMD") of Ridgeline's application for permission to treat and remove the sludge in the tanks.

The Agreement is in the best interest of the bankruptcy estate and its creditors, because (a) provides the estate with $750,000 in stock which can be sold for the benefit of the estate, (b) pushes forward the dewatering of the storage tanks as a prelude to their removal by Lakeland, (c) moves the permit process forward by which the sludge and other "solids" in the tanks can be removed and processed, and (d) it resolves the ongoing disputes regarding the responsibility for these matters.

This Motion is based upon the Motion, the attached Memorandum of Points and Authorities, the Declarations of Vincent Papa and Lawrence M. Jacobson, and such other and further grounds as may be properly presented to the Court.

This motion is made pursuant to Local Bankruptcy Rule 9013-1(o)(1), and unless an objection along with a request for a hearing is properly filed and served within fourteen (14) days after the date of this Notice, a proposed order will be lodged by the Debtor approving the proposed Agreement.

DATED:    March 10, 2015          LAW OFFICES OF RICHARD T. BAUM and
                                  GLICKFELD, FIELDS & JACOBSON


                                  /s/ Richard T. Baum
                                  _____
                                  RICHARD T. BAUM, Attorneys for Debtor-in-
                                  Possession LAKELAND DEVELOPMENT
                                  COMPANY

**MEMORANDUM OF POINTS AND AUTHORITIES**

### I. INTRODUCTION

By this Motion, Debtor Lakeland Development Company ("Lakeland") seeks approval of its settlement with Ridgeline Energy Services (USA), Inc. ("Ridgeline"), which provides for the satisfaction of a contested default judgment that Lakeland obtained against Ridgeline, plus partial reimbursement of demolition costs incurred by Lakeland, as well as a clear undertaking by Ridgeline to remove water, fats and grease, and sludge from storage tanks on the property, so Lakeland can then demolish them. The settlement avoids the possibility that Ridgeline will be successful in having the default judgment set aside, avoids potentially years of expensive and uncertain ancillary litigation and costs in trying to collect the default judgment from Ridgeline or its Canadian parent company, and significantly reduces the possibility and potential size of administrative claims from Goodman.  In short, it fulfills the twin goals of bringing assets into the estate and permitting the completion of the Lakeland's duties on the land.

### II. STATEMENT OF FACTS

On May 4, 2012 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of Title 11 of the United States Code. The Debtor continues to operate its business and manage its affairs as a debtor-in-possession, pursuant to 11 USC §§ 1107(a) and 1108.  At the time of the filing of the Petition, the Debtor was the owner of 55 acres of land located in Santa Fe Springs, California. The land is divided into ten parcels, four of which form a rectangular shape of approximately 17 acres (the "17 acre parcels"), and six of which form a rectangular shape of approximately 38 acres (the "38 acre parcels").  Lakeland obtained this court's approval and sold the 17 acre parcels to

1 Ridgeline Energy Services (USA) Inc. ("Ridgeline"). The sale was closed on or about

2 April 5, 2013 pursuant to a Purchase Agreement ("Ridgeline APA").  The Ridgeline APA

3 required Ridgeline to have certain obligations to clean up and remove certain about

4 ground storage tanks, and other materials upon the sale of the 38 acre parcels by

5 Lakeland.  In January 2014, the Court entered its order of approval for the sale of the

6 38 acre parcels to Goodman Santa Fe Springs SPE LLC, ("Goodman").  That sale

7 closed in June 2014.

8 　　　　In addition, Lakeland entered into a license agreement with Ridgeline in 2013,

9 permitting Ridgeline to use five acres on the 38 acre parcels ("the 5 acres"), in

10 connection with the waste-water reclamation facility that Ridgeline purchased, for a

11 period ending February 28, 2015.  That license was transferred to Goodman when it

12 became the owner of the 38 acre parcels (including the 5 acres) upon buying them from

13 Lakeland in 2014.  In accordance with that fact, Goodman agreed to enter into a license

14 agreement with Ridgeline on the same terms and conditions as the Lakeland-Ridgeline

15 license agreement for the 5 acres.  Under those license agreements, Ridgeline had the

16 obligation to de-water and clean up the tanks on the 5 acres.  Ridgeline also had the

17 obligation to clean up and remove any material that it left on the 38 acre parcels in the

18 course of its use of those parcels for its waste-water operation.  Based on Ridgeline's

19 obligations to de-water and clean the tanks (which was a prerequisite to demolishing

20 those tanks) Lakeland agreed with Goodman to demolish the tanks on the 38 acre

21 parcels, including the tanks on the 5 acres.

22 　　　　After the sale closed, Lakeland learned that Goodman's plans for the

23 remediation of the contamination of the property were set to start on the eastern edge

24 of the 38 acre parcels.  Lakeland accordingly demanded that Ridgeline commence its

25 above ground demolition obligations including the de-watering and cleaning of Tank

26 17001 located on the north-east corner of the 38 acre parcels.  Ridgeline refused,

27

28

1   claiming that there were contaminants in the tank for which it blamed Lakeland.[1]

2   Goodman, in turn, alleged that it could not start its remediation activities if the tank was

3   not taken down, which would cause Goodman to incur damages for the delay of its

4   project.  At that time, the officers of Lakeland evaluated its estimated costs for de-

5   watering and removing the tank, and compared that to what Lakeland expected

6   Goodman to incur as costs if it were to remove the tank itself (based on Goodman's

7   own cost estimates).  Lakeland concluded that its costs would be substantially less than

8   Goodman's costs, and that Goodman would file an administrative claim in the

9   bankruptcy for its greater costs if it had to de-water and remove the tank itself.

10  Consequently, Lakeland decided that it would be more cost-effective and beneficial to

11  the estate for Lakeland to drain and clean tank 17001 itself, since it would be cheaper,

12  Lakeland would have control over the costs and would have the option of pursuing

13  Ridgeline for those costs.  Approximately $650,000 was spent on the removal of tank

14  17001 and the removal of various above-ground material from the site including piles of

15  contaminated dirt, trash, and discarded equipment parts, thereby fulfilling additional

16  obligations to Goodman.

17          Lakeland's relationship with Ridgeline proved rocky in other ways as well,

18  starting shortly after the sale of the land and waste-water reclamation facility closed.

19  Ridgeline had agreed to reimburse Lakeland for costs related to the operation of the

20  facility, most notably the electricity usage, but did not do so.  These charges accrued

21  despite Lakeland's pressure upon Ridgeline.  By May 2014, Ridgeline had reached a

22  deal to sell most of its 17 acre parcels to Goodman, but that required Ridgeline to reach

23  an accord with Lakeland.  Lakeland needed to resolve the operational-cost issue with

24  Ridgeline in order for Lakeland's sale to Goodman to close.  A compromise was

25  _____

26          [1]Lakeland denies those contentions, but proving either side's contentions would
    entail time-consuming and costly testing and analysis of the material in the tanks, as well
27  as discovery and review of each party's documents concerning operations of the
    waste-water plant.
28

1   reached whereby Ridgeline agreed to pre-pay an existing $392,857 note to Lakeland

2   from the property sale, agreed to pay $350,000, in weekly installments, with respect to

3   the operational costs, and agreed to give Lakeland $500,000 worth of stock in

4   Ridgeline's parent company RDX Technologies, Inc.  More importantly for the whole of

5   the transactions, Goodman assumed the onus of remediating the 17 acre parcels

6   relieving Lakeland of that responsibility.  The compromise was approved by the Court

7   on May 29, 2014, and shortly thereafter, Lakeland's deal with Goodman closed.

8   Ridgeline fully paid the $392,857 note.  However, it made only three weekly payments

9   on the $350,000 operational cost obligation and did not timely deliver the RDX stock.

10        When Ridgeline failed to respond to demands for full performance from

11   Lakeland's attorneys, Lakeland commenced an adversary proceeding against

12   Ridgeline, seeking the balance of the agreed $350,000 operational cost reimbursement

13   plus the value of the $500,000 stock.  (Ridgeline did finally deliver the stock, but by that

14   time the value had fallen substantially, and Lakeland sought damages for that delay.)

15   Ridgeline did not answer the complaint or oppose Lakeland's application for

16   pre-judgment writs of attachment. The Right to Attach Order was entered and

17   Ridgeline's default was entered.  On October 10, 2014, the Court granted Lakeland's

18   motion for a default judgment in the amount of $662,998.33.  Not long thereafter,

19   Ridgeline hired a new lawyer and filed a motion to vacate the default.  At the Court's

20   instruction, Lakeland, Ridgeline and Goodman then entered into the negotiations which

21   ultimately resulted in the settlement that is the subject of this motion

22        The situation was complicated by various factors, including the following.  There

23   was a serious question as to whether Ridgeline had sufficient assets to satisfy the

24   judgment.  Opposing Ridgeline's motion to set aside that judgment would use up estate

25   resources.  Lakeland believed that it might have claims against RDX based on the

26   default judgment against Ridgeline, including alter-ego claims and fraudulent transfer

27   claims, but would not have sufficient facts to pursue those claims without conducting

28

1   discovery.  Even if Lakeland successfully opposed Ridgeline's motion to set aside the

2   default judgment, it would have had to conduct that discovery, litigate its claims against

3   RDX and then attempt to collect against Ridgeline, which is based in Arizona and

4   Canada.  Lakeland was not able to get any collection agency or Canadian law firm to

5   collect on a judgment against RDX for less than a 40% contingency.  The cost of

6   pursuing Ridgeline (and/or RDX) based on Ridgeline's failure to remove the materials

7   from tank 17001 would also have been substantial, despite the risk of not prevailing or

8   not being able to collect any judgment. In addition, a major problem for all parties was

9   that the Los Angeles Superior Court had enjoined Ridgeline from moving the solids (i.e.,

10  sludge) in the tanks without approval by the Southern California Air Quality

11  Management District ("AQMD"), which also entailed approval by the Santa Fe Springs

12  Fire Department.  That raised a substantial concern that Ridgeline would not pursue

13  obtaining such approval.

14          Lakeland's negotiations with Ridgeline ultimately led to the settlement, under

15  which  Ridgeline give Lakeland $750,000 worth of RDX stock and would agree to

16  remove the water, press forward with the AQMD permit application, and remove the

17  solids when the plan is approved.  After several weeks of negotiating the deal and the

18  language of the agreement, Lakeland and Ridgeline executed the settlement

19  agreement in late February, 2015.

20          The management of Lakeland recognizes that there are risks in the agreement

21  with Ridgeline (e.g. RDX's stock price could decline, Ridgeline could fail to comply with

22  its obligations under the agreement), but believes that they are outweighed by its

23  benefits.  Lakeland's management has evaluated the difficulties in obtaining a judgment

24  against RDX, the costs thereof and the very substantial costs of enforcement against

25  Ridgeline and RDX, and the substantial costs of draining and cleaning the tanks if

26  Ridgeline did not do that, all of which would adversely impact the estate's cash, which

27  Lakeland desires to pay as possible to creditors.  After discussion of all of these

28

1  matters, Lakeland believes that the settlement embodied in the settlement agreement,

2  a true copy of which is attached as Exhibit 1, presents the best compromise that could

3  be reached, and the best alternative under the circumstances.

4         After the deal was made, Goodman filed an action in the Los Angeles Superior

5  Court against Ridgeline, RDX and a number of their affiliates for breach of contract

6  (related to the failure to drain, clean and take down tanks on the 17 acre parcels of the

7  property) and for fraudulent transfer of assets by Ridgeline.  Lakeland's management

8  evaluated this development and determined that the goals and motivations of Goodman

9  are different than Lakeland's.  Lakeland wants to fulfill the obligation to remove the

10  tanks and needs Ridgeline to do that economically.  Goodman has its eyes on the

11  remaining two acres of property which Ridgeline did not sell to it. Goodman wants all 55

12  acres in order to develop the site fully and does not need to be required to cater its

13  plans to a different land owner.  Lakeland's management decided to stay with the deal it

14  made with Ridgeline.

15         In reaching the settlement with Ridgeline, Lakeland and its management

16  exercised their reasonable business judgment that the settlement is in the best interest

17  of Lakeland and its estate on the merits of the deal.

18

19  **III. THE AGREEMENT IS IN THE BEST INTEREST OF THE DEBTOR'S**

20  **ESTATE AND ITS UNSECURED CREDITORS AND, THEREFORE, SHOULD**

21  **BE APPROVED**

22  **1. Standards for Approval of Compromises of Claims.**

23         Federal Rule of Bankruptcy Procedure 9019(a) provides that on the trustee's motion

24  and after a hearing on notice to creditors, the debtor and indenture trustees, as provided

25  in Rule 2002(a), and such other entities as the Court may designate, the Court may

26  approve a compromise or settlement.

27

28

1    The Supreme Court in <u>Protective Committee for Independent Stock Holders of TNT</u>

2    <u>Trailer Fairy, Inc. v. Anderson</u>, 390 US 414, 425 (1968), held that a bankruptcy court, in

3    considering whether to approve a compromise, should apprise itself of all facts necessary

4    for an intelligent and objective opinion of the probabilities of ultimate success should the

5    claim be litigated. It also explained that the court should form an educated estimate of the

6    complexity, expense and likely duration of such litigation, the possibility of collection on any

7    judgement that might be obtained, and all other factors relevant to a full and fair

8    assessment of the wisdom of the proposed compromise. See also <u>In re A&C Properties</u>,

9    784 F 2d 1377, 1380-84 (9th Cir. 1986), cert. denied, 479 S Ct, 854 (1986). The Court need

10    not, however, conduct an exhaustive investigation into the validity of the claims to be

11    compromised nor is the Court is expected to conduct a mini-trial on the merits. <u>In re Walsh</u>

12    <u>Construction, Inc.</u>, 669 F 2d 1325, 1328 (9th Cir 1982).

13

14    The purpose of any compromise agreement is to allow the trustee and the creditors

15    to avoid the expenses and burdens associated with litigating sharply contested and

16    dubious claims. <u>In re Walsh Construction, Inc.</u>, 669 F 2d 1325, 1328 (9th Cir. 1982) (citing

17    <u>In re California Associated Products</u>, 183 F 2d 946, 949-50 (9th Cir. 1950)). The law favors

18    compromise and not litigation for its own sake. <u>In re Blair</u>, 538 F2d 849, 851 (9th Cir. 1976).

19

20    Consistent with these Bankruptcy Act cases, the Ninth Circuit in <u>In re A&C</u>

21    <u>Properties</u>, 784 F2d 1377, 1381 (9th Cir. 1986) reiterated that in determining the fairness,

22    reasonableness and adequacy of a proposed settlement agreement, a court should

23    consider: (1) the probability of success in litigation, (2) the difficulties, if any, to be

24    encountered in the matter of collection, (3) the complexity of the litigation involved and the

25    expense, inconvenience and delay necessarily attending it, and (4) the paramount interest

26    of the creditors and the proper deference to their reasonable views.  Consideration of these

27    factors does not require the Court to decide questions of law and fact in the parties'

28

1    dispute, or to determine that the settlement is the best possible resolution; instead the

2    Court needs only determine whether the settlement falls below the lowest point of the

3    range of reasonableness. In re Schmitt, 215 BR 417, 423 (Bankr 9th Cir. 1997).

4

5        **2.  The Agreement Should Be Approved Under Bankruptcy Rule 9019**

6

7        Applying the above standards to the circumstances herein, the Agreement

8    should be approved.

9

10            a) The Probability of Success in Litigation

11        There are two phases of litigation which this compromise avoids.  First, there are

12   the efforts to stave off Ridgeline's motion to set aside the default and default judgment, and

13   if successful, the efforts to collect on the judgment.  Second, there is litigation to be filed

14   against Ridgeline related to the costs incurred in de-watering, cleaning, and demolishing

15   Tank 17001 and removal of other above ground materials.  Lakeland believes that it has

16   a good chance of defeating the effort to set aside the default judgment, and a good chance

17   of prevailing in litigation based on tank 17001.  However, the substantial costs of litigation

18   and collection, as discussed above, militate in favor of settlement.

19

20            b) The Probability of Collection

21        Collectability against Ridgeline is doubtful. While Lakeland may be claims for

22   fraudulent transfer or alter-ego against Ridgeline's parent RDX, those claims will be

23   expensive and time-consuming to litigate, during which time any assets may be removed

24   from reach.  Even if Lakeland is successful, costs of collection would be significant, even

25   if assets could be found.  For example, as discussed above, Lakeland would have to give

26   up a 40% contingency to collection counsel in the U.S. and Canada. This substantially

27   reduced whatever recovery might be had.

28

c) <u>The Need to Avoid Expensive, Inconvenient and Protracted Litigation</u>.

Any litigation with Ridgeline over the demolition costs promises to be long and drawn out if litigated, and will consume valuable resources to fund Lakeland's attorneys. Collection from Ridgeline and its transferees promises to be expensive, and may be labyrinthine in the struggle to follow the assets.  The settlement places stock in Lakeland's hands which can be sold and turned quickly into cash.

d) <u>The Agreement Benefits The Paramount Interests of Creditors</u>

The Agreement gives up claims of $1.2-million, one of which is reduced to judgment and the other of which must be litigated from the beginning, in exchange for stock having a current value of $750,000.  This is a 37.5% reduction, but it accomplishes three objectives of interest to the creditor body.  First, it liquidates the judgment by funding it.  Second, Ridgeline's performance of its obligations to drain and clean the tanks permits Lakeland to fulfill its obligation to Goodman, and eliminates or significantly reduces the administrative claims of Goodman.  Third, it eliminates the expenditure of substantial sums for attorneys' fees in pursuing Ridgeline.

**3. CONCLUSION**

For the foregoing reasons, the Debtor respectfully requests that the Court approve the proposed Settlement Agreement as a proper compromise under FRBP Rule 9019, and grant such further relief as the Court deems just and proper.

DATED:   March 6, 2015                    LAW OFFICES OF RICHARD T. BAUM and
                                          GLICKFELD, FIELDS & JACOBSON

                                          /s/ Richard T. Baum
                                          _____
                                          RICHARD T. BAUM, Attorneys for Debtor-in-
                                          Possession LAKELAND DEVELOPMENT
                                          COMPANY

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### DECLARATION OF VINCENT PAPA

I, VINCENT PAPA, declare:

1. I am the interim President, Secretary and General Counsel of the Debtor Lakeland Development Company ("Lakeland") which is a Delaware corporation. Along with Michael Egner, I am responsible for the management of the Debtor in this Bankruptcy case. I am also the interim President of Energy Merchant Corp. ("EMC"), the Debtor's ultimate parent corporation. (I have been the Secretary and General Counsel to Lakeland and EMC for many years.  I was appointed as those companies' interim president in January 2015, following the death of their former president, Siegfried Hodapp.) I have personal knowledge of the facts set forth in this Declaration, and if called as a witness I could testify competently thereto.

2. In April 2013, Lakeland closed the Asset Purchase Agreement, as amended, with Ridgeline Energy Services (USA) Inc. ("Ridgeline") whereby Lakeland sold Ridgeline its 17 acre parcels on which were located a waste water reclamation facility. In addition, Lakeland entered into a license agreement with Ridgeline in 2013, permitting Ridgeline to use five acres on the 38 acre parcels ("the 5 acres"), in connection with the waste-water reclamation facility that Ridgeline purchased, for a period ending February 28, 2015.  That license was transferred to Goodman when it became the owner of the 38 acre parcels (including the 5 acres) upon buying them from Lakeland in 2014.  In accordance with that fact, Goodman agreed to enter into a license agreement with Ridgeline on the same terms and conditions as the Lakeland-Ridgeline license agreement for the 5 acres.  Under those license agreements, Ridgeline had the obligation to de-water and clean up the tanks on the 5 acres.  Ridgeline also had the obligation to clean up and remove any material that it left on the 38 acre parcels in the course of its use of those parcels for its waste-water operation.  Based on Ridgeline's obligations to de-water and clean the tanks (which was

1    a prerequisite to demolishing those tanks) Lakeland agreed with Goodman to demolish the

2    tanks on the 38 acre parcels, including the tanks on the 5 acres.

3         3.  Goodman's plans for the remediation of the contamination of the property were

4    set to start on the eastern edge of the 38 acre parcels.  Lakeland accordingly demanded

5    that Ridgeline commence above-ground demolition obligations including de-watering and

6    cleaning of Tank 17001 located on the north-east corner of the 38 acre.  Ridgeline refused,

7    claiming that there were contaminants in tank 17001 for which it blamed Lakeland[2] .  If that

8    tank were not taken down, Goodman alleged that it could not start its remediation activities

9    which would cause it to incur damages for the delay of its project.  I consulted with Michael

10   Egner and Siegfried Hodapp regarding this matter.  We evaluated Lakeland's estimated

11   costs for de-watering and removing the tank, and compared that to what Lakeland

12   expected Goodman to incur as costs if it were to remove the tank itself (based on

13   Goodman's own cost estimates).  We concluded that its costs would be substantially less

14   than Goodman's costs, and that Goodman would file an administrative claim in the

15   bankruptcy for its greater costs if it had to de-water and remove the tank itself.

16   Consequently, we decided that it would be more cost-effective and beneficial to the estate

17   for Lakeland to drain and clean tank 17001 itself, since it would be cheaper, Lakeland

18   would have control over the costs and would have the option of pursuing Ridgeline for

19   those costs.  Approximately $650,000 was spent on the removal of tank 17001 and the

20   removal of various above-ground material from the site including piles of contaminated dirt,

21   trash, and discarded equipment parts, thereby fulfilling additional obligations to Goodman.

22        4.  Lakeland's relationship with Ridgeline proved rocky in other ways as well, starting

23   shortly after the sale of the land and waste water reclamation facility closed.  Ridgeline

24   agreed to reimburse Lakeland for costs related to the operation of the facility, most notably

25   _____

26        [2]Lakeland denies those contentions, but proving either side's contentions would
     entail time-consuming and costly testing and analysis of the material in the tanks, as well
27   as discovery and review of each party's documents concerning operations of the
     waste-water plant.
28

1   the electricity usage, but failed to do so.[3]   These charges accrued despite Lakeland's

2   pressure upon Ridgeline.  By May 2014, Ridgeline had reached a deal to sell most of its

3   17 acre parcels to Goodman, but that required Ridgeline to reach an accord with Lakeland.

4   Lakeland needed to resolve the issue with Ridgeline in order for Lakeland's sale to

5   Goodman to close.  A compromise was reached whereby Ridgeline agreed to pre-pay a

6   $392,857 note owed Lakeland from the property sale, and agreed to weekly payments to

7   reduce the $350,000 in accrued operational reimbursements.  More importantly for the

8   whole of the transactions, Goodman assumed the onus of remediating the 17 acre parcels

9   relieving Lakeland of that responsibility, and relieving Ridgeline of the obligation to give

10  Lakeland $5-million in RDX stock to pay for it (and which subsequently declined in value).

11  The compromise was put before the Bankruptcy Court, which approved it, and shortly

12  thereafter, Lakeland's deal with Goodman closed and Goodman's deal with Ridgeline

13  closed.  Ridgeline paid the $392,857 note.  However, it made only three weekly payments

14  on the accrue account, and did not timely deliver $500,000 worth of stock of its corporate

15  parent, RDX Technologies, Inc.

16       5. Unfortunately it appears that Ridgeline did not perform its obligations to Goodman

17  on the site.  When Ridgeline failed to respond to demands for full performance from

18  Lakeland's attorneys, Lakeland filed an adversary proceeding against Ridgeline in this

19  case, which sought the balance on the agreed account for operational reimbursements

20  plus the value of the $500,000 stock.  Ridgeline did finally deliver the stock, but by that time

21  the value had fallen substantially, and Lakeland sought damages for that delay.  Ridgeline

22  did not answer the complaint nor oppose Lakeland's application for pre-judgment writs of

23  attachment.  The Right to Attach Order was entered and Ridgeline's default was entered.

24  On October 10, 2014, the Court granted Lakeland's motion for a default judgment in the

25  _____

26       [3]Because the whole of the 55 acre parcels are served by one electrical substation,
    either entirely new substations would have to be built at very substantial cost, or Lakeland
27  could continue to be the electricity "customer" and be reimbursed by the actual user. The
    latter arrangement is still in effect with Ridgeline and with Goodman.
28

1    amount of $662,998.33.  Not long thereafter, Ridgeline hired a new lawyer, filed a motion

2    to vacate the default, and, at the Court's instruction, entered into negotiations with

3    Lakeland and Goodman.

4        6.    We looked but did not see that Ridgeline had substantial assets against which

5    a judgment could be enforced.    Sometime after Ridgeline sold most of its land to

6    Goodman, a number of changes took place at the property.  Ridgeline fired its employees

7    and most were rehired by another company affiliated with RDX Technologies.   A new

8    company took over management of the site and began shipping equipment and other

9    materials off the site.  RDX Technologies' SEC filings indicate that these companies were

10   recently formed.  In short, there may be alter ego and fraudulent transfer issues.

11       7.  As the management of Lakeland we looked into retaining lawyers to pursue the

12   assets.  Several firms in the United States and Canada (where RDX is located) were

13   contacted and agreed to collect against Ridgeline, RDX and related entities, once a

14   judgment was obtained against them, for a contingency fee of 40% of the amount

15   collected, but each stated that the liability of RDX or related companies had to be

16   established first.  In other words, they would not litigate Lakeland's alter-ego or fraudulent

17   transfer claims against RDX or related companies, but would only seek to domesticate and

18   enforce existing judgments that Lakeland had already obtained.   We discussed the pro's

19   and con's of going after Ridgeline for the demolition costs associated with Tank 17001.

20   We discussed the situation regarding the motion to set aside default which had been filed

21   and which was continued while we attempted to reach an agreement.  We discussed the

22   costs of obtaining a judgment against RDX, and the costs of collection.  We saw that this

23   was a fact intensive inquiry, and that we would incur substantial attorneys' fees to

24   prosecute it.  We discussed the costs of moving the water out of the tanks if it were not

25   processed by Ridgeline or if it had to be trucked off the property.  We discussed the

26   injunction issued by the Superior Court in a suit by the Southern California Air Quality

27   Management District ("AQMD") prohibiting Ridgeline from moving the water and solids (i.e.,

28

1  sludge) in the tanks without an AQMD- and Santa Fe Springs Fire Department-approved

2  plan, which interferes with Ridgeline,s obligation to clean the tanks and Lakeland's

3  obligation to remove the tanks.  We came to the conclusion that none of these problems

4  all had very serious costs and delay factors.  We believed that delay could increase the

5  possibility and amounts of administrative claims by Goodman[4].

6      8. Another pressing problem was removal of the water from the tanks located on the

7  5 acres which prevented Lakeland from performing its obligation to take the tank down.

8  I kept in frequent contract with Dennis Danzik, Ridgeline/RDX's president.   These

9  discussions led to a proposal that Ridgeline gets RDX to issue stock to Lakeland in

10 exchange for the satisfaction of the judgment and release of the current demolition

11 expense claim.  Ridgeline would agree to remove the water, press forward with the AQMD

12 permit application, and remove the solids when the plan is approved.  After discussion, we

13 arrived at the figure of $750,000 plus the agreement to move forward with the draining and

14 cleaning of the tanks.   Several weeks were spent in negotiating the language of the

15 agreement (Mr Danzik would become unavailable for significant periods of time).

16 Eventually, on February 25, 2015, Ridgeline signed the written agreement, and I signed

17 the agreement on Lakeland's behalf on February 27, 2015, with the blessing of the

18 shareholders of Lakeland's ultimate parent corporation, EMC.

19      9.  While the management of Lakeland believes that there are substantial risks in

20 the agreement with Ridgeline (RDX's stock could fall in price between the time it is

21 delivered to us and the time that we can sell it, Ridgeline and RDX's finances may impede

22 their ability to complete their duties on the property, Ridgeline could breach the settlement

23 agreement), we believe that the settlement is in the best interest of Lakeland, its estate and

24 its creditors.  Lakeland's management evaluated the substantial costs of draining and

25 cleaning the tanks ourselves, if that liability was determined to be Lakeland's liability, the

26

27 _____

   [4]Lakeland has a number of defenses to administrative claims by Goodman, some
28 which may defeat the claims, and some which may reduce them.

difficulties in obtaining a judgment against RDX, the costs thereof and the costs of enforcement against Ridgeline and RDX. We also evaluated the likelihood that we could obtain a judgment against Ridgeline for the demolition expenses and the costs thereof. We considered the time factors involved in all of these steps. We considered that the estate has a limited amount of cash and that we desire to return as much of it to creditors as possible. After discussion of all of these matters, we believe that the settlement reached with Ridgeline, a true copy of which is attached as Exhibit 1, presents the best compromise that could be reached, and that despite its shortcomings, presents the best alternative in approaching the myriad considerations that must be taken into account.

10. Subsequently I learned that on March 5, 2015, Goodman filed a complaint in the Los Angeles Superior Court against Ridgeline, RDX and a number of affiliates, alleging claims of breach of contract and fraudulent transfer of Ridgeline assets. That complaint was filed after Lakeland and Ridgeline signed the settlement agreement. Nevertheless, I have discussed this development with Mr Egner, and we believe that the settlement is still in Lakeland's best interests, given the facts stated above. According, I ask that the court approve the compromise with Ridgeline.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 10th day of March 2015 at New York, New York.

VINCENT PAPA

1

2

### DECLARATION OF LAWRENCE M. JACOBSON

3

I, Lawrence M. Jacobson, declare as follows:

4

1.  I am an attorney at law, duly licensed to practice law in the State of California

5

and am duly admitted to practice before the United States Courts for the Central District

6

of California.  I am a partner in Glickfeld, Fields & Jacobson LLP ("GF&J") which is

7

co-counsel for Debtor and Debtor-In-Possession Lakeland Development Company in this

8

case (along with Richard T. Baum). I have personal knowledge of the facts set forth herein

9

and if called and sworn as a witness I could and would testify competently thereto.

10

2.  In November and December 2014, after Lakeland obtained a default judgment

11

against Ridgeline Energy Services (USA), Inc. ("Ridgeline"), I contacted collection agencies

12

and law firms in the United States and Canada, to find out what they would charge to

13

enforce a judgment against Ridgeline or its parent company RDX Technology, Inc. ("RDX")

14

in California, Arizona and Canada.  The lowest quotes that I received were for a forty

15

percent (40%) contingency fee to enforce judgments that Lakeland had obtained against

16

Ridgeline or RDX.  Those quotes did not include obtaining a judgment against RDX on

17

alter-ego, fraudulent transfer or any other grounds.   Rather, they were only for

18

domesticating and enforcing existing judgments against Ridgeline and/or RDX in the United

19

States and Canada.

20

I declare under the penalty of perjury under the laws of the United States of America

21

that the foregoing is true and correct.

22

Executed this 9th day of March, 2015 at Beverly Hills, California.

23

24

*/s/ Lawrence M. Jacobson*

25

LAWRENCE M. JACOBSON

26

27

28

# EXHIBIT 1

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this "Agreement") is made as of the 25th day of February 2015, by and among Lakeland Development Company ("LDC"), Ridgeline Energy Services (USA), Inc. ("Ridgeline") . Capitalized terms used herein but not defined herein shall have the meanings given to such terms in the Purchase Agreement (as defined below).

## RECITALS

WHEREAS LDC is currently a Debtor and Debtor-in-Possession in Central District of California Bankruptcy Case No. 2:12-bk-25842-RN ("the LDC Bankruptcy"), which was commenced by LDC's filing of a voluntary petition for relief pursuant to Chapter 11 of the United States Bankruptcy Code on May 4, 2012;

WHEREAS LDC and Ridgeline entered into an Asset Purchase Agreement, as amended, dated April 9, 2012 (the "Asset Agreement") providing for the purchase of certain assets and a Purchase Agreement, dated as of January 25, 2013, as amended (the "Purchase Agreement"), providing for Ridgeline's purchase of approximately 17 acres of land (the "Ridgeline Property"), which closed on April 5, 2013;

WHEREAS the Asset Purchase Agreement and the Purchase Agreement contemplated that Ridgeline would continue to use certain portion of the remaining 36 acres of LDC's land (the "Land") in its wastewater activities and that Ridgeline upon termination of the wastewater activities on the Land would complete certain above ground demolition and cleaning activities with respect to the Land;

WHEREAS Ridgeline operated the wastewater reclamation activities and LDC advanced various amounts for utilities and other costs which Ridgeline agreed in writing to reimburse to LDC.  As a result of Ridgeline's alleged breach of that and other promises contained in the Settlement Agreement dated April 14, 2014, LDC received a default judgment in the amount of $662,998.33 against Ridgeline in Adversary Case No. 2:12-bk-25842-RN on November 10, 2014 (the "Default Judgment"); Ridgeline disputes the judgment and has filed a Motion to Set Aside the Default Judgment in that adversary proceeding;

WHEREAS LDC, subsequent to entry of the Default Judgment, and based upon promises contained in agreements other than the April 14, 2014 Settlement Agreement, it has spent approximately $650,000 in demolition costs (The "Additional Demolition Costs") and LDC alleges that these costs are Ridgeline's responsibility; Ridgeline disputes this liability as it contends that it had no control on what LDC spent and Ridgeline was not apprised by LDC, or approve of LDC spending on Ridgeline's behalf;

WHEREAS LDC, and Ridgeline   ("the Parties") desire to settle their differences relating to the Default Judgment and the Additional Demolition Costs, all as set forth below.

## AGREEMENT

The Parties hereby agree as follows, subject to Final Bankruptcy Court Approval (as defined in paragraph 6.7 of this Agreement):

## ARTICLE I.

1.1    Ridgeline shall  borrow from the issuer, RDX Technologies Corporation (RDX) , as approved by the Toronto Venture Exchange (the "Exchange"),  $750,000 of RDX common stock ("the RDX Common Stock"), and deliver said RDX Common Stock to LDC and shall immediately provide LDC's designated broker with a corporate authorization Stock Letter, executed by an authorized RDX officer,  that LDC can sell the RDX Common Stock, notwithstanding any restrictive legend(s) on the RDX Common Stock, subject only to any restrictions or legends on the RDX Common Stock as to the date on which such stock may be sold, not to exceed 160 days from the date of issuance (the "Stock Letter").  Subject to the approval of the Exchange the RDX Common Stock shall be issued in three tranches of $250,000 each with the first trance issued within 10 days upon approval of the LDC Bankruptcy Court, the second tranche issued 30 days after such approval and the third tranche issued 60 days after such approval, or on such schedule that may be approved by the Exchange. The parties agree to use their best efforts to have the RDX Common Stock issued in accordance with the schedule listed above, but both sides will accept the final decision of the Exchange.  In the event the Exchange does not approve the RDX Common Stock being issued in three tranches, the parties shall consult together with the Exchange to determine an acceptable schedule for release of the RDX Common Stock as soon as possible.  The RDX Common stock shall be priced at the volume weighed average price of common stock of RDX for the 30 trading days prior to the date of issuance.

1.2    LDC and Ridgeline acknowledge that they have certain future demolition obligations relating to their individual agreements with Goodman Santa Fe Springs SPE LLC ("Goodman"). In order to facilitate those future demolition obligations, the Parties agree to place into a joint escrow account the proceeds from the sale of the steel content of their individual tanks to facilitate each parties future individual obligation relating to the movement of water, processing of solids and taking down of tanks, as approved by regulators to the extent that the approval of such owner or regulatory authority is required.

1.3    Ridgeline shall immediately begin transferring the wastewater out of tanks 8, 9 and 15, and the fats, oils and grease out of tank 8 and 50, so long as there is no objection by the property owner or regulatory authority to the extent that the approval of such owner or regulatory authority is required.

1.4    Ridgeline shall use its best efforts to have a Solids Dewatering Plan approved by the Southern California Air Quality Management District and (to the extent necessary) the Santa Fe Springs Fire Department, such that the solids can be processed and disposed of.

1.5    Nothing herein is intended to terminate or release Ridgeline or LDC under any obligation they may have to Goodman pursuant to each party's individual agreements with Goodman.

1.6    Upon LDC's receipt of the full amount of RDX Common Stock and one or more Stock Letters covering the full amount of RDX Common Stock, (a) LDC shall file an Acknowledgment of Full Satisfaction of the Default Judgment in the Adversary Proceeding, and shall release Ridgeline from any claims it may have relating to the Additional Demolition Costs, and (b) Ridgeline shall release LDC from any claims it has other than arising out of this agreement. Pending LDC's receipt of the full amount of RDX Common Stock, (a) LDC will not take any further steps to enforce the Default Judgment, 2) Ridgeline and LDC will stipulate to continue the hearing of its Motion to Set Aside the Default Judgment (and, if necessary, stipulate to continue that hearing multiple times, and (c) none of the Parties shall contend that the rights, claims or defenses of any other Party with respect to the Default Judgment or Additional Demolition Costs has been prejudiced or adversely affected due to the length of time it takes LDC to receive the full amount of the RDX Common Stock.

Upon the issuance of all tranche's of shares of RDX Common Stock to be paid to LDC, LDC will within five (5) business days make application to the Bankruptcy Court to set aside, with prejudice the Default Judgment.

## ARTICLE II.
### REPRESENTATIONS AND WARRANTIES OF RDX AND RIDGELINE

Ridgeline represents and warrants as follows:

2.1    Ridgeline is a validly existing corporation, duly organized and validly existing in its state of formation.

2.2    Ridgeline has all requisite power, authority and legal right to execute and deliver this Agreement and to consummate the transactions and perform its obligations hereunder.

2.3    This Agreement has been duly executed and delivered by Ridgeline and is the legal, valid and binding obligation of Ridgeline, enforceable against Ridgeline in accordance with its terms and provisions, subject to Final Bankruptcy Court Approval (as defined in paragraph 6.7 of this Agreement).

## ARTICLE III.
### REPRESENTATIONS AND WARRANTIES OF LDC

LDC represents and warrants that:

3.1    LDC is a validly existing corporation, duly organized and validly existing in its state of formation.

3

3.2    LDC has all requisite power, authority and legal right to execute and deliver this Agreement and to consummate the transactions and perform its obligations hereunder, subject to Final Bankruptcy Court Approval (as defined in paragraph 6.7 of this Agreement).

3.3    The execution, delivery and performance by LDC have been duly authorized by all necessary action on the part of LDC.

3.4    This Agreement has been duly executed and delivered by LDC and is the legal, valid and binding obligation of LDC, enforceable against LDC in accordance with its terms and provisions, subject to Final Bankruptcy Court Approval (as defined in paragraph 6.7 of this Agreement).

## ARTICLE IV.
## COVENANTS

4.1    Further Assurances.  Each party hereto agrees to perform all acts and to execute and deliver any documents that may reasonably be necessary to carry out the provisions of this Agreement.

## ARTICLE V.
## RELEASES

5.1    In consideration of the mutual agreements, covenants and releases contained herein, and with the exception of the rights and obligations created or preserved by this Agreement:

(a)    Effective upon LDC's receipt of the full amount of the RDX Common Stock and one or more Stock Letters covering the full amount of RDX Common Stock, LDC, on behalf of itself and its parents, subsidiaries, partners, shareholders, directors, employees, officers, members, representatives, managers, agents, servants, attorneys, subcontractors, suppliers, affiliates and their respective successors, assigns and predecessors-in-interest, and all persons, firms, corporations and organizations acting in their respective behalf (collectively, the "LDC Parties"), hereby fully, unconditionally, and irrevocably release Ridgeline, and each of their affiliates, partners, shareholders, directors, employees, officers, members, representatives, managers, agents, servants, attorneys, affiliates, parents, sureties, subsidiaries and their respective successors, assigns and predecessors-in-interest, and all persons, firms, corporations and organizations acting in their respective behalf (collectively, the "Ridgeline Parties"), from any and all claims, rights, demands, actions, suits, causes of action, damages, counterclaims, defenses, losses, costs, obligations, liabilities and expenses of every kind or nature arising out of or based on the Default Judgment, the claims on which the Default Judgment is based, the Additional Demolition Costs, and any  act(s), omission(s), statement(s) or in connection with any of the foregoing ("Released Matters"). This release includes claims of which the LDC Parties are

4

presently unaware or which they do not presently suspect to exist which, if known to them would materially affect their release of the Ridgeline Parties.

      (b)    Effective upon LDC's receipt of the full amount of the RDX Common Stock and one or more Stock Letters covering the full amount of RDX Common Stock, Ridgeline on behalf of themselves and the Ridgeline Parties, hereby fully, unconditionally, and irrevocably release the LDC Parties, and each of them, from any and all ("Released Matters"). This release includes claims of which the Ridgeline Parties are presently unaware or which they do not presently suspect to exist which, if known to them would materially affect their release of the Ridgeline Parties.

      5.2    Each Party acknowledges that it has had the opportunity to receive independent legal advice from its counsel with respect to the facts and controversies described herein, their rights arising out of those facts and controversies, and the provisions of this Agreement, including (without limitation) the releases set forth above ("the Releases").

## ARTICLE VI.
## MISCELLANEOUS

      6.1    The warranties, representations and covenants of the parties contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement.

      6.2    This Agreement shall be governed by and construed under the laws of the State of California. Any action to enforce or interpret this Agreement or any of its terms shall be brought in the United States Bankruptcy Court for the Central District of California as part of the LDC Bankruptcy, or if that cannot be done (e.g. if the LDC Bankruptcy has been closed) in any United States District Court or California Superior Court in Los Angeles County, California.

      6.3    All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified, (ii) when sent by confirmed facsimile or e-mail if sent during normal business hours of the recipient, if not, then on the next business day; (iii) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) one day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the address as set forth on the signature page hereof or at such other address as such party may designate by ten days advance written notice to the other parties hereto.

      6.4    Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of LDC, RDX and Ridgeline.

6.5    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

6.6.    Except as hereby modified by this Agreement, all of the terms of the Purchase Agreement and the representations and warranties contained therein that are expressly stated as surviving closing thereunder shall continue to survive and remain in full force and effect.

6.7    The Parties agree to execute a stipulation seeking approval of this Agreement by the Bankruptcy Court in the LDC Bankruptcy. This Agreement is not effective unless and until approved by an order of the Bankruptcy Court in the LDC Bankruptcy ("the Approval Order"), which has become final in that (a) the period for appeal of the Approval Order has expired without any appeal having been filed, (b) a ruling affirming the Approval Order has been entered on appeal and is no longer subject to challenge or further appeal or (c) the dismissal of all appeals of the Approval Order after the appeal period has expired. The finality of the Approval Order, as set forth in the preceding sentence, is referred to in this Agreement as "Final Bankruptcy Court Approval."

6.8    If any provision of this Agreement shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein. One or more waivers of any term, condition or other provisions of this Agreement by any of Ridgeline or LDC shall not be construed as a waiver of any other provision.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above-written.

**RIDGELINE ENERGY SERVICES (USA), INC.**

By: _____

**Candy Blazar – CFO**

**Its:** Custodial Manager – An Authorized Person for the Board of Directors

This Agreement was approved by the Board of Ridgeline Energy Services (USA), Inc. on February 25, 2015.

**LAKELAND DEVELOPMENT COMPANY**

By: _____

Its: _____


**Notice:**

Ridgeline Energy Service (USA), Inc.
Attn: Candy Blazar
Suite #101, 3016 19 Street N.E.
Calgary, Alberta T2E 6Y9

**Notice:**

_____

_____

_____

7

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 11500 West Olympic Boulevard, Suite 400, Los Angeles, California 90064-1525. A true and correct copy of the foregoing document described as MOTION FOR ORDER APPROVING SETTLEMENT WITH RIDGELINE ENERGY SERVICES (USA), INC; DECLARATIONS OF VINCENT PAPA AND LAWRENCE M. JACOBSON will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On March 10, 2015   I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

 ▣  Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On March 10, 2015, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

 ▣  Service information continued on attached page

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on March 10, 2015   I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

Judge Richard Neiter, bin outside courtroom 1645, 255 East Temple Street, Los Angeles, California 90012 (hand delivered by attorney service)

 ☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| March 10, 2015 | Richard T. Baum | /s/ Richard T. Baum |
| *Date* | *Type Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                                      F 9013-3.1

**LAKELAND DEVELOPMENT COMPANY**

*2:12-bk-25842 RN*

TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")

Attorneys for Debtor Lakeland Development Company:
•Richard T Baum    rickbaum@hotmail.com, rickbaum@ecf.inforuptcy.com
•Lawrence M Jacobson    lmj@gfjlawfirm.com

Attorneys for Secured Creditor 12345 Lakeland LLC:
•Lorie A Ball    LABall@rkmc.com
•Howard J Weg    HJWeg@rkmc.com

Attorney for Goodman Santa Fe Springs SPE LLC:
•Randy P Orlik    rorlik@coxcastle.com

Attorney for Ridgeline Energy Services (USA) Inc.:
•Louis E Kempinsky    lek@kempinskylaw.com

Attorney for the County of Los Angeles Treasurer/Tax Collector:
•Barry S Glaser    bglaser@swesq.com, erhee@swesq.com

Attorneys for Creditor Argo Partners:
•Matthew A Gold    courts@argopartners.net
•Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com;
vcorbin@winthropcouchot.com

Attorney for the City of Santa Fe Springs:
•Ronald E Ostrin    ron@ostrinlaw.com

Attorneys for Creditors Loeb & Loeb:
•Lance N Jurich    ljurich@loeb.com, karnote@loeb.com;ladocket@loeb.com
•Jeanne C Wanlass    jwanlass@loeb.com, karnote@loeb.com;ladocket@loeb.com

Attorney for Regional Water Quality Control Board, Los Angeles Region; State Water Resources Control
Board:
•Noah M Golden-Krasner    noah.goldenkrasner@doj.ca.gov, gwen.blanchard@doj.ca.gov

Attorney for SoCal Developers, Michael Abbasfard:
•Christopher F Wilson    cfw.cwanda@gmail.com, cindy.c.wilson@gmail.com

Attorney for Secured Creditor Iron Mountain:
•Joseph Corrigan    Bankruptcy2@ironmountain.com

Attorney for Creditor Seaport Group:
•Scott D Friedberg    sfriedberg@theseaportgroup.com, sdfriedberg@gmail.com

Attorney for Creditors ACE Property and Casualty Insurance Company and Central National Ins Company of
Omaha:
•Mark D Plevin    mplevin@crowell.com

Attorney for National Union Fire Insurance Company of Pittsburgh, PA:
•Stephen Wong    swong@spcclaw.com

Attorney for Creditor Smith, Gambrell & Russell:
•John G McCarthy    jmccarthy@sgrlaw.com, nyoecf@sgrlaw.com

Attorneys for the Office of the United States Trustee:
•Kenneth G Lau    kenneth.g.lau@usdoj.gov
• United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov


**SERVED BY U.S. MAIL OR OVERNIGHT MAIL:**

By US Mail:

Special Notice:

Rafael Bernardino
Hobson Bernardino + Davis LLP
725 S Figueroa St, Ste 3230
Los Angeles, CA 90017

H. Henry Eshraghian
Expert Accounting & Tax Firm
112 W 9th St Ste 325
Los Angeles, CA 90015

The Seaport Group LLC Profit Sharing Plan
c/o The Seaport Group LLC
Attn: Scott Friedberg
360 Madison Ave 22nd Fl
New York, NY 10017

**20 Largest Unsecured Creditors**
Served by US Mail

City of SFS-Legal(Planning)
11710 E. Telegraph Road
Santa Fe Springs, CA  90670

Reuters America LLC
GPO Box 10410
Newark, NJ  07193-0410

Loeb &Loeb, LLP
10100 Santa Monica Blvd, Suite 2200
Los Angeles, CA  90067-4164

PDQ Rental Center
10826 Shoemaker
Santa Fe Springs, CA  90670

Brownstein Hyatt Farber & Schreck
Steven M. Sommers, Esq
410 Seventeenth St, Ste 2200
Denver, CO  80202-4432

Robertson Charitable Remainder Unitrust
c/o Louis Isakoff
977 Centerville Turnpike, SHB 202
Virginia Beach, Virginia 23463

White O'Connor Fink&Brenner
10100 Santa Monica Blvd
Los Angeles, CA  90067

Argo Partners
12 West 37th Street, 9th Floor
New York, NY 10018

Morse & Associates, Inc
12127 SW Grenoble St.
Wilsonville, OR 97070

Matthew H. Kagan
Thrifty Oil Co.
13116 Imperial Highway
Santa Fe Springs, CA 90670

American Express
PO Box 0001
Los Angeles, CA   90096-0001

Kevin Bridges (CFO)
RDX Technologies Corporation
Ridgeline Energy Services (USA)
14555 N 82nd Street
Scottsdale, AZ 85260

Aetna Health California
PO Box 894920
Los Angeles, CA  90189-4920

Ken Spiker Jr/OC Office
605 Frankfort Ave
Huntington Beach, CA  92648

Michele J. Thurnblom
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402-1498

MGM
3930-B Cherry Avenue
Long Beach, CA  90807

City of SFS-Planning &Develpmt
11710 E. Telegraph Road
Santa Fe Springs, CA  90670

City of SFS-Fire Department
11300 Greenstone Ave
Santa Fe Springs, CA  90670

Iron Mountain
PO Box 27128
New York, NY  10087-7128