LILLIAN G. STENFELDT (Bar No. 104929)
lillian.stenfeld@sedgwicklaw.com
JOEL M. LONG (Bar No. 226061)
joel.long@sedgwicklaw.com
SEDGWICK LLP
333 Bush Street, 30th Floor
San Francisco, CA 94104-2834
Telephone: (415) 781-7900
Facsimile: (415) 781-2635

Attorneys for Creditor
Goodman Santa Fe Springs SPE LLC

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>LAKELAND DEVELOPMENT COMPANY,<br><br>Debtor. | CASE NO. 2:12-bk-25842 RN<br><br>**GOODMAN SANTA FE SPRINGS SPE LLC'S MOTION TO CONVERT CASE TO CHAPTER 7**<br><br>Date:        July 8, 2015<br>Time:       10:00 am<br>Courtroom: 1645<br>Location:   255 E. Temple Street<br>                  Los Angeles, CA |

Creditor Goodman Santa Fe Springs SPE LLC, pursuant to 11 U.S.C. section 1112(b), Rules 1017, 2002, and 9014 of the Federal Rules of Bankruptcy Procedure, and LBR 9013-1, moves to convert this case to Chapter 7 for cause. Cause for conversion exists based on substantial continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, as well as the Debtor's inability to effectuate a plan. Conversion is in the best interests of the estate and creditors, and the debtor has not established, and cannot establish, either unusual circumstances or the other factors required under Section 1112(b)(2) to avoid conversion.

1   This motion is based on the memorandum of points and authorities below, the
2   accompanying declaration of Ryan Jones, the file and record of the Court in this matter, and any
3   such argument or evidence that the Court may consider at the hearing on the motion.
4   DATED: June 29, 2015                    SEDGWICK LLP

By: /s/ Joel M. Long
    Lillian G. Stenfeldt
    Joel M. Long
    Counsel for Creditor
    Goodman Santa Fe Springs SPE LLC

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

This is a textbook case for conversion to Chapter 7 based on the Debtor's post-petition losses and negative cash flow and the fact that there is no business to reorganize or save in this liquidating case. Given the Debtor's continued delay in moving forward with a liquidating plan and the ongoing and substantial erosion of any meaningful creditor recovery, no unusual circumstances are present that would justify continuing to administer the case under Chapter 11. Conversion is also in the best interests of the estate and creditors, both because it will avoid the unnecessary expense of confirming a liquidating plan, and because it should be more economical for a Chapter 7 trustee to close out the case than for the recently appointed Chapter 11 trustee to close out the case.

### II. FACTS

#### A. Bankruptcy Filing

1. The Debtor filed its Chapter 11 petition on May 4, 2012, to effectuate an orderly sale of its assets.

2. In its amended Statement of Financial Affairs, (Docket No. 38), the Debtor reported $648,000 in insider transfers in the form of various payments to or for the benefit of Energy Merchant Corporation ("EMC") or its executives or employees.

3. EMC is the sole shareholder of Energy Merchant Holding Corp., which is the Debtor's sole shareholder. EMC is owned by various individual shareholders, including Siegfried Hodapp, who owned the controlling interest in EMC (58% of the stock) and served as the sole director and president of EMC, the Debtor, and Powerine Oil Company (discussed below) before he died in January 2015. (See February 26, 2015 Chapter 11 Status Report; Declaration of Vincent Papa, Docket No. 543 at p. 8.)

4. At the time of the bankruptcy filing, the Debtor owned 55 acres of real estate in Santa Fe Springs, California (the "Property"), which was purportedly contaminated due to the prior operation of an oil refinery and various related activities on the Property.

5. In its prior disclosure statements filed with this Court, the Debtor stated that it acquired the Property from an affiliated entity, Powerine Oil Company ("Powerine"), in 1998, and that from the 1930's to 1996, Powerine and other former owners had operated an oil refinery on the Property. According to the Debtor, Powerine is wholly owned by EMC, but the Debtor has never provided details regarding its purchase of the Property from Powerine, including whether the Debtor acquired the right to any insurance recoveries for environmental contamination to the Property in connection with the purchase (or had other insurance claims of its own to pursue).

6. After filing bankruptcy, the Debtor the Debtor focused its efforts on selling the Property and liquidating its other assets.

**B.    Debtor's Prior Asset Sales**

7. On September 20, 2012, the Debtor obtained Court permission to sell the waste water facility and a 17-acre tract of the Property to Ridgeline (the "17-Acre Parcel"), which sale closed on April 5, 2013. The Debtor initially received approximately $1.5 million in cash and in excess of 4 million shares of stock in Ridgeline's parent company, RDX Technologies, Inc. ("RDX"), in connection with this sale. (See April 11, 2013 Chapter 11 Status Report, Docket No. 206 at p. 2.)

8. In June 2014, Goodman closed its Court-approved purchase of the remaining 38-acre tract of the Property (the "38-Acre Parcel") from the Debtor. (Declaration of Ryan Jones ("Jones Dec.") at para. 3.)

9. The total purchase price for the 38-Acre Parcel was $23.6 million, free and clear of liens, claims, and interests, and the Debtor reported approximately $2.3 million in net cash proceeds received from the sale after payment of secured claims and other required payments. (See August 7, 2014 Chapter 11 Status Report, Docket No. 446 at p. 2.)

10. Goodman later purchased the 17-Acre Parcel from Ridgeline that Ridgeline had previously purchased from the Debtor. (Jones Dec. at para. 4.)

11. According to various status reports filed by the Debtor and as discussed below, the Debtor has now sold most of its other assets.

**C.      Goodman's Administrative Expense Claim**

12.     In connection with the sale of the 38-Acre Parcel to Goodman, the Debtor was authorized to and did enter into to an "Amended and Restated Agreement of Purchase and Sale and Joint Escrow Instructions" with Goodman (the "Purchase and Sale Agreement"). Built into the Purchase and Sale Agreement was a "Leaseback Agreement" under which the Debtor was authorized to continue to occupy a portion of the 38-Acre Parcel (approximately five acres) in exchange for payment to Goodman of rent in the amount of $20,000 per month, plus utilities and pro-rated taxes and assessments, starting on July 1, 2014. (Jones Dec. at para. 5, 6, exh. A.)

13.     The Debtor's personnel vacated the leased premises on or about April 30, 2015, and the lease term expires on June 30, 2015. To date, despite repeated demands by Goodman, the Debtor has not made any of the required payments under the Leaseback Agreement. (Jones Dec. at para. 7, exh. B.)

14.     As of the date of filing of this motion to convert, the total amount owed by the Debtor to Goodman under the Leaseback Agreement for unpaid rent and the associated expenses described above is $299,944. (Jones Dec. at para. 8.)

15.     Under the Leaseback Agreement, the Debtor was required to perform specified "Work" on the 38-Acre Parcel, including draining, cleaning, and removing several large storage tanks. The sum of $500,000 was placed in an escrow account as partial security for the Debtor's obligation to perform, and to partially fund the Debtor's cost of performing, the Work. These terms were material to the sale of the 38-Acre Parcel to Goodman. (Jones Dec. at para. 9.)

16.     The Debtor failed to fully or timely perform the Work under the Leaseback Agreement. (Jones Dec. at para. 10, exh. C.)

17.     Further, by its own admission, the Debtor is now incapable of performing the Work under the Leaseback Agreement, because the Debtor ceased operations as of April 30, 2015. (See April 10, 2015 Chapter 11 Status Report, Docket No. 570 at p. 2; and April 30, 2015 Chapter 11 Status Report, Docket No. 577 at p. 2.)

18.     In addition, after the sale of the 38-Acre Parcel closed, Goodman discovered that the Debtor, without any authority, removed, transported, and dumped water and sludge on the

adjoining 17-Acre Parcel and, in a separate incident, dumped material into a sump pit on the 38-Acre Parcel without cleaning it, all of which has resulted in substantial damages to Goodman. (Jones Dec. at para. 11.)

19.    Given the Debtor's failure to perform under the Leaseback Agreement, Goodman has been forced to carry out the Work at its own expense. To date, the $500,000 in escrowed funds has been substantially consumed in paying for the cost of the Work, and Goodman has incurred actual or expected costs relating to the 38-Acre Parcel in the total amount of approximately $4,801,993 in connection with the completion or anticipated completion of the Work under the Leaseback Agreement and the performance or anticipated performance of the additional clean-up necessitated by the Debtor's actions described in Paragraph 18 above. (Jones Dec. at para. 12.) The Debtor's obligation to carry out the Work is distinct and separate from the remediation work Goodman has agreed to complete as the owner of the 38-Acre Parcel.

**D.    The Debtor's Remaining Assets, Other Than Possible Recoveries Against Insiders or Affiliates**

20.    The Debtor's most recent Monthly Operating Report, for the month ending May 31, 2015, (Docket No. 586), lists unrestricted cash totaling $460,906.

21.    The Debtor's most recent Status Report, dated June 19, 2015, (Docket No. 587), refers to a proposed settlement with Ridgeline under which Ridgeline would provide the Debtor with stock in Ridgeline's parent company, RDX, with a value of $750,000. The Debtor's motion to approve this settlement, (Docket No. 552), is pending. Even if the motion is approved, however, publicly available information confirms that RDX stock is virtually unmarketable and almost valueless.[1]

---

[1] Trading of RDX stock was suspended in March 2015, at which point it was selling for approximately $0.11 per share. See, for example, the Yahoo Finance website, http://finance.yahoo.com/news/rdx-reports-trading-halt-123000359.html, last visited June 29, 2015. Goodman requests that the Court take judicial notice of this and similar publicly available information regarding RDX stock pursuant to Rule 201(b) of the Federal Rules of Evidence.

**E.** **The Debtor's Proposed Plans and Suggestions of Future Contributions From Powerine**

22.  The Debtor has filed a number of liquidating plans and disclosure statements, but has made no real progress toward confirming a liquidating plan in this case since its filing on May 4, 2012, over three years ago.

23.  The Debtor's first plan was filed on January 8, 2013, and amended on April 11, 2013. (Docket Nos. 142, 204.) The disclosure statements for these plans were never noticed for hearing.

24.  On November 19, 2014, the Debtor filed its second amended plan and accompanying disclosure statement. (Docket Nos. 518, 519.)

25.  On December 30, 2014, the Debtor withdrew its second amended plan, (Docket No. 534), and no new plan or disclosure statement has been filed.

26.  In its proposed plans and associated disclosure statements, the Debtor referred to certain insurance claims and litigation that are being pursued by the Debtor's affiliate, Powerine, for contamination to the Property, and characterized any recovery on said claims and litigation as a source of funds for this estate. (See, for example, November 19, 2014 Debtor-In-Possession Lakeland Development Company's Disclosure Statement Describing Its Second Amended Chapter 11 Plan, Docket No. 519 at p. 27.) But the Debtor has never provided details regarding said claims and litigation. Further, the Debtor has never identified any basis or mechanism by which Powerine, a non-party, would be obligated or willing to provide funds to the estate in the event of any recovery by Powerine.

**F.** **Recent Filings and Events**

27.  On May 22, 2015, the Court entered an order, (Docket No. 580), approving a stipulation between the Debtor and the City of Santa Fe Springs stating that: "City shall have an allowed unsecured claim having priority under Bankruptcy Code Section 507(a)(8) against the Debtor's estate in the amount of $120,680.00."

28.  The Debtor's most recent Monthly Operating Report, for the month ending May 31, 2015, (Docket No. 586), reflects a cumulative net loss of $4,875,339 based on total revenues

of $14,343,291 and total expenses of $19,218,557 over the life of this case, including $2,101,754 in insider compensation and $1,534,630 in professional fees.

29.  The same Monthly Operating Report reflects $460,906 in ending cash and $7,726,010 of other assets, with the other assets consisting primarily of an unexplained line item for "Investment in Subsidiary – HPTC" in the amount of $4,250,000, an unexplained line item for "Due from Insiders" in the amount of $1,866,116, prepaid expenses in the amount of $648,570, a line item for "Due from Ridgeline" in the amount of $607,404 (presumably for what is the Debtor's likely uncollectible default judgment against Ridgeline), and an unexplained line item for "Investment in Ridgeline (Stock)" in the amount of $68,945.

30.  The same Monthly Operating Report reflects current post-petition liabilities in the total amount of $7,566,013, consisting of accounts payable in the amount of $430,666, professional fees in the amount of $229,524, and estimated remediation costs in the amount of $6,905,822.

31.  In its most recent Status Report, dated June 19, 2015, (Docket No. 587), the Debtor discusses its attempt to settle Goodman's approximately $5.1 million administrative expense claim, its proposed settlement with Ridgeline discussed above, and its counsel's pending fee application.  The Status Report concludes:  "Even if the settlement with Goodman is approved, it is not anticipated that there will be any funds to pay counsel unless and until the RDX stock is liquidated or other assets come into the estate from Powerine or elsewhere."

32.  As reported at the June 23, 2015 status conference, Goodman and the Debtor were unable to reach a settlement.  Further, as discussed above, any RDX stock received by the Debtor as part of a proposed settlement with Ridgeline is currently unsellable and of nominal value.  Finally, as also discussed above, the notion that other assets are coming into the estate "from Powerine or elsewhere" is, at best, unrealistic and unsubstantiated.

33.  At the conclusion of the June 23, 2015 status conference, the Court appointed a Chapter 11 trustee and ordered Goodman to file its motion to convert by June 29, 2015.

Case 2:12-bk-25842-RN    Doc 598    Filed 06/29/15    Entered 06/29/15 18:06:36    Desc
Main Document    Page 9 of 13


## III. ARGUMENT

### A. Legal Standard

Under 11 U.S.C. section 1112(b)(1), a Chapter 11 case may be converted to Chapter 7 for "cause." Section 1112(b)(4) sets forth a non-exhaustive list of factors constituting cause for conversion. A court may also convert the case for other cause, including the debtor's inability to effectuate a confirmable plan, if the court finds that conversion is in the best interests of the estate and the creditors. *See In re Pioneer Mortgage Entities*, 248 B.R. 368, 375 (B.A.P. 9th Cir. 2000) (holding that the factors enumerated in Section 1112(b)(4) are not exhaustive); *In re Johnston*, 149 B.R. 158, 162 (B.A.P. 9th Cir. 1992) (affirming conversion based on debtor's inability to effectuate a plan and prejudicial delay to creditors); *see also In re FRGR Managing Member LLC*, 419 B.R. 576, 582-83 (Bankr. S.D.N.Y. 2009) (collecting cases holding that inability to effectuate a plan constitutes a basis for dismissal or conversion).

### B. Cause Exists Under Section 1112(b)(4)(A)

Cause exists under Section 1112(b)(4)(A) where there is (1) substantial or continuing loss to or diminution of the estate, and (2) the absence of a reasonable likelihood of rehabilitation. Each of these factors is discussed below.

#### 1. The Record Demonstrates Significant Loss to and Diminution of the Estate

"The loss may be substantial or continuing. It need not be both in order to constitute cause under [Section] 1112(b)(4)(A)." *In re Creekside Senior Apartments, L.P.*, 489 B.R. 51, 61 (B.A.P. 6th Cir. 2013). In the context of a liquidating Chapter 11, both negative cash flow and accrual of unpaid administrative expenses constitute sufficient evidence of continuing loss or diminution to warrant conversion. *See In re BHS&B Holdings, LLC*, 439 B.R. 342, 349 (Bankr. S.D.N.Y. 2010) (observing that administrative insolvency is a cause factor); *see also In re Mense,* 509 B.R. 269, 284 (Bankr. C.D. 2014) (stating that "[i]n the context of a debtor which has ceased business operations and liquidated virtually all of its assets, any negative cash flow – including that resulting from administrative expenses – effectively comes straight from the pockets of the creditors") (quotation omitted).

### a. **Negative Cash Flow**

The Monthly Operating Reports and periodic Status Reports filed by the Debtor reflect a substantial and continuing loss to and diminution of the estate and, therefore, establish cause for conversion under Section 1112(b)(4)(A). The Debtor's most recent Monthly Operating Report shows that the Debtor has experienced a cumulative net loss of nearly $5 million since the bankruptcy was filed. And the Debtor's Status Reports, viewed over time, show a steady and substantial depletion of the amount of available cash and sale proceeds to distribute to creditors despite the Debtor's liquidation of most of its assets, including real estate holdings, vehicles, and securities, and various collection efforts.[2] Thus, the first requirement for conversion under Section 1112(b)(4)(A) is satisfied. *See In re Om Shivai*, Inc., 447 B.R. 459, 464 (Bankr. D.S.C. 2011) (holding that cause was established by debtor's monthly operating reports reflecting overall net operating loss by debtor's business); *BHS&B Holdings*, 439 B.R. at 347 (holding that cumulative net operating loss reported in debtor's monthly operating reports satisfied the first requirement for conversion under Section 1112(b)(4)(A)).

### b. **Administrative Insolvency**

As discussed previously, the Debtor's current post-petition liabilities as of May 31, 2015, totaled almost $7.6 million. Further, Goodman asserts a Chapter 11 administrative expense claim in the total amount of approximately $5.1 million, including $299,944 in administrative rent that the Debtor failed to pay in its entirety. Further still, based on the stipulation between the Debtor and the City of Santa Fe Springs that was recently approved by the Court, the City now has an allowed unsecured priority claim against the estate in the amount of $120,680.

The Debtor already has sold substantially all of its assets and has less than $500,000 in available cash. The only assets identified by the Debtor in its most recent Status Report as available for potential liquidation or collection are (1) the RDX stock that it would receive under

---

[2] The Debtor's August 7, 2014 Chapter 11 Status Report, which was filed after the Debtor completed the lion's share of its liquidation and collection efforts, reported net cash collected of approximately $2.75 million. Six months later, in its February 26, 2015 Chapter 11 Status Report, the Debtor reported just $751,000 in remaining cash. As of May 31, 2015, the Debtor's cash fell to $460,906.

a proposed settlement with Ridgeline, and (2) recovery on Powerine's – not the Debtor's –claims in certain litigation with insurance companies. The RDX stock is unsellable and of nominal value. The Powerine claims are speculative and contingent, and even if Powerine is successful, there is no evidence that any recovery will be paid into the estate. Further, and in any event, "[c]ase law is clear that the mere hope of prevailing on potential litigation claims is not a sufficient basis to defeat a showing of cause to convert." *BHS&B Holdings*, 439 B.R. at 350.

In sum, the Debtor lacks cash resources or the legitimate prospect of any future operating revenue to pay its substantial administrative debts. For this additional reason, the first requirement for conversion under Section 1112(b)(4)(A) is satisfied.

### 2. There Is No Reasonable Likelihood of Rehabilitation

There is no reasonable likelihood of rehabilitation in a liquidating case with no business to save and no means by which to effectuate a plan of reorganization. *See Mense*, 509 B.R. at 284 (stating that "[a] reasonable likelihood of rehabilitation is absent when the debtor's business operations do not justify continuance of the reorganization effort"); *see also Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 516 (8th Cir. 2004) (holding that there was no reasonable likelihood of rehabilitation where the debtors intended to liquidate their assets rather than restore their business operations).

Here, there is no business to save. To the contrary, the Debtor has confirmed in multiple filings with the Court that it ceased operations as of April 30, 2015. For the same reason, the Debtor has no means to fund a plan of reorganization through continued business operations or revenue. And for the reasons explained previously, including the Debtor's administrative insolvency, the Debtor has no other means to fund a plan of reorganization. Therefore, the second and final requirement for conversion under Section 1112(b)(4)(A) is also satisfied.

### C. Other Cause Exists

The Debtor's apparent inability to effectuate a plan also establishes cause to convert. *See In re Babayoff*, 445 B.R. 64, 77 (Bankr. E.D.N.Y. 2011) (recognizing that "cause under Section 1112(b) may be established where the record shows that the debtor cannot effectuate a plan"); *FRGR Managing Member,* 419 B.R. at 582-83 (collecting cases holding that inability to

effectuate a plan constitutes a basis for dismissal or conversion).

Here, the Debtor has made no concerted effort or real progress toward confirming a plan. Instead, the Debtor has filed a series of plans, only to amend or later withdraw them. The case has been pending for over three years, but there is no plan before the Court. Meanwhile, the Debtor has liquidated most of its assets, consumed substantially all the proceeds, and racked up substantial and unpaid administrative debt in the process. The Debtor has no apparent means to pay its administrative debt, much less pay or provide for any unsecured priority claims, both of which are preconditions to the confirmation of any liquidating plan in this case. *See* 11 U.S.C. section 1129(a)(9).

The record demonstrates that the Debtor has no viable business to reorganize, with confirmation of any liquidating plan now predicated on (1) an unapproved settlement with Ridgeline under which the Debtor would receive unsellable and almost worthless RDX stock, and (2) speculative recovery by the Debtor's affiliate, Powerine, in contested insurance litigation. Viewed together, these facts also establish cause for conversion. *See FRGR Managing Member,* 419 B.R. at 582 (holding that plan feasibility cannot rest on speculative litigation recoveries, and that conversion or dismissal is the appropriate remedy where a debtor maintains a Chapter 11 case to pursue litigation, rather than to reorganize a viable business).

### D. No Unusual Circumstances Are Present

Once cause is established, the burden shifts to the debtor to prove "unusual circumstances" demonstrating that conversion or dismissal is not in the best interests of the creditors and the estate. *See In re Domaino*, 442 B.R. 97, 107 (Bankr. M.D. Pa. 2010). This requires, among other things, proof that there is a reasonable likelihood of reorganization within a reasonable period of time. *Id.* Here, for all of the reasons discussed above, there is no reasonable likelihood for the Debtor to reorganize within a reasonable period of time.

### E. Conversion to Chapter 7 Is In the Best Interests of the Estate and Creditors

Upon a showing of cause, a court has discretion to convert or dismiss the case, whichever is in the best interests of the estate and the creditors. *See In re Sullivan*, 522 B.R. 604, 612 (B.A.P. 9th Cir. 2014). Courts examine a variety of factors in determining whether to covert or

dismiss, including whether a Chapter 7 trustee can recover assets for creditors, and whether conversion or dismissal would maximize the estate value as an economic enterprise. *See Babayoff*, 445 B.R. at 81-82; *FRGR Managing Member*, 419 B.R. at 580. Courts also consider the Bankruptcy Code's fundamental policy of achieving equality among creditors. *Sullivan*, 522 B.R. at 613. In deciding between dismissal or conversion, the court should consider the interests of all of the creditors. *In re Owens*, 552 F.3d 958, 961 (9th Cir. 2009).

Here, conversion is in the best interests of creditors because it will put a stop to the costly Chapter 11 administration of this case – featuring substantial insider compensation and professional fees – that has consumed most of the Debtor's case with no commensurate benefit to the estate or creditors. Conversion will also spare the estate the time-consuming and expensive process of confirming a liquidating plan and permit a Chapter 7 trustee to close out the case in a more economical and efficient manner. Therefore, conversion is appropriate.

## IV. **CONCLUSION**

Based on the foregoing, Goodman respectfully requests that the Court grant this motion and convert the case to Chapter 7 forthwith.

DATED:  June 29, 2015                     SEDGWICK LLP

By: /s/ Joel M. Long
Lillian G. Stenfeldt
Joel M. Long
Counsel for Creditor
Goodman Santa Fe Springs SPE LLC