1

MORGAN, LEWIS & BOCKIUS LLP
Richard W. Esterkin, Bar No. 70769

2

300 South Grand Avenue
Twenty-Second Floor

3

Los Angeles, CA 90071-3132
Tel:    +1.213.612.2500

4

Fax:    +1.213.612.2501
richard.esterkin@morganlewis.com

5

6

MORGAN, LEWIS & BOCKIUS LLP
Jeffrey S. Raskin, Bar No. 169096

7

One Market Spear Street Tower
San Francisco, CA 94105-1596

8

Tel:    +1.415.442.1000
Fax:    +1.415.442.1001

9

jeffrey.raskin@morganlewis.com

10

Attorneys for Plaintiff, Jason M. Rund
Chapter 7 Trustee

11

UNITED STATES BANKRUPTCY COURT

12

CENTRAL DISTRICT OF CALIFORNIA

13

LOS ANGELES DIVISION

14

15

In re

Case No. 2:12-bk-25842-BR

16

LAKELAND DEVELOPMENT COMPANY,

Chapter Number 7

17

Debtor

**MOTION FOR ORDER APPROVING
SETTLEMENT RE INSURANCE
POLICIES AND TO DISMISS
ADVERSARY PROCEEDING;
MEMORANDUM OF POINTS AND
AUTHORITIES AND DECLARATIONS
OF VINCENT PAPA AND JASON M.
RUND IN SUPPORT THEREOF**

18

19

20

21

Date: July 18, 2018
Time: 2:00 p.m.
Ctrm: 1688

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

MOTION FOR ORDER APPROVING
SETTLEMENT RE INSURANCE
POLICIES, ETC.

DB2/ 33291802.3

1    Pursuant to the provisions of Federal Rule of Bankruptcy Procedure 9019, Jason M. Rund,

2    the chapter 7 trustee herein, hereby moves this Court for the entry of an order:  (a) approving the

3    compromise and settlement of a dispute between this bankruptcy estate and Powerine Oil

4    Company regarding the estate's interest in certain insurance policies and (b) dismissing the

5    adversary proceeding filed by the Trustee to resolve that dispute.  The foregoing motion will be

6    based upon the *Notice of Motion to Approve Settlement re Insurance Policies, etc.* to which this

7    motion is appended, the attached *Memorandum of Points and Authorities*, *Declaration of Vincent

8    Papa* and *Declaration of Jason M. Rund*, and such other and further evidence and argument as

9    may be presented in support of this motion in any reply papers filed herein or at the hearing of

10   this motion.

11   Dated: June 22, 2018                         MORGAN, LEWIS & BOCKIUS LLP
                                                   Richard W. Esterkin
12

13

14                                                 By /s/  Richard W. Esterkin
                                                      Richard W. Esterkin
15                                                    Attorneys for Jason M. Rund, chapter 7
                                                      trustee
16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 33291802.3

2

MOTION APPROVING SETTLEMENT
RE INSURANCE POLICIES, ETC.

# MEMORANDUM OF POINTS AND AUTHORITIES

Jason M. Rund, the chapter 7 trustee herein, (the "**Trustee**") respectfully submits the following Memorandum of Points and Authorities in support of his motion for an order: (a) approving a settlement between this bankruptcy estate and Powerine Oil Company ("**Powerine**") and (b) dismissing the adversary proceeding filed by the Trustee to resolve the settled dispute:

## I.
## INTRODUCTION

On August 31, 2017, the Trustee filed an adversary proceeding (Adv. No. 1:17-ap-01459-BR, the "**Adversary Proceeding**") to obtain a declaration from this Court as to the estate's and Powerine's respective rights, if any, under certain insurance policies (the "**Policies**") that provide coverage for soil and groundwater contamination at and beneath certain real property (the "**Property**") located at 12345 Lakeland Road, Santa Fe Springs, California (the "**On-Site Liabilities**"), as well as alleged property damage associated with contaminated groundwater that allegedly has migrated away from the Property (the "**Off-Site Liabilities**"). This motion seeks approval of a settlement as between the estate and Powerine with respect to those issues. Neither this motion nor the proposed settlement attempt to resolve any issues that may exist as to the extent of the coverage afforded by the Policies, the amounts due, if any, from the insurers that issued the Policies, or the manner in which any policy proceeds that may be received by the estate or Powerine ought to be distributed. Because the proposed settlement resolves the issues raised by the Trustee in the Adversary Proceeding, this motion also seeks an order dismissing the Adversary Proceeding.

In substance, the proposed settlement provides that the estate exclusively owns the Policies to the extent that they provide coverage for On-Site Liabilities. As to Off-Site Liabilities, the settlement provides that Powerine has primary right, title and interest to the Policies, but that the estate retains an interest in the Policies to the extent that the estate may be responsible for any Off-Site Liabilities not paid by or on behalf of Powerine. Thus, the proposed settlement agreement recognizes that the estate has rights under the Policies both with respect to On-Site Claims and Off-Site Claims, which mirrors the declaration that the Trustee seeks in the Adversary

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 33291802.3

3

MOTION APPROVING SETTLEMENT
RE INSURANCE POLICIES, ETC.

1  Proceeding.  As a result, the proposed settlement represents a sound exercise of the Trustee's

2  business judgment, is in the best interests of this bankruptcy estate and its creditors, and should be

3  approved by this Court.

4
## II.
## STATEMENT OF FACTS
5

6      On or about July 24, 1998, Powerine (as seller) and CENCO Refining Co. (now known as

7  Lakeland Development Company, the "**Debtor**") (as buyer) entered into an Asset Purchase

8  Agreement (the "**Agreement**").[1]  Among other assets, the Agreement provided that the Debtor

9  would acquire the Property, which was then known to be contaminated with hazardous

10 substances, and "all insurance policies or rights thereto, now or previously in force and owned by

11 Seller or any predecessor of Seller …."[2]  Because the Agreement transferred Powerine's

12 insurance rights under the Policies, the Agreement also required the Debtor to indemnify

13 Powerine with respect to "the defense of, and any amounts owed in respect of, the superfund

14 claims known as OII and WDI" and environmental claims arising in relation to the Property.[3]

15     Due to the fact that the Polices provided that the insurers had to consent to any assignment

16 of the Policies, the Agreement contained two provisions dealing with the effect of the insurers'

17 refusal to provide their consent.[4]  First, in order to ensure that no insurance rights were lost, the

18 Agreement contained a superpreemptory clause rendering ineffective any attempted assignment

19 that would adversely affect contractual rights to be assigned, absent consent, until such consent

20 had been obtained or was no longer necessary. This clause also required Powerine to obtain any

21 required consent:

22          Anything in this Agreement to the contrary notwithstanding, neither
           this Agreement nor the consummation of the transactions
23

---

24  [1]   Declaration of Vincent Papa (the "Papa Decl.") at Ex. 1.

25  [2]   Papa Decl., Ex.1 at Article 1.1 (definitions of "Assets" and "Insurance Policies"); Article 2.1 ("as of the Closing
         (i) Seller will sell, convey, transfer, assign and deliver to Buyer, and Buyer or one or more of its nominees will
26       acquire from Seller, the Assets.").

27  [3]   Papa Decl., Ex. 1 at Articles 2.2, 10.4(b)(iii) and 3.2(b) and Environmental Indemnity and Reimbursement
         Agreement, Ex. B to Ex. 1 to Papa Decl. at Article 2.1.

28  [4]   At the time, under California law, such provisions likely were enforceable.  *Henkel Corp. v. Hartford Accident
         & Indemnity Co.*, 29 Cal. 4th 934 (2003).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 33291802.3

4

MOTION APPROVING SETTLEMENT
RE INSURANCE POLICIES, ETC.

1
2
3
4
5
6
7
8
9
10
11
12

> contemplated hereby shall constitute an agreement to assign or an assignment of any Contract or Permit or any claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment thereof, without the consent of a third party thereto or any Governmental Authority or agency, would constitute a breach thereof or in any way adversely affect the respective rights or obligations of Buyer or Seller thereunder.  If any such consent is not obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the respective rights or obligations of Buyer or Seller thereunder, Seller, at no cost to Seller, shall use its best efforts (i) to provide to Buyer the benefits under any such Contract or Permit (including enforcement for the benefit of Buyer of any and all rights of Seller against a third party thereto arising out of the breach or cancellation by such third party or otherwise) as if such Contract or Permit had been assigned to Buyer and (ii) to obtain as soon as practicable the consent or approval of any such third party or Governmental Authority to the assignment of such Contract or Permit and to transfer such Contract or Permit to Buyer; and any transfer or assignment to Buyer of any property or property rights or any Contract or Permit that shall require the consent or approval of any third party or Governmental Authority shall be made subject to such consent or approval being obtained.

13  Papa Decl., Ex. 1 at Article 3.3.  More specifically, as to the insurance policies that were to be

14  assigned to the Debtor, the Agreement provided that:

15
16
17
18
19

> To the extent any of the Insurance Policies cannot be assigned without the consent of the carrier thereunder, until such time as such consent is obtained or is no longer necessary, Seller will make available to Buyer any and all rights and benefits under such Policy in order to enable Buyer to mitigate the impact of the Assumed Liabilities and the other liabilities of Buyer hereunder, including Buyer's indemnification obligations hereunder and under the Environmental Indemnity and Reimbursement Agreement.

20  Papa Decl., Ex. 1 at Article 10.5.

21      Following the execution of the Agreement, Powerine assumed the burden of responding to

22  the environmental claims relating to the Property and dealing with the insurers whose policies

23  potentially provided insurance coverage for those claims.  Because Powerine had ceased its

24  operations at the Property, and the Policies had been issued no later than the mid-1980's, the

25  assignment of the Policies in the Agreement concerned the right to make claims under the

26  Policies, and to receive Policy proceeds, as the result of historical events, rather than insuring the

27  Debtor's ongoing activities at the Property.

28      On August 20, 2015, the California Supreme Court issued its opinion in *Fluor Corp. v.*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 33291802.3

5

MOTION APPROVING SETTLEMENT
RE INSURANCE POLICIES, ETC.

*Superior Court (Hartford Accident & Indemnity Co.)*, 61 Cal. 4th 1175 (2015), which, in the views of the Trustee and certain of the insurers who issued the Policies, rendered the insurers' consent to the assignment of Powerine's right to make claims under the Policies, and to collect policy proceeds, unnecessary. Consistent with the assignment provision in the Agreement, the Trustee and certain insurers contend that the Agreement transferred the right to make claims under the Policies, and to receive Policy proceeds, to the Debtor.

Powerine disputes the foregoing contention. In addition, based upon the fact that Powerine has been dealing with the insurers who issued the Policies, and the environmental claims arguably covered by the Policies, since the Agreement was signed in 1998, Powerine contends that the Debtor has waived any right that it might have had to the Policies and should now be estopped to claim such rights, if they otherwise exist.

The proposed settlement resolves the foregoing disputes. Pursuant to the Agreement:[5]

- The Debtor will acquire all rights under the Policies "for the purpose of seeking reimbursement for damages incurred by [the Debtor] as the result of soil and groundwater contamination at and beneath [the Property]."

- Powerine will receive rights in the Policies "for purposes of defending and resolving liability for property damage associated with contaminated groundwater that has migrated away from the Property;" provided that the Debtor will "retain an interest in the Policies to the extent that [the Debtor] is allegedly liable for Off-Site Liabilities not paid by or on behalf of Powerine.

- The Debtor is released from any obligation that it may have had to indemnify Powerine for environmental liabilities.

- The parties release one another for any claims that they may have had with respect to either On-Site Liabilities or Off-Site Liabilities.

The proposed settlement is highly beneficial to the estate as it eliminates the need for further litigation with Powerine, thereby saving administrative expenses, eliminating the possibility of an

---

[5] The description of the Agreement in this Memorandum is qualified in its entirety by the terms of the Agreement. To the extent that the description of the Agreement in this Memorandum and the terms of the Agreement conflict, the terms of the Agreement shall control.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 33291802.3

6

MOTION APPROVING SETTLEMENT
RE INSURANCE POLICIES, ETC.

adverse judgment and eliminating delay that would otherwise be encountered in litigating the

Adversary Proceeding.  In addition, the proposed settlement confirms the estate's interest to make

claims under the Policies, and to receive Policy proceeds, both as to On-Site and Off-Site

Liabilities, subject only to Powerine's primary right (and responsibility) to deal with the Off-Site

Liabilities and collect insurance proceeds to address those liabilities.  Thus, the proposed

settlement satisfies the criteria for approving a compromise established by the Ninth Circuit Court

of Appeals in *In re A&C Properties*, 784 F.2d 1377 (9th Cir. 1986) and should be approved by

this Court.

## III.
## THE PROPOSED SETTLEMENT SHOULD BE APPROVED

**A.**    **Introduction**

As many courts have observed, "The law favors compromise and not litigation for its own

sake." *Martin v. Kane (In re A&C Properties)*, 784 F.2d 1377 (9th Cir. 1986) *quoting In re Blair*,

538 F.2d 849 (9th Cir. 1976).

The standards by which courts evaluate a proposed settlement are well established – a

court should approve a compromise if it is fair and equitable and in the best interest of the

debtor's creditors.  *Arden v. Motel Partners (In re Arden)*, 176 F.3d 1226 (9th Cir. 1999).  In

making that determination, courts generally consider four factors:

> (a) the probability of success in the litigation; (b) the difficulties, if
> any, to be encountered in the matter of collection; (c) the
> complexity of the litigation involved, and the expense,
> inconvenience and delay necessarily attending it; (d) the paramount
> interests of the creditors and a proper deference to their reasonable
> views in the premises.

*A&C Properties*, 784 F.2d at 1381.  The proposed settlement easily meets that standard.

**B.**    **The Probability of Success in the Litigation**

While the language of the Agreement supports the estate's claim to the Policies, the

Agreement was entered into in 1998 and, for the past 20 years, Powerine has acted as the insured

under the Policies, and has made claims to coverage under the Policies.  Thus, Powerine's waiver

and estoppel arguments create uncertainty as to whether the Trustee will prevail in the Adversary

Proceeding.  The proposed settlement eliminates that uncertainty at little or no cost to the estate.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 33291802.3

7

MOTION APPROVING SETTLEMENT
RE INSURANCE POLICIES, ETC.

1    Under the proposed settlement, the estate receives sole and exclusive right to any sums

2    due under the Policies with respect to On-Site Liabilities.  The estate also retains its rights with

3    respect to Off-Site Liabilities, in the event that those liabilities are not satisfied by, or on behalf

4    of, Powerine.  Thus, in substance, the estate will receive all of the insurance rights that it could

5    have received by prevailing in the Adversary Proceeding, ceding to Powerine primary and

6    exclusive right, title and interest in the Policies with respect to Off-Site Liabilities in the first

7    instance.  Powerine has been addressing the Off-Site Liabilities, and will continue to do so.  The

8    subordination of the estate's interest in the Policies as to Off-Site Liabilities under the proposed

9    settlement is, at best, a small price to pay to eliminate the uncertainty inherent in the litigation.

10   As a result, this factor strongly favors approving the proposed compromise.

11   **C.**    **The Difficulties to be Encountered in Collection**

12   This factor is not relevant to the proposed settlement as the Adversary Proceeding seeks a

13   declaration as to rights in the Policies, not a money judgment that would have to be collected, if

14   the Trustee prevailed.

15   **D.**    **The Complexity of the Litigation, and the Expense, Inconvenience and Delay
             Necessarily Attending it**

16   In order to litigate the Trustee's claim to the right to obtain coverage under Policies, and

17   Powerine's defenses to that claim, it would likely be necessary to hold a trial with respect to

18   Powerine's waiver and estoppel defenses as there is likely to be conflicting evidence as to the

19   material facts upon which those claims are based.  Thus, absent settlement, the Trustee would

20   likely be involved in litigation tracing Powerine's actions in relation to the environmental claims

21   pertaining to the Property for the past 20 years.  That litigation would likely be very expensive

22   and delay the closure of this bankruptcy case pending the trial of the Adversary Proceeding and

23   appeals following the entry of judgment by this Court.  Thus, this factor strongly favors approval

24   of the proposed settlement.

25   **E.**    **The Paramount Interests of the Creditors**

26   The interest of creditors favors approval of the proposed settlement.  As noted above, the

27   settlement insures that the estate will retain an interest in the Policies both as to On-Site

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 33291802.3

8

MOTION APPROVING SETTLEMENT
RE INSURANCE POLICIES, ETC.

1  Liabilities and Off-Site Liabilities.  Absent those rights, there would be few or no assets in the

2  estate with which to satisfy the estate's administrative expenses or creditors' claims.  The

3  settlement confirms the estate's interest in the Policies and, as a result, will allow the Trustee to

4  begin negotiations with the insurers who issued the Policies in order to resolve any coverage

5  issues that may exist so as to monetize the Policies for the benefit of the estate.  Thus, the

6  proposed settlement furthers the interests of the estate's creditors.

7  ## IV.
## THE COURT SHOULD DISMISS THE ADVERSARY PROCEEDING

8

9      Other than as to complaints objecting to the debtor's discharge, Federal Rule of

10  Bankruptcy Procedure 7041 makes Federal Rule of Civil Procedure 41 applicable to adversary

11  proceedings.  Federal Rule of Civil Procedure 41(a)(2) provides that, after a party has answered,

12  as in the present case, the Court may dismiss an action at the plaintiff's request.  A plaintiff's

13  request to dismiss a proceeding is addressed to the sound discretion of the court and, ordinarily,

14  should be granted in the absence of plain legal prejudice to a party.  *Waller v. Financial Corp. of*

15  *America*, 828 F.2d 579, 583 (9th Cir. 1987) ("In this circuit, as elsewhere, a district court should

16  grant a motion for voluntary dismissal unless a defendant can show that it will suffer some plain

17  legal prejudice as a result.").  Here, the proposed settlement resolves the issues raised by the

18  Adversary Proceeding.  Thus, there is good cause to dismiss the Adversary Proceeding as no

19  purpose would be served by perpetuating litigation over issues that have been resolved in the

20  proposed settlement.

21  ## V.
## CONCLUSION

22

23      The proposed settlement confirms all of the rights that the Trustee could obtain by

24  litigating the Adversary Proceeding and prevailing upon all of the Trustee's claims in that

25  proceeding, without the expense and delay that would result from that litigation.  Resolution of

26  the estate's interests in the Policies will enable the Trustee to resolve any coverage issues that

27  may exist under the Policies so as to monetize the estate's rights under the Policies for the benefit

28  of the estate's creditors and bring this bankruptcy case to a close.  Thus, this motion should be

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES
DB2/ 33291802.3

9

MOTION APPROVING SETTLEMENT
RE INSURANCE POLICIES, ETC.

1    granted, the proposed settlement approved and the Adversary Proceeding dismissed.

2    Dated: June 22, 2018                                MORGAN, LEWIS & BOCKIUS LLP
                                                         Richard W. Esterkin
3

4
                                                    By  /s/  Richard W. Esterkin
5                                                        _____
                                                         Richard W. Esterkin
6                                                        Attorneys for Jason M. Rund, chapter 7
                                                         trustee
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 33291802.3                                          10                      MOTION APPROVING SETTLEMENT
                                                                                RE INSURANCE POLICIES, ETC.

1

**DECLARATION OF VINCENT PAPA**

2      I, Vincent Papa, declare:

3      1.      I am presently the President of Powerine Oil Company ("Powerine"). Until June

4   2015, I served as the Secretary and General Counsel for both Powerine and Lakeland

5   Development Company, formerly known as CENCO Refining Co., (the "**Debtor**").

6      2.      Attached hereto as Exhibit 1 is a true and correct copy of an Asset Purchase

7   Agreement by and between Powerine, as seller, and CENCO Refining Co., as buyer, dated July

8   24, 1998 (the "**Sale Agreement**"). I was one of the persons responsible for the negotiation and

9   drafting of the foregoing agreement.

10      3.      Powerine ceased operations at 12345 Lakeland Road, Santa Fe Springs, California

11   prior to 1998.

12      4.      Following the execution of the Sale Agreement, Powerine continued to act on

13   behalf of itself and the Debtor with regard to defending and resolving environmental and toxic

14   liabilities, as well as dealing with insurers that had issued policies potentially covering those

15   liabilities.

16      I declare under penalty of perjury that the foregoing is true and correct and that this

17   declaration was executed at _Patterson   NY_ on June _8_, 2018.

18

19   _____
                        Vincent Papa

20

21

22

23

24

25

26

27                                                                Page 11

28

MORGAN, LEWIS &

**EXHIBIT 1**

**EXECUTION COPY**

ASSET PURCHASE AGREEMENT

by and between

Powerine Oil Company

as "Seller,"

and

CENCO Refining Co.

as "Buyer,"

Dated: July 24, 1998

## TABLE OF CONTENTS

Page

ARTICLE I. DEFINITIONS ..................................................................................1
  1.1. Defined Terms. ...........................................................................................1
  1.2. Other Defined Terms. ..................................................................................6

ARTICLE II. PURCHASE AND SALE OF ASSETS ...........................................6
  2.1. Purchase and Sale of Assets. ......................................................................6
  2.2. Assumption of Liabilities. ...........................................................................7
  2.3. Excluded Liabilities. ...................................................................................7
  2.4. Closing Costs. .............................................................................................7
  2.5. Allocation. ..................................................................................................8

ARTICLE III. CLOSING .......................................................................................8
  3.1. Closing. ......................................................................................................8
  3.2. Deliveries at Closing. .................................................................................8
  3.3. Consent to Assignment; Non-transferred Assets. ......................................9
  3.4. Other Closing Matters. ...............................................................................9

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF SELLER ...........9
  4.1. Organization. ..............................................................................................9
  4.2. Authorization. .............................................................................................9
  4.3. Consents and Approvals. ...........................................................................10
  4.4. No Conflict or Violation. ...........................................................................10
  4.5. Absence of Certain Changes or Events. ....................................................10
  4.6. Financial Statements. .................................................................................10
  4.7. Taxes. .........................................................................................................10
  4.8. Title. ...........................................................................................................11
  4.9. Litigation. ...................................................................................................11
  4.10. Creditors. ..................................................................................................11
  4.11. Employees. ...............................................................................................11
  4.12. No Other Agreements to Sell the Assets. .................................................12
  4.13. No Brokers. ...............................................................................................12
  4.14. As Is Where Is .........................................................................................12

ARTICLE V. REPRESENTATIONS AND WARRANTIES OF BUYER ............12
  5.1. Organization of Buyer. ..............................................................................12
  5.2. Authorization. ............................................................................................12
  5.3. No Conflict or Violation. ...........................................................................13
  5.4. Consents and Approvals. ...........................................................................13
  5.5. No Brokers. ................................................................................................13

ARTICLE VI. COVENANTS ...............................................................................13

i

NOV. 21. 2006   9:44AM   MAIN OFFICE 5629038911                           NO. 960   P. 7

6.1. Covenants of Seller. ...................................................................................13
6.2. Covenants of Buyer. ...................................................................................14
6.3. Of Each Party. ..........................................................................................15
6.4. Employee Matters. .....................................................................................15

ARTICLE VII.  CONDITIONS TO SELLER'S OBLIGATIONS.............................15
7.1. Representations, Warranties and Covenants. .................................................16
7.2. No Proceedings or Litigation. ......................................................................16

ARTICLE VIII.  CONDITIONS TO BUYER'S OBLIGATIONS ...........................16
8.1. Representations, Warranties and Covenants. .................................................16
8.2. No Proceedings or Litigation. ......................................................................16
8.3. Title Insurance. ........................................................................................17
8.4. Lien Clearance. .........................................................................................17

ARTICLE IX.  TERMINATION ........................................................................17

ARTICLE X.  ACTIONS BY SELLER AND BUYER AFTER CLOSING .................18
10.1. Books and Records. ..................................................................................18
10.2. Cooperation and Records Retention. ...........................................................18
10.3. Tax Elections. .........................................................................................18
10.4. Indemnification. ......................................................................................18
10.5. Insurance Policies. ...................................................................................20

ARTICLE XI.  MISCELLANEOUS ...................................................................20
11.1. Assignment. ...........................................................................................20
11.2. Confidentiality. ........................................................................................20
11.3. Survival of Representations. ......................................................................21
11.4. Notices. .................................................................................................21
11.5. Choice of Law. ........................................................................................22
11.6. Entire Agreement; Amendments and Waivers. ..............................................22
11.7. Multiple Counterparts. ..............................................................................22
11.8. Invalidity. ...............................................................................................22
11.9. Cumulative Remedies. ..............................................................................22
11.10. Attorneys' Fees. .....................................................................................22

ii

NY_DOCS\259564.13                                              07/27/98 10:11

NOV. 21. 2006   9:45AM    MAIN OFFICE 5629038911    NO. 960    P. 8

EXHIBIT

Description of Assets ............................................................................................................... A

Environmental Indemnity and Reimbursement Agreement ............................................... B

Bill of Sale ............................................................................................................................... C

Assignment and Assumption of Contracts and Warranties .................................................. D

iii

NOV. 21. 2006   9:45AM      MAIN OFFICE 5629038911                          NO. 969     P. 9

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of July 24, 1998, is by and among CENCO Refining Co., a Delaware corporation ("Buyer") and Powerine Oil Company, a California corporation ("Seller").

### RECITALS

A.      Seller owns certain land and improvements located in Santa Fe Springs, California, constituting a refinery, together with miscellaneous assets previously used in conjunction therewith, including a pipeline system and miscellaneous items of equipment and other personal property.

B.      Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, the foregoing assets, upon the terms and subject to the conditions of this Agreement.

### AGREEMENT

NOW THEREFORE, in consideration of the respective covenants and promises contained herein and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I.

### DEFINITIONS

1.1.    Defined Terms.  As used in this Agreement, except as otherwise expressly provided or unless the context otherwise requires, (i) the terms defined in this Article include the plural as well as the singular; (ii) all accounting terms not otherwise defined herein have the meanings ascribed to them in accordance with GAAP; (iii) all references in this Agreement to designated "Articles," "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of this Agreement; (iv) the words "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; (v) "including" shall mean "including, without limitation," "including, without limiting the generality of the foregoing," and other phrases of similar import; and (vi) the following terms shall have the meanings ascribed to them set forth below.

"Action" shall mean any action, claim, suit, litigation, proceeding, order, labor dispute, arbitral action, governmental audit, inquiry, criminal prosecution, investigation or unfair labor practice charge or complaint.

"Affiliate" with respect to any Person, shall mean any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. For the purposes of this definition "control" when used with respect to any specified Person means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the term "controlled" has the meaning correlative to the foregoing.

"Assets" shall mean all of Seller's right, title and interest in and to the Refinery, the Pipelines and other assets used or useful in the operation of the Refinery, including all of Seller's right, title and interest to the following:

    (a)    all Contracts;

    (b)    all Equipment;

    (c)    all Books and Records;

    (d)    all Proprietary Rights and all associated or related goodwill;

    (e)    to the extent transferable, all Permits;

    (f)    all Insurance Policies, subject to the provisions of Section 10.5 hereof; and

    (g)    all rights under or pursuant to all warranties, representations and guarantees made by suppliers in connection with the foregoing assets or services furnished to Seller pertaining to the Assets, to the extent such warranties, representations and guarantees are assignable;

*provided, however,* that except for the Insurance Policies and rights described in clause (g) above, in no event shall the Assets include any cash or cash equivalents, any choses in action or other claims against third parties or any Contract or Permit not transferred pursuant to Section 3.3.

"Assumed Liabilities" shall mean the liabilities specifically assumed by Buyer pursuant to Section 2.2. hereof.

"Benefit Plan" shall mean any employee benefit plan, as defined in Section 3(3) of ERISA and any material benefit arrangement that is not such an employee benefit plan, including (i) each employment or consulting agreement, (ii) each arrangement providing insurance benefits, (iii) each incentive bonus or deferred bonus arrangement, (iv) each arrangement providing termination allowance, severance or similar benefits, (v) each equity compensation plan, and (vi) each deferred compensation plan, that is or was sponsored or contributed to by Seller or any ERISA Affiliate of Seller or with respect to which Seller or any ERISA Affiliate has or had an obligation to contribute.

"Books and Records" shall mean all books, records, lists, ledgers, files, reports, plans, drawings and operating records of every kind and held or maintained by Seller pertaining to the Assets, business, customers, suppliers, distributors or personnel of Seller including (a) all disk or tape files, printouts, runs or other computer-prepared information and Seller's interest in all computer programs required to access, and the equipment containing, all such computer-based information, (b) all product, business and marketing plans, (c) all environmental control records and (d) all sales, maintenance and production records; excluding, however, the financial records, stock books or ledgers or minute books of Seller.

"Business Days" shall mean all calendar days other than Saturdays, Sundays and all days on which national banks in New York, New York are authorized or required by law to close.

2

NOV. 21. 2006  9:45AM    MAIN OFFICE 5629038911                    NO. 960    P. 11

"Closing Date" shall mean the Scheduled Closing Date, or such other date as Buyer and Seller shall mutually agree upon.

"Code" shall mean the Internal Revenue Code of 1986, as amended, and the rules and regulations thereunder.

"Contract" shall mean any agreement, contract, lease, note, loan, evidence of indebtedness, purchase order, letter of credit, franchise agreement, undertaking, covenant not to compete, employment agreement, license, instrument, obligation, commitment, purchase and sales order and other executory commitment to which Seller is a party or which relates to the Assets, whether oral or written, express or implied.

"Court Order" shall mean any judgment, decision, consent decree, injunction, ruling or order of any federal, state, local or foreign court or governmental agency, department or authority that is binding on any Person or its property under applicable law.

"days" shall mean all calendar days.

"Default" shall mean (i) a material breach of or default under any Contract; (ii) the occurrence of an event that, with the passage of time or the giving of notice or both, would constitute a material breach of or default under any Contract; or (iii) the occurrence of an event that, with or without the passage of time or the giving of notice or both, would give rise to a right of termination or acceleration under any Contract.

"Disclosure Documents" shall mean the Schedules attached hereto or to the letter from Vincent J. Papa to Marshall Staunton dated April 13, 1998, as supplemented and updated to the date hereof.

"Encumbrance" shall mean any claim, lien, pledge, option, charge, easement, security interest, deed of trust, mortgage, right-of-way, encroachment, building or use restriction, conditional sales agreement, encumbrance or other right of third parties, whether voluntarily incurred or arising by operation of law, including any agreement to give any of the foregoing in the future, and any contingent sale or other title retention agreement or lease in the nature thereof.

"Environmental Laws" shall mean all Regulations which regulate or relate to the protection, clean-up and restoration of the environment; the use, treatment, storage, transportation, generation, manufacture, processing, distribution, handling or disposal of, or emission, discharge or other release or threatened release of Hazardous Substances or otherwise dangerous substances, wastes, pollution or materials (whether, gas, liquid or solid); the preservation or protection of waterways, groundwater, drinking water, air, wildlife, plants or other natural resources, or the health and safety of persons or property, including protection of the health and safety of employees; and compensation for personal injury, property damage or damages to natural resources resulting from a release or threatened release of Hazardous Substances or otherwise dangerous substances, wastes, pollution or materials (whether, gas, liquid or solid). Environmental Laws shall include, the Resource Conservation & Recovery Act ("RCRA"), Clean Water Act, Safe Drinking Water Act, Endangered Species Act, Atomic Energy Act, Occupational Safety and Health Act, Toxic Substances Control Act, Clean Air Act, Oil Pollution Act of 1990, Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") and the Hazardous Materials Transportation Act; California Health & Safety Code §25100, et seq. and §39000 et seq., California Fish & Game Code §2014 and §2050 et seq.,

3

NOV. 21. 2006  9:45AM    MAIN OFFICE 5629038911                          NO. 960   P. 12

and California Water Code §13000 *et seq.*; and all other analogous or related Regulations, each as amended.

"Equipment" shall mean all of the furniture, furnishings, machinery, equipment, spare parts, supplies, appliances, vehicles and other tangible personal property in which Seller has any interest and which are located in, at or upon the Refinery or are associated with the Pipelines.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" shall mean any Person that, together with Seller as of the relevant measuring date under ERISA, was or is required to be treated as a single employer under Section 414 of the Code.

"Excluded Liabilities" shall mean the Liabilities described in Section 2.3.

"Financial Statements" shall mean the unaudited balance sheet of Seller and its subsidiaries on a consolidated basis, as of the last day of the fiscal year ended December 31, 1997.

"GAAP" shall mean generally accepted accounting principles applied in a manner consistent with past practices.

"Governmental Authority" shall mean any agency, authority, board, bureau, commission, court, department, office or instrumentality of any nature whatsoever of the United States or any other country, including any political subdivision of any thereof, or any officer or official thereof acting in an official capacity.

"Hazardous Substance" shall mean any pollutants, contaminants, chemicals, waste and any toxic, infectious, carcinogenic, reactive, corrosive, ignitable or flammable chemical or chemical compound or hazardous substance, material or waste, whether solid, liquid or gas, including any quantity of asbestos in any form, urea formaldehyde, PCB's, radon gas, crude oil or any fraction thereof, all forms of natural gas, petroleum products or by-products or derivatives, radioactive substance, waste waters, sludges, slag and any other substance, material or waste that is subject to regulation, control or remediation under any Environmental Law.

"Insurance Policies" shall mean any and all insurance policies or rights thereto, now or previously in force and owned by Seller or any predecessor of Seller, including the insurance policies identified on Schedule 1.1 hereto.

"IRS" shall mean the United States Internal Revenue Service.

"Knowledge of Seller" shall mean with respect to Seller, the actual knowledge of Siegfried Hodapp, James Button or Michael Egner.

"Liabilities" shall mean any direct or indirect liability, indebtedness, obligation, responsibility, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any type, whether accrued, absolute, contingent, matured, unmatured or other.

"material adverse effect" or "material adverse change" shall mean any substantial adverse effect or change in the financial or other condition, business, results of operations,

NOV. 21. 2006   9:45AM   MAIN OFFICE 5629038911                      NO. 960   P. 13

prospects, Assets, Liabilities or operations of Seller or on the ability of Seller to consummate the transactions contemplated hereunder, or any event or condition which would, with the passage of time, constitute a "material adverse effect" or "material adverse change", in each case depending upon the context in which the phrase is used.

"ordinary course of business" or "ordinary course" or any similar phrase shall mean the ordinary course of the operation of the Assets consistent with past practice.

"Permits" shall mean all licenses, permits, franchises, approvals, authorizations, consents or orders of, or filings with, or notifications to, any Governmental Authority, whether foreign, federal, state or local, or any other person, necessary for the past or present conduct of, or relating to the operation of the Refinery and Pipelines.

"Permitted Encumbrances" shall mean (i) liens for current Property Taxes not yet due; (ii) with respect to the Refinery, the Encumbrances shown as exceptions on the Title Commitment other than any mortgage, deed of trust, security interest or other similar lien; (iii) materialmen's, mechanics' or other like liens arising in the ordinary course of business for amounts not yet due or which are being contested in good faith by appropriate proceedings; (iv) liens identified in Schedule 4.10 hereto; and (v) other Encumbrances which do not (A) breach any covenant, representation or warranty of Seller in this Agreement; (B) materially adversely affect the use or value of any of the Assets; (C) render Seller's interest in any of the Assets unmarketable; (D) constitute a lien in the nature of a mortgage, deed of trust, security interest or other similar lien; or (E) constitute a lease, sublease or other occupancy agreement that gives any third party any right to occupy or use all or any portion of any of the Assets following Closing.

"Person" shall mean any individual, firm, corporation, partnership, limited liability company, trust, unincorporated organization, Governmental Authority or other entity, and shall include any successor by merger or otherwise of such Person.

"Pipeline(s)" shall mean all of Seller's right, title and interest in and to the refined products and crude oil or other feedstock pipeline(s) depicted on the pipeline map and/or identified on the table attached as Exhibit A hereto.

"Property Taxes" shall mean all state, local and other taxes, levies, imposts, assessments, impositions or other similar government charges levied or assessed against the Assets or the rents or other revenues therefrom, and any premium, including interest, penalties and additions in connection therewith, but excluding all such taxes, assessments or charges measured by the net income of Seller.

"Proprietary Rights" shall mean all of Seller's copyrights, patents, trademarks, service marks, trade names, trade dress, processes, computer software, trade secrets and know-how, all licenses from any party of any of the above, and all other intellectual property or rights thereto owned by Seller and used or useful in the operation of the Assets.

"Refinery" shall mean the land depicted on the refinery map attached as Exhibit A hereto underlying, and the plants, processing units, buildings and other improvements or fixtures constituting, the approximately 49,500 bpd refinery located in Santa Fe Springs, California.

"Regulations" shall mean all laws, statutes, ordinances, regulations, rules, notice requirements, Court Orders, agency guidelines, principles of law and orders of any Governmental Authority, including Environmental Laws.

5

NOV. 21. 2006   9:45AM    MAIN OFFICE 5629038911                    NO. 960   P. 14

"Representative" shall mean any officer, director, principal, attorney, agent, employee or other representative.

"Scheduled Closing Date" shall mean August 15, 1998.

"Tax Returns" shall mean any returns, reports, declarations, information statements and other documents with respect to Taxes required to be filed with the IRS or any other taxing (or similar) authority, domestic or foreign, including consolidated, combined and unitary tax returns.

"Taxes" shall mean any federal, state, local, foreign or other tax, levy, impost, fee, assessment or other government charge of any kind, including net or gross income, gross receipts, estimated income, windfall profits, production, business occupation, franchise, profits, license, lease, service, service use, utility, Property Taxes, sales, transfer and gains, use, ad valorem, excise, severance, stamp customs, duty, value added, capital stock, superfund or oil spill, payroll, employment, social security, workers' compensation, unemployment compensation or withholding taxes, and any premium, including interest, penalties and additions in connection therewith.

"Title Commitment" shall mean the preliminary title commitment issued by the Title Company, as from time to time amended or supplemented.

"Title Company" shall mean First American Title Insurance Company.

    1.2.    Other Defined Terms. The following terms shall have the meanings defined for such terms in the Sections set forth below:

| Term | Section |
|---|---|
| Agreement | Preamble |
| Buyer | Preamble |
| Closing | 3.1 |
| Confidential Information | 11.2 |
| EMC | 2.3(e) |
| Excluded Liabilities | 2.3 |
| Seller | Preamble |

## ARTICLE II.

## PURCHASE AND SALE OF ASSETS

    2.1.    Purchase and Sale of Assets. Upon the terms and subject to the conditions contained herein, as of the Closing (i) Seller will sell, convey, transfer, assign and deliver to Buyer, and Buyer or one or more of its nominees will acquire from Seller, the Assets; and (ii) in consideration for the purchase of the Assets, Buyer shall pay to Seller $15,000,000 less a Three Hundred Thousand Dollar ($300,000) credit for a July option payment previously made and less amounts, if any, owed under the Pipeline Option Agreement dated as of May 1, 1998, by wire transfer of immediately available funds to an account or accounts designated by Seller.

    2.2.    Assumption of Liabilities. Upon the terms and subject to the conditions contained herein, as of the Closing, Buyer shall assume all of the obligations and liabilities of Seller under the Contracts identified in the Disclosure Documents and which accrue after the date hereof and all obligations and liabilities of Seller whether fixed or contingent, known or unknown, matured or

6

NOV. 21. 2006   9:46AM    MAIN OFFICE 5629038911                         NO. 969    P. 15

unmatured, liquidated or unliquidated, for (i) the defense of, and any amounts owed in respect of, the superfund claims known as OII and WDI and (ii) any severance obligations owed to current or former employees of Seller as and to the extent set forth in the Disclosure Documents.

2.3.     Excluded Liabilities. Notwithstanding any other provision of this Agreement, Buyer shall not assume or be responsible for, and Seller shall retain and shall discharge, perform and be fully responsible for, all of the liabilities and obligations, fixed or contingent, known or unknown, matured or unmatured of Seller relating to:

(a)     any petroleum terminal, storage facility, service station or other property, other than the Refinery and the Pipelines, now or previously owned or operated by Seller;

(b)     any obligation or liability of Seller for Taxes incurred in connection with the consummation of the transactions contemplated by this Agreement or other Taxes, interest and penalties thereon, if any, incurred or owing by Seller or any Affiliate of Seller prior to the Closing Date; excluding, however, the Assumed Liabilities, sales taxes that may be incurred solely as a result of the transfer of Assets contemplated by this Agreement and any Property Taxes payable on or with respect to the Assets;

(c)     Energy Merchant Corp., a Delaware corporation ("EMC") or any shareholder, employee or Affiliate of EMC, other than Seller;

(d)     any Benefit Plan (other than the severance obligations assumed in Section 2.2) that covers or covered any past, current or prospective employee of Seller or any Affiliate of Seller, including any obligation under any Benefit Plan arising out of any collective bargaining agreement or other agreement between or among (i) Seller or any group representing, or purporting to represent, Seller or any Affiliate of Seller with respect to any such employee; and (ii) any employee employed in the operation of the Refinery or any labor organization, union, group or association representing, or purporting to represent, any such employee; and

(e)     any other liability or obligation of Seller other than as, and then only to the extent, identified in the Disclosure Documents.

2.4.     Closing Costs.

(a)     Seller. Seller shall pay the legal, professional and consultant fees incurred by Seller.

(b)     Buyer. Buyer shall pay (i) the costs of a policy or policies of title insurance insuring ownership of the Refinery in Buyer as of the Closing in the aggregate amount of the Purchase Price allocated thereto pursuant to Section 2.5 hereof or if no such amount is allocated prior to the Closing Date, Fifteen Million Dollars ($15,000,000); (ii) any documentary transfer taxes; (iii) the fees and costs of recording or filing any conveyancing instruments; (iv) any sales, use or other taxes imposed by reason of the transfer of the Assets, including any deficiency, interest or penalty asserted with respect thereto; and (v) the legal, professional and consulting fees incurred by Buyer.

7

NOV. 21. 2006    9:46AM    MAIN OFFICE 5629038911    NO. 960    P. 16

2.5.    Allocation.  Buyer and Seller will use their best efforts to agree upon an allocation of the Purchase Price prior to the Closing Date in accordance with the allocation method required by Section 1060 of the Code.  The parties shall cooperate to comply with the substantive and procedural requirements of Section 1060 and the regulations thereunder, and the allocation, if agreed to, shall be adjusted only if and to the extent necessary to comply with such requirements and each party agrees that it will not take or permit any of its Affiliates to take, for income tax purposes, any position inconsistent with such allocation.

ARTICLE III.

CLOSING

3.1.    Closing.  The Closing of the transactions contemplated hereunder ("Closing") shall be held commencing at 10:00 a.m. local time, on the Closing Date at the New York, New York offices of Latham & Watkins or at such other time or place as the parties hereto otherwise designate.

3.2.    Deliveries at Closing.

(a)    By Seller.  Seller shall, on the Closing Date, deliver to the Buyer or its nominee:

(i)    a Bill of Sale, in the form attached hereto as Exhibit C, conveying Seller's personal property included in the Assets;

(ii)    a grant deed in the Title Company's standard form;

(iii)    counterpart originals of (i) an Assignment and Assumption Agreement for the Contracts in substantially the form attached hereto as Exhibit D and (ii) an Environmental Indemnity and Reimbursement Agreement in substantially the form of Exhibit B;

(iv)    one or more certificates regarding the tax status of Seller as a domestic corporation; and

(v)    such other bill(s) of sale, deeds, endorsements, assignments and other good and sufficient instruments of sale, conveyance, transfer and assignment, in form and substance reasonably satisfactory to Buyer, with respect to the Assets, as reasonably requested by Buyer, sufficient to vest in Buyer title in and to the Assets in accordance with the provisions hereof.

(b)    By Buyer.  Buyer shall deliver to Seller on the Closing Date counterpart originals of (i) an Assignment and Assumption Agreement for the Contracts substantially in the form attached hereto as Exhibit D and (ii) an Environmental Indemnity and Reimbursement Agreement in substantially the form of Exhibit B.

3.3.    Consent to Assignment; Non-transferred Assets.  Anything in this Agreement to the contrary notwithstanding, neither this Agreement nor the consummation of the transactions contemplated hereby shall constitute an agreement to assign or an assignment of any Contract or Permit or any claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment thereof, without

8

the consent of a third party thereto or any Governmental Authority or agency, would constitute a breach thereof or in any way adversely affect the respective rights or obligations of Buyer or Seller thereunder. If any such consent is not obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the respective rights or obligations of Buyer or Seller thereunder, Seller, at no cost to Seller, shall use its best efforts (i) to provide to Buyer the benefits under any such Contract or Permit (including enforcement for the benefit of Buyer of any and all rights of Seller against a third party thereto arising out of the breach or cancellation by such third party or otherwise) as if such Contract or Permit had been assigned to Buyer and (ii) to obtain as soon as practicable the consent or approval of any such third party or Governmental Authority to the assignment of such Contract or Permit and to transfer such Contract or Permit to Buyer; and any transfer or assignment to Buyer of any property or property rights or any Contract or Permit that shall require the consent or approval of any third party or Governmental Authority shall be made subject to such consent or approval being obtained.

3.4.    Other Closing Matters.  Each of the parties shall take such other actions required hereby to be performed by it prior to or on the Closing Date. Seller shall take all additional reasonable steps as may be necessary or desirable to put Buyer in possession of, and in operational control of, the Assets.

## ARTICLE IV.

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows, which representations and warranties are, as of the date hereof, and will be, as of the Closing Date, true and correct; subject, however, to any fact or facts disclosed in this Agreement or in the Disclosure Documents or otherwise disclosed to Buyer during its due diligence investigation of Seller:

4.1.    Organization.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of California; has full corporate power and authority to conduct the business presently being conducted by it as it is presently being conducted and to own or lease its assets.

4.2.    Authorization.  This Agreement has been duly executed and delivered by Seller and is, and upon execution and delivery of each of the other instruments required or contemplated to be executed and delivered hereunder by Seller will be, the legal, valid and binding obligations of Seller, enforceable against it in accordance with their respective terms.

4.3.    Consents and Approvals.  Other than in connection with or in compliance with the consents, notices, filings, or registrations with Governmental Authorities which have been identified in the Disclosure Documents that may be necessary in order to transfer to Buyer a Permit or which can be obtained in the normal course of business, to Seller's Knowledge no notice to, declaration, filing or registration with, or authorization, consent or approval of, or Permit from, any Governmental Authority is required to be made or obtained by Seller in connection with the execution, delivery or performance of this Agreement or any other instrument required or contemplated to be executed and delivered hereunder by Seller or the consummation of the transactions contemplated hereunder or thereunder.

4.4.    No Conflict or Violation.  Neither the execution, delivery or performance of this Agreement or any other instruments required or contemplated to be executed and delivered hereunder by Seller or the consummation of the transactions contemplated hereunder or thereunder, will (i) violate or conflict with any provision of the certificate of incorporation or bylaws of Seller or any shareholders' agreement or other similar agreement to which Seller is a party; (ii) result in the creation of any Encumbrance upon any of the Assets under any of the terms, conditions or provisions of any Contract or

9

Permit; or (iii) violate any Regulation, except for such violations, conflicts or creations of Encumbrances which, in the aggregate, would not have a material adverse effect on the value or use of any of the Assets or the ability of Seller to consummate the transactions contemplated hereunder.

4.5.    Absence of Certain Changes or Events.  Since July 1, 1998:

(i)    there has not been any damage or destruction to, or sale or other disposition of, any material portion of the Assets;

(ii)    there has not been any increase in, or commitment to increase, the operating expenses of the Assets, including the compensation paid or payable to the employees of Seller, except for increases in the ordinary course which are caused by general economic conditions or factors affecting the refining industry generally; and

(iii)    there has not been any amendment or termination, or proposed amendment or termination, of any Contract or Permit which, either individually or in the aggregate, would materially adversely affect the value or operation of the Assets.

4.6.    Financial Statements.  Seller has heretofore delivered to Buyer the Financial Statements. The Financial Statements were prepared in accordance with the Books and Records which, in turn, are maintained in accordance with GAAP, and accurately reflect the liabilities of Seller, including liabilities for any Taxes.

4.7.    Taxes.  Seller has properly and accurately completed and filed on a timely basis true and correct Tax Returns and paid all Taxes, in each instance for which Buyer could be made liable as a result of the transactions contemplated by this Agreement or which could result in liens on the Assets, other than Property Taxes on the Refinery and sales taxes imposed on the transfer of the Assets pursuant to this Agreement.

4.8.    Title.  Seller has good and marketable title to the Assets, free and clear of any Encumbrances, except for Permitted Encumbrances.

4.9.    Litigation.  Schedule 4.9 identifies and contains an accurate description of all Actions pending, or to the best of Seller's knowledge, threatened or anticipated against, related to or affecting Seller or the Assets.  Except as identified in Schedule 4.9, there are no Actions pending, or to the best of Seller's knowledge, threatened or anticipated against, related to or affecting Seller or the Assets that would (i) have any adverse effect on Seller or the Assets from and after Closing; (ii) delay, limit or enjoin the transactions contemplated hereunder; or (iii) involve any risk of criminal liability on the part of Seller or, from and after Closing, Buyer.

4.10.    Creditors.  To Seller's Knowledge, the Disclosure Documents identify all of the creditors of Seller, and the amounts owed to each, as of the dates set forth thereon, except for contingent liabilities which are not reflected on the Financial Statements.  To the best of Seller's Knowledge, Schedule 4.10 identifies all of the liens against the Assets.  Except as identified in such Schedule, there are no other liens against the Assets and the amounts required to release such liens do not materially exceed the amounts set forth on such Schedule, plus any interest accrued thereon in the ordinary course since the dates set forth thereon.

4.11.    Employees.  Seller (i) is not a party to any labor agreement with respect to any employees at or in connection with the Refinery and the operation thereof with any labor organization,

10

union, group or association; and (ii) to Seller's Knowledge has not experienced any attempt by organized labor or its representatives to make Seller or any of Seller's Affiliates conform to the demands of, or enter into any agreement with, organized labor that would cover any of such employees. Seller is in compliance in all material respects with all applicable laws respecting employment practices, terms and conditions of employment and wages and hours and to Seller's Knowledge is not and has not engaged in any unfair labor practice. Except as set forth in the Disclosure Documents, there is no unfair labor practice charge or complaint against Seller or any of Seller's Affiliates with respect to the operation of the Refinery pending before the National Labor Relations Board or any other Governmental Authority, and to Seller's Knowledge, no presently existing facts or information would lead to any such charge or complaint. Each Benefit Plan has been maintained in compliance with its terms and, both as to form and operation, with the requirements of all applicable statutes, orders, rules and regulations which are applicable to such Benefit Plan, including but not limited to ERISA and the Code. To Seller's Knowledge there are no unfunded benefit liabilities or accumulated funding deficiencies with respect to any Benefit Plan applicable to Seller; neither Seller nor any Affiliate of Seller nor any of the Assets are subject to any lien under ERISA with respect to any such plan; and neither Seller nor any ERISA Affiliate has any liability for unpaid contributions with respect to any Benefit Plan. Neither Seller nor any Affiliate of Seller is or has been a party to, or participated in a complete or partial withdrawal from any multiemployer plan as defined in Section 4001(a)(3) of ERISA or any similar plan.

4.12.    No Other Agreements to Sell the Assets. Seller has no commitment or legal obligation, absolute or contingent, to any Person other than Buyer to sell, assign, transfer or effect a sale of any of the Assets, to sell or effect a sale of any of its capital stock or to effect any merger, consolidation, liquidation, dissolution or other reorganization of Seller; or to enter into any agreement or cause the entering into of an agreement with respect to any of the foregoing.

4.13.    No Brokers. None of Seller and any of its officers, directors, employees, shareholders or Affiliates has employed or made any agreement with any broker, finder or other Person which will result in the obligation of Buyer or any of its Affiliates to pay any finder's fee, brokerage fee or commission or similar payment in connection with the transactions contemplated hereunder.

4.14.    As Is Where Is. Buyer shall acquire the Assets "as is" and "where is", and, except as specifically set forth above, any other representation or warranty with respect to the Assets, whether express or implied, is hereby disclaimed, including any representation or warranty as to merchantability or fitness for any particular purpose.

ARTICLE V.

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows, which representations and warranties are, as of the date hereof, and will be, as of the Closing Date, true and correct; subject, however, to any fact or facts disclosed in this Agreement or otherwise disclosed to Seller by Buyer:

5.1.    Organization of Buyer. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.

5.2.    Authorization. Buyer has all requisite corporate power and authority, and has taken all corporate action necessary to execute and deliver this Agreement and each of the other instruments required or contemplated to be executed and delivered hereunder by Buyer, to consummate the transactions contemplated hereunder and thereunder and to perform its obligations hereunder and

11

thereunder. The execution and delivery of this Agreement and each of the other instruments required or contemplated to be executed and delivered hereunder by Buyer and the consummation by Buyer of the transactions contemplated hereunder and thereunder have been duly approved by its board of directors. No other corporate proceedings on the part of Buyer are necessary to authorize this Agreement, any of the other instruments required or contemplated to be executed and delivered hereunder by Buyer or the consummation of the transactions contemplated hereunder or thereunder. This Agreement has been duly executed and delivered by Buyer and is, and is, upon execution and delivery each of the other instruments required or contemplated to be executed and delivered hereunder by Buyer will be, the legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

    5.3.   No Conflict or Violation. Neither the execution, delivery or performance of this Agreement or any other instruments required or contemplated to be executed and delivered hereunder by Buyer or the consummation of the transactions contemplated hereunder or thereunder, will (i) violate or conflict with any provision of the articles of incorporation or bylaws of Buyer; or (ii) violate any Regulation or Court Order, except for such violations or conflicts, which, in the aggregate, would not have a material adverse effect on the ability of Buyer to consummate the transactions contemplated hereunder.

    5.4.   Consents and Approvals. To Buyer's knowledge, no notice to, declaration, filing or registration with, or authorization, consent or approval of, or Permit from, any Governmental Authority is required to be made or obtained by Buyer in connection with the execution, delivery and performance of this Agreement or any other instruments required or contemplated to be executed and delivered hereunder by Buyer or the consummation of the transactions contemplated hereunder or thereunder.

    5.5.   No Brokers. Neither Buyer nor any of its officers, directors, employees, shareholders or Affiliates has employed or made any agreement with any broker, finder or similar agent or any Person or firm which will result in the obligation of Seller or any of its Affiliates to pay any finder's fee, brokerage fees or commission or similar payment in connection with the transactions contemplated hereby.

ARTICLE VI.

COVENANTS

    6.1.   Covenants of Seller.

    (a)   Conduct of the Business by Seller. Seller shall, except as contemplated by this Agreement, or as consented to by Buyer in writing, maintain the Assets in the ordinary course and not take any action inconsistent with this Agreement or with the consummation of the transactions contemplated hereunder. Without limiting the generality of the foregoing:

    (i)   Seller shall not (y) enter into, extend, materially modify, terminate or renew any Contract other than in the ordinary course of business; or (z) sell, assign, transfer, convey, lease, mortgage, pledge or otherwise dispose of or encumber any Asset; and

    (ii)   Seller shall (y) maintain the Assets in substantially their current state of repair, normal wear and tear excepted; and (z) comply with all Regulations applicable to the Assets, except where the failure to so comply would not have a material adverse effect on the operation of the Assets;

12

(b)    No Solicitation. From the date hereof through Closing or the earlier termination of this Agreement, none of Seller and its Representatives shall, directly or indirectly, enter into, solicit, initiate or continue any discussions or negotiations with, or encourage or respond to any inquiries or proposals by, or participate in any negotiations with, or provide any information to, or otherwise cooperate in any other way with, any Person other than Buyer and its Representatives, concerning the sale of the Assets or of any shares of its stock or any merger, consolidation, liquidation, dissolution or similar transaction involving Seller, that in any case, would in any way be inconsistent with or interfere with the transactions contemplated hereby. Seller shall not, directly or indirectly, solicit, initiate or encourage the submission of any proposal or offer from any Person relating to any such transaction or participate in any negotiations regarding, or furnish to any Person any information with respect to Seller for the purposes of, or otherwise cooperate in any way with, or assist or participate in, facilitate or encourage, any effort or attempt by any other Person to seek or effect any such transaction.

(c)    Notification of Certain Matters. From the date hereof through Closing, Seller, promptly upon obtaining knowledge thereof, shall give notice to Buyer of (i) the occurrence, or failure to occur, of any event which would be likely to cause any representation or warranty contained in this Agreement to be untrue or inaccurate in any material respect; and (ii) any failure of Seller to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder; *provided, however,* that no such disclosure shall cure or be deemed to cure any breach of a representation, warranty, covenant or agreement or to satisfy any condition. Seller shall promptly notify Buyer of any Default, the commencement of any Action, or any credible threat thereof, or any other event that occurs before Closing that could in any way materially affect the value or operation of any Asset.

(d)    Lien Clearance. Seller shall remove and release from the public records, effective as of the Closing Date, all UCC Financing Statements or other evidence of liens relating to any obligations owed to EMC and shall cooperate with Buyer, at no cost or expense to Seller, to enable Buyer to either (i) remove and release from the public records, effective as of the Closing Date, or (ii) reduce the underlying secured obligation to a sum certain not materially greater than the amount reflected on Schedule 4.10 hereto, plus any interest accrued thereon in the ordinary course since the date(s) set forth thereon, all liens with respect to the Assets other than any UCC Financing Statements which show Seller as the lessee under an equipment lease.

(e)    Consents. To the extent that the transactions contemplated hereunder cannot be consummated without the approval, consent or waiver of a third party, Seller shall use its best efforts to obtain such approval, consent or waiver; *provided, however,* that Seller shall not be obligated to pay any consideration for obtaining any such approval, consent or waiver other than nominal fees or transactional expenses requested by the third party.

6.2.    Covenants of Buyer. Effective for the period July 20, 1998 through the Closing Date, Buyer will pay (or reimburse) to Seller amounts which Seller can demonstrate to the reasonable satisfaction of Buyer have been paid or accrued on or subsequent to July 20, 1998 and are necessary to preserve and maintain the Assets, including payroll and arrearages that must be paid to the Southern California Air Quality Management District prior to July 31, 1998 (the "SCAQMD Fees"). If for any reason other than the fault of Buyer the transactions contemplated hereunder do not close, Seller will repay to Buyer the SCAQMD Fees.

6.3.    Of Each Party. Buyer and Seller shall (i) use their respective best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated hereunder as soon as practicable

13

following the satisfaction or waiver of the conditions set forth in Article VII and Article VIII hereof, but in no event prior to August 1, 1998; (ii) execute any documents, instruments or conveyances of any kind which may be reasonably necessary or advisable to carry out any of the transactions contemplated hereunder; and (iii) cooperate with each other in connection with the foregoing.

6.4.    Employee Matters.

(a)    Continued Employment.  Seller shall cooperate with, and use its good faith efforts to assist Buyer in its efforts to secure satisfactory employment arrangements with, those employees of Seller to whom Buyer makes offers of employment.  Seller shall terminate, as of the Closing, its employment relationship with those of such employees to whom Buyer makes an offer of employment. During the one (1) year period after the Closing Date, neither Seller nor any Affiliate of Seller shall, directly or indirectly, hire or offer employment to or seek to hire or offer employment to any employee of Seller whose employment is continued by Buyer after the Closing Date or any employee of Buyer or any successor or Affiliate of Buyer who is engaged in the operation of the Refinery, unless Buyer first terminates the employment of such employee or gives its written consent to such employment or offer of employment.

(b)    WARN.  Seller shall comply with the requirements of the Worker Adjustment and Retraining Notification Act of 1988 with respect to any "plant closing" or "mass layoff", as those terms are defined in such Act, which may result from Seller's termination of the employment of any of the employees in connection with the sale of the Assets to Buyer or any of the other transactions contemplated by this Agreement.

(c)    Third Party Beneficiary.  Nothing contained in this Agreement shall (i) confer upon any employee of Seller any right with respect to continuance of employment by Buyer, (ii) interfere with the right of Buyer to terminate the employment of any employee of Seller at any time, with or without cause, or (iii) otherwise create any third party beneficiary rights in any employee of Seller, any beneficiary or dependents thereof or any collective bargaining representative thereof, with respect to the compensation, terms and conditions of employment and benefits that may be provided to any employee of Seller by Buyer or under any Benefit Plan which Buyer may maintain.

ARTICLE VII.

CONDITIONS TO SELLER'S OBLIGATIONS

The obligations of Seller to sell the Assets to the Buyer on the Closing Date and to consummate the transactions contemplated hereby are subject to the satisfaction or waiver, on or prior to the Closing Date, of each of the following conditions:

7.1.    Representations, Warranties and Covenants.  All representations and warranties of Buyer contained in this Agreement that are qualified by materiality shall be true and correct and all other representations and warranties shall be true and correct in all material respects, in each instance at and as of the Closing Date as if such representations and warranties were made at and as of the Closing Date, and Buyer shall have performed in all material respects all agreements and covenants required hereby to be performed by it prior to or at the Closing.

7.2.    No Proceedings or Litigation.  No Action by any Governmental Authority shall have been instituted for the purpose of enjoining or preventing, or which question the validity or legality of,

14

the transactions contemplated hereby and which would reasonably be expected materially to damage Seller if the transactions contemplated hereby are consummated. No preliminary or permanent injunction or other order, decree or ruling by any United States federal or state court of competent jurisdiction or by any United States federal or state governmental, regulatory or administrative agency or authority which prevents the consummation of the transactions contemplated hereby shall have been issued and remain in effect.

## ARTICLE VIII.

### CONDITIONS TO BUYER'S OBLIGATIONS

The obligations of Buyer to purchase the Assets and to consummate the transactions contemplated hereby are subject to the satisfaction or waiver, on or prior to the Closing Date, of each of the following conditions:

8.1.    Representations, Warranties and Covenants. All representations and warranties of Seller contained in this Agreement that are qualified by materiality shall be true and correct and all other representations and warranties shall be true and correct in all material respects, in each instance at and as of the Closing Date as if such representations and warranties were made at and as of the Closing Date, and Seller shall have performed in all material respects all agreements and covenants required hereby to be performed by it prior to or at the Closing.

8.2.    No Proceedings or Litigation. No Action by any Governmental Authority shall have been instituted for the purpose of enjoining or preventing, or which question the validity or legality of, the transactions contemplated hereby and which would reasonably be expected materially to damage Seller if the transactions contemplated hereby are consummated. No preliminary or permanent injunction or other order, decree or ruling by any United States federal or state court of competent jurisdiction or by any United States federal or state governmental, regulatory or administrative agency or authority which prevents the consummation of the transactions contemplated hereby shall have been issued and remain in effect.

8.3.    Title Insurance. Buyer shall have received a commitment for a standard coverage ALTA policy or policies of title insurance with respect to the Refinery, with such endorsements thereto as Buyer shall reasonably require, pursuant to which the Title Company agrees to insure, at its regular rates in the amount of at least Fifteen Million Dollars ($15,000,000), good and marketable title to the Refinery subject only to the Permitted Encumbrances with respect thereto.

8.4.    Lien Clearance. Buyer shall have received, in form and substance satisfactory to Buyer, (i) UCC termination statements, reconveyances, releases or other instruments sufficient to remove and release from the public records all liens relating to any obligations owed to EMC; and (ii) either (y) lien releases, in the form of UCC termination statements, reconveyances, releases or otherwise, of all liens on the Assets; or (z) other assurances satisfactory to Buyer that it will be able to remove and release all such liens from the public records following the Closing Date upon the payment of a sum certain not materially greater than the amount(s) reflected on Schedule 4.10 hereto; *provided, however*, that the condition set forth in clause (ii) above shall be limited to liens where the potential amount thereof, relative to the Assets secured thereby, could have a material adverse effect on Buyer.

15

ARTICLE IX.

TERMINATION

This Agreement may be terminated at any time prior to Closing:

(i)      by mutual written consent of Buyer and Seller;

(ii)      by Buyer or Seller if the Closing shall not have occurred on or before the Scheduled Closing Date; *provided, however,* that this provision shall not be available to Buyer if Seller has the right to terminate this Agreement under clause (iv)(x) of this Article IX, and this provision shall not be available to Seller if Buyer has the right to terminate this Agreement under clause (iii)(x) of this Article IX;

(iii)      by Buyer if there is (x) a material breach of any representation or warranty set forth in Article IV hereof or any covenant or agreement to be complied with or performed by Seller pursuant to the terms of this Agreement; (y) a failure of a condition set forth in Article VIII to be satisfied (and such condition is not waived in writing by Buyer) on or prior to the Closing Date; or (z) an occurrence of any event which results or would result in the failure of a condition set forth in Article VIII to be satisfied on or prior to the Closing Date; *provided, however,* that Buyer may not terminate this Agreement prior to Closing if Seller has not had an adequate opportunity to cure such failure; or

(iv)      by Seller if there is (x) a material breach of any representation or warranty set forth in Article V hereof or of any covenant or agreement to be complied with or performed by Buyer pursuant to the terms of this Agreement; (y) a failure of a condition set forth in Article VII to be satisfied (and such condition is not waived in writing by Seller) on or prior to the Closing Date; or (z) an occurrence of any event which results or would result in the failure of a condition set forth in Article VII to be satisfied on or prior to the Closing Date; *provided, however,* that Seller may not terminate this Agreement prior to the Closing Date if Buyer has not had an adequate opportunity to cure such failure.

In the event of any termination of this Agreement, no party hereto shall have any Liability to any other party to this Agreement, except for any willful breach of this Agreement occurring prior to the proper termination of this Agreement. The foregoing provisions shall not limit or restrict the availability of specific performance or other injunctive relief to the extent that specific performance or such other relief would otherwise be available to a party hereunder.

ARTICLE X.

ACTIONS BY SELLER AND BUYER AFTER CLOSING

10.1.    Books and Records. Each party agrees that it will cooperate with and make available to the other parties, during normal business hours, the Books and Records, information and employees (without substantial disruption of employment) retained and remaining in existence after Closing which are necessary or useful in connection with any tax inquiry, audit, investigation or dispute, any litigation or investigation or any other matter requiring any such Books and Records, information or employees for

16

NOV. 21. 2006  9:52AM      MAIN OFFICE 5629038911                        NO. 961    P. 5

any reasonable business purpose. The party requesting any such Books and Records, information or employees shall bear all of the out-of-pocket costs and expenses, including attorneys' fees, but excluding reimbursement for salaries and employee benefits reasonably incurred in connection with providing such Books and Records, information or employees. In addition, Buyer shall permit Seller to store at the Refinery any financial records or other financial information that it retains pursuant to this Agreement and provide to Seller reasonable access to such materials at no charge to Seller.

10.2.  Cooperation and Records Retention.  Buyer and Seller shall (i) each provide the other with such assistance as may reasonably be requested by any of them in connection with the preparation of any Tax Return, audit, or other examination by any taxing authority or judicial or administrative proceedings relating to Liability for Taxes of Seller; and (ii) each retain and provide the other with any records or other information that may be relevant to such return, audit or examination, proceeding or determination.

10.3.  Tax Elections.  Seller shall make no new elections with respect to Taxes that affect Buyer or the Assets or any changes in current elections with respect to Taxes affecting Buyer or the Assets, without, in each instance, the prior written consent of Buyer.

10.4.  Indemnification.

(a)  By Seller.  Seller shall indemnify, save and hold harmless Buyer and its Affiliates and its and their respective Representatives from and against any and all costs, losses, Taxes, Liabilities, obligations, damages, lawsuits, deficiencies, claims, demands and expenses (whether or not arising out of third-party claims), including interest, penalties, attorneys' fees and all amounts paid in investigation, defense or settlement of any of the foregoing (collectively hereafter, for purposes of this Section 10.4, "damages") incurred in connection with, arising out of, resulting from or incident to (i) any breach of any representation or warranty or the inaccuracy of any representation made by Seller in or pursuant to this Agreement; (ii) any breach of any covenant or agreement made by Seller in or pursuant to this Agreement; or (iii) any Excluded Liability; excluding, however, any damages attributable to any failure to pay sales and use taxes, if any, imposed on the sale and subsequent repossession of certain elements of the Refinery to Kenyen Projects Limited and the amounts payable by Seller pursuant to the Environmental Indemnity and Reimbursement Agreement.

(b)  By Buyer.  In addition to the obligations of Seller pursuant to the Environmental Indemnity and Reimbursement Agreement, Buyer shall indemnify, save and hold harmless Seller, its Affiliates and its and their respective Representatives, from and against any and all damages incurred in connection with, arising out of, resulting from or incident to (i) any breach of any representation or warranty or the inaccuracy of any representation, made by Buyer in or pursuant to this Agreement; (ii) any breach of any covenant or agreement made by Buyer in or pursuant to this Agreement; (iii) any Assumed Liability; (iv) the litigation identified in Schedule 4.9 hereto; and (v) any claim relating to creditors identified in Schedule 4.10 hereto, but only to the extent of the amounts set forth as owing thereon, without duplication, plus any interest accrued thereon in the ordinary course since June 30, 1998.

(c)  Defense Of Claims.  If a claim for damages, other than a claim by Seller pursuant to and governed by the Environmental Indemnity and Reimbursement Agreement (a "Claim") is to be made by a party entitled to indemnification hereunder against the indemnifying party, the party claiming such indemnification shall give written notice (a "Claim Notice") to the indemnifying party as soon as practicable after the party entitled to indemnification becomes aware of any fact, condition or event which may give rise to damages for which indemnification may be sought under this Section 10.4. If any lawsuit or enforcement Action is filed against any party entitled to the benefit of indemnity

17

hereunder, written notice thereof shall be given to the indemnifying party as promptly as practicable (and in any event within thirty (30) days after the service of the citation or summons). The failure of any indemnified party to give timely notice hereunder shall not affect rights to indemnification hereunder, except to the extent that the indemnifying party demonstrates actual damage caused by such failure. After such notice, if the indemnifying party shall acknowledge in writing to the indemnified party that the indemnifying party shall be obligated under the terms of its indemnity hereunder in connection with such lawsuit or Action, then the indemnifying party shall be entitled, if it so elects at its own cost, risk and expense, (i) to take control of the defense and investigation of such lawsuit or Action; (ii) to employ and engage attorneys of its own choice to handle and defend the same unless the named parties to such Action or proceeding include both the indemnifying party and the indemnified party and the indemnified party has been advised in writing by counsel that there may be one or more legal defenses available to such indemnified party that are different from or additional to those available to the indemnifying party, in which event the indemnified party shall be entitled, at the indemnified party's cost, risk and expense, to separate counsel of its own choosing; and (iii) to compromise or settle such Claim. If the indemnifying party fails to assume the defense of such Claim within thirty (30) days after receipt of the Claim Notice, the indemnified party against which such Claim has been asserted will have the right to undertake, at the indemnifying party's cost and expense, the defense, compromise or settlement of such Claim on behalf of and for the account and risk of the indemnifying party; *provided, however*, that such Claim shall not be compromised or settled without the written consent of the indemnifying party, which consent shall not be unreasonably withheld. In the event the indemnified party assumes the defense of the Claim, the indemnified party will keep the indemnifying party reasonably informed of the progress of any such defense, compromise or settlement.

   10.5.   Insurance Policies.  To the extent any of the Insurance Policies cannot be assigned without the consent of the carrier thereunder, until such time as such consent is obtained or is no longer necessary, Seller will make available to Buyer any and all rights and benefits under such Policy in order to enable Buyer to mitigate the impact of the Assumed Liabilities and the other liabilities of Buyer hereunder, including Buyer's indemnification obligations hereunder and under the Environmental Indemnity and Reimbursement Agreement.

ARTICLE XI.

MISCELLANEOUS

   11.1.   Assignment.  Neither this Agreement nor any of the rights or obligations hereunder may be assigned by any party without the prior written consent of the other parties; *provided, however*, that Buyer may, without such consent, assign all such rights to any lender as collateral security and assign all such rights and obligations to a subsidiary or subsidiaries of Buyer or to a successor in interest to Buyer which shall assume all obligations and Liabilities of Buyer under this Agreement; *provided, however*, that no such assignment shall relieve Buyer of its obligations under this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, and no other Person shall have any right, benefit or obligation under this Agreement as a third party beneficiary or otherwise.

   11.2.   Confidentiality.  The parties hereto acknowledge that the transactions contemplated hereunder are of a confidential nature and neither party shall make an announcement of this Agreement, in whole or in part, or the transaction contemplated hereby, to the public or any third party (except as expressly herein permitted), other than with the express written consent of the other party hereto. Further, until the Closing Date, all "Confidential Information" (as hereinafter defined) acquired by Buyer with respect to Seller, except for such disclosure as may be required by law or disclosures made with the

18

mutual consent of the parties hereto, shall be (i) maintained in confidence, (ii) used only for the purpose of and in connection with evaluating the business of Seller and (iii) disclosed only to employees, attorneys, consultants and other advisors to Buyer who have a need to know the information, *provided, however*, that with respect to information received by Buyer regarding Taxes, Buyer will use its best efforts to keep such information confidential and not disclose the same other than pursuant to advice of counsel or underwriters. If such advice is given, Buyer will promptly notify Seller of same. For the purposes of this Agreement, the term "Confidential Information" shall mean all information acquired by Buyer from Seller with respect to the business of Seller other than (x) information generally available to the public, (y) information which becomes available to Buyer from a source other than Seller or (z) was within Buyer's possession prior to its being furnished to Buyer pursuant to this Agreement.

11.3.   Survival of Representations. All of the representations, warranties, covenants and agreements made by Seller or Buyer in this Agreement or in any attachment, exhibit, schedule, certificate, document or list delivered by any such party pursuant hereto shall survive Closing and the delivery of any conveyancing instruments hereunder until the second anniversary of the Closing Date.

11.4.   Notices. All notices, requests, demands and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received if personally delivered: one (1) Business Day after transmission if transmitted by telecopy, electronic or digital transmission, one (1) Business Day after it is sent if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., FedEx); and upon receipt, if sent by certified or registered mail, return receipt requested. In each case notice shall be sent to:

If to Buyer to:

    CENCO, Inc.
    c/o Dean J. Nelson Happy
    Regent University School of Law
    1000 Regent University Drive
    Virginia Beach, Virginia 23464-9880

With a copy to:

    Latham & Watkins
    633 W. Fifth Street
    Suite 4000
    Los Angeles, California 90071
    Attention: David V. Lee, Esq.

19

NOV. 21. 2006   9:53AM     MAIN OFFICE 5629038911                    NO. 961   P. 8

If to Seller to:

     Vincent Papa, Esq.
     Managing Director and General Counsel
     PMG Capital Corp.
     General Motors Building
     767 Fifth Avenue, 23rd Floor
     New York, New York  10153

With a copy to:

     Loeb & Loeb
     1000 Wilshire Boulevard
     Suite 1800
     Los Angeles, California  90017
     Attention:  Robert S. Barry, Jr., Esq.

or to such other place and with such other copies as either party may designate as to itself by written notice to the others.

    11.5.  Choice of Law.  This Agreement shall be construed and interpreted and the rights of the parties shall be determined in accordance with the laws of the State of California, except with respect to matters of law concerning the internal corporate affairs of any corporate entity which is a party to or the subject of this Agreement, and as to those matters the law of the jurisdiction under which the respective entity derives its powers shall govern.

    11.6.  Entire Agreement, Amendments and Waivers.  This Agreement, together with all exhibits and schedules hereto and the Environmental Indemnity and Reimbursement Agreement, constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties. This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.  No amendment, supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the party to be bound thereby.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

    11.7.  Multiple Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

    11.8.  Invalidity.  In the event that any one or more of the provisions of this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument.

    11.9.  Cumulative Remedies.  All rights and remedies of either party hereto are cumulative of each other and of every other right or remedy such party may otherwise have at law or in equity, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

20

NOV. 21. 2006   9:53AM    MAIN OFFICE 5629038911                    NO. 961    P. 9

11.10.  <u>Attorneys' Fees.</u>  If any party to this Agreement brings an Action to enforce its rights under this Agreement, the prevailing party shall be entitled to recover its costs and expenses, including reasonable attorneys' fees, incurred in connection with such Action, including any appeal of such Action.

(Signature Page Follows)

21

NOV. 21. 2006   9:53AM   MAIN OFFICE 5629038911                    NO. 961   P. 10

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be signed by their respective officers thereunto duly authorized, all as of the date first written above

CENCO REFINING CO.
a Delaware corporation

By: _____
   Name:
   Title:

POWERINE OIL COMPANY,
a California corporation

By: _____
   Name:
   Title:

Page 38

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be signed by their respective officers thereunto duly authorized, all as of the date first written above.

CENCO REFINING CO.,
a Delaware corporation

By: _____
   Name:
   Title:

POWERINE OIL COMPANY,
a California corporation

By: _____
   Name:
   Title:

S-1

NY_DOCS\259564.10

NOV. 21. 2006  9:53AM    MAIN OFFICE 5629038911    VO. 961    P. 12

Exhibit A

## DESCRIPTION OF ASSETS

See attached Refinery and Pipeline Maps.

NOV. 21. 2006  9:53AM    MAIN OFFICE 5629038911                          NO. 961    P. 13



POWERINE OIL CO.
PIPELINES

POWERINE OIL CO.

POC-PL-01

NOV. 21. 2006  9:53AM    MAIN OFFICE 5629038911    NO. 961    P. 14

POWERINE OIL COMPANY
REFINERY, TERMINAL & ADMINISTRATIVE OFFICES

ALKY  – ALKYLATION UNIT
FCC   – FLUID CATALYTIC CRACKING UNIT
PLAT  – PLATFORMER/REFORMER
SRU   – SULFUR RECOVERY UNIT
TGU   – TAILGAS UNIT
VAC   – VACUUM UNIT
ZTOF  – ZINC THERMAL OXIDIZER FLARE

3/5/90 HR DEPT

NOV. 21. 2006  9:53AM    MAIN OFFICE 5629038911                                 NO. 961    P. 16

## Powerine Oil Company

### MEMORANDUM

DATE:      July 23, 1998

TO:        Bob Wenom

FROM:      Ed Sato

RE:        Miles of Powerine Pipelines (Revised)

| Powerine Pipeline No. | Miles | Map Key |
|---|---|---|
| POC #1 | 20.2 | |
| POC #1 | 2.69 | A |
| POC #2 | 3.37 | |
| POC #2 | 0.03 | B |
| POC #3 | 3.17 | |
| POC #3B | 1.75± | |
| POC #4 | 17.58 | |
| POC #4A | 1.57± | |
| POC #6 | 0.45 | H |
| POC #7 | 6.50 | |
| POC #7A | 6.50 | C |
| POC #8 | 0.23 | G |
| POC #9 | 3.00± | |
| POC #9 | 2.12 | D |
| POC #10 | 2.80 | |
| POC #11 | 0.65 | |
| POC #11 | 0.11 | E |
| POC #12 | 1.30 | F |
| POC #13 | 0.10 | |
| POC #14 | 1.00± | |
| POC #15 | 0.10 | |

Miscellaneous pipelines in the City of Santa Fe Springs:

| Size | Miles | |
|---|---|---|
| 1" | 0.03 | * |
| 2" | 0.03 | * |
| 4" | 2.11 | * |
| 6" | 0.66 | * |
| 8" | 0.02 | * |

* Not included on system map

Page 44

## ENVIRONMENTAL INDEMNITY AND REIMBURSEMENT AGREEMENT

This Environmental Indemnity and Reimbursement Agreement (this "Agreement"), dated as of July ___, 1998, is by and between Powerine Oil Company, a California corporation ("Seller"), and CENCO Refining Co., a Delaware corporation ("Buyer"), and is meant to supplement that certain Asset Purchase Agreement (the "Purchase Agreement") dated as of July ____, 1998 by and between Seller and Buyer.

### RECITALS

A.     Upon the terms and subject to the conditions set forth in the Purchase Agreement, Seller agreed to convey to Buyer the Refinery, the Pipelines and certain other assets used or useful in connection with the operation of the Refinery.

B.     In accordance with the Purchase Agreement and as a material component in establishing the consideration for the assets purchased thereunder, Seller and Buyer have agreed to enter into this Agreement to set forth their respective responsibilities for potential environmental liabilities and defense costs related to certain claimed environmental liabilities.

NOW, THEREFORE, in consideration of the foregoing recitals and the terms and conditions set forth below, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, Buyer and Seller agree as follows:

### ARTICLE I.

### DEFINITIONS

Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed to such terms in the Purchase Agreement. The following terms shall have the meanings ascribed to them as set forth below:

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, disbursal, leaching or migration into the indoor or outdoor environment or into or out of any property, including, without limitation, the movement of Hazardous Substances through or in the air, soil, surface water, ground water or property.

"Remedial Action" means all actions required to (i) clean up, remove, treat or in any other way address Hazardous Substances in the indoor or outdoor environment, (ii) prevent the Release or threat of Release or minimize the further Release of Contaminants so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor

B-1

NOV. 21. 2006   9:53AM          MAIN OFFICE   562903897      NO. 961      P. 18

environment, or (iii) perform pre-remedial studies and investigations and post-remedial monitoring and care.

## ARTICLE II.

## DAMAGES AND DEFENSE COSTS

2.1.    Indemnity for Purchased Assets.   Seller shall have no liability to Buyer and Buyer shall defend, indemnify, save and hold harmless Seller, its Affiliates, each of their assigns and successors and its and their respective Representatives, from and against any and all costs, losses, liabilities (including liabilities arising under CERCLA or personal injury or property damage claims, including claims for diminution in value), obligations, damages, lawsuits, deficiencies, claims, demands and expenses (whether or not arising out of third-party claims), including interest, penalties, attorneys fees and all amounts paid in investigation, defense or settlement of any of the foregoing (collectively hereafter, "Damages") in connection with, resulting from, or incident to any liability or obligation arising out of any Remedial Action, Hazardous Substance on, under, about or from the Refinery (including off-site disposal sites), Release, and any Environmental Laws, which in each case pertain to the Refinery, the operations of the Refinery, or any real property or leasehold interest or other asset which constitutes a portion of the Refinery or the Pipelines (the "Purchased Assets"), whether arising prior to or after the transactions contemplated by the Purchase Agreement.

2.2.    Limited Indemnity for Other Property.   Buyer has not assumed or otherwise agreed to be responsible for, and Seller shall retain and shall discharge, perform and be fully responsible for, all of the obligations, fixed or contingent, known or unknown, matured or unmatured, of Seller relating to any petroleum terminal, storage facility, pipeline, service station or other property (other than the Purchased Assets) now or previously owned or operated by Seller, including the storage tanks and pipelines formerly operated by Seller at the Mission Valley Terminal in San Diego, California (each, for purposes of this Agreement, an "Other Property"). Notwithstanding the foregoing, but subject to the terms and conditions of this Agreement, Buyer shall indemnify Seller for Damages in connection with, resulting from, or incident to any liability or obligations arising out of any Remedial Action, Hazardous Substance on, under, about or from the Other Property, Release, and any Environmental Laws, which in each case pertain to the Other Property; provided, however, that in no event shall Buyer be liable or otherwise obligated for Damages, individually or in the aggregate, under this Section 2.2 in excess of One Million Five Hundred Thousand Dollars ($1,500,000) (the "Maximum Contribution").

## ARTICLE III.

## CONDITIONS TO BUYER'S OBLIGATIONS

3.1.    Conditions to Buyer's Obligations.   Buyer's duty to pay Seller under this Agreement for any Damages is subject to each of the following conditions, any of which may be

B-2

waived by Buyer:

(a)     If a claim for Damages (a "Claim") is to be made by Seller hereunder, Seller shall give written notice (a "Claim Notice") to Buyer as soon as practicable (but not later than thirty (30) days) after the Seller becomes aware of any fact, condition or event which may give rise to such Damages. The failure of Seller to give timely notice shall not affect rights to reimbursement hereunder, except to the extent that Buyer demonstrates actual Damages caused by such failure.

(b)     Prior to any indemnification or reimbursement of Seller hereunder, Seller shall agree in writing to assign to Buyer all of Seller's: (i) rights and interests to receive proceeds for Damages under any policies of insurance which potentially cover the Damages at issue, except to the extent any applicable insurance policy has been assigned to Buyer pursuant to the Purchase Agreement; and (ii) any rights to contribution from third parties for Damages in connection with the Damages at issue.

(c)     Except to the extent any applicable insurance policy has been assigned to Buyer pursuant to the Purchase Agreement, Seller shall fulfill all obligations and take all actions required by each policy of insurance that may apply to the Damages at issue, including the timely submittal of necessary notices.

## ARTICLE IV.

## DEFENSE OF CLAIMS

4.1.    Buyer's Rights and Obligations.

4.1.1.   Control of Defense.    If Buyer, after receiving a Claim Notice, acknowledges in writing to Seller that Buyer shall be obligated under the terms of this Agreement to pay for the Damages referred to herein, then Buyer shall be entitled, if it so elects at its own cost, risk and expense, (i) to take control of the defense and investigation concerning such Damages; (ii) to employ and engage attorneys of its own choice to handle and defend the same unless the named parties to such action or proceeding include both the Seller and Buyer, and Seller shall have been advised in writing by counsel that there may be one or more legal defenses available to Seller that are different from or in addition to those available to the Buyer, in which event Seller shall be entitled, at its own cost, risk and expense, to separate counsel of its own choosing; and (iii) to settle such claim, so long as Buyer agrees to pay the full settlement amount. Seller shall provide promptly to Buyer any amounts paid on account of Damages paid hereunder that is paid to Seller under any of its insurance policies. Notwithstanding anything to the contrary set forth in the foregoing:

(a)     In no event shall Buyer be obligated to pay or assume any liability hereunder relating to Damages attributable to Other Property in excess of the Maximum Contribution; and

B-3

(b)      If in defending any Claim, or otherwise assuming any liability or obligation for Damages attributable to any Other Property, it becomes evident that the potential liability or obligation, when added to the aggregate amounts previously paid on account of Damages attributable to Other Property, could exceed One Million Five Hundred Thousand Dollars ($1,500,000), Buyer may, in lieu of further defending such Claim or otherwise incurring any liability or obligation for such Damages, pay to Seller the difference between (i) the aggregate amount previously paid on account of Damages attributable to Other Property and (ii) the Maximum Contribution. Upon such payment, Buyer's duty to defend such Claim, or any other Claim, with respect to Other Property shall be satisfied and discharged in its entirety, at which point Seller shall assume exclusive control, at its sole cost and expense, of the defense, compromise or settlement of such Claim. Notwithstanding the foregoing, if Buyer decides not to make such payment, Seller may assume control of the defense of such Claim at Buyer's costs and expense, but in such instance, Buyer's obligation to pay such damages shall only continue until such time as the Maximum Contribution has been paid.

(c)      Buyer agrees that it will make available to Seller, as long as she is an employee of Buyer, the reasonable consultation of Ms. June Christman or her replacement, at no cost or expense to Seller.

4.2.    Seller's Rights and Obligations

4.2.1.  Seller's Right to Undertake Defense. If Buyer's indemnification of Seller for Damages attributable to Other Property has not exceeded the Maximum Contribution and if Buyer fails to assume the defense of a Claim within thirty (30) days after receipt of the Claim Notice, Seller shall (upon delivering notice to such effect to Buyer) have the right to undertake, at Buyer's cost and expense (but subject to the Maximum Contribution limits in Section 4.1.1 hereunder), the defense, compromise or settlement of such Claim, provided that Buyer shall have the exclusive right to approve reasonably and promptly Seller's choice of counsel and any experts, consultants and other professionals retained by Seller. In the event the Seller assumes the defense of the Claim, Seller shall keep Buyer reasonably informed of the progress of any such defense, compromise or settlement.

4.2.2.  Cooperation and Reasonableness. In connection with any Claim hereunder, Seller shall (i) as soon as reasonably practicable following receipt by Seller provide Buyer with copies of all notices, demands or other communications between Seller and any Governmental Authority and all reports, data, manifests, materials or other material documents concerning the liability or obligation underlying such Claim (the "Reports"); (ii) use reasonable efforts to provide Buyer with a reasonable opportunity to review and comment upon any Report which is to be submitted to a Governmental Authority prior to such submittal; (iii) use its best efforts to provide Buyer with reasonable opportunity to review and comment upon any agreement, settlement or action plan with a Governmental Authority before such document is finalized; and (iv) use reasonable efforts to provide Buyer with reasonable prior notice of any meeting between Governmental Authority and Seller and an opportunity to attend such meeting. In addition, Buyer and Seller shall cooperate in all reasonable respects with each other and their

B-4

attorneys in the investigation, trial and defense of any pending lawsuit or other action and any appeal arising therefrom.

## ARTICLE V.

## MISCELLANEOUS

5.1.    No Third-Party Beneficiaries.  This Agreement shall be binding upon and inure to the benefit of Seller and Buyer and their respective predecessors, successors and assigns.  This Agreement is intended to confer rights and benefits only upon the Seller and Buyer (their successors and assigns) and is not intended to confer any right or benefit upon any Person.  No Person shall have any legally enforceable right hereunder.  All rights of action for any breach of this Agreement are hereby reserved to the parties, their successors or assigns.

5.2.    Notices.  All notices, requests, demands and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received if personally delivered: one (1) Business Day after transmission if transmitted by telecopy, electronic or digital transmission, one (1) Business Day after it is sent if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., FedEx); and upon receipt, if sent by certified or registered mail, return receipt requested.  In each case notice shall be sent to:

If to Buyer to:

> CENCO, Inc.
> c/o Dean J. Nelson Happy
> Regent University School of Law
> 1000 Regent University Drive
> Virginia Beach, Virginia 23464-9880

With a copy to:

> Latham & Watkins
> 633 W. Fifth Street
> Suite 4000
> Los Angeles, California 90071
> Attention:  David V. Lee, Esq.

If to Seller to:

> Vincent Papa, Esq.
> Managing Director and General Counsel
> PMG Capital Corp.
> Managing Director and General Counsel
> General Motors Building

B-5

767 Fifth Avenue, 23rd Floor
New York, New York

With a copy to:

Loeb & Loeb
1000 Wilshire Boulevard
Suite 1800
Los Angeles, California 90017
Attention: Robert S. Barry, Jr. Esq.

or to such other place and with such other copies as either party may designate as to itself by written notice to the others.

5.3.    Choice of Law.    This Agreement shall be construed, interpreted and the rights of the parties determined in accordance with the laws of the State of California (without reference to the choice of law provisions of California law), except with respect to matters of law concerning the internal corporate affairs of any corporate entity which is a party to or the subject of this Agreement, and as to those matters the law of the jurisdiction under which the respective entity derives its powers shall govern.

5.4.    Entire Agreement; Amendments and Waivers.    This Agreement, together with the Purchase Agreement and all Exhibits, Schedules and ancillary agreements thereto, constitute the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties. This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto. No amendment, supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the party to be bound thereby. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

5.5.    Conflict with Purchase Agreement.    This Agreement is intended to modify and supplement certain of the terms of the Purchase Agreement with respect to the parties' rights and obligations with respect to certain environmental matters. In the event of any conflict or ambiguity between the Purchase Agreement and this Agreement, the provisions of the Purchase Agreement shall control.

5.6.    Multiple Counterparts.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

5.7.    Invalidity.    In the event that any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law,

B-6

such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument.

5.8.    Cumulative Remedies.  All rights and remedies of either party hereto are cumulative of each other and of every other right or remedy such party may otherwise have at law or in equity, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

5.9.    Headings.  The headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

5.10.    Attorneys' Fees.  If any party to this Agreement brings an Action to enforce its rights under this Agreement, the prevailing party shall be entitled to recover its costs and expenses, including reasonable attorneys' fees incurred in connection with such Action, including any appeal of such Action.

B-7

NY_DOCS\262963.8

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, or have caused this Agreement to be duly executed on their respective behalf by their respective officers thereunto duly authorized, as of the day and year first above written.

BY OWNER:

CENCO Refining Co.,
a Delaware corporation

By: _____

Name:
Title:

BY SELLER:

POWERINE OIL COMPANY,
a California corporation

By: _____

Name:
Title:

B-8

Exhibit C

## BILL OF SALE

**KNOW ALL MEN BY THESE PRESENTS** that POWERINE OIL COMPANY ("Seller"), a California corporation having offices at 12345 Lakeland Road, P.O. Box 2108, Santa Fe Springs, CA 90670, for a valuable consideration, the receipt of which is hereby acknowledged, hereby grants, bargains, sells, conveys, transfers and sets over unto CENCO REFINING CO., a Delaware corporation ("Buyer"), having offices at 977 Centerville Turnpike, SHB-301, Virginia Beach, Virginia 23463, its successors and assigns, all of Seller's right, title and interests in and to the Assets, as such term is defined in the Asset Purchase Agreement between Seller and Buyer dated as of July __, 1998.

Seller hereby warrants and represents to Buyer and its successors and assigns that Seller has good legal title to, and good and lawful right to sell the Assets, that the Assets are free and clear of any and all claims, liens, security interests and other encumbrances of any kind or nature whatsoever, and that upon the delivery of this Bill of Sale to Purchaser, Purchaser has and will have good and marketable title to the Assets, free and clear of any and all claims, liens, security interests and other encumbrances of any kind or nature whatsoever; subject, however, to the liens disclosed pursuant to the above-referenced Agreement.

All the terms, covenants and conditions herein contained shall be for and shall inure to the benefit of and shall bind the respective parties hereto, and their legal representatives, successors, and assigns, respectively.

Seller will, at any time and from time to time, upon written request therefor, execute and deliver to Buyer any new or confirmatory instruments which Buyer may reasonably request in order to fully assign and transfer to and vest in Buyer and to protect Buyer's right, title and interest in and to and under the property conveyed hereunder or to otherwise realize upon or enjoy such rights therein and thereto.

**IN WITNESS WHEREOF**, Seller has caused this Bill of Sale to be duly executed in its name by its duly authorized officers this ___ day of _____, 1998.

POWERINE OIL COMPANY,
a California corporation


By _____
Name _____
    Its _____


C-1

NY_DOCS\262965.8

NOV. 21. 2006   9:56AM   MMM OFFICE 302903897T   VO. 962   P. 6/20

Exhibit D

## ASSIGNMENT AND ASSUMPTION OF CONTRACTS AND WARRANTIES

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are acknowledged, the undersigned "Assignor" hereby assigns, transfers, sets-over and delivers unto CENCO REFINING CO., a Delaware corporation ("Assignee"), all of the rights, benefits and privileges of Assignor in, to and under (i) the contracts (the "Contracts") defined in the Asset Purchase Agreement and (ii) all guaranties and warranties with respect to the Assets as such term is defined in the Asset Purchase Agreement dated as of July __, 1998 among Assignor and Assignee (the "Agreement"); TO HAVE AND TO HOLD unto Assignee, its successors and assigns, forever.

Assignor will, at any time and from time to time, upon written request therefor, execute and deliver to Assignee any new or confirmatory instruments which Assignee may reasonably request in order to fully assign and transfer to and vest in Assignee and to protect Assignee's right, title and interest in, to and under, the Contracts and the Warranties or to otherwise realize upon or enjoy such rights therein and thereto.

This Assignment may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, Assignor has executed this Assignment as of _____, 1998.

POWERINE OIL COMPANY,
a California corporation

By _____
Name _____
Its _____

D-1

NY_DOCS\262963.8

Assignee hereby assumes all of the terms, covenants, and conditions arising after the date hereof and to be performed by Assignor under the Contracts.

IN WITNESS WHEREOF, Assignee has executed this Assumption as of _____, 1998.

ASSIGNEE:

CENCO REFINING CO.,
a Delaware corporation

By _____
Name _____
Its _____

D-2

NOV. 21. 2006   9:56AM   MAIN OFFICE 50290389111   VO. 962   P. 8/20

## SCHEDULE 1.1

### INSURANCE POLICIES

NOV. 21. 2006   9:56AM     MAIN OFFICE 5629038911               NO. 962   P. 9/20

POWERINE OIL COMPANY LIABILITY INSURANCE POLICIES

| | | | |
|---|---|---|---|
| 5/1/58-5/1/59 | 200,000 | primary | Lloyd's London #LAB2579 |
| | 1,800,000 | excess | Lloyd's London #LA62213 |
| | 2,000,000 | | |
| 5/1/59-5/1/61 | 50,000 | primary | Citizens Casualty Co. #SP-1176 |
| | 1,950,000 | excess | Lloyd's London #LA62213 |
| | 2,000,000 | | |
| 5/1/61-5/1/62 | 50,000 | primary | Citizens Casualty Co. #SP-1176 |
| | 450,000 | excess | Seven Provinces Ins. Co. #SP 01-05-50 |
| | 500,000 | excess | Mission Insurance Co. #M 374 |
| | 1,000,000 | excess | Employers' Surplus Lines #E 503300 |
| | 2,000,000 | | |
| 5/1/62-5/1/63 | 50,000 | primary | Harbor Insurance Co. #S 1922 |
| | 450,000 | excess | Seven Provinces Ins. Co. #SP 01-05-50 |
| | 500,000 | excess | Mission Insurance Co. #M 374 |
| | 1,000,000 | excess | Employers' Surplus Lines #E 503300 |
| | 2,000,000 | | |
| 5/1/63-5/1/64 | 50,000 | primary | Harbor Insurance Co. #S 1922 |
| | 450,000 | excess | Seven Provinces Ins. Co. #SP 01-05-50 |
| | 500,000 | excess | Mission Insurance Co. #M 374 |
| | 1,000,000 | excess | Employers' Surplus Lines #E 503300 |
| | 2,000,000 | | |
| added 8/17/63 | 1,000,000 | excess | Swett & Crawford #36098 |
| added 8/17/63 | 2,000,000 | excess | Employers' Surplus Lines #E 506597 |
| | 5,000,000 | | |
| added 9/1/63 | 25,000 | primary BI | Pacific Employers Ins. Co. #01G82684 |
| 5/1/64-5/1/65 | 2,000,000? | primary | Harbor Insurance Co. #S 1922 |
| | 25,000 | primary BI | Pacific Employers Ins. Co. #01G82684 |
| | 1,000,000 | excess | Swett & Crawford #36098 |
| | 2,000,000 | excess | Employers' Surplus Lines #E 506597 |
| | 5,000,000? | | |
| 5/1/65-8/17/66 | 25,000 | primary BI | Pacific Employers Ins. Co. #01G82684 |
| | 2,000,000 | primary & excess | Harbor Insurance Co. #102693 |
| | 1,000,000 | excess | Swett & Crawford #36098 |
| | 2,000,000 | excess | Employers' Surplus Lines #E 506597 |
| | 5,000,000 | | |
| 8/17/66-9/1/66 | 25,000 | primary BI | Pacific Employers Ins. Co. #01G82684 |
| | 2,000,000 | primary & excess | Harbor Insurance Co. #102694 |
| | 2,000,000 | excess | Sayre & Toso, Inc. #ST 12754 |
| | 4,000,000 | | |

NOV. 21. 2006   9:56AM    MAIN OFFICE 5629038911    NO. 962    P. 10/20

| Period | Amount | Type | Insurer |
|---|---|---|---|
| 1/1/66-10/15/67 | 25,000 | primary | Aetna Casualty #33AL053521-SR(Y) |
| | 1,975,000 | excess | Harbor Insurance Co. #102694 |
| | 2,000,000 | excess | Sayre & Toso, Inc. #ST 12754 |
| | 4,000,000 | | |
| 10/15/67-12/11/67 | 100,000 | primary | Aetna Casualty #33AL053521-SR(Y) |
| | 100,000 | primary PD | Signal Ins. Co. #GLA 200066 |
| | 900,000 | excess | Employers' Surplus Lines #E513017 |
| | 900,000 | excess PD | Reserve Insurance Co. #EL 985-2103 |
| | 4,000,000 | excess | Employers' Surplus Lines #E513016 |
| | 5,000,000 | | |
| 12/11/67-10/15/68 | 100,000 | primary | Aetna Casualty #33AL053521-SR(Y) |
| | 100,000 | primary PD | Signal Ins. Co. #GLA200066 |
| | 900,000 | excess | Employers' Surplus Lines #E513017 |
| | 4,000,000 | excess | Employers' Surplus Lines #E513016 |
| | 5,000,000 | | |
| 10/15/68-10/26/68 | 100,000 | primary | Aetna Casualty #33AL053521-SR(Y) |
| | 100,000 | primary PD | Signal Ins. Co. #GLA200066 |
| | 900,000 | excesss | Employers' Surplus Lines #513017 |
| | 4,000,000 | excess | Employers' Surplus Lines #513016 |
| | 5,000,000 | | |
| 9/26/68-10/1/69 | 100,000 | primary | Aetna Casualty #33AL053521-SR(Y) |
| | 100,000 | primary PD | Signal Ins. Co. #GLA200066 |
| | 100,000 | primary PD | Holland-America Ins. Co. #10017 |
| | 900,000 | excess | Employers' Surplus Lines #513017 |
| | 4,000,000 | excess | Employers' Surplus Lines #513016 |
| | 5,000,000 | | |
| 10/1/69-10/26/69 | 100,000 | primary | Aetna Casualty #33AL84477SR(Y) |
| | 100,000 | primary PD | Signal Ins. Co. #GLA200066 |
| | 100,000 | primary PD | Holland-America Ins. Co. #10017 |
| | 900,000 | excess | Employers' Surplus Lines #513017 |
| | 4,000,000 | excess | Employers' Surplus Lines #513016 |
| | 5,000,000 | | |
| 10/26/69-10/8/70 | 100,000 | primary | Aetna Casualty #33AL84477SR(Y) |
| | 100,000 | primary PD | Signal Ins. Co. #GLA200066 |
| | 50,000 | primary PD | Holland-America Ins. Co. #23HAC10177 |
| | 150/200,000 | excess | Employers' Surplus Lines #E60180 |
| | 750,000 | excess | Harbor Ins. Co. #108295 |
| | 4,000,000 | excess | Employers' Surplus Lines #513016 |
| | 5,000,000 | | |
| 10/8/70-10/15/70 | 50,000 | primary | Mission Ins. Co. #HAC10684 |
| | 100,000 | primary | Signal Ins. Co. #GLA200066 |
| | 50,000 | primary PD | Holland-America Ins. Co. #23HAC10177 |
| | 150/200,000 | excess | Employers' Surplus Lines #E60188 |
| | 750,000 | excess | Harbor Ins. Co. #108295 |
| | 4,000,000 | excess | Employers' Surplus Lines #513016 |
| | 5,000,000 | | |

| | | | |
|---|---|---|---|
| 0/15/70-10/26/70 | 50,000 | primary | Mission Ins. Co. #HAC10684 |
| | 50,000 | primary PD | Holland-America Ins. Co. #23HAC10177 |
| | 150/200,000 | excess | Employers' Surplus Lines #E60188 |
| | 750,000 | excess | Harbor Ins. Co. #108295 |
| | 4,000,000 | excess | Employers' Surplus Lines #513016 |
| | 5,000,000 | | |
| | | | |
| 10/26/70-10/8/71 | 50,000 | primary | Mission Ins. Co. #HAC10684 |
| | 200,000 | excess | Employers' Surplus Lines #E65362 |
| | 750,900 | excess | Harbor Ins. Co. #108295 |
| | 4,000,000 | excess | Sayre & Toso #V21649 |
| | 5,000,000 | | |
| | | | |
| 10/8/71-10/26/71 | 50,000 | primary | Mission Ins. Co. #HAC11301 |
| | 200,000 | excess | Employers' Surplus Lines #E63983 |
| | 750,000 | excess | Harbor Ins. Co. #108295 |
| | 4,000,000 | excess | Sayre & Toso #V21649 |
| | 5,000,000 | | |
| | | | |
| 10/26/71-10/8/72 | 50,000 | primary | Mission Ins. Co. #HAC11301 |
| | 200,000 | excess | Employers' Surplus Lines #E63983 |
| | 750,000 | excess | Harbor Ins. Co. #108295 |
| | 4,000,000 | excess | Sayre & Toso #V21649 |
| | 5,000,000 | | |
| added 3/10/72 | 5,000,000 | excess | Mission Ins. Co. #M74739 |
| | 10,000,000 | | |
| | | | |
| 10/8/72-3/10/73 | 50,000 | primary | Mission Ins. Co. #HAC11682 |
| | 200,000 | excess | Mission Ins. Co. #M77466 |
| | 750,000 | excess | Harbor Ins. Co. #113836 |
| | 4,000,000 | excess | Sayre & Toso #V21649 |
| | 5,000,000 | excess | Mission Ins. Co. #M74739 |
| | 10,000,000 | | |
| | | | |
| 3/10/73-10/8/73 | 50,000 | primary | Mission Ins. Co. #HAC11682 |
| | 200,000 | excess | Mission Ins. Co. #M77466 |
| | 750,000 | excess | Harbor Ins. Co. #113836 |
| | 4,000,000 | excess | Sayre & Toso #V21649 |
| | 5,000,000 | excess | Mission Ins. Co. #M79913 |
| | 10,000,000 | | |
| | | | |
| 10/8/73-10/8/74 | 50,000 | primary | Highlands Ins. Co. #GA816262 |
| | 9,950,000 | excess | Central National #CNU12-20-39 |
| | 10,000,000 | | |
| | | | |
| 10/8/74-10/8/75 | 50,000 | primary | Aetna Ins. Co. #CG655683 |
| | 9,950,000 | excess | Central National #CNU12-26-82 |
| | 10,000,000 | | |
| added 1/24/75 | 15,000,000 | excess | Ins. Co. of State of PA #4275-1336 |
| added 1/24/75 | 15,000,000 | excess | Midland Ins. Co. #XL146555 |
| | 40,000,000 | | |

NOV. 21. 2006  9:57AM    M.D.H. 6010389P                                    NO. 962    P. 12/20

| | | | |
|---|---|---|---|
| .0/8/75-10/8/76 | 50,000 | primary | Aetna Ins. Co. #CG608578 |
| | 9,950,000 | excess | Central National #CNU12-30-08 |
| | 15,000,000 | excess | Ins. Co. of State of PA #4275-1336 |
| | 15,000,000 | excess | Midland Ins. Co. #XL146555 |
| | 40,000,000 | | |
| 10/8/76-10/8/77 | 50,000 | primary | Aetna Ins. Co. #CG608578 |
| | 9,950,000 | excess | Central National #CNU12-56-25 |
| | 8,000,000) | excess | Lloyds, London #12732 |
| | 17,000,000) | excess | Ins. Co. of State of PA #4275-1336 |
| | 15,000,000 | excess | Midland Ins. Co. #XL146555 |
| | 50,000,000 | | |
| 10/8/77-10/8/78 | 500,000 | primary | Central National #CNS9-47-57 |
| | 9,500,000 | excess | Central National #CNU12-79-39 |
| | 20,000,000 | excess | Northbrook Ins. Co. #63003675 |
| | 2,000,000) | excess | International Surplus #XSI3554 |
| | 3,000,000) | excess | First State Ins. Co. #914277 |
| | 10,000,000) | excess | National Union Fire Ins. #1228241 |
| | 3,000,000) | excess | Lexington Ins. Co. #GC5502896 |
| | 2,000,000) | excess | Federal Ins. Co. #7932-71-06 |
| | 50,000,000 | | |
| 10/8/78-10/8/79 | 500,000 | primary | Central National #CNS9-44-63 |
| | 9,500,000 | excess | Central National #CNU03-31-78 |
| | 20,000,000 | excess | Northbrook Ins. Co. #63 005 104 |
| | 5,000,000) | excess | Interstate Fire #155-U 025585 |
| | 2,000,000) | excess | International Surplus #XSI3607 |
| | 2,000,000) | excess | Federal Ins. Co. #(79)7932-71-06 |
| | 8,000,000) | excess | New England Reins. #781060 |
| | 3,000,000) | excess | Lexington Ins. Co. #5513542 |
| | 50,000,000 | | |
| 10/8/79-10/8/80 | 500,000 | primary | Central National #CNS9-45-93 |
| | 9,500,000 | excess | Central National #CNU03-49-44 |
| | 40,000,000 | excess | Central National #CNZ14-16-35 |
| | 50,000,000 | | |
| 10/8/80-10/8/81 | 500,000 | primary | Central National #CNS9-48-84 |
| | 9,500,000 | excess | Central National #CNU00-40-80 |
| | 40,000,000 | excess | Central National #CNZ14-20-56 |
| | 50,000,000 | | |
| 10/8/81-2/8/83 | 500,000 | primary | Central National #CNS13-29-57 |
| | 9,500,000 | excess | Central National #CNU00-81-61 |
| | 40,000,000 | excess | Central National #CNZ00-60-84 |
| | 50,000,000 | | |

| Period | Amount | Type | Insurer |
|---|---|---|---|
| 2/8/83-2/8/84 | 500,000 | primary | National Union Fire #GLA918-54-46 |
| | 24,500,000 | excess | Twin City Fire Ins. #TXU106136 |
| | 20,000,000 | excess | Integrity Ins. Co. #XL206557 |
| | 5,000,000 | excess | American Centennial #CC-01-57-01 |
| | 10,000,000) | excess | Federal Ins. Co. #(84)7928-47-25 |
| | 10,000,000) | excess | Fireman's Funds #0-75XEX01346962 |
| | 10,000,000) | excess | Ins. Co. of N. A. #XCP145241 |
| | 20,000,000) | excess | First State Ins. Co. #EU935954 |
| | 15,000,000) | excess | Lexington Ins. Co. #5522289 |
| | 25,000,000) | excess | National Union Fire #9606065 |
| | 10,000,000) | excess | Midland Ins. Co. #XL724388 |
| | 150,000,000 | | |
| 2/8/84-2/8/85 | 500,000 | primary | Protective National #CGL347-32-56 |
| | 9,500,000 | excess | Mission National Ins. #MN032091 |
| | 14,000,000) | excess | Century Indemnity Co. #CIZ426304 |
| | 6,000,000) | excess | Republic Indemnity #4CX10061 |
| | 10,000,000) | excess | Industrial Underwriters #JE884-2610 |
| | 4,000,000) | excess | Granite State Ins. Co. #6284-4477 |
| | 6,000,000) | excess | Integrity Ins. Co. #XL208423 |
| | 25,000,000) | excess | First State Ins. Co. #EU000917 |
| | 15,000,000) | excess | Harbor Ins. Co. #HI180721 |
| | 10,000,000) | excess | National Union Fire #90606538 |
| | 20,000,000) | excess | Federal Ins. Co. #(85)7928-47-25 |
| | 10,000,000) | excess | National Union Fire #9606538 |
| | 20,000,000) | excess | Fireman's Fund #0-75XLX-1620378 |
| | 150,000,000 | | |
| 2/8/85-7/8/85 | 500,000 | primary | Harbor Ins. Co. #GLA188126 |
| | 9,500,000 | excess | Mission National #MN044978 |
| | 10,000,000 | excess | National Union Fire #9609453 |
| | 5,000,000 | excess | Industrial Ins. Co. #JE884-3919 |
| | 5,000,000 | excess | Granite State Ins. #6285-5614 |
| | 5,000,000) | excess | Transport Indemnity #TEL900606 |
| | 5,000,000) | excess | Highlands Ins. Co. #SR NO. 30542 |
| | 5,000,000) | excess | First State Ins. Co. #EU002629 |
| | 5,000,000) | excess | Pacific Employers Ins. #XCC012126 |
| | 50,000,000 | | |
| 7/8/85-2/8/86 | 500,000 | primary | Harbor Ins. Co. #GLA188126 |
| | 9,500,000 | excess | Mission National #MN044978 |
| | 10,000,000 | excess | National Union Fire #9609453 |
| | 5,000,000 | excess | Industrial Ins. Co. #JE884-3919 |
| | 5,000,000 | excess | Granite State Ins. #6285-5614 |
| | 5,000,000) | excess | Highlands Ins. Co. #SR NO. 30542 |
| | 5,000,000) | excess | First State Ins. Co. #EU002629 |
| | 5,000,000) | excess | Pacific Employers Ins. #XCC012126 |
| | 45,000,000 | | |

| Period | Amount | Type | Insurer |
|---|---|---|---|
| 2/8/86-3/1/86 | 1,000,000 | primary | National Union Fire #EGA154-2733 |
| | 5,000,000 | excess | National Union Fire #BE1320594 |
| | 6,000,000 | | |
| 3/1/86-2/8/87 | 1,000,000 | primary | National Union Fire #EGA154-2733 |
| | 5,000,000 | excess | National Union Fire #BE1320594 |
| | 4,000,000 | excess | Lexington Ins. Co. #5521924 |
| | 10,000,000 | | |
| 2/8/87-2/8/88 | 2,000,000 | primary | National Union Fire #EGA5402763RA |
| | 4,000,000 | excess | National Union Fire #CLM3076176 |
| | 4,000,000 | excess | Lexington Ins. Oo. #5523094 |
| | 10,000,000 | | |
| 2/8/88-2/8/89 | 2,000,000 | primary | National Union Fire #GLCM540-8188RA |
| | 8,000,000 | excess | National Union Fire #CLM3076184 |
| | 10,000,000 | | |
| 2/8/89-2/8/90 | 500,000 | primary | London companies #NPE34386 |
| | 500,000 | excess | Lloyd's #NPE34387 |
| | 1,000,000 | excess | Lloyd's #NPE34388 |
| | 5,000,000 | excess | Lloyd's #NPE34390 |
| | 10,000,000 | excess | Lloyd's #NPE34389 |
| | 17,000,000 | | |
| 2/8/90-2/8/91 | 500,000 | primary | Lloyd's #NPE38319 |
| | 500,000 | excess | Lloyd's #NPE38320 |
| | 1,000,000 | excess | Lloyd's #NPE38321 |
| | 5,000,000 | excess | Lloyd's #NPE38322 |
| | 5,000,000 | excess | Lloyd's BNPE38323 |
| | 12,000,000 | | |
| 2/8/91-2/8/92 | 500,000 | primary | Lloyd's #43055E |
| | 500,000 | excess | Lloyd's #43056E |
| | 5,000,000 | excess | Lloyd's #43057E |
| | 5,000,000 | excess | Lloyd's #43058E |
| | 14,000,000 | excess | Lloyd's #43164 and #43165 |
| | 25,000,000 | | |
| 2/8/92-2/8/93 | 500,000 | primary | Lloyd's #ET011390L |
| | 500,000 | excess | Lloyd's #ET011400L |
| | 4,000,000 | excess | Lloyd's #ET011410L |
| | 10,000,000 | excess | Lloyd's #ET011420L |
| | 10,000,000 | excess | Lloyd's #ET011430L |
| | 25,000,000 | | |

| | | | |
|---|---|---|---|
| 2/8/93-1/14/94 | 250,000 | primary | Lloyd's #ET011390M |
| | 750,000 | excess | Lloyd's #ET011400M |
| | 1,000,000 | excess | Lloyd's #ET011410M |
| | 23,000,000 | excess | Lexington #ET011420M |
| | 25,000,000 | | |
| | | | |
| 1/14/94-1/14/95 | 1,400,000 | primary | Home Insurance Co. #SLM9261549 |
| 1/14/94-1/14/95 | 25,000,000 | excess | American Intl. Surplus Lines #7732008 |
| 1/28/94-1/28/95 | 15,000,000 | excess retro | Lexington Ins. Co. #801671/8668555 |
| | excess of | buyback | |
| | 10,000,000 | | |
| 1/28/94-1/28/95 | 20,000,000 | excess | Lexington Ins. Co. #801672/8668554 |
| 1/31/94-1/31/95 | 100,000,000 | excess | XL Insurance Co. #XLUMB02547 |
| 11/30/93-11/30/94 | 20,000,000 | primary aviation prod. liability | Americas Insurance Co. #0103654 |
| 11/30/93-11/30/94 | 300,000,000 | excess aviation prod. liability | Underwriters at Lloyd's London #62328 |
| 1/14/94-1/14/95 | 2,000,000 | terminal operators liability | Underwriters at Lloyd's London #801670/62553 |
| | 146,400,000 | | Total General/Excess Liability Limit |
| | 320,000,000 | | Total Aviation Products Liability |
| | 147,000,000 | | Total Terminal Operator's Liability |

NOV. 21. 2006  9:57AM    MAODER DOCUMENT 891    VO. 962    P. 16/20

## INSURANCE POLICIES
### 1995 - 1998

| | |
|---|---|
| Home Insurance Company of Illinios | #SLM-C20-09-02 |
| American International Specialty Lines | #7736951 |
| Lexington Insurance Company (Bowring Bermuda Branch) | #8781501 |
| Zurich American Insurance (CT Bowring Branch) | |
| Starr Technical Risks Agency (Bowring Bermuda Branch) | #200764 |
| Steadfast Insurance Company (Zurich-American Insurance) | #BOG 833 2043 |
| National Union Fire of Pittsburgh through American Home Excess Casualty | #BB 932-07-05 |
| Lexington Insurance Company (Bermuda Branch) | #8781523 |
| Fireman's Fund Insurance Company | #MXA 8015-5080 |
| Starr Technical Risks Agency | #ST-260-4122 |
| National Union Fire Insurnace Company of Pittsburgh, | #PA482-49-06 |
| National Union Fire Insurnace Company of Pittsburgh, PA | #482-49-84 |
| Aetna Casualty & Surety Company | #001 FF 100972067 BCA |
| National Union Fire Insurance Company of Pittsburgh, PA. | #GL 543-77-38 |
| National Union Fire Insurance Company of Pittsburgh, PA. | #BB 932-59-02 |
| National Union Fire Insurance Company of Pittsburgh, PA | #CA 543-77-39 |
| National Union Fire Insurance Company of Pittsburgh, PA. | #484-73-63 |
| National Union Fire Insurance Company of Pittsburgh, PA | #484-73-64 |
| Aetna Insurance Company | #QD FF 101093932 B |
| Reliance National Insurance Company | #NZB 0135670 |
| National Union Fire Insurance Company | #GL 565-30-82 |
| National Union Fire Insurance Company | #CA 565-51-10 |
| State Workers Compensation Fund (California) | TBD |
| National Union Fire Insurance Company of Pittsburgh, PA | #BB 357-01-55 |
| National Union Fire Insurance Company of Pittsburgh, PA | #770-57-78 |
| National Union Fire Insurance Company of Pittsburgh, PA | #770-58-12 |
| Travelers Casualty & Surety | #001 FF 103007792 BCM |

## SCHEDULE 2.2

## EMPLOYEE SEVERANCE

*Potreine Oil Company*
*Accrued Payroll - Active S-P*
*As of June 30, 1998*

7/15/98 9:48 AM

| Name | Address | | City | State | Zip | EARNINGS |
|---|---|---|---|---|---|---|
| Bonnett, Sharon K | 3609 East 2Nd St | #406 | Long Beach | CA | 90803 | 9,182.45 |
| Caballero, Thomas R | 14288 Trumball St | | Whittier | CA | 90604 | 16,449.19 |
| Campos, Tarcicio | 5154 Eagle Rock Blvd | | Los Angeles | CA | 90041 | 15,397.70 |
| Christman, June M | 1321 Ridgeview Ter | | Fullerton | CA | 92631 | 33,719.39 |
| Duran, Martha V | 9901 Frederick Cr | | Huntington Beach | CA | 92646 | 13,584.13 |
| Egner, Michael H | 18196 Santa Sophia | | Fountain Valley | CA | 92708 | 41,466.66 |
| Hawk, Larry E | 17935 Gooseberry Dr | | Rowland Heights | CA | 91748 | 26,280.16 |
| Martlaro, Cynthia A | 2357 Blackfoot Avenue | Unit A | Placentia | CA | 92870 | 13,323.55 |
| Moffat, Scott M | 5921-F Templeton St | | Huntington Park | CA | 90255 | 24,436.11 |
| Ramirez, Eddie | 10436 La Reina Ave | #101 | Downey | CA | 90241 | 25,307.55 |
| Robertson, Ronald A | 8101 Dabny Ln | | La Palma | CA | 90623 | 27,864.88 |
| Ruiz, Maria E | 11560 Buell St | | Santa Fe Springs | CA | 90670 | 13,013.87 |
| Sato, Edwin J | 4618 Opal St | | Riverside | CA | 92509 | 26,294.21 |
| Turner, Robert B | 824 S Newhaven | | Orange | CA | 92869 | 33,560.95 |
| Wenom, Robert A | 2540 Country Hills Rd | | Brea | CA | 92621 | 62,500.00 |

| Total | 15 | | | | | $382,362.80 |

Ladb0598.xls                              Page 1 of 1                    Accrued Payroll - Active S-P

Powerine Oil Company
Accrued Payroll - Laid-off S-P
As of June 30, 1998

| Name | Address | | City | State | Zip | EARNINGS |
|------|---------|---|------|-------|-----|----------|
| Acayturri, Carlos | 15568 Quiet Oak Dr | | Chino Hills | CA | 91709 | 21,999.57 |
| Aguirre, Noel R | 1139 E Allen Ave | | Glendora | CA | 91740 | 22,416.30 |
| Bracy, Roberta M | 6036 Oak Meadow Dr | | Yorba Linda | CA | 92886 | 8,867.05 |
| Bryant, William J | 3491 Thornlake | | Long Beach | CA | 90808 | 13,521.93 |
| Chase, Kenneth, R | 11267 Roanoke Cl | | Cypress | CA | 90630 | 24,705.20 |
| Cooney, John D | 3163 Silver Smith | | Lake Havasu | AZ | 86403 | 19,897.27 |
| Espinoza, Jesse | 12134 Lowemont St | | Norwalk | CA | 90650 | 5,731.09 |
| Fiero, Paul D | 8454 Albla St | | Downey | CA | 90242 | 21,097.70 |
| Figula, William D | P.O. Box 2940 | | Wrightwood | CA | 92397 | 20,450.83 |
| Greene, Kenneth | 24641 Apple St | | Newhall | CA | 91321 | 18,485.38 |
| Hammersmith, Jim A | 1726 Esplanade St | # 4 | Redondo Beach | CA | 90277 | 17,875.82 |
| Hesse, Regina Y | 10215 Brian Ct | | Whittier | CA | 90601 | 12,993.25 |
| Hogan, William D | 5116 Raton Cir | | Long Beach | CA | 90807 | 18,970.51 |
| Jackson, Norman E | 1063 Stonebryn Dr | | Harbor City | CA | 90710 | 21,103.92 |
| Jacquez, Mario S | 14420 Fairford | | Norwalk | CA | 90650 | 23,125.37 |
| Jerome, Anna Maria | 9224 Foxbury Way | | Pico Rivera | CA | 90660 | 11,139.73 |
| Johnson, James R | 1610 Chetney Dr | | West Covina | CA | 91790 | 20,009.23 |
| Lopez, Carlos Ray | 12636 Bloomfield | # 63 | Norwalk | CA | 90650 | 17,595.93 |
| Magana, John C | 37770 Sea Pines Ct | | Murieta | CA | 92362 | 17,969.12 |
| Manuel, David W | 916 S Montebello | # 8 | Montebello | CA | 90640 | 5,731.09 |
| Monzon, James E | 6132 Pearce Ave | | Lakewood | CA | 90712 | 19,866.17 |
| Naylor, Tommy L | 1475 W Wedgewood Dr | | Anaheim | CA | 92801 | 25,837.22 |
| Robles, David | 6198 Woodsboro | | Anaheim | CA | 92807 | 22,584.24 |
| Sanchez, John | 11154 See Dr | | Whittier | CA | 90606 | 6,656.32 |
| Tucker, Mark A | 8832 Kermita Rd | | Bakersfield | CA | 93307 | 18,982.95 |
| Walhovd, Jim | 6016 Pennswood | | Lakewood | CA | 90712 | 14,790.78 |
| Wells, Darrel W | 3747 Aqueduct Ln | | Chino Hills | CA | 91709 | 18,572.44 |
| Total | 27 | | | | | $470,966.39 |

*Powerine Oil Company*
*Supplemental Severance—Active*
*June 30, 1998*

| Employee Name | Hire Date | Amount |
|---|---|---|
| Larry Berndt | 3/23/98 | - |
| Ed Bryant | 2/17/98 | - |
| Jess Corral | 4/29/96 | 1,992.80 |
| Larry Germain | 3/24/97 | 789.60 |
| Ray Huic | 7/21/97 | 1,096.40 |
| Mark Mealey | 3/23/98 | - |
| Bob Moedl | 4/29/96 | 1,992.80 |
| Tim Moriz | 12/9/97 | - |
| Javier Pena | 2/10/97 | 629.60 |
| Keith Rogers | 12/19/97 | - |
| | | 6,501.20 |

## SCHEDULE 4.9

## PENDING LITIGATION

    This Schedule supersedes the litigation identified in Vincent J. Papa's letter to Marshall Staunton dated April 13, 1998 and excludes certain of such litigation now reduced to a judgment and identified in Schedule 4.10 or which has previously been settled.

NOV. 21. 2006  9:59AM    MANHATTAN NATIONAL 8891    NO. 963   P. 2

Abarca et al v Powerine Oil Company et al
Los Angeles County Superior Court
Case No. VC 021767
Description:  Action for private nuisance, trespass, battery, negligence, etc claiming damages as a
result of POC having operated its refinery in a manner causing damage to plaintiff's persons and
real property.  Plaintiff's allege that POC failed to avoid excessive releases of toxic substances into
the atmosphere and environment.  Plaintiff's initially totaled in excess of 800.  The present number
of plaintiff's is less than 300.  Plaintiff's are asking for general, special and punitive damages.  The
action started as a result of a canvassing effort by the law firm of Girardi and Kesse at a time when
the refinery was shut down.  Defense costs for the action are covered under POC's various
insurance policies.

Larry Andrews, et al v Powerine Oil Company, et al
Orange County Superior Court
Case No. 792570
Description:  Complaint for Personal Injury - Asbestos

Castle Energy Corporation v. Powerine Oil Company
Los Angeles County Superior Court - Central District
Case No. BC192026
Description:  Complaint for Breach of Contract and Common Count for Money Paid regarding
unpaid attorney's fees for Jenner & Block in the amount of $330,000.00 plus $49,454.27 accrued
interest.

Fisher Scientific v Powerine Oil Company
Municipal Court of California - Whittier District
Case No. 98C01782
Description:  Action for open book account in the amount of $11,174.81 plus interest, attorneys'
fees and costs.

Vickie Goodson-Watson vs. Fibreboard Corporation, et al.
Superior Court for the State of California, County of Los Angeles-Central District
Case No. BC187623
Description:  Wrongful Death, Negligence, Breach of Warranty, Strict Liability and Premises
Liability.  Defendant's stepfather was employed as a pipefitter at Powerine Oil Company from
1947 to 1955 and was exposed to asbestos-containing dusts and fibers on her stepfather's person
and clothes.  Defendant's mother died as a result of exposure.

Highlands Insurance Company v Powerine Oil Company et al
Los Angeles Superior Court, Southeast District
Case No. VC025771
Description: Action for declaratory relief.  Highlands contends that it has no obligation to defend
POC under its insurance policies because POC intentionally continuously and in the regular course
of business transported hazardous waste to certain waste disposal sites.  POC has filed a cross
complaint against Plaintiff and certain of its other insurance carriers claiming that such insurance

carriers have a duty to defend POC and a duty to indemnify POC against liability for various claims and losses covered by POC's liability insurance policies.

Bob A. Smits vs. Raybestos-Manhattan, et al.
Superior Court of California in and for the County of San Francisco
Case No. 983394
Description: Negligence, Strict Liability, Enterprise Liability, False Representation, Punitive Damage, and Premises Liability. Exposure to asbestos containing products.

Williams Communications Solutions, LLC v Powerine Oil Company
Los Angeles County Municipal Court - Whittier Judicial District
Case No. 98C01856
Description: Action for failure to pay outstanding balance due to former company known as Nortel Communications Systems, Inc. Plaintiff's attorney filed Request for Entry of Default on June 30, 1998 in the amount of $21,002.48 that includes interest, costs and attorney fees.

### Certain Threatened Claims

Certain former employees of POC have filed a claim with the California Division of Labor Standards Enforcement. In an attempt to settle such claim POC has made an offer to pay disputed severance payments upon the raising of money for refinery start up.

City of Santa Fe Springs has informed POC to remove certain chemicals from town property.

NOV. 21. 2006   9:59AM   MARTIN... VO. 963   P. 4

## SCHEDULE 4.10

## SECURED CREDITORS

## UCC FINANCING STATEMENTS

<u>Creditor</u>                                    <u>Amount</u>
Kenyen Projects Limited                      3,000,000.00

## STATE TAX LIENS

<u>Creditor</u>                                    <u>Amount</u>
State Board of Equalization                  270,106.97

## DELINQUENT PROPERTY TAXES
(as of June 30, 1998)

<u>Creditor</u>                                    <u>Amount</u>
Los Angeles County                           $999,172.33

## DEEDS OF TRUST

<u>Creditor</u>                                    <u>Amount</u>
Demtriou, Del Guercio                        $344,186.84

KENYON PAID
DOMITRIOU PAID

Page 73

## POWERINE OIL COMPANY
### NOTICES OF ATTACHMENT
As of July 16, 1998

| Plaintiff | Attorney | Case Number | Original Filed | Served | Court | Attachment Amount | A/P Amount | Notes |
|---|---|---|---|---|---|---|---|---|
| Bragg Investment Co., Inc | Donald G. Estall, Esq. 6242 Pinewood Blvd. Long Beach, CA 90805 | NC021431 | ? | 11/28/97 12/01/97 | Los Angeles Superior Court 415 W. Ocean Boulevard Long Beach, CA 90801 South District - Long Beach | 109,880.97 | 115,534.97 | Seizes any documentary evidence in defendant's possession of title to any property and any fiduciary evidence, and all documentary evidence of real property owned by Demeter. Any and all property for which a method of levy is provided by the code of civil procedure |
| Demetrios, Del Guercio, Spinner and Moyes | Renita L. Cobb Demetrios, Del Guercio, Springs and Moyer 801 S. Grand Avenue 10th Floor Los Angeles, CA 90017-4613 | BC177783 | 10/06/97 | 10/06/97 10/29/97 11/19/97 11/06/97 11/21/97 11/21/97 10/22/97 10/22/97 10/22/97 10/22/97 10/22/97 10/22/97 | Superior Court of California 111 North Hill Street Los Angeles, CA 90012-3117 | 377,135.92 | 377,531.64 | Recorded on 10/30/97 at 97-1724892 Install Keeper Levy Bank Account # 3164-111108 (Wells Fargo closed) APPN Nos. 9095-022-017, 025, 031, 001. Red Ford Explorer, License Number 3RRB298 Ford F134 Truck, License Plate No. 2J14337 An escrow company in possession of, in control 1990 Ford Stakebed F-700 1979 Chev U61 1990 Ford Pick Up Cat Vacuum Trailer 1994 Ford F-150 1/2 Ton 1991 GMC S-15 1983 Pablo Vacuum Truck 1934 Small Pablo Vacuum Truck |
| Petro-Chemical Insulation, Inc. | Anderson & Brush/field 1930 Willow Pass Road, Suite 500 Concord, CA 94520 | L00341 | 07/25/98 | 03/09/98 (rec'd in mail) | Superior Court of CA, County of Solano | 145,252.71 | 145,250.25 | Judgment: $79,555.57 Principal + $18,884.84 Int + $17,605.00 Att's interest + $10,215.74 Costs Sec'd State Filing No. 9800160033 Notice of Levy Received 6/2/98, Wells Fargo Operating Account |
| Attorney Recovery Systems, Inc. (Pressure Vessel) | Joseph P. Giaciano 20750 Ventura Boulevard #209 Woodland Hills, CA 91602 | 99CO0407 | 05/08/98 | 06/01/98 | Los Angeles Municipal Court 7339 S. Painter Avenue Whittier, CA 90602-1498 Whittier Judicial District | 55,110.72 + Int | 9,238.18 | (Keeper) |

*(handwritten notes)*
PRESSURE VESSEL
PARP
9-11-98

DAMAGES PAYMENT
PAYMENTS TO
PETRO CHEM UNDER
A STIP

Page 74

POWERINE COMPANY
JUDGMENTS
As of July 16, 1998

| Vendor | Judgment Date | Judgment Principal | Judgment Interest | Added Interest | Attorneys Fees | Court Costs | Other/ Unknown | Total | A/P Amount | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| Lee Cook | 10/08/97 | 12,915.12 | 3,060.74 | | 660.00 | 112.00 | | 16,687.86 | 16,687.86 | Interest 10% from 6/13/95-10/8/97 (Did not seek interest past 10/8/97) |
| Concrete Coring | 03/12/98 | 155.59 | | | | 90.00 | | 245.59 | 245.59 | |
| C & A Rainey Corporation | 05/05/98 | 33,444.06 | (?) | | 3,500.00 | | | 36,944.06 | 36,944.06 | + Interest & Costs |
| Kenneth Greene | 03/11/98 | 18,588.36 | | | | | | 18,588.36 | 18,588.36 | |
| MGM Inc (Signed by Arbitrator but not by Clerk of the Court) | 01/28/98 | 33,418.59 | 4,284.89 | | 5,000.00 | 217.00 | | 42,920.39 | 36,385.18 | |
| Orange County Wholesale | 10/15/97 | 3,323.92 | | | | 40.00 | | 3,363.92 | 3,363.92 | |
| Crane Leasing Company | 11/21/97 | 12,555.81 | | | 1,230.00 | 549.50 | | 14,335.31 | 14,335.31 | |
| Anson Manne, Inc (Judgment Not Signed by Judge) | (10/08/97) | 45,372.28 | 5,196.06 | | 660.00 | 266.00 | | 51,494.34 | 51,494.34 | Interest accrued as of 10/8/97 (Did not seek interest past 10/8/97) |
| M & N Valve Corporation (Judgment Not Signed by Court Clerk) | (03/30/98) | 17,002.42 | 12,018.00 | | 660.00 | 111.00 | | 29,791.42 | 29,791.42 | |
| Randall Winkler/Sylas Meyer Trust (Judgment Not Signed by Court Clerk) | (04/07/98) | 18,865.75 | 483.48 | | 1,550.00 | 161.00 | | 21,060.23 | 21,060.23 | |
| Arizona Communications (Judgment Not Signed by Court Clerk) | (06/30/98) | 17,949.59 | 1,469.10 | | 1,447.79 | 136.00 | | 21,002.48 | 21,002.48 | |

Interest 1.5% per month from April 30, 1997 until date of judgment and interest from date of judgment until paid in full at the rate of 9.22% per annum

*(handwritten)* ANSON PAID
8-21-98

*(handwritten)* WINKLER PAID
9-11-98
GREENE PAID
8-20-98

POWERINE COMPANY
MECHANICS LIENS
As of July 16, 1998

| Firm | Services Rendered | Date Recorded/ Filed | Recorded As | Stated $ Amount | Original A/P Amount | Amount Paid | Current A/P Amt |
|---|---|---|---|---|---|---|---|
| 5DC-Falcon Special Waste Services | Hazardous and non-hazardous waste hauling | 07/31/97 | 97 1169213 | 2,035.34 ** | 980.00 | | 980.00 |
| Electro Industries | Provided labor and materials for automatic power transfer scheme at Central Sub, Heavy Oil. | 06/21/95 | 95 986100 | 33,726.00 | 72,545.00 | 72,545.00 | 5,000.00 |
| Jim A. Hammersmith 1726 Esplanade #4 Redondo Beach, CA 90277 | Electrical and instrumentation service, along with accrued severance time | 1/31/97 | 97 171902 | 19,459.36 ** | 0.00 | | |
| Long Roofing, Inc. 5901 Clara Street Bell Gardens, CA 90202 | General roof repair and maintenance | 7/23/97 | 97-1112070 | 1,855.00 ** | 1,855.00 | | 1,855.00 |
| Petrochem Insulation, Inc. 24301 S. Santa Fe Ave., #117 Rancho Dominguez, CA 90221 | Thermal insulation for piping, equipment, and labor to install | 5/12/95 | 95 771102 | 242,850.05 ** | 199,098.05 | 100,544.53 | 147,739.73 |
| Siemens Industrial Automation, Inc. | Continuous Emissions Monitor Systems including on site testing and supervision | 07/18/95 | 95 1160946 | 860,019.50 * | 860,019.50 | 770,000.00 | 152,639.79 |
| Tank & Refinery Services Co. | Provided labor, equipment & materials to erect a 50,000 barrel diesel fuel storage tank including foundation & coatings. | 06/29/95 | 95 1041506 | 169,759.26 ** | 192,896.84 | 135,606.48 | 52,082.15 |
| TriHydro Corporation 920 Sheridan Street Laramie, WY 82070 | Furnished the work and/or materials at the request of, or under contract with POC | 09/18/97 | 97 1445709 | 5,619.13 ** | 5,619.13 | | 5619 13 |

* Waiting for recorded release. Amount was paid at land sale close of September 19, 1997.
** 90 day window to file lawsuit has passed

SIEMENS
PAID

7/16/98  LNScoRoo



## SCHEDULE 10.4

### UNSECURED CREDITORS

Date 07/16/98 09:10am
06-98-184

Powerline Oil Company
Aged AP - Summary
Aging Date: 06/30/98

Page  1
Rept 03.680

| Vendor | Name | Vendor Status | Days Past Due | | | | | |
|--------|------|---------------|---------|---------|----------|----------|---------|---------|
| | | | Current | 1 To 30 | 31 To 60 | 61 To 90 | Over 90 | Balance |
| 005254 | ACT | A | 0.00 | 0.00 | 0.00 | 0.00 | 639.23 | 639.23 |
| 011564 | A & G INSTRUMENT SERVICE | A | 0.00 | 0.00 | 0.00 | 0.00 | 1,189.00 | 1,189.00 |
| 014801 | A.H. & S. CONSTRUCTION CORP | A | 0.00 | 0.00 | 0.00 | 0.00 | 849.10 | 849.10 |
| 015540 | AICCO | A | 0.00 | 5,624.01 | 0.00 | 0.00 | 0.00 | 5,624.01 |
| 016621 | AIR LIQUID AMERICA CORP | A | 0.00 | 0.00 | 0.00 | 0.00 | 3,582.74 | 3,582.74 |
| 016695 | AIRTOUCH CELLULAR - LA | A | 0.00 | 0.00 | 0.00 | 0.00 | 113.47 | 113.47 |
| 021961 | ALL INDUSTRIAL VALVES | A | 0.00 | 0.00 | 0.00 | 0.00 | 639.95 | 639.95 |
| 022035 | ALLWASTE OF SOUTHERN CA | A | 0.00 | 0.00 | 0.00 | 0.00 | 30,506.13 | 30,506.13 |
| 023064 | AMAN ENVIRONMENTAL | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,413.15 | 2,413.15 |
| 023380 | AMERICAN BOA, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 10,835.33 | 10,835.33 |
| 023388 | AMERICAN ENVIRONMENTAL | A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 023390 | AMERICAN EXPRESS | A | 0.00 | 15,627.33 | 0.00 | 0.00 | 0.00 | 15,627.33 |
| 023395 | AMERICAN EXPRESS | A | 0.00 | 259.31 | 0.00 | 0.00 | 0.00 | 259.31 |
| 023405 | AMERICAN INSTRUMENT | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,227.50 | 2,227.50 |
| 023427 | AMERICAN PETROLEUM INSTITUTE | A | 0.00 | 7,877.00 | 0.00 | 0.00 | 16,095.44 | 23,972.44 |
| 025191 | ANCON | A | 0.00 | (330.00) | 330.00 | 0.00 | 51,404.34 | 51,404.34 |
| 027885 | AON RISK SERVICES | A | 0.00 | 0.00 | 0.00 | 150,000.00 | 0.00 | 150,000.00 |
| 031953 | AQUATECH | A | 0.00 | 0.00 | 0.00 | 0.00 | 717.00 | 717.00 |
| 032787 | ARB,INC. CONSTRUCTORS | A | 80,574.34 | 181,563.00 | 0.00 | 0.00 | 0.00 | 262,137.34 |
| 032882 | ARCO TERMINAL SERVICES CORP | A | 0.00 | 0.00 | 0.00 | 0.00 | 75,992.74 | 75,992.74 |
| 034120 | ARTHUR ANDERSEN LLP | A | 0.00 | 0.00 | 0.00 | 0.00 | 51,480.00 | 51,480.00 |
| 035990 | ASSOCIATED LABORATORIES | A | 0.00 | 0.00 | 0.00 | 0.00 | 540.00 | 540.00 |
| 036708 | ATCHISON,TOPEKA AND SANTA FE | A | 0.00 | 0.00 | 0.00 | 0.00 | 10,947.67 | 10,947.67 |
| 037331 | ATLAS COPCO RENTAL INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 23,091.37 | 23,091.37 |
| 037940 | AT & T | A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (68.98) |
| 037950 | AT & T WIRELESS SERVICES | A | 0.00 | 0.00 | 0.00 | (68.98) | 0.00 | (68.98) |
| 039907 | AUTOMATIC DATA PROCESSING | A | 213.74 | 150.00 | 0.00 | 0.00 | 0.00 | 363.74 |
| 050752 | BAKER TANKS, INC. | A | 615.00 | 0.00 | 0.00 | 0.00 | 0.00 | 615.00 |
| 050858 | BAKER AND JACOBSON | A | 2,237.05 | 0.00 | 0.00 | 0.00 | 0.00 | 2,237.05 |
| 053863 | B C ANALYTICAL | A | 0.00 | 0.00 | 0.00 | 0.00 | 1,435.00 | 1,435.00 |
| 053896 | BC LABORATORIES, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 4,735.00 | 4,735.00 |
| 057863 | BECHTEL CORPORATION | A | 0.00 | 0.00 | 0.00 | 0.00 | 117,542.65 | 117,542.65 |
| 058971 | BERG-NELSON CO., INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 3,205.14 | 3,205.14 |
| 059102 | BETA MONTORS INTERNATIONAL INC | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,217.78 | 2,217.78 |
| 059176 | BETZ WATER MANAGEMENT | A | 0.00 | 0.00 | 0.00 | 0.00 | 58,712.55 | 58,712.55 |
| 059719 | BEVERLY HILLS TRANSFER AND | A | 0.00 | 0.00 | 0.00 | 0.00 | 186.25 | 186.25 |
| 066200 | BILL'S COMMERCIAL LOCK | A | 0.00 | 0.00 | 214.50 | 0.00 | 499.44 | 713.94 |
| 066422 | BIOPHARM, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 194.96 | 194.96 |
| 071161 | BLACK & VEATCH | A | 0.00 | 0.00 | 0.00 | 0.00 | 19,472.79 | 19,472.79 |
| 092784 | BRAGG CRANE & RIGGING CO | A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 092787 | BRAGG INVESTMENT COMPANY, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 115,264.37 | 115,264.37 |
| 088640 | BUCKINGHAM'S SERVICE CENTER | A | 385.01 | 0.00 | 0.00 | 0.00 | 0.00 | 385.01 |
| 089800 | BUSINESS & LEGAL REPORTS, INC. | A | 66.75 | 0.00 | 0.00 | 0.00 | 0.00 | 66.75 |
| 089666 | JAMES C. BUTTON | A | 0.00 | 110.64 | 0.00 | 0.00 | 0.00 | 110.64 |
| 100603 | CALIFORNIA FILTRATION PRODUCTS | A | 0.00 | 0.00 | 0.00 | 0.00 | 573.30 | 573.30 |



Date 02/16/98 09:16am
06:50:184

**PowerIne Oil Company**
**Aged AP - Summary**
**Aging Date: 06/30/98**

Page 3
Rept 03,680

| Vendor | Name | Vendor Status | Current | 1 To 30 | 31 To 60 | 61 To 90 | Over 90 | Balance |
|---|---|---|---|---|---|---|---|---|
| 160730 | DELTA MOTOR CO, INC | A | 0.00 | 0.00 | 0.00 | 0.00 | 409.69 | 409.69 |
| ~~438678~~ | ~~DEMETRIOU-DEL-GUERRO~~ | ~~A~~ | ~~(5,141.57)~~ | ~~0.00~~ | ~~0.00~~ | ~~0.00~~ | ~~916,194.84~~ | ~~911,053.27~~ |
| 160026 | DEPT. OF INDUSTRIAL RELATIONS | A | 0.00 | 0.00 | 0.00 | 0.00 | 630.00 | 630.00 |
| ~~465423~~ | ~~DHLEROSA~~ | ~~A~~ | ~~0.00~~ | ~~246.93~~ | ~~0.00~~ | ~~0.00~~ | ~~0.00~~ | ~~246.93~~ |
| 174652 | DMV RENEWAL | A | 0.00 | 0.00 | 0.00 | 0.00 | 1,328.00 | 1,328.00 |
| 178626 | DOTY BROS. EQUIPMENT CO. | A | 0.00 | 0.00 | 0.00 | 0.00 | 100,289.18 | 100,289.18 |
| 182592 | DRESSER-RAND COMPANY | A | 0.00 | 0.00 | 0.00 | 0.00 | 600.28 | 600.28 |
| 187500 | DTSC | A | 0.00 | 0.00 | 0.00 | 0.00 | 1,170.00 | 1,170.00 |
| 188468 | DUANE, MORRIS & HECKSCHER | A | 0.00 | 0.00 | 0.00 | 0.00 | 3,187.10 | 3,187.10 |
| 188649 | DUN & BRADSTREET | A | 0.00 | 0.00 | 0.00 | 0.00 | 1,141.00 | 1,141.00 |
| 193794 | DuraTherm, Inc. | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,673.00 | 2,673.00 |
| 205065 | ECOLOCHEM, INC | A | 560.82 | 579.52 | 0.00 | 560.82 | 77,623.46 | 79,324.62 |
| 207308 | EDI-TECH INDUSTRIES | A | 0.00 | 0.00 | 0.00 | 0.00 | 21,468.28 | 21,468.28 |
| 211996 | E G & G ENVIRONMENTAL | A | 0.00 | 0.00 | 0.00 | 0.00 | 3,060.00 | 3,060.00 |
| 212508 | MICHAEL EGNER | A | 393.68 | 0.00 | 0.00 | 0.00 | 0.00 | 393.68 |
| ~~221457~~ | ~~ELECTRO INDUSTRY~~ | ~~A~~ | ~~0.00~~ | ~~0.00~~ | ~~0.00~~ | ~~0.00~~ | ~~5,494.60~~ | ~~5,494.60~~ |
| 221685 | ELEVATOR SPECIALTY CORP. | A | 0.00 | 0.00 | 0.00 | 0.00 | 553.99 | 553.99 |
| 225361 | ENERSOURCE ENGINEERING | A | 0.00 | 0.00 | 0.00 | 0.00 | 25,781.80 | 25,781.80 |
| 237129 | ETHYL PETROLEUM ADDITIVES, INC | A | 0.00 | 0.00 | 0.00 | 0.00 | 38,617.87 | 38,617.87 |
| 259971 | FALCON DISPOSAL SERVICE | A | 0.00 | 0.00 | 0.00 | 0.00 | 980.00 | 980.00 |
| 258115 | FEDERAL CONTAINER CORPORATION | A | 0.00 | 0.00 | 0.00 | 0.00 | 17,718.51 | 17,718.51 |
| 258150 | FEDERAL EXPRESS CORP | A | 445.50 | 0.00 | 0.00 | 0.00 | 0.00 | 445.50 |
| 258347 | FINANCE AND ACCOUNTING OFFICER | A | 0.00 | 0.00 | 0.00 | 0.00 | 3,320.00 | 3,320.00 |
| 258846 | FIRST INTEGRATED HEALTH | A | 1,258.44 | 0.00 | 0.00 | 779.05 | 0.00 | 2,037.63 |
| 260035 | FISHER SCIENTIFIC | A | 0.00 | 0.00 | 0.00 | 0.00 | 10,264.02 | 10,264.02 |
| 272487 | FLOWAY PUMPS | A | 0.00 | 0.00 | 0.00 | 0.00 | 233,041.75 | 233,041.75 |
| ~~272591~~ | ~~FLOWTRACE, INC.~~ | ~~A~~ | ~~1,986.25~~ | ~~0.00~~ | ~~0.00~~ | ~~0.00~~ | ~~1,880.89~~ | ~~2,808.84~~ |
| 289726 | FURMANITE AMERICA, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 1,290.50 | 1,290.50 |
| ~~301746~~ | ~~GEA RAINEY CORPORATION~~ | ~~A~~ | ~~0.00~~ | ~~5,500.00~~ | ~~0.00~~ | ~~0.00~~ | ~~29,944.60~~ | ~~35,444.60~~ |
| 308505 | JEFFREY T. GELVIN | A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 310728 | GENESIS CAPITAL CORPORATION | A | 0.00 | 0.00 | 0.00 | 0.00 | 9,422.71 | 9,422.71 |
| ~~314626~~ | ~~GLICKFELD, FIELDS & JAFFE~~ | ~~A~~ | ~~0.00~~ | ~~0.00~~ | ~~0.00~~ | ~~0.00~~ | ~~937.60~~ | ~~937.60~~ |
| 324897 | GOLD STAR PAINTING | A | 0.00 | 0.00 | 0.00 | 0.00 | 885.00 | 885.00 |
| 326317 | GOLDEN WEST PIPE & SUPPLY | A | 0.00 | 0.00 | 0.00 | 0.00 | 200.77 | 200.77 |
| 327747 | GOLDEN WEST REFINING COMPANY | A | 0.00 | 0.00 | 0.00 | 0.00 | 7,323.11 | 7,323.11 |
| 330105 | G.P. RESOURCES | A | 0.00 | 0.00 | 0.00 | 0.00 | 432.08 | 432.08 |
| 331428 | GRAPHIC CONTROLS CORPORATION | A | 0.00 | 0.00 | 0.00 | 122.71 | 184.60 | 307.31 |
| 332747 | GRASEBY STI | A | 0.00 | 0.00 | 0.00 | 0.00 | 35,839.49 | 35,839.49 |
| 332904 | GRAVES SERVICE CO. | A | 0.00 | 0.00 | 0.00 | 0.00 | 7,179.95 | 7,179.95 |
| ~~332955~~ | ~~GREENE, KENNETH G. & HYDEN~~ | ~~A~~ | ~~0.00~~ | ~~0.00~~ | ~~0.00~~ | ~~10,668.06~~ | ~~0.00~~ | ~~16,505.65~~ |
| 337053 | GTE CALIFORNIA | A | 3,535.27 | 288.12 | 0.00 | 0.00 | 0.00 | 3,823.39 |
| 337054 | GTE | A | 0.00 | 0.00 | 0.00 | 0.00 | 1,760.00 | 1,760.00 |
| 339441 | GUTIERREZ, ALEJANDRO | A | 212.68 | 0.00 | 0.00 | 0.00 | 0.00 | 212.68 |
| ~~350861~~ | ~~HAARMANN,HEMMELRATH & PARTNER~~ | ~~A~~ | ~~0.00~~ | ~~0.00~~ | ~~0.00~~ | ~~0.00~~ | ~~5,399.00~~ | ~~5,399.00~~ |
| 351523 | HARCOURT BRACE & COMPANY | A | 0.00 | 0.00 | 0.00 | 0.00 | 744.83 | 744.83 |

Date 07/16/98 09:10am
08-98-184

Powerine Oil Company
Aged AP - Summary
Aging Date: 06/30/98

Page 4
Rept 09.680

| Vendor | Name | Vendor Status | Current | 1 To 30 | Days Past Due 31 To 60 | 61 To 90 | Over 90 | Balance |
|--------|------|---------------|---------|---------|-------------------------|----------|---------|---------|
| 351542 | HARDING LAWSON ASSOCIATES | A | 0.00 | 0.00 | 0.00 | 0.00 | 15,000.00 | 15,000.00 |
| 351859 | HAZCO SERVICES, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 1,586.31 | 1,586.31 |
| 360578 | H.F. DRILLING | A | 0.00 | 0.00 | 0.00 | 0.00 | 6,675.00 | 6,675.00 |
| 363426 | HIGHTECH SIGNS | A | 0.00 | 0.00 | 0.00 | 0.00 | 309.60 | 309.60 |
| 377291 | SIEGFRIED K. HEBAPP | A | 0.00 | 8,534.55 | 0.00 | 0.00 | 0.00 | 8,534.55 |
| 377345 | HOERBIGER SERVICE INC | A | 0.00 | 0.00 | 0.00 | 0.00 | 51,869.20 | 51,869.20 |
| 397315 | HYPROTECH LTD. | A | 0.00 | 0.00 | 0.00 | 0.00 | 6,315.00 | 6,315.00 |
| 425678 | INGERSOLL-DRESSER PUMP COMPANY | A | 0.00 | 0.00 | 0.00 | 0.00 | 21,310.26 | 21,310.26 |
| 426259 | INSPECTORATE AMERICA CORP. | A | 0.00 | 0.00 | 0.00 | 0.00 | 3,169.22 | 3,169.22 |
| 433012 | IRELL & MANELLA | A | 0.00 | 0.00 | 0.00 | 0.00 | 65,432.40 | 65,432.40 |
| 433028 | IRENE COHEN TEMPS, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 1,014.75 | 1,014.75 |
| 433654 | IRON MOUNTAIN | A | 1,051.72 | 0.00 | 0.00 | 0.00 | 0.00 | 1,051.72 |
| 450264 | JACOBS ENGINEERING GROUP INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 32,169.61 | 32,169.61 |
| 454329 | JENNER & BLOCK | A | 0.00 | 0.00 | 0.00 | 0.00 | 45,865.65 | 45,865.65 |
| 459401 | J.J. KELLER & ASSOCIATES, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 290.99 | 290.99 |
| 464247 | JOHN CRANE INC | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,491.40 | 2,491.40 |
| 464268 | JOHN LISEE PUMP INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,098.24 | 2,098.24 |
| 464331 | JOHNSON YOKOGAWA CORP | A | 0.00 | 0.00 | 0.00 | 0.00 | 217,359.10 | 217,359.10 |
| 464405 | JOHN ZINK CO. | A | 0.00 | 0.00 | 0.00 | 0.00 | 217,359.10 | 217,359.10 |
| 464664 | JONES ENVIRONMENTAL | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,923.68 | 2,923.68 |
| 479754 | KEYSTONE VALVES AND CONTROLS, | A | 0.00 | 0.00 | 0.00 | 0.00 | 5,470.00 | 5,470.00 |
| 483242 | KIS COMPUTER CENTER | A | 0.00 | 0.00 | 0.00 | 0.00 | 6,533.20 | 6,533.20 |
| 488949 | KOCH ENG. - TRUE TECH DIVISION | A | 0.00 | 0.00 | 0.00 | 0.00 | 210.47 | 210.47 |
| 500873 | LAKELAND FENCE CO. | A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 500951 | LANG ROOFING, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 250.00 | 250.00 |
| 501208 | LANIER WORLDWIDE, INC. | A | 139.80 | 0.00 | 0.00 | 0.00 | 1,855.00 | 1,855.00 |
| 501565 | LASER NETWORK, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 36,076.63 | 36,215.83 |
| 501858 | LAYNE CHRISTENSEN COMPANY | A | 0.00 | 0.00 | 0.00 | 0.00 | 597.96 | 597.96 |
| 501889 | LAZERPERFECT INT'L | A | 1,054.65 | 0.00 | 0.00 | 0.00 | 21,160.95 | 21,160.95 |
| 509768 | LFC CORPORATION | A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,054.65 |
| 515472 | LIBERTY TECHNOLOGIES, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 450.00 | 450.00 |
| 516792 | LITTLEJOHN-REULAND CORP | A | 0.00 | 0.00 | 0.00 | 0.00 | 9,219.42 | 9,219.42 |
| 527226 | LOEB AND LOEB | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,033.53 | 2,033.53 |
| 526294 | LOS ANGELES COUNTY DEPT OF | A | 0.00 | 0.00 | 0.00 | 0.00 | 58,704.68 | 58,704.68 |
| 528348 | LOS ANGELES COUNTY - | A | 0.00 | 0.00 | 0.00 | 0.00 | 180.00 | 180.00 |
| 528404 | LOS ANGELES HARBOR DEPARTMENT | A | 0.00 | 0.00 | 0.00 | 0.00 | 14,623.59 | 14,623.59 |
| 538587 | LUBRIZOL CORP | A | 0.00 | (14,532.12) | 97.63 | 3,411.66 | 11,152.62 | 129.99 |
| 547264 | LYONS SAFETY | A | 0.00 | 0.00 | 0.00 | 0.00 | 12,852.50 | 12,852.50 |
| 550157 | MAC ADAM INTERNATIONAL INC | A | 0.00 | 0.00 | 0.00 | 0.00 | 911.54 | 911.54 |
| 550379 | MaComCo | A | 0.00 | 0.00 | 0.00 | 0.00 | 661.00 | 661.00 |
| 551460 | MARSH & MCLENNAN, INC | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,315.19 | 2,315.19 |
| 551682 | MASTER FAN CORP. | A | 0.00 | 0.00 | 0.00 | 0.00 | 4,500.00 | 4,500.00 |
| 551756 | MATTHEW BENDER & CO., INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 973.25 | 973.25 |
| 554029 | McCLINTOCK, WESTON, BENSHOOF | A | 0.00 | 293.54 | 0.00 | 23,020.02 | (110.42) | (110.42) |
| 554155 | MCDERMOTT, WILL & EMERY | A | 0.00 | 0.00 | 0.00 | 0.00 | 276,723.74 | 300,037.30 |
| | | | | | | | 2,150.26 | 2,150.26 |

Powerine Oil Company
Aged AP - Summary
Aging Date: 06/30/98

| Vendor | Name | Vendor Status | Current | 1 To 30 | 31 To 60 | 61 To 90 | Over 90 | Balance |
|--------|------|---------------|---------|---------|----------|----------|---------|---------|
| 554301 | THE MCGRAW-HILL COMPANIES | A | 0.00 | 0.00 | 0.00 | 0.00 | 117.45 | 117.45 |
| 554437 | McGUIRE & WALKER | A | 0.00 | 0.00 | 0.00 | 0.00 | 370.50 | 370.50 |
| 554736 | McMASTER-CARR SUPPLY CO | A | 0.00 | 0.00 | 0.00 | 0.00 | 589.71 | 589.71 |
| 559026 | MESA SERVICES, INC | A | 0.00 | 0.00 | 0.00 | 0.00 | 18,638.92 | 18,638.92 |
| 559373 | METROPOLITAN TOWER CONDOMINIUM | A | 1,133.80 | 0.00 | 0.00 | 0.00 | 0.00 | 1,133.80 |
| 562452 | MGM INC | A | 0.00 | 0.00 | 0.00 | 0.00 | 39,385.18 | 39,385.18 |
| 565682 | ARTHUR R. MICHAELIAN | A | 0.00 | 0.00 | 0.00 | 1,000.00 | 3,000.00 | 4,000.00 |
| 565756 | MIDTOWN PLUMBING & MECHANICAL | A | 0.00 | 0.00 | 0.00 | 0.00 | 4,191.29 | 4,191.29 |
| 566348 | MILLER BROOKS ENVIROMENTAL,INC | A | 0.00 | 0.00 | 0.00 | 0.00 | 3,867.74 | 3,867.74 |
| 576555 | M & N VALVE CORPORATION | A | 0.00 | 0.00 | 0.00 | 0.00 | 29,791.42 | 29,791.42 |
| 576998 | MOBILE NATURAL GAS INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 39,405.76 | 39,405.76 |
| 578254 | MOORE PRODUCTS COMPANY | A | 0.00 | 0.00 | 0.00 | 0.00 | 832.60 | 832.60 |
| 578520 | MOTOROLA, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 122.50 | 122.50 |
| 601776 | NATIONAL SANITARY CO. | A | 0.00 | 0.00 | 0.00 | 0.00 | 1,001.64 | 1,001.64 |
| 628102 | NORTEL COMMUNICATIONS SYSTEMS | A | 3,952.59 | 0.00 | 0.00 | 0.00 | 17,949.63 | 21,892.46 |
| 647128 | NYNEX | A | 0.00 | 0.00 | 0.00 | 0.00 | (41.86) | (41.86) |
| 669578 | OFFICIAL COMMITTEE OF | A | 0.00 | 5,698.00 | 0.00 | 0.00 | 0.00 | 5,698.00 |
| 674064 | OMNI COMPUTER PRODUCTS | A | 0.00 | 0.00 | 0.00 | 0.00 | (200.00) | (200.00) |
| 682933 | ORANGE COUNTY REGISTER | A | 295.39 | 0.00 | 0.00 | 0.00 | 0.00 | 295.39 |
| 682938 | ORANGE COUNTY TAX COLLECTOR | A | 114.82 | 0.00 | 0.00 | 0.00 | 0.00 | 114.82 |
| 682961 | ORANGE COUNTY WHOLESALE | A | 0.00 | 0.00 | 0.00 | 0.00 | 3,363.92 | 3,363.92 |
| 683063 | ORBIT VALVE COMPANY | A | 0.00 | 0.00 | 0.00 | 0.00 | 17,844.75 | 17,844.75 |
| 700087 | PACHULSKI,STANG,ZIEHL & YOUNG | A | 0.00 | 0.00 | 0.00 | 0.00 | 22,007.66 | 22,007.66 |
| 700174 | PACIFIC BELL | A | 1.84 | 0.00 | 0.00 | 0.00 | 0.00 | 1.84 |
| 700169 | PACIFIC COAST ENGINEERING INC | A | 0.00 | 0.00 | 0.00 | 0.00 | 403.20 | 403.20 |
| 700203 | PACIFIC ENVIROSYSTEMS, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 28,677.80 | 28,677.80 |
| 701184 | PAN PACIFIC SURVEYORS, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 11,235.50 | 11,235.50 |
| 701266 | PARAMOUNT PETROLEUM CORP | A | 0.00 | 0.00 | 0.00 | 0.00 | 3,180.30 | 3,180.30 |
| 701776 | PAUL, HASTINGS, JANOFSKY | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,398.37 | 2,398.37 |
| 707177 | PDQ EQUIPMENT RENTAL CENTER | A | 16.33 | 0.00 | 0.00 | 0.00 | 0.00 | 16.33 |
| 709248 | PETROCHEM INSULATION, INC. | A | 0.00 | 0.00 | 2,410.02 | 0.00 | 145,320.71 | 147,730.73 |
| 716644 | PIONEER BUSINESS FORMS, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 546.39 | 546.39 |
| 716792 | PIPE FABRICATING & SUPPLY | A | 0.00 | 0.00 | 0.00 | 0.00 | 14,383.99 | 14,383.99 |
| 728256 | PORT OF LONG BEACH | A | 0.00 | (35,996.84) | 0.00 | 0.00 | 63,938.60 | 27,941.76 |
| 728626 | POWELL-ESCO COMPANY | A | 0.00 | 0.00 | 0.00 | 0.00 | 12,185.63 | 12,185.63 |
| 728700 | POWER MAINTENANCE | A | 0.00 | 0.00 | 0.00 | 0.00 | 1,122.75 | 1,122.75 |
| 730807 | POWER & TELEPHONE | A | 0.00 | 0.00 | 0.00 | 0.00 | 101.48 | 101.48 |
| 732915 | PRAXAIR,INC. | A | 1,774.68 | 2,993.64 | 5,025.44 | 2,952.42 | 21,384.25 | 34,130.63 |
| 732916 | PRAXAIR DISTRIBUTION, INC. | A | 423.00 | 423.00 | 0.00 | 0.00 | 0.00 | 846.00 |
| 735285 | PRESSURE VESSEL SERVICE, INC. | A | 0.00 | 2,052.19 | 0.00 | 0.00 | 7,186.00 | 9,238.19 |
| 733581 | PRICE COSTCO | A | 0.00 | 0.00 | 0.00 | 0.00 | 277.99 | 277.99 |
| 733694 | PRINDLE, DECKER & AMARO | A | 0.00 | 0.00 | 0.00 | 0.00 | 7,623.14 | 7,623.14 |
| 733735 | PROCESS CHEMICALS, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,025.00 | 2,025.00 |
| 739054 | PUGET SOUND PIPE AND SUPPLY CO | A | 0.00 | 0.00 | 0.00 | 0.00 | 763.22 | 763.22 |
| 739783 | PURVIN & GERTZ, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 4,320.00 | 4,320.00 |



Date 07/16/98 09:10am
06-98-184

Powerline Oil Company
Aged AP - Summary
Aging Date: 06/30/98

Page   7
Rept 03.680

| Vendor | Name | Vendor Status | Current | 1 To 30 | 31 To 60 | 61 To 90 | Over 90 | Balance |
|---|---|---|---|---|---|---|---|---|
| | | | | | Days Past Due | | | |
| 878330 | TOTAL WESTERN, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 889526 | TRIHYDRO CORPORATION | A | 0.00 | 0.00 | 0.00 | 0.00 | 5,619.13 | 5,619.13 |
| 902220 | UCISCO, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 30,359.42 | 30,359.42 |
| 912718 | UNION PACIFIC RAILROAD | A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 912895 | UNITED COMMUNICATIONS GROUP | A | 0.00 | 0.00 | 0.00 | 1,438.84 | 0.00 | 1,438.84 |
| 912913 | UNITED CORPORATE SERVICES, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 1,295.00 | 1,295.00 |
| 913001 | UNIVERSITY OF S. CALIFORNIA | A | 0.00 | 0.00 | 0.00 | 0.00 | 135.41 | 135.41 |
| 913006 | UNOCAL -76 | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,260.00 | 2,260.00 |
| 914134 | UOP | A | 0.00 | 0.00 | 0.00 | 0.00 | 53,220.39 | 53,220.39 |
| 925518 | VALLEN SAFETY SUPPLY COMPANY | A | 0.00 | 0.00 | 0.00 | 0.00 | 133,511.55 | 133,511.55 |
| 925553 | VALLEY X-RAY SERVICES | A | 0.00 | 521.30 | 0.00 | 0.00 | 667.14 | 667.14 |
| 925592 | VALTEK | A | 0.00 | 0.00 | 0.00 | 0.00 | 6,575.72 | 7,097.02 |
| 925703 | VALVETECHNOLOGIES, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 19,347.58 | 19,347.58 |
| 929014 | VECTOR ASSOCIATES | A | 0.00 | 0.00 | 0.00 | 0.00 | 28,171.17 | 28,171.17 |
| 933481 | VIVITAR SECURITY SYSTEMS | A | 0.00 | 0.00 | 0.00 | 0.00 | 24,514.03 | 24,514.03 |
| 946793 | VWR SCIENTIFIC | A | 0.00 | 0.00 | 0.00 | 0.00 | 10,414.57 | 10,414.57 |
| 950648 | WARREN, GORHAM & LAMONT | A | 0.00 | 0.00 | 0.00 | 0.00 | 132.48 | 132.48 |
| 950835 | WASTE WATER TECHNOLOGY SERVICE | A | 0.00 | 0.00 | 0.00 | 0.00 | 351.00 | 351.00 |
| 954551 | RANDALL W. WENKER, AS TRUSTEE | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,145.00 | 2,145.00 |
| 954615 | WESTERN FEDERAL, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 21,060.23 | 21,060.23 |
| 954625 | WESTERN INDEPENDENT REFINERS | A | 0.00 | 0.00 | 0.00 | 0.00 | 629.32 | 629.32 |
| 957780 | WICKLAND INTERNATIONAL | A | 0.00 | 0.00 | 0.00 | 850.00 | 51,496.15 | 52,346.15 |
| 958290 | WITTENBERG & WITTENBERG | A | 0.00 | 0.00 | 3,000.00 | 0.00 | 4,026.62 | 4,026.62 |
| | | | | | | | 0.00 | 3,000.00 |
| | | Report Total | 98,543.53 | 202,692.26 | 11,359.33 | 203,221.43 | 5,212,199.07 | 5,726,015.62 |

(as of June 30, 1998)

Accounts Payable Trade
    A/P Trade Accrual
        City of Long Beach .......................................... 55,440.00
        ~~Los Angeles County~~ .......................................... ~~41,475.34~~
        Bechtel .......................................... 117,855.44
        Castle Energy Corp. .......................................... 330,000.00
    A/P - Accrual CENCO .......................................... 160,097.32
    A/P Trade Disputed .......................................... 67,915.19

Accrued Accounts Payable
    Accrued Property Taxes
        ~~Secured~~ .......................................... ~~999,172.33~~
        ~~Other Lien~~ .......................................... ~~8,553.12~~
        Unsecured: .......................................... 15,361.51
    ~~Accrued Motor Vehicle Tax - FET~~ .......................................... ~~1,508.29~~
    Acc Taxes - Lead Poisoning .......................................... 99,705.14
    ~~State Board of Equalization Lien~~ .......................................... ~~270,106.97~~
    Accrued Payroll
        ~~Severance:~~ .......................................... ~~852,229.19~~
        ~~Payroll:~~ .......................................... ~~102,170.99~~
    Accrued Vacation
        Powerine Employees .......................................... 73,533.59
        ~~EMC Employees~~ .......................................... ~~60,153.44~~
    Accrued Comptime .......................................... 5,809.75
    ACC P/R Taxes - FICA .......................................... 5,578.90
    ACC P/R Taxes - FUTA .......................................... 25.30
    ACC P/R Taxes - CA SUI .......................................... 81.20
    ACC P/R Taxes - NY SDI .......................................... 89.82
    ACC P/R Taxes - NY SDI .......................................... (51.89)
    Accrued Utilities .......................................... 4,636.58
    Accrued Insurance .......................................... 65,563.35
    Accrued Licenses & Permits .......................................... 150,759.26
    ACC Royalties - HF Alkylation .......................................... 15,691.80
    ACC Royalties - Platforming .......................................... 15,827.16
    ACC Royalties - FCC .......................................... 7,677.66
    ACC Royalties - Merox .......................................... 1,650.79
    ACC Royalties - Isom .......................................... 9,185.50
    A/P A/R Credit Balances .......................................... 1,869.76

Current Portion - L.T. Liabilities
    Est. Claims Payable - Current .......................................... 1,700,000
    ~~EMC Loan~~ .......................................... ~~1,715,493.03~~
    ~~EMC Management Fees~~ .......................................... ~~1,785,000.00~~
    ~~EMC Management Fees-Contra~~ .......................................... ~~(1,712,437.98)~~
    NMB - Contra .......................................... (1,719.95)
    ~~Notes Payable - Kenyen~~ .......................................... ~~2,000,000.00~~

Liabilities - Non-Current
    Est. Claims Payables - Non-Current .......................................... 21,289,907.04

# DECLARATION OF JASON M. RUND

I, Jason M. Rund, declare:

1.    I am the duly appointed and acting chapter 7 trustee in the matter of *In re Lakeland Development Company*, United States Bankruptcy Court for the Central District of California Case No. 2:12-bk-25842-BR.

2.    I have reviewed the Asset Purchase Agreement by and between Powerine Oil Company, as seller, ("**Powerine**") and CENCO Refining Co., as buyer, dated July 24, 1998, a copy of which is attached hereto as Exhibit 1 (the "**Sale Agreement**") and the proposed Agreement Regarding Insurance Assignment and Environmental Reimbursement and Indemnity Agreement, a copy of which is attached hereto as Exhibit 2 (the "**Insurance Agreement**").

3.    On August 31, 2017, I filed an adversary proceeding (Adv. No. 2:17-ap-01459-BR, the "**Adversary Proceeding**") against Powerine and certain insurers that had issued insurance policies to Powerine prior to 1990 that may provide a defense to, and coverage for, environmental claims at and beneath the real property located at 12345 Lakeland Road, Santa Fe Springs, California (the "**Property**") formerly owned by the estate ("**On-Site Liabilities**") and property damage claims associated with contaminated groundwater that has allegedly migrated away from the Property ("**Off-Site Liabilities**").  The Adversary Proceeding sought a declaration as to this bankruptcy estate's and Powerine's respective rights under the Policies.

4.    I believe that the Insurance Agreement is in the best interests of this bankruptcy estate for the foregoing reasons:

(a)    The Insurance Agreement resolves the current dispute between the estate and Powerine regarding rights under certain insurance policies (the "**Policies**") that may provide a defense to, and coverage for, On-Site Liabilities and Off-Site Liabilities, without the delay, expense and risk that would exist were the current dispute to be litigated to a conclusion.

(b)    The Insurance Agreement confirms the estate's rights in the Policies as to both On-Site Liabilities and Off-Site Liabilities.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 33291802.3

12

MOTION APPROVING SETTLEMENT
RE INSURANCE POLICIES, ETC.

Page 87

(c)    The Insurance Agreement terminates any liability that the estate may have to Powerine under the Sale Agreement and the Environmental Indemnity and Reimbursement Agreement that was entered into pursuant to the terms of the Sale Agreement.

5.    Assuming that the Court determines to approve the Insurance Agreement, I believe that the Court should also dismiss the Adversary Proceeding as the issues raised by my complaint in the Adversary Proceeding will have been resolved by the Insurance Agreement. Thus, no purpose would be served by continuing to litigate the Adversary Proceeding.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at El Segundo, California on June 15, 2018.

Jason M. Rund

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 33291802.3

MOTION APPROVING SETTLEMENT
RE INSURANCE POLICIES, ETC.

**EXHIBIT 2**

**AGREEMENT REGARDING INSURANCE ASSIGNMENT AND**

**ENVIRONMENTAL REIMBURSEMENT AND INDEMNITY AGREEMENT**

This Agreement Regarding Insurance Assignment and Environmental Reimbursement and Indemnity Agreement (the "**Agreement**") is entered into as of this 5th day of June, 2018 between Powerine Oil Company, Inc. ("**Powerine**") and Jason M. Rund, chapter 7 trustee in bankruptcy for Lakeland Development Company (the "**Trustee**" and, together with Powerine, the "**Parties**").

**RECITALS**

A.    On July 24, 1998 Powerine and Lakeland Development Company ("**Lakeland**") (then known as CENCO Refining Company) entered into an Asset Purchase Agreement (the "**APA**") whereby substantially all of Powerine's assets were sold to Lakeland.  The sold assets included Powerine's rights under any and all insurance policies, or rights thereto, then or previously in force and owned by Powerine (the "**Policies**") including, but not limited to, certain insurance policies listed on Schedule 1.1. to the APA.  A true and correct copy of the APA is attached to this Agreement as Exhibit A.

B.    Each of the Policies contained a provision that required the insurer that issued the policy to consent to any assignment of that insurer's policy.

C.    In order to accomplish the parties' intention with respect to the assignment of the Policies, the APA contained two provisions:

1.    Article 3.3 of the APA provides as follows:

Anything in this Agreement to the contrary notwithstanding, neither this Agreement nor the consummation of the transactions contemplated hereby shall constitute an agreement to assign or an assignment of any Contract or Permit or any claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment thereof, without the consent of a third party thereto or any Governmental Authority or agency, would constitute a breach thereof or in any way adversely affect the respective rights or obligations of Buyer or Seller thereunder.  If any such consent is not obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the respective rights or obligations of Buyer or Seller thereunder, Seller, at no cost to Seller, shall use its best efforts (i) to provide to Buyer the benefits under any such Contract or Permit (including enforcement for the benefit of Buyer of any and all rights of Seller against a third party thereto arising out of the breach or cancellation by such third party or otherwise) as if such Contract or Permit had been assigned to Buyer and (ii) to obtain as soon as practicable the consent or approval of any such third party or Governmental Authority to the

1

assignment of such Contract or Permit and to transfer such
Contract or Permit to Buyer; and any transfer or assignment to
Buyer of any property or property rights or any Contract or Permit
that shall require the consent or approval of any third party or
Governmental Authority shall be made subject to such consent or
approval being obtained.

2.      Article 10.5 of the APA provided as follows:

To the extent any of the Insurance Policies cannot be assigned
without the consent of the carrier thereunder, until such time as
such consent is obtained or is no longer necessary, Seller will make
available to Buyer any and all rights and benefits under such
Policy in order to enable Buyer to mitigate the impact of the
Assumed Liabilities and the other liabilities of Buyer hereunder,
including Buyer's indemnification obligations hereunder and under
the Environmental Indemnity and Reimbursement Agreement.

D.      On August 20, 2015, the California Supreme Court issued its opinion in *Fluor
Corp. v. Superior Court (Hartford Accident & Indemnity Co.)*, 61 Cal. 4th 1175 (2015).  The
Trustee contends that the Court's decision in *Fluor* confirmed Lakeland's rights under the APA
to pursue insurance recoveries for losses covered under the Policies. .  Powerine disputes this
contention.

E.      Exhibit B of the APA, "Environmental Indemnity and Reimbursement
Agreement," creates certain obligations on the part of Lakeland to defend, indemnify, and hold
Powerine harmless from various environmental and toxic liabilities (the "**Indemnity
Agreement**").

F.      The California Department of Toxic Substances Control (the "**DTSC**") has filed a
claim in *In re Lakeland Development Company*, United States Bankruptcy Court, Central District
of California, Case No. 2:12-bk-25842-BR (the "**Bankruptcy Case**") asserting that Lakeland is
potentially liable "under state and federal law for response costs DTSC has incurred, and
continues to incur, at two sites in California: the 'Omega Chemical Superfund Site' (the "**Omega
Site**") and the 'BKK Landfills Facility (the "**BKK Facility**" and, together with the Omega Site,
the "**Sites**"), where a release or threatened release of hazardous substances occurred." ("**Claim
93**").  See Claim 93-1 Part 2.

G.      The DTSC asserts that Powerine is liable under state and federal law for the same
costs asserted in Claim 93 based on the same facts and circumstances alleged in Claim 93.

H.      Other environmental and/or toxic tort litigation and/or claims have been asserted
in connection with the Sites, and with respect to other activities for which Powerine and/or
Lakeland are allegedly liable.

2

I.       A dispute has arisen between the Parties regarding their respective rights and obligations under Sections 2.1 and Exhibit B to the APA.  The Trustee has filed an adversary proceeding, *Jason M. Rund, chapter 7 trustee v. ACE Property & Casualty Insurance Company, et al*., United States Bankruptcy Court for the Central District of California Adv. No. 2:17-ap-01459-BR, (the "**Adversary Proceeding**") seeking declaratory relief as to the Parties' respective rights and obligations arising out of the APA.

J.        The Parties desire to avoid the expense and uncertainty associated with prosecuting and defending the Adversary Proceeding and have therefore reached a compromise over the disputed issues arising from the APA.

K.       Nothing in this Agreement is intended to increase the liability of any insurance company under the Policies, and any contrary assertion is rejected by the Parties.

**NOW, THEREFORE,** in consideration of the foregoing and the mutual promises contained herein, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.       Powerine agrees that Lakeland has all right, title, and interest in the Policies for the purpose of seeking reimbursement for damages incurred by Lakeland as the result of soil and groundwater contamination at and beneath the former Powerine refinery located at 12345 Lakeland Road, Santa Fe Springs, California (the "**Property**").  Powerine irrevocably disclaims any right, title, or interest in the Policies identified in the attached Schedule of Insurance for the purpose of seeking reimbursement for damages as the result of soil and groundwater contamination at and beneath the Property.

2.       Lakeland agrees that, except as provided in paragraph 3 below, Powerine has the primary and exclusive right, title and interest in the Policies for purposes of defending and resolving liability for property damage associated with contaminated groundwater that has migrated away from the Property ("**Off-Site Liabilities**"), including, but not limited to, the actions concerning the Sites.

3.       Notwithstanding provisions of paragraph 2 of this Agreement, Lakeland shall retain an interest in the Policies for Off-Site Liabilities that is subordinate to Powerine's right, title and interest in the Policies for Off-Site Liabilities only to the extent that Lakeland is allegedly responsible for Off-Site Liabilities not paid by or on behalf of Powerine.  The Parties acknowledge that Lakeland's liability for Off-Site Liabilities, if any, is derivative of Powerine's liability for Off-Site Liabilities and, thus, to the extent that the Policies, or any of them, provide coverage for Off-Site Liabilities, Lakeland's retention of an interest in the Policies with respect to Off-Site Liabilities does not increase any insurance coverage that exists with respect to Off-Site Liabilities. Or, in other words, Lakeland may only recover under the Policies for Off-Site Liabilities to the extent that (i) those liabilities are not satisfied by or on behalf of Powerine, and

3

(ii) third-parties and/or governmental entities seek to hold Lakeland responsible to satisfy the Off-Site Liabilities in place of Powerine.

4.      The Parties rescind the Indemnity Agreement as if it were void ab initio.

5.      The Parties mutually waive and release each other from any past, present, or future claims that they may have or acquire against each other relating to:  (a) soil and groundwater contamination at and beneath the Property and (b) Off-Site Liabilities.

6.      This Agreement shall become effective upon the entry of a "final order" in the Bankruptcy Case (the "**Approval Order**") authorizing the Trustee to enter into this Agreement, to perform his obligations pursuant to this Agreement and providing that the Adversary Proceeding shall be dismissed, with prejudice, upon the Approval Order becoming a "final order."[1]  The Trustee shall file a motion in the Bankruptcy Case to obtain the foregoing order within fourteen days of the execution of this Agreement by the Parties and use his best efforts to have it granted by the court.

7.      Miscellaneous:

(a)      This Agreement shall be deemed to fall within the protection afforded compromises and offers to compromise by Rule 408 of the Federal Rules of Evidence and corresponding state rules.

(b)      This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

(c)      All notices or other communications which any Party desires or is required to give shall be given in writing and, regardless of the method of delivery, shall be deemed to have been given if hand-delivered, sent by reputable overnight courier service or mailed by

---

[1]      As used herein, the term "final order" means an order of the bankruptcy court having jurisdiction of the Bankruptcy Case that has been entered upon the docket in that case, and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or, in the event that an appeal, petition for a writ of certiorari, or motion for reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Federal Rules of Civil Procedure 59, or any analogous rule under the Federal Rules of Bankruptcy Procedure may be filed with respect to such order shall not cause such order not to be a "final order."

4

depositing in the United States mail, certified mail, return receipt requested, prepaid to the other Party at the address noted below or such other address as a Party may designate in writing from time to time:

If to Powerine:

> David R. Isola
> Isola Law Group, LLP
> 405 West Pine Street
> Lodi, California 95240

If to Lakeland:

> (i)  Jason M. Rund, chapter 7 trustee
> Sheridan & Rund
> 840 Apollo Street, Suite 351
> El Segundo, CA 90245
>
> with a copy to:
>
> (ii)  Jeffrey S. Raskin
> Morgan, Lewis & Bockius LLP
> One Market Spear Street Tower
> San Francisco, CA 94105-1596

(d)  No amendment or variations of the terms or provisions of this Agreement shall be valid unless made in writing and signed by each of the Parties.

(e)  This Agreement may be executed in duplicate counterparts, each of which shall be deemed an original.  Taken together, the counterparts shall constitute one and the same Agreement.

(f)  This Agreement was negotiated at arms-length, with each Party receiving advice from legal counsel.  It is the intent of the Parties that no part of this Agreement be construed against any one or more of the Parties because of the identity of the drafter.  The language in all parts of the Agreement shall be construed as a whole according to its meaning, and not strictly against any of the Parties.

(g)  The Parties agree that the recitals set forth in this Agreement are made an integral and material part of this Agreement, and are binding on the Parties, as applicable, now and hereafter.

5

(h)    This Agreement is an integrated agreement, containing the entire understanding among the Parties regarding the matters addressed herein and, except as set forth in this Agreement, no representations, warranties or promises have been made or relied upon by the Parties.  This Agreement supersedes any prior agreements and communications among the Parties regarding or relating to the matters addressed herein.  This Agreement may not be modified, changed, contradicted, added to, or altered in any way by any previous written or oral agreements or any subsequent oral agreements.

Powerine Oil Company

_____
Jason M. Rund, chapter 7 trustee

By:_____
    Vincent Papa, President

6

(h)     This Agreement is an integrated agreement, containing the entire understanding among the Parties regarding the matters addressed herein and, except as set forth in this Agreement, no representations, warranties or promises have been made or relied upon by the Parties. This Agreement supersedes any prior agreements and communications among the Parties regarding or relating to the matters addressed herein. This Agreement may not be modified, changed, contradicted, added to, or altered in any way by any previous written or oral agreements or any subsequent oral agreements.

Powerine Oil Company

By: _____

_____

Jason M. Rund, chapter 7 trustee                    Vincent Papa, President

# EXHIBIT A

NOV. 21. 2006 9:44AM MAIN OFFICE 5629038911 NO. 960 P. 5

EXECUTION COPY

ASSET PURCHASE AGREEMENT

by and between

Powerine Oil Company

as "Seller,"

and

CENCO Refining Co.

as "Buyer,"

Dated: July 24, 1998

## TABLE OF CONTENTS

Page

ARTICLE I. DEFINITIONS ...............................................................................1
  1.1. Defined Terms. ........................................................................................1
  1.2. Other Defined Terms. ..............................................................................6

ARTICLE II. PURCHASE AND SALE OF ASSETS ..........................................6
  2.1. Purchase and Sale of Assets. ..................................................................6
  2.2. Assumption of Liabilities. .......................................................................7
  2.3. Excluded Liabilities. ...............................................................................7
  2.4. Closing Costs. .........................................................................................7
  2.5. Allocation. ..............................................................................................8

ARTICLE III. CLOSING ...................................................................................8
  3.1. Closing. ..................................................................................................8
  3.2. Deliveries at Closing. .............................................................................8
  3.3. Consent to Assignment; Non-transferred Assets. .....................................9
  3.4. Other Closing Matters. ...........................................................................9

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF SELLER ...........9
  4.1. Organization. ..........................................................................................9
  4.2. Authorization. .........................................................................................9
  4.3. Consents and Approvals. .......................................................................10
  4.4. No Conflict or Violation. .......................................................................10
  4.5. Absence of Certain Changes or Events. .................................................10
  4.6. Financial Statements. ............................................................................10
  4.7. Taxes. ...................................................................................................10
  4.8. Title. ....................................................................................................11
  4.9. Litigation. .............................................................................................11
  4.10. Creditors. ...........................................................................................11
  4.11. Employees. .........................................................................................11
  4.12. No Other Agreements to Sell the Assets. ..............................................12
  4.13. No Brokers. ........................................................................................12
  4.14. As Is Where Is ....................................................................................12

ARTICLE V. REPRESENTATIONS AND WARRANTIES OF BUYER ............12
  5.1. Organization of Buyer. ..........................................................................12
  5.2. Authorization. .......................................................................................12
  5.3. No Conflict or Violation. .......................................................................13
  5.4. Consents and Approvals. .......................................................................13
  5.5. No Brokers. ..........................................................................................13

ARTICLE VI. COVENANTS ...........................................................................13

i

6.1. Covenants of Seller. ..................................................13
6.2. Covenants of Buyer. ..................................................14
6.3. Of Each Party. ..........................................................15
6.4. Employee Matters. ....................................................15

ARTICLE VII.  CONDITIONS TO SELLER'S OBLIGATIONS.......................15
7.1. Representations, Warranties and Covenants. ........................16
7.2. No Proceedings or Litigation. ......................................16

ARTICLE VIII.  CONDITIONS TO BUYER'S OBLIGATIONS .....................16
8.1. Representations, Warranties and Covenants. ........................16
8.2. No Proceedings or Litigation. ......................................16
8.3. Title Insurance. .......................................................17
8.4. Lien Clearance. ........................................................17

ARTICLE IX.  TERMINATION. ..................................................17

ARTICLE X.  ACTIONS BY SELLER AND BUYER AFTER CLOSING .............18
10.1. Books and Records. ...................................................18
10.2. Cooperation and Records Retention. ................................18
10.3. Tax Elections. ........................................................18
10.4. Indemnification. ......................................................18
10.5. Insurance Policies. ...................................................20

ARTICLE XI.  MISCELLANEOUS ...............................................20
11.1. Assignment. ...........................................................20
11.2. Confidentiality. .......................................................20
11.3. Survival of Representations. ........................................21
11.4. Notices. ..............................................................21
11.5. Choice of Law. .......................................................22
11.6. Entire Agreement; Amendments and Waivers. .......................22
11.7. Multiple Counterparts. ..............................................22
11.8. Invalidity. ............................................................22
11.9. Cumulative Remedies. ...............................................22
11.10. Attorneys' Fees. ....................................................22

ii

EXHIBIT

Description of Assets .......................................................................................................... A

Environmental Indemnity and Reimbursement Agreement ........................................... B

Bill of Sale .......................................................................................................................... C

Assignment and Assumption of Contracts and Warranties ............................................ D

iii

NOV. 21. 2006   9:45AM      MAIN OFFICE 5629038911                    NO. 960    P. 9

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of July 24, 1998, is by and among CENCO Refining Co., a Delaware corporation ("Buyer") and Powerine Oil Company, a California corporation ("Seller").

### RECITALS

A.      Seller owns certain land and improvements located in Santa Fe Springs, California, constituting a refinery, together with miscellaneous assets previously used in conjunction therewith, including a pipeline system and miscellaneous items of equipment and other personal property.

B.      Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, the foregoing assets, upon the terms and subject to the conditions of this Agreement.

### AGREEMENT

NOW THEREFORE, in consideration of the respective covenants and promises contained herein and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I.

### DEFINITIONS

1.1.    Defined Terms.  As used in this Agreement, except as otherwise expressly provided or unless the context otherwise requires, (i) the terms defined in this Article include the plural as well as the singular; (ii) all accounting terms not otherwise defined herein have the meanings ascribed to them in accordance with GAAP; (iii) all references in this Agreement to designated "Articles," "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of this Agreement; (iv) the words "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; (v) "including" shall mean "including, without limitation," "including, without limiting the generality of the foregoing," and other phrases of similar import; and (vi) the following terms shall have the meanings ascribed to them set forth below.

"Action" shall mean any action, claim, suit, litigation, proceeding, order, labor dispute, arbitral action, governmental audit, inquiry, criminal prosecution, investigation or unfair labor practice charge or complaint.

"Affiliate" with respect to any Person, shall mean any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. For the purposes of this definition "control" when used with respect to any specified Person means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the term "controlled" has the meaning correlative to the foregoing.

NOV. 21. 2006  9:45AM   MAIN OFFICE 5629038911                    NO. 960    P. 10

"Assets" shall mean all of Seller's right, title and interest in and to the Refinery, the Pipelines and other assets used or useful in the operation of the Refinery, including all of Seller's right, title and interest to the following:

     (a)     all Contracts;

     (b)     all Equipment;

     (c)     all Books and Records;

     (d)     all Proprietary Rights and all associated or related goodwill;

     (e)     to the extent transferable, all Permits;

     (f)     all Insurance Policies, subject to the provisions of Section 10.5 hereof; and

     (g)     all rights under or pursuant to all warranties, representations and guarantees made by suppliers in connection with the foregoing assets or services furnished to Seller pertaining to the Assets, to the extent such warranties, representations and guarantees are assignable;

*provided, however,* that except for the Insurance Policies and rights described in clause (g) above, in no event shall the Assets include any cash or cash equivalents, any choses in action or other claims against third parties or any Contract or Permit not transferred pursuant to Section 3.3.

"Assumed Liabilities" shall mean the liabilities specifically assumed by Buyer pursuant to Section 2.2. hereof.

"Benefit Plan" shall mean any employee benefit plan, as defined in Section 3(3) of ERISA and any material benefit arrangement that is not such an employee benefit plan, including (i) each employment or consulting agreement, (ii) each arrangement providing insurance benefits, (iii) each incentive bonus or deferred bonus arrangement, (iv) each arrangement providing termination allowance, severance or similar benefits, (v) each equity compensation plan, and (vi) each deferred compensation plan, that is or was sponsored or contributed to by Seller or any ERISA Affiliate of Seller or with respect to which Seller or any ERISA Affiliate has or had an obligation to contribute.

"Books and Records" shall mean all books, records, lists, ledgers, files, reports, plans, drawings and operating records of every kind and held or maintained by Seller pertaining to the Assets, business, customers, suppliers, distributors or personnel of Seller including (a) all disk or tape files, printouts, runs or other computer-prepared information and Seller's interest in all computer programs required to access, and the equipment containing, all such computer-based information, (b) all product, business and marketing plans, (c) all environmental control records and (d) all sales, maintenance and production records; excluding, however, the financial records, stock books or ledgers or minute books of Seller.

"Business Days" shall mean all calendar days other than Saturdays, Sundays and all days on which national banks in New York, New York are authorized or required by law to close.

2

NY_DOCS\259564.13

07/27/98 10:11

"Closing Date" shall mean the Scheduled Closing Date, or such other date as Buyer and Seller shall mutually agree upon.

"Code" shall mean the Internal Revenue Code of 1986, as amended, and the rules and regulations thereunder.

"Contract" shall mean any agreement, contract, lease, note, loan, evidence of indebtedness, purchase order, letter of credit, franchise agreement, undertaking, covenant not to compete, employment agreement, license, instrument, obligation, commitment, purchase and sales order and other executory commitment to which Seller is a party or which relates to the Assets, whether oral or written, express or implied.

"Court Order" shall mean any judgment, decision, consent decree, injunction, ruling or order of any federal, state, local or foreign court or governmental agency, department or authority that is binding on any Person or its property under applicable law.

"days" shall mean all calendar days.

"Default" shall mean (i) a material breach of or default under any Contract; (ii) the occurrence of an event that, with the passage of time or the giving of notice or both, would constitute a material breach of or default under any Contract; or (iii) the occurrence of an event that, with or without the passage of time or the giving of notice or both, would give rise to a right of termination or acceleration under any Contract.

"Disclosure Documents" shall mean the Schedules attached hereto or to the letter from Vincent J. Papa to Marshall Staunton dated April 13, 1998, as supplemented and updated to the date hereof.

"Encumbrance" shall mean any claim, lien, pledge, option, charge, easement, security interest, deed of trust, mortgage, right-of-way, encroachment, building or use restriction, conditional sales agreement, encumbrance or other right of third parties, whether voluntarily incurred or arising by operation of law, including any agreement to give any of the foregoing in the future, and any contingent sale or other title retention agreement or lease in the nature thereof.

"Environmental Laws" shall mean all Regulations which regulate or relate to the protection, clean-up and restoration of the environment; the use, treatment, storage, transportation, generation, manufacture, processing, distribution, handling or disposal of, or emission, discharge or other release or threatened release of Hazardous Substances or otherwise dangerous substances, wastes, pollution or materials (whether, gas, liquid or solid); the preservation or protection of waterways, groundwater, drinking water, air, wildlife, plants or other natural resources, or the health and safety of persons or property, including protection of the health and safety of employees; and compensation for personal injury, property damage or damages to natural resources resulting from a release or threatened release of Hazardous Substances or otherwise dangerous substances, wastes, pollution or materials (whether, gas, liquid or solid). Environmental Laws shall include, the Resource Conservation & Recovery Act ("RCRA"), Clean Water Act, Safe Drinking Water Act, Endangered Species Act, Atomic Energy Act, Occupational Safety and Health Act, Toxic Substances Control Act, Clean Air Act, Oil Pollution Act of 1990, Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") and the Hazardous Materials Transportation Act; California Health & Safety Code §25100, *et seq.* and §39000 *et seq.*, California Fish & Game Code §2014 and §2050 *et seq.*,

3

NOV. 21. 2006  9:45AM    MAIN OFFICE 5629038911                    NO. 960   P. 12

and California Water Code §13000 *et seq.*; and all other analogous or related Regulations, each as amended.

"Equipment" shall mean all of the furniture, furnishings, machinery, equipment, spare parts, supplies, appliances, vehicles and other tangible personal property in which Seller has any interest and which are located in, at or upon the Refinery or are associated with the Pipelines.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" shall mean any Person that, together with Seller as of the relevant measuring date under ERISA, was or is required to be treated as a single employer under Section 414 of the Code.

"Excluded Liabilities" shall mean the Liabilities described in Section 2.3.

"Financial Statements" shall mean the unaudited balance sheet of Seller and its subsidiaries on a consolidated basis, as of the last day of the fiscal year ended December 31, 1997.

"GAAP" shall mean generally accepted accounting principles applied in a manner consistent with past practices.

"Governmental Authority" shall mean any agency, authority, board, bureau, commission, court, department, office or instrumentality of any nature whatsoever of the United States or any other country, including any political subdivision of any thereof, or any officer or official thereof acting in an official capacity.

"Hazardous Substance" shall mean any pollutants, contaminants, chemicals, waste and any toxic, infectious, carcinogenic, reactive, corrosive, ignitable or flammable chemical or chemical compound or hazardous substance, material or waste, whether solid, liquid or gas, including any quantity of asbestos in any form, urea formaldehyde, PCB's, radon gas, crude oil or any fraction thereof, all forms of natural gas, petroleum products or by-products or derivatives, radioactive substance, waste waters, sludges, slag and any other substance, material or waste that is subject to regulation, control or remediation under any Environmental Law.

"Insurance Policies" shall mean any and all insurance policies or rights thereto, now or previously in force and owned by Seller or any predecessor of Seller, including the insurance policies identified on Schedule 1.1 hereto.

"IRS" shall mean the United States Internal Revenue Service.

"Knowledge of Seller" shall mean with respect to Seller, the actual knowledge of Siegfried Hodapp, James Button or Michael Egner.

"Liabilities" shall mean any direct or indirect liability, indebtedness, obligation, responsibility, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any type, whether accrued, absolute, contingent, matured, unmatured or other.

"material adverse effect" or "material adverse change" shall mean any substantial adverse effect or change in the financial or other condition, business, results of operations,

4

NOV. 21. 2006   9:45AM    MAIN OFFICE 5629038911    NO. 960    P. 13

prospects, Assets, Liabilities or operations of Seller or on the ability of Seller to consummate the transactions contemplated hereunder, or any event or condition which would, with the passage of time, constitute a "material adverse effect" or "material adverse change", in each case depending upon the context in which the phrase is used.

"ordinary course of business" or "ordinary course" or any similar phrase shall mean the ordinary course of the operation of the Assets consistent with past practice.

"Permits" shall mean all licenses, permits, franchises, approvals, authorizations, consents or orders of, or filings with, or notifications to, any Governmental Authority, whether foreign, federal, state or local, or any other person, necessary for the past or present conduct of, or relating to the operation of the Refinery and Pipelines.

"Permitted Encumbrances" shall mean (i) liens for current Property Taxes not yet due; (ii) with respect to the Refinery, the Encumbrances shown as exceptions on the Title Commitment other than any mortgage, deed of trust, security interest or other similar lien; (iii) materialmen's, mechanics' or other like liens arising in the ordinary course of business for amounts not yet due or which are being contested in good faith by appropriate proceedings; (iv) liens identified in Schedule 4.10 hereto; and (v) other Encumbrances which do not (A) breach any covenant, representation or warranty of Seller in this Agreement; (B) materially adversely affect the use or value of any of the Assets; (C) render Seller's interest in any of the Assets unmarketable; (D) constitute a lien in the nature of a mortgage, deed of trust, security interest or other similar lien; or (E) constitute a lease, sublease or other occupancy agreement that gives any third party any right to occupy or use all or any portion of any of the Assets following Closing.

"Person" shall mean any individual, firm, corporation, partnership, limited liability company, trust, unincorporated organization, Governmental Authority or other entity, and shall include any successor by merger or otherwise of such Person.

"Pipeline(s)" shall mean all of Seller's right, title and interest in and to the refined products and crude oil or other feedstock pipeline(s) depicted on the pipeline map and/or identified on the table attached as Exhibit A hereto.

"Property Taxes" shall mean all state, local and other taxes, levies, imposts, assessments, impositions or other similar government charges levied or assessed against the Assets or the rents or other revenues therefrom, and any premium, including interest, penalties and additions in connection therewith, but excluding all such taxes, assessments or charges measured by the net income of Seller.

"Proprietary Rights" shall mean all of Seller's copyrights, patents, trademarks, service marks, trade names, trade dress, processes, computer software, trade secrets and know-how, all licenses from any party of any of the above, and all other intellectual property or rights thereto owned by Seller and used or useful in the operation of the Assets.

"Refinery" shall mean the land depicted on the refinery map attached as Exhibit A hereto underlying, and the plants, processing units, buildings and other improvements or fixtures constituting, the approximately 49,500 bpd refinery located in Santa Fe Springs, California.

"Regulations" shall mean all laws, statutes, ordinances, regulations, rules, notice requirements, Court Orders, agency guidelines, principles of law and orders of any Governmental Authority, including Environmental Laws.

5

NOV. 21. 2006    9:45AM    MAIN OFFICE 5629038911    NO. 960    P. 14

"Representative" shall mean any officer, director, principal, attorney, agent, employee or other representative.

"Scheduled Closing Date" shall mean August 15, 1998.

"Tax Returns" shall mean any returns, reports, declarations, information statements and other documents with respect to Taxes required to be filed with the IRS or any other taxing (or similar) authority, domestic or foreign, including consolidated, combined and unitary tax returns.

"Taxes" shall mean any federal, state, local, foreign or other tax, levy, impost, fee, assessment or other government charge of any kind, including net or gross income, gross receipts, estimated income, windfall profits, production, business occupation, franchise, profits, license, lease, service, service use, utility, Property Taxes, sales, transfer and gains, use, ad valorem, excise, severance, stamp customs, duty, value added, capital stock, superfund or oil spill, payroll, employment, social security, workers' compensation, unemployment compensation or withholding taxes, and any premium, including interest, penalties and additions in connection therewith.

"Title Commitment" shall mean the preliminary title commitment issued by the Title Company, as from time to time amended or supplemented.

"Title Company" shall mean First American Title Insurance Company.

1.2.    Other Defined Terms. The following terms shall have the meanings defined for such terms in the Sections set forth below:

| Term | Section |
|------|---------|
| Agreement | Preamble |
| Buyer | Preamble |
| Closing | 3.1 |
| Confidential Information | 11.2 |
| EMC | 2.3(e) |
| Excluded Liabilities | 2.3 |
| Seller | Preamble |

## ARTICLE II.

## PURCHASE AND SALE OF ASSETS

2.1.    Purchase and Sale of Assets. Upon the terms and subject to the conditions contained herein, as of the Closing (i) Seller will sell, convey, transfer, assign and deliver to Buyer, and Buyer or one or more of its nominees will acquire from Seller, the Assets; and (ii) in consideration for the purchase of the Assets, Buyer shall pay to Seller $15,000,000 less a Three Hundred Thousand Dollar ($300,000) credit for a July option payment previously made and less amounts, if any, owed under the Pipeline Option Agreement dated as of May 1, 1998, by wire transfer of immediately available funds to an account or accounts designated by Seller.

2.2.    Assumption of Liabilities. Upon the terms and subject to the conditions contained herein, as of the Closing, Buyer shall assume all of the obligations and liabilities of Seller under the Contracts identified in the Disclosure Documents and which accrue after the date hereof and all obligations and liabilities of Seller whether fixed or contingent, known or unknown, matured or

6

NOV. 21. 2006  9:46AM    MAIN OFFICE 5629038911    NO. 969   P. 15

unmatured, liquidated or unliquidated, for (i) the defense of, and any amounts owed in respect of, the superfund claims known as OII and WDI and (ii) any severance obligations owed to current or former employees of Seller as and to the extent set forth in the Disclosure Documents.

2.3.  Excluded Liabilities. Notwithstanding any other provision of this Agreement, Buyer shall not assume or be responsible for, and Seller shall retain and shall discharge, perform and be fully responsible for, all of the liabilities and obligations, fixed or contingent, known or unknown, matured or unmatured of Seller relating to:

(a)  any petroleum terminal, storage facility, service station or other property, other than the Refinery and the Pipelines, now or previously owned or operated by Seller;

(b)  any obligation or liability of Seller for Taxes incurred in connection with the consummation of the transactions contemplated by this Agreement or other Taxes, interest and penalties thereon, if any, incurred or owing by Seller or any Affiliate of Seller prior to the Closing Date; excluding, however, the Assumed Liabilities, sales taxes that may be incurred solely as a result of the transfer of Assets contemplated by this Agreement and any Property Taxes payable on or with respect to the Assets;

(c)  Energy Merchant Corp., a Delaware corporation ("EMC") or any shareholder, employee or Affiliate of EMC, other than Seller;

(d)  any Benefit Plan (other than the severance obligations assumed in Section 2.2) that covers or covered any past, current or prospective employee of Seller or any Affiliate of Seller, including any obligation under any Benefit Plan arising out of any collective bargaining agreement or other agreement between or among (i) Seller or any group representing, or purporting to represent, Seller or any Affiliate of Seller with respect to any such employee; and (ii) any employee employed in the operation of the Refinery or any labor organization, union, group or association representing, or purporting to represent, any such employee; and

(e)  any other liability or obligation of Seller other than as, and then only to the extent, identified in the Disclosure Documents.

2.4.  Closing Costs.

(a)  Seller.  Seller shall pay the legal, professional and consultant fees incurred by Seller.

(b)  Buyer.  Buyer shall pay (i) the costs of a policy or policies of title insurance insuring ownership of the Refinery in Buyer as of the Closing in the aggregate amount of the Purchase Price allocated thereto pursuant to Section 2.5 hereof or if no such amount is allocated prior to the Closing Date, Fifteen Million Dollars ($15,000,000); (ii) any documentary transfer taxes; (iii) the fees and costs of recording or filing any conveyancing instruments; (iv) any sales, use or other taxes imposed by reason of the transfer of the Assets, including any deficiency, interest or penalty asserted with respect thereto; and (v) the legal, professional and consulting fees incurred by Buyer.

7

2.5.   Allocation.  Buyer and Seller will use their best efforts to agree upon an allocation of the Purchase Price prior to the Closing Date in accordance with the allocation method required by Section 1060 of the Code.  The parties shall cooperate to comply with the substantive and procedural requirements of Section 1060 and the regulations thereunder, and the allocation, if agreed to, shall be adjusted only if and to the extent necessary to comply with such requirements and each party agrees that it will not take or permit any of its Affiliates to take, for income tax purposes, any position inconsistent with such allocation.

## ARTICLE III.

## CLOSING

3.1.   Closing.  The Closing of the transactions contemplated hereunder ("Closing") shall be held commencing at 10:00 a.m. local time, on the Closing Date at the New York, New York offices of Latham & Watkins or at such other time or place as the parties hereto otherwise designate.

3.2.   Deliveries at Closing.

(a)   By Seller.  Seller shall, on the Closing Date, deliver to the Buyer or its nominee:

(i)   a Bill of Sale, in the form attached hereto as Exhibit C, conveying Seller's personal property included in the Assets;

(ii)   a grant deed in the Title Company's standard form;

(iii)   counterpart originals of (i) an Assignment and Assumption Agreement for the Contracts in substantially the form attached hereto as Exhibit D and (ii) an Environmental Indemnity and Reimbursement Agreement in substantially the form of Exhibit B;

(iv)   one or more certificates regarding the tax status of Seller as a domestic corporation; and

(v)   such other bill(s) of sale, deeds, endorsements, assignments and other good and sufficient instruments of sale, conveyance, transfer and assignment, in form and substance reasonably satisfactory to Buyer, with respect to the Assets, as reasonably requested by Buyer, sufficient to vest in Buyer title in and to the Assets in accordance with the provisions hereof.

(b)   By Buyer.  Buyer shall deliver to Seller on the Closing Date counterpart originals of (i) an Assignment and Assumption Agreement for the Contracts substantially in the form attached hereto as Exhibit D and (ii) an Environmental Indemnity and Reimbursement Agreement in substantially the form of Exhibit B.

3.3.   Consent to Assignment; Non-transferred Assets.  Anything in this Agreement to the contrary notwithstanding, neither this Agreement nor the consummation of the transactions contemplated hereby shall constitute an agreement to assign or an assignment of any Contract or Permit or any claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment thereof, without

8

NOV. 21. 2006  9:46AM    MAIN OFFICE 5629038911                    NO. 960    P. 17

the consent of a third party thereto or any Governmental Authority or agency, would constitute a breach thereof or in any way adversely affect the respective rights or obligations of Buyer or Seller thereunder. If any such consent is not obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the respective rights or obligations of Buyer or Seller thereunder, Seller, at no cost to Seller, shall use its best efforts (i) to provide to Buyer the benefits under any such Contract or Permit (including enforcement for the benefit of Buyer of any and all rights of Seller against a third party thereto arising out of the breach or cancellation by such third party or otherwise) as if such Contract or Permit had been assigned to Buyer and (ii) to obtain as soon as practicable the consent or approval of any such third party or Governmental Authority to the assignment of such Contract or Permit and to transfer such Contract or Permit to Buyer, and any transfer or assignment to Buyer of any property or property rights or any Contract or Permit that shall require the consent or approval of any third party or Governmental Authority shall be made subject to such consent or approval being obtained.

    3.4.   <u>Other Closing Matters</u>.  Each of the parties shall take such other actions required hereby to be performed by it prior to or on the Closing Date.  Seller shall take all additional reasonable steps as may be necessary or desirable to put Buyer in possession of, and in operational control of, the Assets.

ARTICLE IV.

<u>REPRESENTATIONS AND WARRANTIES OF SELLER</u>

    Seller hereby represents and warrants to Buyer as follows, which representations and warranties are, as of the date hereof, and will be, as of the Closing Date, true and correct; subject, however, to any fact or facts disclosed in this Agreement or in the Disclosure Documents or otherwise disclosed to Buyer during its due diligence investigation of Seller:

    4.1.   <u>Organization</u>.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of California; has full corporate power and authority to conduct the business presently being conducted by it as it is presently being conducted and to own or lease its assets.

    4.2.   <u>Authorization</u>.  This Agreement has been duly executed and delivered by Seller and is, and upon execution and delivery of each of the other instruments required or contemplated to be executed and delivered hereunder by Seller will be, the legal, valid and binding obligations of Seller, enforceable against it in accordance with their respective terms.

    4.3.   <u>Consents and Approvals</u>.  Other than in connection with or in compliance with the consents, notices, filings, or registrations with Governmental Authorities which have been identified in the Disclosure Documents that may be necessary in order to transfer to Buyer a Permit or which can be obtained in the normal course of business, to Seller's Knowledge no notice to, declaration, filing or registration with, or authorization, consent or approval of, or Permit from, any Governmental Authority is required to be made or obtained by Seller in connection with the execution, delivery or performance of this Agreement or any other instrument required or contemplated to be executed and delivered hereunder by Seller or the consummation of the transactions contemplated hereunder or thereunder.

    4.4.   <u>No Conflict or Violation</u>.  Neither the execution, delivery or performance of this Agreement or any other instruments required or contemplated to be executed and delivered hereunder by Seller or the consummation of the transactions contemplated hereunder or thereunder, will (i) violate or conflict with any provision of the certificate of incorporation or bylaws of Seller or any shareholders' agreement or other similar agreement to which Seller is a party; (ii) result in the creation of any Encumbrance upon any of the Assets under any of the terms, conditions or provisions of any Contract or

9

NOV. 21. 2006  9:46AM     MAIN OFFICE 5629038911                    NO. 960   P. 18

Permit; or (iii) violate any Regulation, except for such violations, conflicts or creations of Encumbrances which, in the aggregate, would not have a material adverse effect on the value or use of any of the Assets or the ability of Seller to consummate the transactions contemplated hereunder.

    4.5.    Absence of Certain Changes or Events.  Since July 1, 1998:

    (i)    there has not been any damage or destruction to, or sale or other disposition of, any material portion of the Assets;

    (ii)    there has not been any increase in, or commitment to increase, the operating expenses of the Assets, including the compensation paid or payable to the employees of Seller, except for increases in the ordinary course which are caused by general economic conditions or factors affecting the refining industry generally; and

    (iii)    there has not been any amendment or termination, or proposed amendment or termination, of any Contract or Permit which, either individually or in the aggregate, would materially adversely affect the value or operation of the Assets.

    4.6.    Financial Statements.  Seller has heretofore delivered to Buyer the Financial Statements. The Financial Statements were prepared in accordance with the Books and Records which, in turn, are maintained in accordance with GAAP, and accurately reflect the liabilities of Seller, including liabilities for any Taxes.

    4.7.    Taxes.  Seller has properly and accurately completed and filed on a timely basis true and correct Tax Returns and paid all Taxes, in each instance for which Buyer could be made liable as a result of the transactions contemplated by this Agreement or which could result in liens on the Assets, other than Property Taxes on the Refinery and sales taxes imposed on the transfer of the Assets pursuant to this Agreement.

    4.8.    Title.  Seller has good and marketable title to the Assets, free and clear of any Encumbrances, except for Permitted Encumbrances.

    4.9.    Litigation.  Schedule 4.9 identifies and contains an accurate description of all Actions pending, or to the best of Seller's knowledge, threatened or anticipated against, related to or affecting Seller or the Assets.  Except as identified in Schedule 4.9, there are no Actions pending, or to the best of Seller's knowledge, threatened or anticipated against, related to or affecting Seller or the Assets that would (i) have any adverse effect on Seller or the Assets from and after Closing; (ii) delay, limit or enjoin the transactions contemplated hereunder; or (iii) involve any risk of criminal liability on the part of Seller or, from and after Closing, Buyer.

    4.10.    Creditors.  To Seller's Knowledge, the Disclosure Documents identify all of the creditors of Seller, and the amounts owed to each, as of the dates set forth thereon, except for contingent liabilities which are not reflected on the Financial Statements.  To the best of Seller's Knowledge, Schedule 4.10 identifies all of the liens against the Assets.  Except as identified on such Schedule, there are no other liens against the Assets and the amounts required to release such liens do not materially exceed the amounts set forth on such Schedule, plus any interest accrued thereon in the ordinary course since the dates set forth thereon.

    4.11.    Employees.  Seller (i) is not a party to any labor agreement with respect to any employees at or in connection with the Refinery and the operation thereof with any labor organization,

10

union, group or association; and (ii) to Seller's Knowledge has not experienced any attempt by organized labor or its representatives to make Seller or any of Seller's Affiliates conform to the demands of, or enter into any agreement with, organized labor that would cover any of such employees. Seller is in compliance in all material respects with all applicable laws respecting employment practices, terms and conditions of employment and wages and hours and to Seller's Knowledge is not and has not engaged in any unfair labor practice. Except as set forth in the Disclosure Documents, there is no unfair labor practice charge or complaint against Seller or any of Seller's Affiliates with respect to the operation of the Refinery pending before the National Labor Relations Board or any other Governmental Authority, and to Seller's Knowledge, no presently existing facts or information would lead to any such charge or complaint. Each Benefit Plan has been maintained in compliance with its terms and, both as to form and operation, with the requirements of all applicable statutes, orders, rules and regulations which are applicable to such Benefit Plan, including but not limited to ERISA and the Code. To Seller's Knowledge there are no unfunded benefit liabilities or accumulated funding deficiencies with respect to any Benefit Plan applicable to Seller; neither Seller nor any Affiliate of Seller nor any of the Assets are subject to any lien under ERISA with respect to any such plan; and neither Seller nor any ERISA Affiliate has any liability for unpaid contributions with respect to any Benefit Plan. Neither Seller nor any Affiliate of Seller is or has been a party to, or participated in a complete or partial withdrawal from any multiemployer plan as defined in Section 4001(a)(3) of ERISA or any similar plan.

4.12.    No Other Agreements to Sell the Assets. Seller has no commitment or legal obligation, absolute or contingent, to any Person other than Buyer to sell, assign, transfer or effect a sale of any of the Assets, to sell or effect a sale of any of its capital stock or to effect any merger, consolidation, liquidation, dissolution or other reorganization of Seller; or to enter into any agreement or cause the entering into of an agreement with respect to any of the foregoing.

4.13.    No Brokers. None of Seller and any of its officers, directors, employees, shareholders or Affiliates has employed or made any agreement with any broker, finder or other Person which will result in the obligation of Buyer or any of its Affiliates to pay any finder's fee, brokerage fee or commission or similar payment in connection with the transactions contemplated hereunder.

4.14.    As Is Where Is. Buyer shall acquire the Assets "as is" and "where is", and, except as specifically set forth above, any other representation or warranty with respect to the Assets, whether express or implied, is hereby disclaimed, including any representation or warranty as to merchantability or fitness for any particular purpose.

ARTICLE V.

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows, which representations and warranties are, as of the date hereof, and will be, as of the Closing Date, true and correct; subject, however, to any fact or facts disclosed in this Agreement or otherwise disclosed to Seller by Buyer:

5.1.    Organization of Buyer. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.

5.2.    Authorization. Buyer has all requisite corporate power and authority, and has taken all corporate action necessary to execute and deliver this Agreement and each of the other instruments required or contemplated to be executed and delivered hereunder by Buyer, to consummate the transactions contemplated hereunder and thereunder and to perform its obligations hereunder and

11

thereunder. The execution and delivery of this Agreement and each of the other instruments required or contemplated to be executed and delivered hereunder by Buyer and the consummation by Buyer of the transactions contemplated hereunder and thereunder have been duly approved by its board of directors. No other corporate proceedings on the part of Buyer are necessary to authorize this Agreement, any of the other instruments required or contemplated to be executed and delivered hereunder by Buyer or the consummation of the transactions contemplated hereunder or thereunder. This Agreement has been duly executed and delivered by Buyer and is, and upon execution and delivery each of the other instruments required or contemplated to be executed and delivered hereunder by Buyer will be, the legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

5.3.    No Conflict or Violation.   Neither the execution, delivery or performance of this Agreement or any other instruments required or contemplated to be executed and delivered hereunder by Buyer or the consummation of the transactions contemplated hereunder or thereunder, will (i) violate or conflict with any provision of the articles of incorporation or bylaws of Buyer, or (ii) violate any Regulation or Court Order, except for such violations or conflicts, which, in the aggregate, would not have a material adverse effect on the ability of Buyer to consummate the transactions contemplated hereunder.

5.4.    Consents and Approvals.   To Buyer's knowledge, no notice to, declaration, filing or registration with, or authorization, consent or approval of, or Permit from, any Governmental Authority is required to be made or obtained by Buyer in connection with the execution, delivery and performance of this Agreement or any other instruments required or contemplated to be executed and delivered hereunder by Buyer or the consummation of the transactions contemplated hereunder or thereunder.

5.5.    No Brokers.   Neither Buyer nor any of its officers, directors, employees, shareholders or Affiliates has employed or made any agreement with any broker, finder or similar agent or any Person or firm which will result in the obligation of Seller or any of its Affiliates to pay any finder's fee, brokerage fees or commission or similar payment in connection with the transactions contemplated hereby.

## ARTICLE VI.

## COVENANTS

6.1.    Covenants of Seller.

(a)    Conduct of the Business by Seller.   Seller shall, except as contemplated by this Agreement, or as consented to by Buyer in writing, maintain the Assets in the ordinary course and not take any action inconsistent with this Agreement or with the consummation of the transactions contemplated hereunder. Without limiting the generality of the foregoing:

(i)    Seller shall not (y) enter into, extend, materially modify, terminate or renew any Contract other than in the ordinary course of business; or (z) sell, assign, transfer, convey, lease, mortgage, pledge or otherwise dispose of or encumber any Asset; and

(ii)    Seller shall (y) maintain the Assets in substantially their current state of repair, normal wear and tear excepted; and (z) comply with all Regulations applicable to the Assets, except where the failure to so comply would not have a material adverse effect on the operation of the Assets;

12

(b)    No Solicitation. From the date hereof through Closing or the earlier termination of this Agreement, none of Seller and its Representatives shall, directly or indirectly, enter into, solicit, initiate or continue any discussions or negotiations with, or encourage or respond to any inquiries or proposals by, or participate in any negotiations with, or provide any information to, or otherwise cooperate in any other way with, any Person other than Buyer and its Representatives, concerning the sale of the Assets or of any shares of its stock or any merger, consolidation, liquidation, dissolution or similar transaction involving Seller, that in any case, would in any way be inconsistent with or interfere with the transactions contemplated hereby. Seller shall not, directly or indirectly, solicit, initiate or encourage the submission of any proposal or offer from any Person relating to any such transaction or participate in any negotiations regarding, or furnish to any Person any information with respect to Seller for the purposes of, or otherwise cooperate in any way with, or assist or participate in, facilitate or encourage, any effort or attempt by any other Person to seek or effect any such transaction.

(c)    Notification of Certain Matters. From the date hereof through Closing, Seller, promptly upon obtaining knowledge thereof, shall give notice to Buyer of (i) the occurrence, or failure to occur, of any event which would be likely to cause any representation or warranty contained in this Agreement to be untrue or inaccurate in any material respect; and (ii) any failure of Seller to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder; provided, however, that no such disclosure shall cure or be deemed to cure any breach of a representation, warranty, covenant or agreement or to satisfy any condition. Seller shall promptly notify Buyer of any Default, the commencement of any Action, or any credible threat thereof, or any other event that occurs before Closing that could in any way materially affect the value or operation of any Asset.

(d)    Lien Clearance. Seller shall remove and release from the public records, effective as of the Closing Date, all UCC Financing Statements or other evidence of liens relating to any obligations owed to EMC and shall cooperate with Buyer, at no cost or expense to Seller, to enable Buyer to either (i) remove and release from the public records, effective as of the Closing Date, or (ii) reduce the underlying secured obligation to a sum certain not materially greater than the amount reflected on Schedule 4.10 hereto, plus any interest accrued thereon in the ordinary course since the date(s) set forth thereon, all liens with respect to the Assets other than any UCC Financing Statements which show Seller as the lessee under an equipment lease.

(e)    Consents. To the extent that the transactions contemplated hereunder cannot be consummated without the approval, consent or waiver of a third party, Seller shall use its best efforts to obtain such approval, consent or waiver; provided, however, that Seller shall not be obligated to pay any consideration for obtaining any such approval, consent or waiver other than nominal fees or transactional expenses requested by the third party.

6.2.    Covenants of Buyer. Effective for the period July 20, 1998 through the Closing Date, Buyer will pay (or reimburse) to Seller amounts which Seller can demonstrate to the reasonable satisfaction of Buyer have been paid or accrued on or subsequent to July 20, 1998 and are necessary to preserve and maintain the Assets, including payroll and arrearages that must be paid to the Southern California Air Quality Management District prior to July 31, 1998 (the "SCAQMD Fees"). If for any reason other than the fault of Buyer the transactions contemplated hereunder do not close, Seller will repay to Buyer the SCAQMD Fees.

6.3.    Of Each Party. Buyer and Seller shall (i) use their respective best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated hereunder as soon as practicable

13

following the satisfaction or waiver of the conditions set forth in Article VII and Article VIII hereof, but in no event prior to August 1, 1998; (ii) execute any documents, instruments or conveyances of any kind which may be reasonably necessary or advisable to carry out any of the transactions contemplated hereunder; and (iii) cooperate with each other in connection with the foregoing.

6.4.    Employee Matters.

(a)    Continued Employment.  Seller shall cooperate with, and use its good faith efforts to assist Buyer in its efforts to secure satisfactory employment arrangements with, those employees of Seller to whom Buyer makes offers of employment.  Seller shall terminate, as of the Closing, its employment relationship with those of such employees to whom Buyer makes an offer of employment.  During the one (1) year period after the Closing Date, neither Seller nor any Affiliate of Seller shall, directly or indirectly, hire or offer employment to or seek to hire or offer employment to any employee of Seller whose employment is continued by Buyer after the Closing Date or any employee of Buyer or any successor or Affiliate of Buyer who is engaged in the operation of the Refinery, unless Buyer first terminates the employment of such employee or gives its written consent to such employment or offer of employment.

(b)    WARN.  Seller shall comply with the requirements of the Worker Adjustment and Retraining Notification Act of 1988 with respect to any "plant closing" or "mass layoff", as those terms are defined in such Act, which may result from Seller's termination of the employment of any of the employees in connection with the sale of the Assets to Buyer or any of the other transactions contemplated by this Agreement.

(c)    Third Party Beneficiary.  Nothing contained in this Agreement shall (i) confer upon any employee of Seller any right with respect to continuance of employment by Buyer, (ii) interfere with the right of Buyer to terminate the employment of any employee of Seller at any time, with or without cause, or (iii) otherwise create any third party beneficiary rights in any employee of Seller, any beneficiary or dependents thereof or any collective bargaining representative thereof, with respect to the compensation, terms and conditions of employment and benefits that may be provided to any employee of Seller by Buyer or under any Benefit Plan which Buyer may maintain.

## ARTICLE VII.

## CONDITIONS TO SELLER'S OBLIGATIONS

The obligations of Seller to sell the Assets to the Buyer on the Closing Date and to consummate the transactions contemplated hereby are subject to the satisfaction or waiver, on or prior to the Closing Date, of each of the following conditions:

7.1.    Representations, Warranties and Covenants.  All representations and warranties of Buyer contained in this Agreement that are qualified by materiality shall be true and correct and all other representations and warranties shall be true and correct in all material respects, in each instance at and as of the Closing Date as if such representations and warranties were made at and as of the Closing Date, and Buyer shall have performed in all material respects all agreements and covenants required hereby to be performed by it prior to or at the Closing.

7.2.    No Proceedings or Litigation.  No Action by any Governmental Authority shall have been instituted for the purpose of enjoining or preventing, or which question the validity or legality of,

14

the transactions contemplated hereby and which would reasonably be expected materially to damage Seller if the transactions contemplated hereby are consummated. No preliminary or permanent injunction or other order, decree or ruling by any United States federal or state court of competent jurisdiction or by any United States federal or state governmental, regulatory or administrative agency or authority which prevents the consummation of the transactions contemplated hereby shall have been issued and remain in effect.

## ARTICLE VIII.

### CONDITIONS TO BUYER'S OBLIGATIONS

The obligations of Buyer to purchase the Assets and to consummate the transactions contemplated hereby are subject, to the satisfaction or waiver, on or prior to the Closing Date, of each of the following conditions:

8.1. _Representations, Warranties and Covenants._ All representations and warranties of Seller contained in this Agreement that are qualified by materiality shall be true and correct and all other representations and warranties shall be true and correct in all material respects, in each instance at and as of the Closing Date as if such representations and warranties were made at and as of the Closing Date, and Seller shall have performed in all material respects all agreements and covenants required hereby to be performed by it prior to or at the Closing.

8.2. _No Proceedings or Litigation._ No Action by any Governmental Authority shall have been instituted for the purpose of enjoining or preventing, or which question the validity or legality of, the transactions contemplated hereby and which would reasonably be expected materially to damage Seller if the transactions contemplated hereby are consummated. No preliminary or permanent injunction or other order, decree or ruling by any United States federal or state court of competent jurisdiction or by any United States federal or state governmental, regulatory or administrative agency or authority which prevents the consummation of the transactions contemplated hereby shall have been issued and remain in effect.

8.3. _Title Insurance._ Buyer shall have received a commitment for a standard coverage ALTA policy or policies of title insurance with respect to the Refinery, with such endorsements thereto as Buyer shall reasonably require, pursuant to which the Title Company agrees to insure, at its regular rates in the amount of at least Fifteen Million Dollars ($15,000,000), good and marketable title to the Refinery subject only to the Permitted Encumbrances with respect thereto.

8.4. _Lien Clearance._ Buyer shall have received, in form and substance satisfactory to Buyer, (i) UCC termination statements, reconveyances, releases or other instruments sufficient to remove and release from the public records all liens relating to any obligations owed to EMC; and (ii) either (y) lien releases, in the form of UCC termination statements, reconveyances, releases or otherwise, of all liens on the Assets; or (z) other assurances satisfactory to Buyer that it will be able to remove and release all such liens from the public records following the Closing Date upon the payment of a sum certain not materially greater than the amount(s) reflected on Schedule 4.10 hereto; _provided, however,_ that the condition set forth in clause (ii) above shall be limited to liens where the potential amount thereof, relative to the Assets secured thereby, could have a material adverse effect on Buyer.

15

## ARTICLE IX.

### TERMINATION

This Agreement may be terminated at any time prior to Closing:

(i)      by mutual written consent of Buyer and Seller;

(ii)      by Buyer or Seller if the Closing shall not have occurred on or before the Scheduled Closing Date; *provided, however,* that this provision shall not be available to Buyer if Seller has the right to terminate this Agreement under clause (iv)(x) of this Article IX, and this provision shall not be available to Seller if Buyer has the right to terminate this Agreement under clause (iii)(x) of this Article IX;

(iii)      by Buyer if there is (x) a material breach of any representation or warranty set forth in Article IV hereof or any covenant or agreement to be complied with or performed by Seller pursuant to the terms of this Agreement; (y) a failure of a condition set forth in Article VIII to be satisfied (and such condition is not waived in writing by Buyer) on or prior to the Closing Date; or (z) an occurrence of any event which results or would result in the failure of a condition set forth in Article VIII to be satisfied on or prior to the Closing Date; *provided, however,* that Buyer may not terminate this Agreement prior to Closing if Seller has not had an adequate opportunity to cure such failure; or

(iv)      by Seller if there is (x) a material breach of any representation or warranty set forth in Article V hereof or of any covenant or agreement to be complied with or performed by Buyer pursuant to the terms of this Agreement; (y) a failure of a condition set forth in Article VII to be satisfied (and such condition is not waived in writing by Seller) on or prior to the Closing Date; or (z) an occurrence of any event which results or would result in the failure of a condition set forth in Article VII to be satisfied on or prior to the Closing Date; *provided, however,* that Seller may not terminate this Agreement prior to the Closing Date if Buyer has not had an adequate opportunity to cure such failure.

In the event of any termination of this Agreement, no party hereto shall have any Liability to any other party to this Agreement, except for any willful breach of this Agreement occurring prior to the proper termination of this Agreement. The foregoing provisions shall not limit or restrict the availability of specific performance or other injunctive relief to the extent that specific performance or such other relief would otherwise be available to a party hereunder.

## ARTICLE X.

### ACTIONS BY SELLER AND BUYER AFTER CLOSING

10.1.     Books and Records. Each party agrees that it will cooperate with and make available to the other parties, during normal business hours, the Books and Records, information and employees (without substantial disruption of employment) retained and remaining in existence after Closing which are necessary or useful in connection with any tax inquiry, audit, investigation or dispute, any litigation or investigation or any other matter requiring any such Books and Records, information or employees for

16

NOV. 21. 2006  9:52AM    MAIN OFFICE 5629038911                    NO. 961    P. 5

any reasonable business purpose. The party requesting any such Books and Records, information or employees shall bear all of the out-of-pocket costs and expenses, including attorneys' fees, but excluding reimbursement for salaries and employee benefits reasonably incurred in connection with providing such Books and Records, information or employees. In addition, Buyer shall permit Seller to store at the Refinery any financial records or other financial information that it retains pursuant to this Agreement and provide to Seller reasonable access to such materials at no charge to Seller.

    10.2.    Cooperation and Records Retention.  Buyer and Seller shall (i) each provide the other with such assistance as may reasonably be requested by any of them in connection with the preparation of any Tax Return, audit, or other examination by any taxing authority or judicial or administrative proceedings relating to Liability for Taxes of Seller; and (ii) each retain and provide the other with any records or other information that may be relevant to such return, audit or examination, proceeding or determination.

    10.3.    Tax Elections.  Seller shall make no new elections with respect to Taxes that affect Buyer or the Assets or any changes in current elections with respect to Taxes affecting Buyer or the Assets, without, in each instance, the prior written consent of Buyer.

    10.4.    Indemnification.

        (a)    By Seller.  Seller shall indemnify, save and hold harmless Buyer and its Affiliates and its and their respective Representatives from and against any and all costs, losses, Taxes, Liabilities, obligations, damages, lawsuits, deficiencies, claims, demands and expenses (whether or not arising out of third-party claims), including interest, penalties, attorneys' fees and all amounts paid in investigation, defense or settlement of any of the foregoing (collectively hereafter, for purposes of this Section 10.4, "damages") incurred in connection with, arising out of, resulting from or incident to (i) any breach of any representation or warranty or the inaccuracy of any representation made by Seller in or pursuant to this Agreement; (ii) any breach of any covenant or agreement made by Seller in or pursuant to this Agreement; or (iii) any Excluded Liability; excluding, however, any damages attributable to any failure to pay sales and use taxes, if any, imposed on the sale and subsequent repossession of certain elements of the Refinery to Kenyen Projects Limited and the amounts payable by Seller pursuant to the Environmental Indemnity and Reimbursement Agreement.

        (b)    By Buyer.  In addition to the obligations of Seller pursuant to the Environmental Indemnity and Reimbursement Agreement, Buyer shall indemnify, save and hold harmless Seller, its Affiliates and its and their respective Representatives, from and against any and all damages incurred in connection with, arising out of, resulting from or incident to (i) any breach of any representation or warranty or the inaccuracy of any representation, made by Buyer in or pursuant to this Agreement; (ii) any breach of any covenant or agreement made by Buyer in or pursuant to this Agreement; (iii) any Assumed Liability; (iv) the litigation identified in Schedule 4.9 hereto; and (v) any claim relating to creditors identified in Schedule 4.10 hereto, but only to the extent of the amounts set forth as owing thereon, without duplication, plus any interest accrued thereon in the ordinary course since June 30, 1998.

        (c)    Defense Of Claims.  If a claim for damages, other than a claim by Seller pursuant to and governed by the Environmental Indemnity and Reimbursement Agreement (a "Claim") is to be made by a party entitled to indemnification hereunder against the indemnifying party, the party claiming such indemnification shall give written notice (a "Claim Notice") to the indemnifying party as soon as practicable after the party entitled to indemnification becomes aware of any fact, condition or event which may give rise to damages for which indemnification may be sought under this Section 10.4. If any lawsuit or enforcement Action is filed against any party entitled to the benefit of indemnity

17

hereunder, written notice thereof shall be given to the indemnifying party as promptly as practicable (and in any event within thirty (30) days after the service of the citation or summons). The failure of any indemnified party to give timely notice hereunder shall not affect rights to indemnification hereunder, except to the extent that the indemnifying party demonstrates actual damage caused by such failure. After such notice, if the indemnifying party shall acknowledge in writing to the indemnified party that the indemnifying party shall be obligated under the terms of its indemnity hereunder in connection with such lawsuit or Action, then the indemnifying party shall be entitled, if it so elects at its own cost, risk and expense, (i) to take control of the defense and investigation of such lawsuit or Action; (ii) to employ and engage attorneys of its own choice to handle and defend the same unless the named parties to such Action or proceeding include both the indemnifying party and the indemnified party and the indemnified party has been advised in writing by counsel that there may be one or more legal defenses available to such indemnified party that are different from or additional to those available to the indemnifying party, in which event the indemnified party shall be entitled, at the indemnified party's cost, risk and expense, to separate counsel of its own choosing; and (iii) to compromise or settle such Claim. If the indemnifying party fails to assume the defense of such Claim within thirty (30) days after receipt of the Claim Notice, the indemnified party against which such Claim has been asserted will have the right to undertake, at the indemnifying party's cost and expense, the defense, compromise or settlement of such Claim on behalf of and for the account and risk of the indemnifying party; *provided, however*, that such Claim shall not be compromised or settled without the written consent of the indemnifying party, which consent shall not be unreasonably withheld. In the event the indemnified party assumes the defense of the Claim, the indemnified party will keep the indemnifying party reasonably informed of the progress of any such defense, compromise or settlement.

    10.5.  Insurance Policies. To the extent any of the Insurance Policies cannot be assigned without the consent of the carrier thereunder, until such time as such consent is obtained or is no longer necessary, Seller will make available to Buyer any and all rights and benefits under such Policy in order to enable Buyer to mitigate the impact of the Assumed Liabilities and the other liabilities of Buyer hereunder, including Buyer's indemnification obligations hereunder and under the Environmental Indemnity and Reimbursement Agreement.

## ARTICLE XI.

### MISCELLANEOUS

    11.1.  Assignment. Neither this Agreement nor any of the rights or obligations hereunder may be assigned by any party without the prior written consent of the other parties; *provided, however*, that Buyer may, without such consent, assign all such rights to any lender as collateral security and assign all such rights and obligations to a subsidiary or subsidiaries of Buyer or to a successor in interest to Buyer which shall assume all obligations and Liabilities of Buyer under this Agreement; *provided, however*, that no such assignment shall relieve Buyer of its obligations under this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, and no other Person shall have any right, benefit or obligation under this Agreement as a third party beneficiary or otherwise.

    11.2.  Confidentiality. The parties hereto acknowledge that the transactions contemplated hereunder are of a confidential nature and neither party shall make an announcement of this Agreement, in whole or in part, or the transaction contemplated hereby, to the public or any third party (except as expressly herein permitted), other than with the express written consent of the other party hereto. Further, until the Closing Date, all "Confidential Information" (as hereinafter defined) acquired by Buyer with respect to Seller, except for such disclosure as may be required by law or disclosures made with the

18

mutual consent of the parties hereto, shall be (i) maintained in confidence, (ii) used only for the purpose of and in connection with evaluating the business of Seller and (iii) disclosed only to employees, attorneys, consultants and other advisors to Buyer who have a need to know the information, *provided, however*, that with respect to information received by Buyer regarding Taxes, Buyer will use its best efforts to keep such information confidential and not disclose the same other than pursuant to advice of counsel or underwriters. If such advice is given, Buyer will promptly notify Seller of same. For the purposes of this Agreement, the term "Confidential Information" shall mean all information acquired by Buyer from Seller with respect to the business of Seller other than (x) information generally available to the public, (y) information which becomes available to Buyer from a source other than Seller or (z) was within Buyer's possession prior to its being furnished to Buyer pursuant to this Agreement.

11.3.   Survival of Representations. All of the representations, warranties, covenants and agreements made by Seller or Buyer in this Agreement or in any attachment, exhibit, schedule, certificate, document or list delivered by any such party pursuant hereto shall survive Closing and the delivery of any conveyancing instruments hereunder until the second anniversary of the Closing Date.

11.4.   Notices. All notices, requests, demands and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received if personally delivered; one (1) Business Day after transmission if transmitted by telecopy, electronic or digital transmission, one (1) Business Day after it is sent if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., FedEx); and upon receipt, if sent by certified or registered mail, return receipt requested. In each case notice shall be sent to:

If to Buyer to:

    CENCO, Inc.
    c/o Dean J. Nelson Happy
    Regent University School of Law
    1000 Regent University Drive
    Virginia Beach, Virginia 23464-9880

With a copy to:

    Latham & Watkins
    633 W. Fifth Street
    Suite 4000
    Los Angeles, California 90071
    Attention: David V. Lee, Esq.

19

NOV. 21. 2006  9:53AM    MAIN OFFICE 5629038911                    NO. 961    P. 8

If to Seller to:

    Vincent Papa, Esq.
    Managing Director and General Counsel
    PMG Capital Corp.
    General Motors Building
    767 Fifth Avenue, 23rd Floor
    New York, New York  10153

With a copy to:

    Loeb & Loeb
    1000 Wilshire Boulevard
    Suite 1800
    Los Angeles, California  90017
    Attention: Robert S. Barry, Jr., Esq.

or to such other place and with such other copies as either party may designate as to itself by written notice to the others.

    11.5.   Choice of Law. This Agreement shall be construed and interpreted and the rights of the parties shall be determined in accordance with the laws of the State of California, except with respect to matters of law concerning the internal corporate affairs of any corporate entity which is a party to or the subject of this Agreement, and as to those matters the law of the jurisdiction under which the respective entity derives its powers shall govern.

    11.6.   Entire Agreement, Amendments and Waivers. This Agreement, together with all exhibits and schedules hereto and the Environmental Indemnity and Reimbursement Agreement, constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties. This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto. No amendment, supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the party to be bound thereby. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

    11.7.   Multiple Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

    11.8.   Invalidity. In the event that any one or more of the provisions of this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument.

    11.9.   Cumulative Remedies. All rights and remedies of either party hereto are cumulative of each other and of every other right or remedy such party may otherwise have at law or in equity, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

20

NOV. 21. 2006  9:53AM    MAIN OFFICE 5629038911                    NO. 961    P. 9

11.10.  <u>Attorneys' Fees.</u>  If any party to this Agreement brings an Action to enforce its rights under this Agreement, the prevailing party shall be entitled to recover its costs and expenses, including reasonable attorneys' fees, incurred in connection with such Action, including any appeal of such Action.

(Signature Page Follows)

21

NOV. 21. 2006   9:53AM      MAIN OFFICE 5629038911                    NO. 961   P. 10

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be signed by their respective officers thereunto duly authorized, all as of the date first written above

CENCO REFINING CO.
a Delaware corporation

By: _____

Name:
Title:

POWERINE OIL COMPANY,
a California corporation

By: _____

Name:
Title:

NY_DOC82259564.12

NOV. 21. 2006   9:53AM    MAIN OFFICE 5629038911

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be signed by their respective officers thereunto duly authorized, all as of the date first written above.

CENCO REFINING CO.,
a Delaware corporation

By: _____
    Name:
    Title:

POWERINE OIL COMPANY,
a California corporation

By: _____
    Name:
    Title:

S-1

NY_DOCS\259564 \0

NOV. 21. 2006  9:53AM    MAIN OFFICE 5629038911                          NO. 961    P. 12

Exhibit A

## DESCRIPTION OF ASSETS

See attached Refinery and Pipeline Maps.

POWERINE OIL CO.
PIPELINES

POWERINE OIL CO.

POC-PL-01

NOV. 21. 2006  9:53AM    MAIN OFFICE 5629038911                    NO. 961    P. 14



POWERINE OIL COMPANY
REFINERY, TERMINAL & ADMINISTRATIVE OFFICES

ALKY  – ALKYLATION UNIT
FCC   – FLUID CATALYTIC CRACKING UNIT
PLAT  – PLATFORMER/REFORMER
SRU   – SULFUR RECOVERY UNIT
TGU   – TAILGAS UNIT
VAC   – VACUUM UNIT
ZTOF  – ZINC THERMAL OXIDIZER FLARE

3/5/90 HR DEPT

# Powerine Oil Company

## MEMORANDUM

DATE:      July 23, 1998

TO:        Bob Wenom

FROM:      Ed Sato

RE:        Miles of Powerine Pipelines (Revised)

| Powerine Pipeline No. | Miles | Map Key |
|---|---|---|
| POC #1 | 20.2 | |
| POC #1 | 2.69 | A |
| POC #2 | 3.37 | |
| POC #2 | 0.03 | B |
| POC #3 | 3.17 | |
| POC #3B | 1.75 ± | |
| POC #4 | 17.58 | |
| POC #4A | 1.57± | |
| POC #6 | 0.45 | H |
| POC #7 | 6.50 | |
| POC #7A | 6.50 | C |
| POC #8 | 0.23 | G |
| POC #9 | 3.00± | |
| POC #9 | 2.12 | D |
| POC #10 | 2.80 | |
| POC #11 | 0.65 | |
| POC #11 | 0.11 | E |
| POC #12 | 1.30 | F |
| POC #13 | 0.10 | |
| POC #14 | 1.00± | |
| POC #15 | 0.10 | |

Miscellaneous pipelines in the City of Santa Fe Springs:

| Size | Miles | |
|---|---|---|
| 1″ | 0.03 | * |
| 2″ | 0.03 | * |
| 4″ | 2.11 | * |
| 6″ | 0.66 | * |
| 8″ | 0.02 | * |

* Not included on system map

## ENVIRONMENTAL INDEMNITY AND REIMBURSEMENT AGREEMENT

This Environmental Indemnity and Reimbursement Agreement (this "Agreement"), dated as of July ___, 1998, is by and between Powerine Oil Company, a California corporation ("Seller"), and CENCO Refining Co., a Delaware corporation ("Buyer"), and is meant to supplement that certain Asset Purchase Agreement (the "Purchase Agreement") dated as of July ____, 1998 by and between Seller and Buyer.

## RECITALS

A.    Upon the terms and subject to the conditions set forth in the Purchase Agreement, Seller agreed to convey to Buyer the Refinery, the Pipelines and certain other assets used or useful in connection with the operation of the Refinery.

B.    In accordance with the Purchase Agreement and as a material component in establishing the consideration for the assets purchased thereunder, Seller and Buyer have agreed to enter into this Agreement to set forth their respective responsibilities for potential environmental liabilities and defense costs related to certain claimed environmental liabilities.

NOW, THEREFORE, in consideration of the foregoing recitals and the terms and conditions set forth below, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, Buyer and Seller agree as follows:

## ARTICLE I.

## DEFINITIONS

Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed to such terms in the Purchase Agreement. The following terms shall have the meanings ascribed to them as set forth below:

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, disbursal, leaching or migration into the indoor or outdoor environment or into or out of any property, including, without limitation, the movement of Hazardous Substances through or in the air, soil, surface water, ground water or property.

"Remedial Action" means all actions required to (i) clean up, remove, treat or in any other way address Hazardous Substances in the indoor or outdoor environment, (ii) prevent the Release or threat of Release or minimize the further Release of Contaminants so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor

B-1

NOV. 21. 2006  9:53AM   MBNK OF FILE 562903891749   VO. 961   P. 18

environment, or (iii) perform pre-remedial studies and investigations and post-remedial monitoring and care.

## ARTICLE II.

## DAMAGES AND DEFENSE COSTS

2.1.   Indemnity for Purchased Assets.  Seller shall have no liability to Buyer and Buyer shall defend, indemnify, save and hold harmless Seller, its Affiliates, each of their assigns and successors and its and their respective Representatives, from and against any and all costs, losses, liabilities (including liabilities arising under CERCLA or personal injury or property damage claims, including claims for diminution in value), obligations, damages, lawsuits, deficiencies, claims, demands and expenses (whether or not arising out of third-party claims), including interest, penalties, attorneys fees and all amounts paid in investigation, defense or settlement of any of the foregoing (collectively hereafter, "Damages") in connection with, resulting from, or incident to any liability or obligation arising out of any Remedial Action, Hazardous Substance on, under, about or from the Refinery (including off-site disposal sites), Release, and any Environmental Laws, which in each case pertain to the Refinery, the operations of the Refinery, or any real property or leasehold interest or other asset which constitutes a portion of the Refinery or the Pipelines (the "Purchased Assets"), whether arising prior to or after the transactions contemplated by the Purchase Agreement.

2.2.   Limited Indemnity for Other Property.  Buyer has not assumed or otherwise agreed to be responsible for, and Seller shall retain and shall discharge, perform and be fully responsible for, all of the obligations, fixed or contingent, known or unknown, matured or unmatured, of Seller relating to any petroleum terminal, storage facility, pipeline, service station or other property (other than the Purchased Assets) now or previously owned or operated by Seller, including the storage tanks and pipelines formerly operated by Seller at the Mission Valley Terminal in San Diego, California (each, for purposes of this Agreement, an "Other Property"). Notwithstanding the foregoing, but subject to the terms and conditions of this Agreement, Buyer shall indemnify Seller for Damages in connection with, resulting from, or incident to any liability or obligations arising out of any Remedial Action, Hazardous Substance on, under, about or from the Other Property, Release, and any Environmental Laws, which in each case pertain to the Other Property; provided, however, that in no event shall Buyer be liable or otherwise obligated for Damages, individually or in the aggregate, under this Section 2.2 in excess of One Million Five Hundred Thousand Dollars ($1,500,000) (the "Maximum Contribution").

## ARTICLE III.

## CONDITIONS TO BUYER'S OBLIGATIONS

3.1.   Conditions to Buyer's Obligations. Buyer's duty to pay Seller under this Agreement for any Damages is subject to each of the following conditions, any of which may be

B-2

NY_DOCS\262963.8

waived by Buyer:

(a)     If a claim for Damages (a "Claim") is to be made by Seller hereunder, Seller shall give written notice (a "Claim Notice") to Buyer as soon as practicable (but not later than thirty (30) days) after the Seller becomes aware of any fact, condition or event which may give rise to such Damages. The failure of Seller to give timely notice shall not affect rights to reimbursement hereunder, except to the extent that Buyer demonstrates actual Damages caused by such failure.

(b)     Prior to any indemnification or reimbursement of Seller hereunder, Seller shall agree in writing to assign to Buyer all of Seller's: (i) rights and interests to receive proceeds for Damages under any policies of insurance which potentially cover the Damages at issue, except to the extent any applicable insurance policy has been assigned to Buyer pursuant to the Purchase Agreement; and (ii) any rights to contribution from third parties for Damages in connection with the Damages at issue.

(c)     Except to the extent any applicable insurance policy has been assigned to Buyer pursuant to the Purchase Agreement, Seller shall fulfill all obligations and take all actions required by each policy of insurance that may apply to the Damages at issue, including the timely submittal of necessary notices.

## ARTICLE IV.

### DEFENSE OF CLAIMS

4.1.   Buyer's Rights and Obligations.

4.1.1.   Control of Defense.     If Buyer, after receiving a Claim Notice, acknowledges in writing to Seller that Buyer shall be obligated under the terms of this Agreement to pay for the Damages referred to herein, then Buyer shall be entitled, if it so elects at its own cost, risk and expense, (i) to take control of the defense and investigation concerning such Damages; (ii) to employ and engage attorneys of its own choice to handle and defend the same unless the named parties to such action or proceeding include both the Seller and Buyer, and Seller shall have been advised in writing by counsel that there may be one or more legal defenses available to Seller that are different from or in addition to those available to the Buyer, in which event Seller shall be entitled, at its own cost, risk and expense, to separate counsel of its own choosing; and (iii) to settle such claim, so long as Buyer agrees to pay the full settlement amount. Seller shall provide promptly to Buyer any amounts paid on account of Damages paid hereunder that is paid to Seller under any of its insurance policies. Notwithstanding anything to the contrary set forth in the foregoing:

(a)     In no event shall Buyer be obligated to pay or assume any liability hereunder relating to Damages attributable to Other Property in excess of the Maximum Contribution; and

B-3

(b)    If in defending any Claim, or otherwise assuming any liability or obligation for Damages attributable to any Other Property, it becomes evident that the potential liability or obligation, when added to the aggregate amounts previously paid on account of Damages attributable to Other Property, could exceed One Million Five Hundred Thousand Dollars ($1,500,000), Buyer may, in lieu of further defending such Claim or otherwise incurring any liability or obligation for such Damages, pay to Seller the difference between (i) the aggregate amount previously paid on account of Damages attributable to Other Property and (ii) the Maximum Contribution. Upon such payment, Buyer's duty to defend such Claim, or any other Claim, with respect to Other Property shall be satisfied and discharged in its entirety, at which point Seller shall assume exclusive control, at its sole cost and expense, of the defense, compromise or settlement of such Claim. Notwithstanding the foregoing, if Buyer decides not to make such payment, Seller may assume control of the defense of such Claim at Buyer's costs and expense, but in such instance, Buyer's obligation to pay such damages shall only continue until such time as the Maximum Contribution has been paid.

(c)    Buyer agrees that it will make available to Seller, as long as she is an employee of Buyer, the reasonable consultation of Ms. June Christman or her replacement, at no cost or expense to Seller.

4.2.    Seller's Rights and Obligations

4.2.1.    Seller's Right to Undertake Defense. If Buyer's indemnification of Seller for Damages attributable to Other Property has not exceeded the Maximum Contribution and if Buyer fails to assume the defense of a Claim within thirty (30) days after receipt of the Claim Notice, Seller shall (upon delivering notice to such effect to Buyer) have the right to undertake, at Buyer's cost and expense (but subject to the Maximum Contribution limits in Section 4.1.1 hereunder), the defense, compromise or settlement of such Claim, provided that Buyer shall have the exclusive right to approve reasonably and promptly Seller's choice of counsel and any experts, consultants and other professionals retained by Seller. In the event the Seller assumes the defense of the Claim, Seller shall keep Buyer reasonably informed of the progress of any such defense, compromise or settlement.

4.2.2.    Cooperation and Reasonableness. In connection with any Claim hereunder, Seller shall (i) as soon as reasonably practicable following receipt by Seller provide Buyer with copies of all notices, demands or other communications between Seller and any Governmental Authority and all reports, data, manifests, materials or other material documents concerning the liability or obligation underlying such Claim (the "Reports"); (ii) use reasonable efforts to provide Buyer with a reasonable opportunity to review and comment upon any Report which is to be submitted to a Governmental Authority prior to such submittal; (iii) use its best efforts to provide Buyer with reasonable opportunity to review and comment upon any agreement, settlement or action plan with a Governmental Authority before such document is finalized; and (iv) use reasonable efforts to provide Buyer with reasonable prior notice of any meeting between Governmental Authority and Seller and an opportunity to attend such meeting. In addition, Buyer and Seller shall cooperate in all reasonable respects with each other and their

B-4

attorneys in the investigation, trial and defense of any pending lawsuit or other action and any appeal arising therefrom.

## ARTICLE V.

## MISCELLANEOUS

5.1.   No Third-Party Beneficiaries.   This Agreement shall be binding upon and inure to the benefit of Seller and Buyer and their respective predecessors, successors and assigns.   This Agreement is intended to confer rights and benefits only upon the Seller and Buyer (their successors and assigns) and is not intended to confer any right or benefit upon any Person. No Person shall have any legally enforceable right hereunder.   All rights of action for any breach of this Agreement are hereby reserved to the parties, their successors or assigns.

5.2.   Notices.   All notices, requests, demands and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received if personally delivered: one (1) Business Day after transmission if transmitted by telecopy, electronic or digital transmission, one (1) Business Day after it is sent if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., FedEx); and upon receipt, if sent by certified or registered mail, return receipt requested.   In each case notice shall be sent to:

If to Buyer to:

    CENCO, Inc.
    c/o Dean J. Nelson Happy
    Regent University School of Law
    1000 Regent University Drive
    Virginia Beach, Virginia 23464-9880

With a copy to:

    Latham & Watkins
    633 W. Fifth Street
    Suite 4000
    Los Angeles, California 90071
    Attention:  David V. Lee, Esq.

If to Seller to:

    Vincent Papa, Esq.
    Managing Director and General Counsel
    PMG Capital Corp.
    Managing Director and General Counsel
    General Motors Building

B-5

NOV. 21. 2006 9:55AM OFFICE 962 0389 NO. 962 P. 2/20

767 Fifth Avenue, 23rd Floor
New York, New York

With a copy to:

Loeb & Loeb
1000 Wilshire Boulevard
Suite 1800
Los Angeles, California 90017
Attention: Robert S. Barry, Jr. Esq.

or to such other place and with such other copies as either party may designate as to itself by
written notice to the others.

    5.3.   Choice of Law. This Agreement shall be construed, interpreted and the rights of
the parties determined in accordance with the laws of the State of California (without reference to
the choice of law provisions of California law), except with respect to matters of law concerning
the internal corporate affairs of any corporate entity which is a party to or the subject of this
Agreement, and as to those matters the law of the jurisdiction under which the respective entity
derives its powers shall govern.

    5.4.   Entire Agreement; Amendments and Waivers. This Agreement, together with the
Purchase Agreement and all Exhibits, Schedules and ancillary agreements thereto, constitute the
entire agreement among the parties pertaining to the subject matter hereof and supersedes all
prior agreements, understandings, negotiations and discussions, whether oral or written, of the
parties. This Agreement may not be amended except by an instrument in writing signed on
behalf of each of the parties hereto. No amendment, supplement, modification or waiver of this
Agreement shall be binding unless executed in writing by the party to be bound thereby. No
waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of
any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing
waiver unless otherwise expressly provided.

    5.5.   Conflict with Purchase Agreement. This Agreement is intended to modify and
supplement certain of the terms of the Purchase Agreement with respect to the parties' rights and
obligations with respect to certain environmental matters. In the event of any conflict or
ambiguity between the Purchase Agreement and this Agreement, the provisions of the Purchase
Agreement shall control.

    5.6.   Multiple Counterparts. This Agreement may be executed in one or more
counterparts, each of which shall be deemed an original, but all of which together shall constitute
one and the same instrument.

    5.7.   Invalidity. In the event that any one or more of the provisions contained in this
Agreement or in any other instrument referred to herein, shall, for any reason, be held to be
invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law,

B-6

such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument.

5.8. <u>Cumulative Remedies</u>. All rights and remedies of either party hereto are cumulative of each other and of every other right or remedy such party may otherwise have at law or in equity, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

5.9. <u>Headings</u>. The headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

5.10. <u>Attorneys' Fees</u>. If any party to this Agreement brings an Action to enforce its rights under this Agreement, the prevailing party shall be entitled to recover its costs and expenses, including reasonable attorneys' fees incurred in connection with such Action, including any appeal of such Action.

B-7

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, or have caused this Agreement to be duly executed on their respective behalf by their respective officers thereunto duly authorized, as of the day and year first above written.

BY OWNER:

                                                CENCO Refining Co.,
                                                a Delaware corporation

                                              By: _____
                                                  Name:
                                                  Title:

BY SELLER:

                                              POWERINE OIL COMPANY,
                                              a California corporation

                                              By: _____
                                                  Name:
                                                  Title:

B-8

NOV. 21. 2006   9:56AM   MWA110389   NO. 962   P. 5/20

Exhibit C

## BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS that POWERINE OIL COMPANY ("Seller"), a California corporation having offices at 12345 Lakeland Road, P.O. Box 2108, Santa Fe Springs, CA 90670, for a valuable consideration, the receipt of which is hereby acknowledged, hereby grants, bargains, sells, conveys, transfers and sets over unto CENCO REFINING CO., a Delaware corporation ("Buyer"), having offices at 977 Centerville Turnpike, SHB-301, Virginia Beach, Virginia 23463, its successors and assigns, all of Seller's right, title and interests in and to the Assets, as such term is defined in the Asset Purchase Agreement between Seller and Buyer dated as of July __, 1998.

Seller hereby warrants and represents to Buyer and its successors and assigns that Seller has good legal title to, and good and lawful right to sell the Assets, that the Assets are free and clear of any and all claims, liens, security interests and other encumbrances of any kind or nature whatsoever, and that upon the delivery of this Bill of Sale to Purchaser, Purchaser has and will have good and marketable title to the Assets, free and clear of any and all claims, liens, security interests and other encumbrances of any kind or nature whatsoever, subject, however, to the liens disclosed pursuant to the above-referenced Agreement.

All the terms, covenants and conditions herein contained shall be for and shall inure to the benefit of and shall bind the respective parties hereto, and their legal representatives, successors, and assigns, respectively.

Seller will, at any time and from time to time, upon written request therefor, execute and deliver to Buyer any new or confirmatory instruments which Buyer may reasonably request in order to fully assign and transfer to and vest in Buyer and to protect Buyer's right, title and interest in and to and under the property conveyed hereunder or to otherwise realize upon or enjoy such rights therein and thereto.

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be duly executed in its name by its duly authorized officers this ___ day of _____, 1998.

POWERINE OIL COMPANY,
a California corporation

By _____
Name _____
    Its _____

C-1

NY_DOCS\262965-8

NOV. 21. 2006   9:56AM    MAIN OFFICE 5629038911    NO. 962    P. 6/20

Exhibit D

## ASSIGNMENT AND ASSUMPTION OF CONTRACTS AND WARRANTIES

**FOR GOOD AND VALUABLE CONSIDERATION**, the receipt and sufficiency of which are acknowledged, the undersigned "Assignor" hereby assigns, transfers, sets-over and delivers unto CENCO REFINING CO., a Delaware corporation ("Assignee"), all of the rights, benefits and privileges of Assignor in, to and under (i) the contracts (the "Contracts") defined in the Asset Purchase Agreement and (ii) all guaranties and warranties with respect to the Assets as such term is defined in the Asset Purchase Agreement dated as of July __, 1998 among Assignor and Assignee (the "Agreement"); TO HAVE AND TO HOLD unto Assignee, its successors and assigns, forever.

Assignor will, at any time and from time to time, upon written request therefor, execute and deliver to Assignee any new or confirmatory instruments which Assignee may reasonably request in order to fully assign and transfer to and vest in Assignee and to protect Assignee's right, title and interest in, to and under, the Contracts and the Warranties or to otherwise realize upon or enjoy such rights therein and thereto.

This Assignment may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, Assignor has executed this Assignment as of _____, 1998.

POWERINE OIL COMPANY,
a California corporation

By _____
Name _____
Its _____

D-1

NY_DOCS\262963.8

NOV. 21. 2006  9:56AM        MAIN OFFICE 5629038911                    NO. 962    P. 7/20

Assignee hereby assumes all of the terms, covenants, and conditions arising after the date hereof and to be performed by Assignor under the Contracts.

IN WITNESS WHEREOF, Assignee has executed this Assumption as of _____, 1998.

ASSIGNEE:

CENCO REFINING CO.,
a Delaware corporation

By _____
Name _____
Its _____

D-2

NY_DOCS\262963.8

## SCHEDULE 1.1

## INSURANCE POLICIES

NOV. 21. 2006  9:56AM    MAIN OFFICE 5629038911                      NO. 962    P. 9/20

POWERINE OIL COMPANY LIABILITY INSURANCE POLICIES

| Period | Amount | Type | Insurer |
|---|---|---|---|
| 5/1/58–5/1/59 | 200,000 | primary | Lloyd's London #LAB2579 |
| | 1,800,000 | excess | Lloyd's London #LA62213 |
| | 2,000,000 | | |
| 5/1/59–5/1/61 | 50,000 | primary | Citizens Casualty Co. #SP-1176 |
| | 1,950,000 | excess | Lloyd's London #LA62213 |
| | 2,000,000 | | |
| 5/1/61–5/1/62 | 50,000 | primary | Citizens Casualty Co. #SP-1176 |
| | 450,000 | excess | Seven Provinces Ins. Co. #SP 01-05-50 |
| | 500,000 | excess | Mission Insurance Co. #M 374 |
| | 1,000,000 | excess | Employers' Surplus Lines #E 503300 |
| | 2,000,000 | | |
| 5/1/62–5/1/63 | 50,000 | primary | Harbor Insurance Co. #S 1922 |
| | 450,000 | excess | Seven Provinces Ins. Co. #SP 01-05-50 |
| | 500,000 | excess | Mission Insurance Co. #M 374 |
| | 1,000,000 | excess | Employers' Surplus Lines #E 503300 |
| | 2,000,000 | | |
| 5/1/63–5/1/64 | 50,000 | primary | Harbor Insurance Co. #S 1922 |
| | 450,000 | excess | Seven Provinces Ins. Co. #SP 01-05-50 |
| | 500,000 | excess | Mission Insurance Co. #M 374 |
| | 1,000,000 | excess | Employers' Surplus Lines #E 503300 |
| | 2,000,000 | | |
| added 8/17/63 | 1,000,000 | excess | Swett & Crawford #36098 |
| added 8/17/63 | 2,000,000 | excess | Employers' Surplus Lines #E 506597 |
| | 5,000,000 | | |
| added 9/1/63 | 25,000 | primary BI | Pacific Employers Ins. Co. #01G82684 |
| 5/1/64–5/1/65 | 2,000,000? | primary | Harbor Insurance Co. #S 1922 |
| | 25,000 | primary BI | Pacific Employers Ins. Co. #01G82684 |
| | 1,000,000 | excess | Swett & Crawford #36098 |
| | 2,000,000 | excess | Employers' Surplus Lines #E 506597 |
| | 5,000,000? | | |
| 5/1/65–8/17/66 | 25,000 | primary BI | Pacific Employers Ins. Co. #01G82684 |
| | 2,000,000 | primary & excess | Harbor Insurance Co. #102693 |
| | 1,000,000 | excess | Swett & Crawford #36098 |
| | 2,000,000 | excess | Employers' Surplus Lines #E 506597 |
| | 5,000,000 | | |
| 8/17/66–9/1/66 | 25,000 | primary BI | Pacific Employers Ins. Co. #01G82684 |
| | 2,000,000 | primary & excess | Harbor Insurance Co. #102694 |
| | 2,000,000 | excess | Sayre & Toso, Inc. #ST 12754 |
| | 4,000,000 | | |

NOV. 21. 2006   9:56AM      MAIN OFFICE 5629038911                              VO. 962    P. 10/20

| Period | Amount | Type | Insurer |
|---|---|---|---|
| 9/1/66-10/15/67 | 25,000 | primary | Aetna Casualty #33AL053521-SR(Y) |
| | 1,975,000 | excess | Harbor Insurance Co. #102694 |
| | 2,000,000 | excess | Sayre & Toso, Inc. #ST 12754 |
| | 4,000,000 | | |
| 10/15/67-12/11/67 | 100,000 | primary | Aetna Casualty #33AL053521-SR(Y) |
| | 100,000 | primary PD | Signal Ins. Co. #GLA 200066 |
| | 900,000 | excess | Employers' Surplus Lines #E513017 |
| | 900,000 | excess PD | Reserve Insurance Co. #EL 985-2103 |
| | 4,000,000 | excess | Employers' Surplus Lines #E513016 |
| | 5,000,000 | | |
| 12/11/67-10/15/68 | 100,000 | primary | Aetna Casualty #33AL053521-SR(Y) |
| | 100,000 | primary PD | Signal Ins. Co. #GLA200066 |
| | 900,000 | excess | Employers' Surplus Lines #E513017 |
| | 4,000,000 | excess | Employers' Surplus Lines #E513016 |
| | 5,000,000 | | |
| 10/15/68-10/26/68 | 100,000 | primary | Aetna Casualty #33AL053521-SR(Y) |
| | 100,000 | primary PD | Signal Ins. Co. #GLA200066 |
| | 900,000 | excesss | Employers' Surplus Lines #513017 |
| | 4,000,000 | excess | Employers' Surplus Lines #513016 |
| | 5,000,000 | | |
| 9/26/68-10/1/69 | 100,000 | primary | Aetna Casualty #33AL053521-SR(Y) |
| | 100,000 | primary PD | Signal Ins. Co. #GLA200066 |
| | 100,000 | primary PD | Holland-America Ins. Co. #10017 |
| | 900,000 | excess | Employers' Surplus Lines #513017 |
| | 4,000,000 | excess | Employers' Surplus Lines #513016 |
| | 5,000,000 | | |
| 10/1/69-10/26/69 | 100,000 | primary | Aetna Casualty #33AL84477SR(Y) |
| | 100,000 | primary PD | Signal Ins. Co. #GLA200066 |
| | 100,000 | primary PD | Holland-America Ins. Co. #10017 |
| | 900,000 | excess | Employers' Surplus Lines #513017 |
| | 4,000,000 | excess | Employers' Surplus Lines #513016 |
| | 5,000,000 | | |
| 10/26/69-10/8/70 | 100,000 | primary | Aetna Casualty #33AL84477SR(Y) |
| | 100,000 | primary PD | Signal Ins. Co. #GLA200066 |
| | 50,000 | primary PD | Holland-America Ins. Co. #23HAC10177 |
| | 150/200,000 | excess | Employers' Surplus Lines #E60180 |
| | 750,000 | excess | Harbor Ins. Co. #108295 |
| | 4,000,000 | excess | Employers' Surplus Lines #513016 |
| | 5,000,000 | | |
| 10/8/70-10/15/70 | 50,000 | primary | Mission Ins. Co. #HAC10684 |
| | 100,000 | primary | Signal Ins. Co. #GLA200066 |
| | 50,000 | primary PD | Holland-America Ins. Co. #23HAC10177 |
| | 150/200,000 | excess | Employers' Surplus Lines #E60188 |
| | 750,000 | excess | Harbor Ins. Co. #108295 |
| | 4,000,000 | excess | Employers' Surplus Lines #513016 |
| | 5,000,000 | | |

NOV. 21. 2000   9:57AM   THE IRVINE COMPANY   NO. 962   P. 11/20

| | | | |
|---|---|---|---|
| .0/15/70-10/26/70 | 50,000 | primary | Mission Ins. Co. #HAC10684 |
| | 50,000 | primary PD | Holland-America Ins. Co. #23HAC10177 |
| | 150/200,000 | excess | Employers' Surplus Lines #E60188 |
| | 750,000 | excess | Harbor Ins. Co. #108295 |
| | 4,000,000 | excess | Employers' Surplus Lines #513016 |
| | 5,000,000 | | |
| 10/26/70-10/8/71 | 50,000 | primary | Mission Ins. Co. #HAC10684 |
| | 200,000 | excess | Employers' Surplus Lines #E65362 |
| | 750,900 | excess | Harbor Ins. Co. #108295 |
| | 4,000,000 | excess | Sayre & Toso #V21649 |
| | 5,000,000 | | |
| 10/8/71-10/26/71 | 50,000 | primary | Mission Ins. Co. #HAC11301 |
| | 200,000 | excess | Employers' Surplus Lines #E63983 |
| | 750,000 | excess | Harbor Ins. Co. #108295 |
| | 4,000,000 | excess | Sayre & Toso #V21649 |
| | 5,000,000 | | |
| 10/26/71-10/8/72 | 50,000 | primary | Mission Ins. Co. #HAC11301 |
| | 200,000 | excess | Employers' Surplus Lines #E63983 |
| | 750,000 | excess | Harbor Ins. Co. #108295 |
| | 4,000,000 | excess | Sayre & Toso #V21649 |
| | 5,000,000 | | |
| added 3/10/72 | 5,000,000 | excess | Mission Ins. Co. #M74739 |
| | 10,000,000 | | |
| 10/8/72-3/10/73 | 50,000 | primary | Mission Ins. Co. #HAC11682 |
| | 200,000 | excess | Mission Ins. Co. #M77466 |
| | 750,000 | excess | Harbor Ins. Co. #113836 |
| | 4,000,000 | excess | Sayre & Toso #V21649 |
| | 5,000,000 | excess | Mission Ins. Co. #M74739 |
| | 10,000,000 | | |
| 3/10/73-10/8/73 | 50,000 | primary | Mission Ins. Co. #HAC11682 |
| | 200,000 | excess | Mission Ins. Co. #M77466 |
| | 750,000 | excess | Harbor Ins. Co. #113836 |
| | 4,000,000 | excess | Sayre & Toso #V21649 |
| | 5,000,000 | excess | Mission Ins. Co. #M79913 |
| | 10,000,000 | | |
| 10/8/73-10/8/74 | 50,000 | primary | Highlands Ins. Co. #GA816262 |
| | 9,950,000 | excess | Central National #CNU12-20-39 |
| | 10,000,000 | | |
| 10/8/74-10/8/75 | 50,000 | primary | Aetna Ins. Co. #CG655683 |
| | 9,950,000 | excess | Central National #CNU12-26-82 |
| | 10,000,000 | | |
| added 1/24/75 | 15,000,000 | excess | Ins. Co. of State of PA #4275-1336 |
| added 1/24/75 | 15,000,000 | excess | Midland Ins. Co. #XL146555 |
| | 40,000,000 | | |

NOV. 21, 2006   9:57AM    No. 0038   P. 12/20    VO. 962   P. 12/20

| | | | |
|---|---|---|---|
| .0/8/75-10/8/76 | 50,000 | primary | Aetna Ins. Co. #CG608578 |
| | 9,950,000 | excess | Central National #CNU12-30-08 |
| | 15,000,000 | excess | Ins. Co. of State of PA #4275-1336 |
| | 15,000,000 | excess | Midland Ins. Co. #XL146555 |
| | 40,000,000 | | |
| | | | |
| 10/8/76-10/8/77 | 50,000 | primary | Aetna Ins. Co. #CG608578 |
| | 9,950,000 | excess | Central National #CNU12-56-25 |
| | 8,000,000) | excess | Lloyds, London #12732 |
| | 17,000,000) | excess | Ins. Co. of State of PA #4275-1336 |
| | 15,000,000 | excess | Midland Ins. Co. #XL146555 |
| | 50,000,000 | | |
| | | | |
| 10/8/77-10/8/78 | 500,000 | primary | Central National #CNS9-47-57 |
| | 9,500,000 | excess | Central National #CNU12-79-39 |
| | 20,000,000 | excess | Northbrook Ins. Co. #63003675 |
| | 2,000,000) | excess | International Surplus #XSI3554 |
| | 3,000,000) | excess | First State Ins. Co. #914277 |
| | 10,000,000) | excess | National Union Fire Ins. #1228241 |
| | 3,000,000) | excess | Lexington Ins. Co. #GC5502896 |
| | 2,000,000) | excess | Federal Ins. Co. #7932-71-06 |
| | 50,000,000 | | |
| | | | |
| 10/8/78-10/8/79 | 500,000 | primary | Central National #CNS9-44-63 |
| | 9,500,000 | excess | Central National #CNU03-31-78 |
| | 20,000,000 | excess | Northbrook Ins. Co. #63 005 104 |
| | 5,000,000) | excess | Interstate Fire #155-U 025585 |
| | 2,000,000) | excess | International Surplus #XSI3607 |
| | 2,000,000) | excess | Federal Ins. Co. #(79)7932-71-06 |
| | 8,000,000) | excess | New England Reins. #781060 |
| | 3,000,000) | excess | Lexington Ins. Co. #5513542 |
| | 50,000,000 | | |
| | | | |
| 10/8/79-10/8/80 | 500,000 | primary | Central National #CNS9-45-93 |
| | 9,500,000 | excess | Central National #CNU03-49-44 |
| | 40,000,000 | excess | Central National #CNZ14-16-35 |
| | 50,000,000 | | |
| | | | |
| 10/8/80-10/8/81 | 500,000 | primary | Central National #CNS9-48-84 |
| | 9,500,000 | excess | Central National #CNU00-40-80 |
| | 40,000,000 | excess | Central National #CNZ14-20-56 |
| | 50,000,000 | | |
| | | | |
| 10/8/81-2/8/83 | 500,000 | primary | Central National #CNS13-29-57 |
| | 9,500,000 | excess | Central National #CNU00-81-61 |
| | 40,000,000 | excess | Central National #CNZ00-60-84 |
| | 50,000,000 | | |

| 2/8/83-2/8/84 | 500,000 | primary | National Union Fire #GLA918-54-46 |
| | 24,500,000 | excess | Twin City Fire Ins. #TXU106136 |
| | | | |
| | 20,000,000 | excess | Integrity Ins. Co. #XL206557 |
| | 5,000,000 | excess | American Centennial #CC-01-57-01 |
| | | | |
| | 10,000,000) | excess | Federal Ins. Co. #(84)7928-47-25 |
| | 10,000,000) | excess | Fireman's Funds #0-75XBX01346962 |
| | 10,000,000) | excess | Ins. Co. of N. A. #XCP145241 |
| | 20,000,000) | excess | First State Ins. Co. #EU935954 |
| | 15,000,000) | excess | Lexington Ins. Co. #5522289 |
| | 25,000,000) | excess | National Union Fire #9606065 |
| | 10,000,000) | excess | Midland Ins. Co. #XL724388 |
| | 150,000,000 | | |
| | | | |
| 2/8/84-2/8/85 | 500,000 | primary | Protective National #CGL347-32-56 |
| | 9,500,000 | excess | Mission National Ins. #MN032091 |
| | | | |
| | 14,000,000) | excess | Century Indemnity Co. #CIZ426304 |
| | 6,000,000) | excess | Republic Indemnity #4CX10061 |
| | 10,000,000) | excess | Industrial Underwriters #JE884-2610 |
| | 4,000,000) | excess | Granite State Ins. Co. #6284-4477 |
| | 6,000,000) | excess | Integrity Ins. Co. #XL208423 |
| | | | |
| | 25,000,000) | excess | First State Ins. Co. #EU000917 |
| | 15,000,000) | excess | Harbor Ins. Co. #HI180721 |
| | 10,000,000) | excess | National Union Fire #90606538 |
| | | | |
| | 20,000,000) | excess | Federal Ins. Co. #(85)7928-47-25 |
| | 10,000,000) | excess | National Union Fire #9606538' |
| | 20,000,000) | excess | Fireman's Fund #0-75XLX-1620378 |
| | 150,000,000 | | |
| | | | |
| 2/8/85-7/8/85 | 500,000 | primary | Harbor Ins. Co. #GLA188126 |
| | 9,500,000 | excess | Mission National #MN044978 |
| | 10,000,000 | excess | National Union Fire #9609453 |
| | 5,000,000 | excess | Industrial Ins. Co. #JE884-3919 |
| | 5,000,000 | excess | Granite State Ins. #6285-5614 |
| | 5,000,000) | excess | Transport Indemnity #TEL900606 |
| | 5,000,000) | excess | Highlands Ins. Co. #SR NO. 30542 |
| | 5,000,000) | excess | First State Ins. Co. #EU002629 |
| | 5,000,000) | excess | Pacific Employers Ins. #XCC012126 |
| | 50,000,000 | | |
| | | | |
| 7/8/85-2/8/86 | 500,000 | primary | Harbor Ins. Co. #GLA188126 |
| | 9,500,000 | excess | Mission National #MN044978 |
| | 10,000,000 | excess | National Union Fire #9609453 |
| | 5,000,000 | excess | Industrial Ins. Co. #JE884-3919 |
| | 5,000,000 | excess | Granite State Ins. #6285-5614 |
| | 5,000,000) | excess | Highlands Ins. Co. #SR NO. 30542 |
| | 5,000,000) | excess | First State Ins. Co. #EU002629 |
| | 5,000,000) | excess | Pacific Employers Ins. #XCC012126 |
| | 45,000,000 | | |

NOV. 21. 2006  9:57AM                                                    NO. 962   P. 14/20

| Period | Amount | Type | Insurer |
|---|---|---|---|
| 2/8/86-3/1/86 | 1,000,000 | primary | National Union Fire #EGA154-2733 |
| | 5,000,000 | excess | National Union Fire #BE1320594 |
| | 6,000,000 | | |
| 3/1/86-2/8/87 | 1,000,000 | primary | National Union Fire #EGA154-2733 |
| | 5,000,000 | excess | National Union Fire #BE1320594 |
| | 4,000,000 | excess | Lexington Ins. Co. #5521924 |
| | 10,000,000 | | |
| 2/8/87-2/8/88 | 2,000,000 | primary | National Union Fire #EGA5402763RA |
| | 4,000,000 | excess | National Union Fire #CLM3076176 |
| | 4,000,000 | excess | Lexington Ins. Oo. #5523094 |
| | 10,000,000 | | |
| 2/8/88-2/8/89 | 2,000,000 | primary | National Union Fire #GLCM540-8188RA |
| | 8,000,000 | excess | National Union Fire #CLM3076184 |
| | 10,000,000 | | |
| 2/8/89-2/8/90 | 500,000 | primary | London companies #NPE34386 |
| | 500,000 | excess | Lloyd's #NPE34387 |
| | 1,000,000 | excess | Lloyd's #NPE34388 |
| | 5,000,000 | excess | Lloyd's #NPE34390 |
| | 10,000,000 | excess | Lloyd's #NPE34389 |
| | 17,000,000 | | |
| 2/8/90-2/8/91 | 500,000 | primary | Lloyd's #NPE38319 |
| | 500,000 | excess | Lloyd's #NPE38320 |
| | 1,000,000 | excess | Lloyd's #NPE38321 |
| | 5,000,000 | excess | Lloyd's #NPE38322 |
| | 5,000,000 | excess | Lloyd's #NPE38323 |
| | 12,000,000 | | |
| 2/8/91-2/8/92 | 500,000 | primary | Lloyd's #43055E |
| | 500,000 | excess | Lloyd's #43056E |
| | 5,000,000 | excess | Lloyd's #43057E |
| | 5,000,000 | excess | Lloyd's #43058E |
| | 14,000,000 | excess | Lloyd's #43164 and #43165 |
| | 25,000,000 | | |
| 2/8/92-2/8/93 | 500,000 | primary | Lloyd's #ET011390L |
| | 500,000 | excess | Lloyd's #ET011400L |
| | 4,000,000 | excess | Lloyd's #ET011410L |
| | 10,000,000 | excess | Lloyd's #ET011420L |
| | 10,000,000 | excess | Lloyd's #ET011430L |
| | 25,000,000 | | |

| | | | |
|---|---|---|---|
| 2/8/93-1/14/94 | 250,000 | primary | Lloyd's #ET011390M |
| | 750,000 | excess | Lloyd's #ET011400M |
| | 1,000,000 | excess | Lloyd's #ET011410M |
| | 23,000,000 | excess | Lexington #ET011420M |
| | 25,000,000 | | |
| | | | |
| 1/14/94-1/14/95 | 1,400,000 | primary | Home Insurance Co. #SLM9261549 |
| 1/14/94-1/14/95 | 25,000,000 | excess | American Intl. Surplus Lines #7732008 |
| 1/28/94-1/28/95 | 15,000,000 | excess retro | Lexington Ins. Co. #801671/8668555 |
| | excess of | buyback | |
| | 10,000,000 | | |
| 1/28/94-1/28/95 | 20,000,000 | excess | Lexington Ins. Co. #801672/8668554 |
| 1/31/94-1/31/95 | 100,000,000 | excess | XL Insurance Co. #XLUMB02547 |
| 11/30/93-11/30/94 | 20,000,000 | primary aviation prod. liability | Americas Insurance Co. #0103654 |
| 11/30/93-11/30/94 | 300,000,000 | excess aviation prod. liability | Underwriters at Lloyd's London #62328 |
| 1/14/94-1/14/95 | 2,000,000 | terminal operators liability | Underwriters at Lloyd's London #801670/62553 |
| | 146,400,000 | | Total General/Excess Liability Limit |
| | 320,000,000 | | Total Aviation Products Liability |
| | 147,000,000 | | Total Terminal Operator's Liability |

NOV. 21. 2006  9:57AM   MAIN OFFICE NO. 389 P   VO. 962   P. 16/20

## INSURANCE POLICIES
### 1995 - 1998

| | |
|---|---|
| Home Insurance Company of Illinios | #SLM-C20-09-02 |
| American International Specialty Lines | #7736951 |
| Lexington Insurance Company (Bowring Bermuda Branch) | #8781501 |
| Zurich American Insurance (CT Bowring Branch) | |
| Starr Technical Risks Agency (Bowring Bermuda Branch) | #200764 |
| Steadfast Insurance Company (Zurich-American Insurance) | #BOG 833 2043 |
| National Union Fire of Pittsburgh through American Home Excess Casualty | #BE 932-07-05 |
| Lexington Insurance Company (Bermuda Branch) | #8781523 |
| Fireman's Fund Insurance Company | #MXA 8015-5080 |
| Starr Technical Risks Agency | #ST-260-4122 |
| National Union Fire Insurnace Company of Pittsburgh, | #PA482-49-06 |
| National Union Fire Insurnace Company of Pittsburgh, PA | #482-49-84 |
| Aetna Casualty & Surety Company | #001 FF 100972067 BCA |
| National Union Fire Insurance Company of Pittsburgh, PA | #GL 543-77-38 |
| National Union Fire Insurance Company of Pittsburgh, PA | #BE 932-59-02 |
| National Union Fire Insurance Company of Pittsburgh, PA | #CA 543-77-39 |
| National Union Fire Insurance Company of Pittsburgh, PA | #484-73-63 |
| National Union Fire Insurance Company of Pittsburgh, PA | #484-73-64 |
| Aetna Insurance Company | #QD FF 101093932 B |
| Reliance National Insurance Company | #NZB 0135670 |
| National Union Fire Insurance Company | #GL 565-30-82 |
| National Union Fire Insurance Company | #CA 565-51-10 |
| State Workers Compensation Fund (California) | TBD |
| National Union Fire Insurance Company of Pittsburgh, PA | #BE 357-01-55 |
| National Union Fire Insurance Company of Pittsburgh, PA | #770-57-78 |
| National Union Fire Insurance Company of Pittsburgh, PA | #770-58-12 |
| Travelers Casualty & Surety | #001 FF 103007792 BCM |

## SCHEDULE 2.2

## EMPLOYEE SEVERANCE

NOV. 21. 2006  9:58AM                                                      VO. 962   P. 18/20

*Potwcine Oil Company*
*Accrued Payroll - Active S-P*
*As of June 30, 1998*

2/15/98 9:48 AM

| Name | Address | | City | State | Zip | EARNINGS |
|------|---------|---|------|-------|-----|----------|
| Bonnett, Sharon K | 3609 East 2Nd St | #406 | Long Beach | CA | 90803 | 9,182.45 |
| Caballero, Thomas R | 14288 Trumball St | | Whittier | CA | 90604 | 16,449.19 |
| Campos, Tarcicio | 5154 Eagle Rock Blvd | | Los Angeles | CA | 90041 | 15,397.70 |
| Christman, June M | 1321 Ridgeview Ter | | Fullerton | CA | 92631 | 33,719.39 |
| Duran, Martha V | 9901 Frederick Cr | | Huntington Beach | CA | 92646 | 13,584.13 |
| Egner, Michael H | 18196 Santa Sophia | | Fountain Valley | CA | 92708 | 41,468.66 |
| Hawk, Larry E | 17935 Gooseberry Dr | | Rowland Heights | CA | 91748 | 26,280.16 |
| Martlaro, Cynthia A | 2357 Blackfoot Avenue | Unit A | Placentia | CA | 92870 | 13,323.55 |
| Moffat, Scott M | 5921-F Templeton St | | Huntington Park | CA | 90255 | 24,436.11 |
| Ramirez, Eddie | 10436 La Reina Ave | #101 | Downey | CA | 90241 | 25,307.55 |
| Robertson, Ronald A | 8101 Dabny Ln | | La Palma | CA | 90623 | 27,864.88 |
| Ruiz, Maria E | 11560 Buell St | | Santa Fe Springs | CA | 90670 | 13,013.87 |
| Sato, Edwin J | 4618 Opal St | | Riverside | CA | 92509 | 26,294.21 |
| Turner, Robert B | 824 S Newhaven | | Orange | CA | 92869 | 33,560.95 |
| Wenom, Robert A | 2540 Country Hills Rd | | Brea | CA | 92621 | 62,500.00 |
| Total | 15 | | | | | $382,362.80 |

Powerine Oil Company
Accrued Payroll - Laid-off S-P
As of June 30, 1998

| Name | Address | | City | State | Zip | EARNINGS |
|------|---------|---|------|-------|-----|----------|
| Acayturri, Carlos | 15568 Quiet Oak Dr | | Chino Hills | CA | 91709 | 21,999.57 |
| Aguirre, Noel R | 1139 E Allen Ave | | Glendora | CA | 91740 | 22,416.30 |
| Bracy, Roberta M | 6036 Oak Meadow Dr | | Yorba Linda | CA | 92886 | 8,867.05 |
| Bryant, William J | 3491 Thornlake | | Long Beach | CA | 90808 | 13,521.93 |
| Chase, Kenneth, R | 11267 Roanoke Cl | | Cypress | CA | 90630 | 24,705.20 |
| Cooney, John D | 3163 Silver Smith | | Lake Havasu | AZ | 86403 | 19,897.27 |
| Espinoza, Jesse | 12134 Lowemont St | | Norwalk | CA | 90650 | 5,731.09 |
| Fiero, Paul D | 8454 Albla St | | Downey | CA | 90242 | 21,097.70 |
| Figula, William D | P.O. Box 2940 | | Wrightwood | CA | 92397 | 20,450.83 |
| Greene, Kenneth | 24641 Apple St | | Newhall | CA | 91321 | 18,485.36 |
| Hammersmith, Jim A | 1726 Esplanade St | # 4 | Redondo Beach | CA | 90277 | 17,875.82 |
| Hesse, Regina Y | 10215 Brian Cl | | Whittier | CA | 90601 | 12,993.25 |
| Hogan, William D | 5116 Raton Cir | | Long Beach | CA | 90807 | 18,970.51 |
| Jackson, Norman E | 1063 Stonebryn Dr | | Harbor City | CA | 90710 | 21,103.92 |
| Jacquez, Mario S | 14420 Fairford | | Norwalk | CA | 90650 | 23,125.37 |
| Jerome, Anna Maria | 9224 Foxbury Way | | Pico Rivera | CA | 90660 | 11,139.73 |
| Johnson, James R | 1610 Chetney Dr | | West Covina | CA | 91790 | 20,009.23 |
| Lopez, Carlos Ray | 12636 Bloomfield | # 63 | Norwalk | CA | 90650 | 17,595.93 |
| Magana, John C | 37770 Sea Pines Ct | | Murieta | CA | 92362 | 17,969.12 |
| Manuel, David W | 916 S Montebello | # 6 | Montebello | CA | 90640 | 5,731.09 |
| Monzon, James E | 6132 Pearce Ave | | Lakewood | CA | 90712 | 19,866.17 |
| Naylor, Tommy L | 1475 W Wedgewood Dr | | Anaheim | CA | 92801 | 25,837.22 |
| Robles, David | 6198 Woodsboro | | Anaheim | CA | 92807 | 22,584.24 |
| Sanchez, John | 11154 See Dr | | Whittier | CA | 90606 | 6,656.32 |
| Tucker, Mark A | 8832 Kermita Rd | | Bakersfield | CA | 93307 | 18,982.95 |
| Walhovd, Jim | 6016 Pennswood | | Lakewood | CA | 90712 | 14,790.78 |
| Wells, Darrel W | 3747 Aqueduct Ln | | Chino Hills | CA | 91709 | 18,672.44 |

Total          27                                                                $470,966.39

*Powerine Oil Company*
*Supplemental Severance—Active*
*June 30, 1998*

| Employee Name | Hire Date | Amount |
|---|---|---|
| Larry Berndt | 3/23/98 | - |
| Ed Bryant | 2/17/98 | - |
| Jess Corral | 4/29/96 | 1,992.80 |
| Larry Germain | 3/24/97 | 789.60 |
| Ray Huie | 7/21/97 | 1,096.40 |
| Mark Mealey | 3/23/98 | - |
| Bob Moedl | 4/29/96 | 1,992.80 |
| Tim Moniz | 12/9/97 | - |
| Javier Pena | 2/10/97 | 629.60 |
| Keith Rogers | 12/19/97 | - |
| | | 6,501.20 |

## SCHEDULE 4.9

### PENDING LITIGATION

This Schedule supersedes the litigation identified in Vincent J. Papa's letter to Marshall Staunton dated April 13, 1998 and excludes certain of such litigation now reduced to a judgment and identified in Schedule 4.10 or which has previously been settled.

NOV. 21. 2006   9:59AM   MARILYN BEDNARSKI 389 P   NO. 963   P. 2

Abarca et al v Powerine Oil Company et al
Los Angeles County Superior Court
Case No. VC 021767
Description: Action for private nuisance, trespass, battery, negligence, etc claiming damages as a
result of POC having operated its refinery in a manner causing damage to plaintiff's persons and
real property. Plaintiff's allege that POC failed to avoid excessive releases of toxic substances into
the atmosphere and environment. Plaintiff's initially totaled in excess of 800. The present number
of plaintiff's is less than 300. Plaintiff's are asking for general, special and punitive damages. The
action started as a result of a canvassing effort by the law firm of Girardi and Kesse at a time when
the refinery was shut down. Defense costs for the action are covered under POC's various
insurance policies.

Larry Andrews, et al v Powerine Oil Company, et al
Orange County Superior Court
Case No. 792570
Description: Complaint for Personal Injury - Asbestos

Castle Energy Corporation v. Powerine Oil Company
Los Angeles County Superior Court - Central District
Case No. BC192026
Description: Complaint for Breach of Contract and Common Count for Money Paid regarding
unpaid attorney's fees for Jenner & Block in the amount of $330,000.00 plus $49,454.27 accrued
interest.

Fisher Scientific v Powerine Oil Company
Municipal Court of California - Whittier District
Case No. 98C01782
Description: Action for open book account in the amount of $11,174.81 plus interest, attorneys'
fees and costs.

Vickie Goodson-Watson vs. Fibreboard Corporation, et al.
Superior Court for the State of California, County of Los Angeles-Central District
Case No. BC187623
Description: Wrongful Death, Negligence, Breach of Warranty, Strict Liability and Premises
Liability. Defendant's stepfather was employed as a pipefitter at Powerine Oil Company from
1947 to 1955 and was exposed to asbestos-containing dusts and fibers on her stepfather's person
and clothes. Defendant's mother died as a result of exposure.

Highlands Insurance Company v Powerine Oil Company et al
Los Angeles Superior Court, Southeast District
Case No. VC025771
Description: Action for declaratory relief. Highlands contends that it has no obligation to defend
POC under its insurance policies because POC intentionally continuously and in the regular course
of business transported hazardous waste to certain waste disposal sites. POC has filed a cross
complaint against Plaintiff and certain of its other insurance carriers claiming that such insurance

NOV. 21. 2006   9:59AM    MAMJR   MT(OT3891P                    NO. 963    P. 3

carriers have a duty to defend POC and a duty to indemnify POC against liability for various claims and losses covered by POC's liability insurance policies.

Bob A. Smits vs. Raybestos-Manhattan, et al.
Superior Court of California in and for the County of San Francisco
Case No. 983394
Description: Negligence, Strict Liability, Enterprise Liability, False Representation, Punitive Damage, and Premises Liability. Exposure to asbestos containing products.

Williams Communications Solutions, LLC v Powerine Oil Company
Los Angeles County Municipal Court - Whittier Judicial District
Case No. 98C01856
Description: Action for failure to pay outstanding balance due to former company known as Nortel Communications Systems, Inc. Plaintiff's attorney filed Request for Entry of Default on June 30, 1998 in the amount of $21,002.48 that includes interest, costs and attorney fees.

### Certain Threatened Claims

Certain former employees of POC have filed a claim with the California Division of Labor Standards Enforcement. In an attempt to settle such claim POC has made an offer to pay disputed severance payments upon the raising of money for refinery start up.

City of Santa Fe Springs has informed POC to remove certain chemicals from town property.

## SCHEDULE 4.10

## SECURED CREDITORS

## UCC FINANCING STATEMENTS

Creditor                                           Amount
Kenyen Projects Limited                    3,000,000.00

## STATE TAX LIENS

Creditor                                           Amount
State Board of Equalization                 270,106.97

## DELINQUENT PROPERTY TAXES
(as of June 30, 1998)

Creditor                                           Amount
Los Angeles County                          $999,172.33

## DEEDS OF TRUST

Creditor                                           Amount
Demtriou, Del Guercio                       $344,186.84

Kenyon Paid
Domotriou Paid

**POWERLINE OIL COMPANY**
**NOTICES OF ATTACHMENT**
As of July 16, 1998

| Plaintiff | Attorney | Case Number | Original Filed | Served | Court | Attachment Amount | A/P Amount | Notes |
|---|---|---|---|---|---|---|---|---|
| Briggs Investment Co., Inc | Donald G. Esralt, Esq 4242 Rosewood Blvd, Long Beach, CA 90805 | NC027401 | ? | 11/25/97 12/01/97 | Los Angeles Superior Court 415 W. Ocean Boulevard Long Beach, CA 90801 South District - Long Beach | 109,860.97 | 115,554.97 | Seizes any documentary evidence in defendant's possession of title to any property and any documentary evidence, and all documentary evidence of real property owned by Deventure Any and all property for which a method of levy is provided by the code of civil procedure |
| Deventure Del Garcia, Spinner and Meyer | Renita L. Cobb / Demetrios, Del Garcia, Spinner and Meyer 801 S. Grand Avenue 10th Floor Los Angeles, CA 90017-4613 | BC117383 | 10/06/97 | 10/06/97 11/19/97 11/06/97 11/21/97 11/21/97 12/22/97 12/23/97 12/22/97 12/22/97 12/22/97 12/22/97 | Superior Court of California 111 North Hill Street Los Angeles, CA 90012-3117 | 372,150.92 | 372,521.64 | Recorded on 10/30/97 at 97-1724692 Install Keeper Levy Book Account # 3164-11008 (Wells Fargo closed) APPN Nos. 9008-023-017, 025, 018, 011, Red Ford Explorer, License Number 3XEB298 Ford F154 Truck, License Plate No. 2J14057 An escrow company in possession of, in control 1990 Ford Stakebed F-700 1979 Chev Util 1990 Ford Pick Up Cat Vacuum Trailer 1994 Ford F-150 1/2 Ton 1994 GMC S-15 1992 Publk Vacuum Truck 1994 Small Publk Vacuum Truck |
| Pete-Chemical Insulation, Inc | Anderson & Bonnifield 1708 Willow Pass Road, Suite 500 Concord, CA 94520 | L00001 | 02/25/98 | 03/05/98 (recd in mail) | Superior Court of CA, County of Solano | 145,292.71 | 145,730.23 | Judgment $59,555.51 Principal + $18,854.84 Int + $17,463.40 Add'l interest + $10,215.74 Costs Sec'd State Filing No. 9806160035 Notice of Levy Received 6/2/98, Wells Fargo Operating Account |
| Itturney Recovery Systems, Inc Pressure Vessel | Joseph F. Giustano 20750 Ventura Boulevard #309 Woodland Hills, CA 91602 | 99C00407 | 05/08/98 | 06/01/98 | Los Angeles Municipal Court 7320 S. Pacher Avenue Whittier, CA 90602-1498 Whittier Judicial District | 55,110.72 + Int | 9,238.18 | (Keeper) |

*(handwritten annotations:)* PRESSURE VESSEL PAID 9-11-98

*(handwritten annotations:)* DEMOSLASH PAID PAYMOTS TO PETRO CHSN UNDER A SNP

Page 158

POWERINE COMPANY
JUDGMENTS
As of July 16, 1998

| Vendor | Judgment Date | Judgment Principal | Judgment Interest | Added Interest | Attorneys Fees | Court Costs | Other/ Unknown | Total | A/P Amount | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| Lee Cook | 10/08/97 | 12,915.12 | 3,060.74 | | 660.00 | 112.00 | | 16,687.86 | 16,687.86 | Interest 10% from 6/13/95-10/8/97 (Did not seek interest past 10/8/97) |
| Concrete Coring | 03/12/98 | 155.59 | | | | 90.00 | | 245.59 | 245.59 | |
| C & Rainey Corporation | 05/05/98 | 33,444.06 | (?) | | 3,500.00 | | | 36,944.06 | 36,944.06 | + Interest & Costs |
| Kenneth Greene | 03/11/98 | 18,588.36 | | | | | | 18,588.36 | 18,588.36 | |
| MGM, Inc Signed by Arbitrator but not by Clerk of the Court | 01/28/98 | 33,418.59 | 4,284.89 | | 5,000.00 | 217.00 | | 42,920.39 | 36,385.18 | |
| Orange County Wholesale | 10/15/97 | 3,323.92 | | | | 40.00 | | 3,363.92 | 3,363.92 | |
| Spare Leasing Company | 11/21/97 | 12,555.81 | | | 1,230.00 | 549.50 | | 14,335.31 | 14,335.31 | |
| Aaron Manne, Inc Judgment Not Signed by Judge | (10/08/97) | 45,372.28 | 5,196.06 | | 660.00 | 266.00 | | 51,494.34 | 51,494.34 | Interest accrued as of 10/8/97 (Did not seek interest past 10/8/97) |
| M & N Valve Corporation Judgment Not Signed by Court Clerk | (03/30/98) | 17,002.42 | 12,018.00 | | 660.00 | 111.00 | | 29,791.42 | 29,791.42 | |
| Randall Winkler/Sylas Meyer Trust Judgment Not Signed by Court Clerk | (04/07/98) | 18,865.75 | 483.48 | | 1,550.00 | 161.00 | | 21,060.23 | 21,060.23 | |
| Alabama Communications Judgment Not Signed by Court Clerk | (06/30/98) | 17,949.59 | 1,469.10 | | 1,447.49 | 136.00 | | 21,002.48 | 21,002.48 | |

ANEW PAID
8-21-98

WINKLE PAID
9-11-98

GREENE PAID
8-20-98

Interest 1.5% per month from April 30, 1997 until date of judgment and interest from date of judgment until paid in full at the rate of 9.22% per annum

POWERINE COMPANY
MECHANICS LIENS
As of July 16, 1998

| Firm | Services Rendered | Date Recorded/ Filed | Recorded As | Stated $ Amount | Original A/P Amount | Amount Paid | Current A/P Amt |
|------|-------------------|----------------------|-------------|-----------------|---------------------|-------------|-----------------|
| SDC-Falcon Special Waste Services | Hazardous and non-hazardous waste hauling | 07/31/97 | 97 1169213 | 2,035.34 ** | 980.00 | | 980.00 |
| Electro Industries | Provided labor and materials for automatic power transfer scheme at Central Sub, Heavy Oil. | 06/21/95 | 95 986100 | 33,726.00 | 72,545.00 | 72,545.00 | 5,000.00 |
| Jim A. Hammersmith 1726 Esplanade #4 Redondo Beach, CA 90277 | Electrical and instrumentation service, along with accrued severance time | 1/31/97 | 97 171902 | 19,459.36 ** | 0.00 | | |
| Lang Roofing, Inc. 5901 Clara Street Bell Gardens, CA 90202 | General roof repair and maintenance | 7/23/97 | 97-1112070 | 1,855.00 ** | 1,855.00 | | 1,855.00 |
| Petrochem Insulation, Inc. 24901 S. Santa Fe Ave., #117 Rancho Dominguez, CA 90221 | Thermal insulation for piping, equipment, and labor to install | 5/12/95 | 95 771102 | 242,850.05 ** | 199,098.05 | 100,544.53 | 147,739.73 |
| Siemens Industrial Automation, Inc. | Continuous Emissions Monitor Systems including on site testing and supervision | 07/18/95 | 95 1160946 | 860,019.50 * | 860,019.50 | 770,000.00 | 152,639.79 |
| Tank & Refinery Services Co. | Provided labor, equipment & materials to erect a 50,000 barrel diesel fuel storage tank including foundation & coatings. | 06/29/95 | 95 1041506 | 169,759.26 ** | 192,896.84 | 135,606.48 | 52,082.15 |
| TriHydro Corporation 920 Sheridan Street Laramie, WY 82070 | Furnished the work and/or materials at the request of, or under contract with POC | 09/18/97 | 97 1445709 | 5,619.13 ** | 5,619.13 | | 5619 13 |

* Waiting for recorded release. Amount was paid at land sale close of September 19, 1997.
** 90 day window to file lawsuit has passed

SIEMENS
PAID



## SCHEDULE 10.4

### UNSECURED CREDITORS

Date 07/16/98 09:10am
06-98-184

Powerline Oil Company
Aged AP - Summary
Aging Date: 06/30/98

Page   1
Rept 03.680

| Vendor | Name | Vendor Status | Current | 1 To 30 | 31 To 60 | 61 To 90 | Over 90 | Balance |
|---|---|---|---|---|---|---|---|---|
| | | | | | Days Past Due | | | |
| 005254 | ACT | A | 0.00 | 0.00 | 0.00 | 0.00 | 639.23 | 639.23 |
| 011564 | A & G INSTRUMENT SERVICE | A | 0.00 | 0.00 | 0.00 | 0.00 | 1,189.00 | 1,189.00 |
| 014801 | A.H. & S. CONSTRUCTION CORP | A | 0.00 | 0.00 | 0.00 | 0.00 | 849.10 | 849.10 |
| 015540 | AICCO | A | 0.00 | 5,624.01 | 0.00 | 0.00 | 0.00 | 5,624.01 |
| 016621 | AIR LIQUID AMERICA CORP | A | 0.00 | 0.00 | 0.00 | 0.00 | 3,582.74 | 3,582.74 |
| 016695 | AIRTOUCH CELLULAR - LA | A | 0.00 | 0.00 | 0.00 | 0.00 | 113.47 | 113.47 |
| 021961 | ALL INDUSTRIAL VALVES | A | 0.00 | 0.00 | 0.00 | 0.00 | 639.95 | 639.95 |
| 022035 | ALLWASTE OF SOUTHERN CA | A | 0.00 | 0.00 | 0.00 | 0.00 | 30,506.13 | 30,506.13 |
| 023064 | AMAN ENVIRONMENTAL | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,413.15 | 2,413.15 |
| 023380 | AMERICAN BOA, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 10,835.33 | 10,835.33 |
| 023388 | AMERICAN ENVIRONMENTAL | A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 023390 | AMERICAN EXPRESS | A | 0.00 | 15,627.33 | 0.00 | 0.00 | 0.00 | 15,627.33 |
| 023395 | AMERICAN EXPRESS | A | 0.00 | 259.31 | 0.00 | 0.00 | 0.00 | 259.31 |
| 023405 | AMERICAN INSTRUMENT | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,227.50 | 2,227.50 |
| 023427 | AMERICAN PETROLEUM INSTITUTE | A | 0.00 | 7,877.00 | 0.00 | 0.00 | 16,095.44 | 23,972.44 |
| 025191 | ANCON | A | 0.00 | (330.00) | 330.00 | 0.00 | 51,404.34 | 51,404.34 |
| 027885 | AON RISK SERVICES | A | 0.00 | 0.00 | 0.00 | 150,000.00 | 0.00 | 150,000.00 |
| 031953 | AQUATECH | A | 0.00 | 0.00 | 0.00 | 0.00 | 717.00 | 717.00 |
| 032787 | ARB, INC. CONSTRUCTORS | A | 80,574.34 | 181,563.00 | 0.00 | 0.00 | 0.00 | 262,137.34 |
| 032882 | ARCO TERMINAL SERVICES CORP | A | 0.00 | 0.00 | 0.00 | 0.00 | 75,992.74 | 75,992.74 |
| 034120 | ARTHUR ANDERSEN LLP | A | 0.00 | 0.00 | 0.00 | 0.00 | 51,480.00 | 51,480.00 |
| 035990 | ASSOCIATED LABORATORIES | A | 0.00 | 0.00 | 0.00 | 0.00 | 540.00 | 540.00 |
| 036708 | ATCHISON, TOPEKA AND SANTA FE | A | 0.00 | 0.00 | 0.00 | 0.00 | 10,947.67 | 10,947.67 |
| 037331 | ATLAS COPCO RENTAL INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 23,091.37 | 23,091.37 |
| 037940 | AT & T | A | 0.00 | 0.00 | 0.00 | (68.96) | 0.00 | (68.96) |
| 037950 | AT & T WIRELESS SERVICES | A | 0.00 | 0.00 | 0.00 | 0.00 | 139.03 | 139.03 |
| 039907 | AUTOMATIC DATA PROCESSING | A | 213.74 | 150.00 | 0.00 | 0.00 | 0.00 | 363.74 |
| 050752 | BAKER TANKS, INC. | A | 615.00 | 0.00 | 0.00 | 0.00 | 0.00 | 615.00 |
| 050858 | BAKER AND JACOBSON | A | 2,237.05 | 0.00 | 0.00 | 0.00 | 0.00 | 2,237.05 |
| 053863 | B C ANALYTICAL | A | 0.00 | 0.00 | 0.00 | 0.00 | 1,435.00 | 1,435.00 |
| 053896 | BC LABORATORIES, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 4,735.00 | 4,735.00 |
| 057863 | BECHTEL CORPORATION | A | 0.00 | 0.00 | 0.00 | 0.00 | 117,542.65 | 117,542.65 |
| 058971 | BERG-NELSON CO, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 3,205.14 | 3,205.14 |
| 059102 | BETA MONTORS INTERNATIONAL INC | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,217.78 | 2,217.78 |
| 059176 | BETZ WATER MANAGEMENT | A | 0.00 | 0.00 | 0.00 | 0.00 | 58,712.55 | 58,712.55 |
| 059719 | BEVERLY HILLS TRANSFER AND | A | 0.00 | 0.00 | 0.00 | 0.00 | 186.25 | 186.25 |
| 066200 | BILL'S COMMERCIAL LOCK | A | 0.00 | 0.00 | 214.50 | 0.00 | 499.44 | 713.94 |
| 066422 | BIOPHARM, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 194.96 | 194.96 |
| 071161 | BLACK & VEATCH | A | 0.00 | 0.00 | 0.00 | 0.00 | 19,472.79 | 19,472.79 |
| 082784 | BRAGG CRANE & RIGGING CO | A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 082787 | BRAGG INVESTMENT COMPANY, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 115,264.37 | 115,264.37 |
| 088640 | BUCKINGHAM'S SERVICE CENTER | A | 385.01 | 0.00 | 0.00 | 0.00 | 0.00 | 385.01 |
| 089800 | BUSINESS & LEGAL REPORTS, INC. | A | 88.75 | 0.00 | 0.00 | 0.00 | 0.00 | 88.75 |
| 089666 | JAMES C. BUTTON | A | 0.00 | 110.64 | 0.00 | 0.00 | 0.00 | 110.64 |
| 100603 | CALIFORNIA FILTRATION PRODUCTS | A | 0.00 | 0.00 | 0.00 | 0.00 | 573.30 | 573.30 |



Date 07/16/98 09:10am
0636-184

Powerline Oil Company
Aged AP - Summary
Aging Date: 06/30/98

Page   3
Rept 03,680

| Vendor | Name | Vendor Status | Current | 1 To 30 | 31 To 60 | 61 To 90 | Over 90 | Balance |
|---|---|---|---|---|---|---|---|---|
| | | | | | Days Past Due | | | |
| 168730 | DELTA MOTOR CO., INC | A | 0.00 | 0.00 | 0.00 | 0.00 | 409.69 | 409.69 |
| 438670 | DEMETRIOU-DEL-GUERCIO | A | (5,141.57) | 0.00 | 0.00 | 0.00 | 922,093.34 | 917,002.77 |
| 169026 | DEPT. OF INDUSTRIAL RELATIONS | A | 0.00 | 0.00 | 0.00 | 0.00 | 630.00 | 630.00 |
| 465423 | DIAEROSA | A | 0.00 | 246.93 | 0.00 | 0.00 | 0.00 | 246.93 |
| 174652 | DMV RENEWAL | A | 0.00 | 0.00 | 0.00 | 0.00 | 1,326.00 | 1,326.00 |
| 178626 | DOTY BROS. EQUIPMENT CO. | A | 0.00 | 0.00 | 0.00 | 0.00 | 100,289.18 | 100,289.18 |
| 182592 | DRESSER-RAND COMPANY | A | 0.00 | 0.00 | 0.00 | 0.00 | 600.28 | 600.28 |
| 187500 | DTSC | A | 0.00 | 0.00 | 0.00 | 0.00 | 1,170.00 | 1,170.00 |
| 188468 | DUANE, MORRIS & HECKSCHER | A | 0.00 | 0.00 | 0.00 | 0.00 | 3,187.10 | 3,187.10 |
| 188649 | DUN & BRADSTREET | A | 0.00 | 0.00 | 0.00 | 0.00 | 1,441.60 | 1,441.60 |
| 193794 | DuraTherm, Inc. | A | 0.00 | 579.52 | 0.00 | 0.00 | 2,673.00 | 2,673.00 |
| 205065 | ECOLOCHEM, INC | A | 560.82 | 0.00 | 0.00 | 560.82 | 77,623.48 | 79,324.82 |
| 207308 | EDI-TECH INDUSTRIES | A | 0.00 | 0.00 | 0.00 | 0.00 | 21,458.32 | 21,458.32 |
| 211996 | E & S G ENVIRONMENTAL | A | 0.00 | 0.00 | 0.00 | 0.00 | 3,060.00 | 3,060.00 |
| 212508 | MICHAEL EGNER | A | 393.68 | 0.00 | 0.00 | 0.00 | 0.00 | 393.68 |
| 221457 | ELECTRO-INDUSTRY | A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 221665 | ELEVATOR SPECIALTY CORP. | A | 0.00 | 0.00 | 0.00 | 0.00 | 553.99 | 553.99 |
| 225351 | ENERSOURCE ENGINEERING | A | 0.00 | 0.00 | 0.00 | 0.00 | 883.99 | 883.99 |
| 237129 | ETHYL PETROLEUM ADDITIVES, INC | A | 0.00 | 0.00 | 0.00 | 0.00 | 25,791.80 | 25,791.80 |
| 259971 | FALCON DISPOSAL SERVICE | A | 0.00 | 0.00 | 0.00 | 0.00 | 38,617.87 | 38,617.87 |
| 258115 | FEDERAL CONTAINER CORPORATION | A | 0.00 | 0.00 | 0.00 | 0.00 | 980.00 | 980.00 |
| 258150 | FEDERAL EXPRESS CORP | A | 445.50 | 0.00 | 0.00 | 0.00 | 17,318.51 | 17,318.51 |
| 258347 | FINANCE AND ACCOUNTING OFFICER | A | 0.00 | 0.00 | 0.00 | 0.00 | 445.50 | 445.50 |
| 258346 | FIRST INTEGRATED HEALTH | A | 1,256.44 | 779.09 | 0.00 | 0.00 | 3,320.00 | 3,320.00 |
| 258035 | FISHER SCIENTIFIC | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,037.63 | 2,037.63 |
| 272487 | FLOWAY PUMPS | A | 0.00 | 0.00 | 0.00 | 0.00 | 10,264.02 | 10,264.02 |
| 272531 | FLOWTRACE, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 233,041.75 | 233,041.75 |
| 289728 | FURMANITE AMERICA, INC. | A | 7,066.25 | 0.00 | 0.00 | 0.00 | 1,860.59 | 7,002.84 |
| 307746 | GEA RAINEY CORPORATION | A | 0.00 | 0.00 | 0.00 | 0.00 | 1,290.50 | 1,290.50 |
| 308805 | G.P. RESOURCES | A | 0.00 | 5,500.00 | 0.00 | 0.00 | 30,444.00 | 35,944.00 |
| 310728 | GENESIS CAPITAL CORPORATION | A | 0.00 | 0.00 | 0.00 | 0.00 | 9,422.71 | 9,422.71 |
| 319467 | GLAXFIELD FIELDS & JAFFE | A | 0.00 | 0.00 | 0.00 | 924.69 | 0.00 | 924.69 |
| 324897 | GOLD STAR PAINTING | A | 0.00 | 0.00 | 0.00 | 0.00 | 885.00 | 885.00 |
| 326317 | GOLDEN WEST PIPE & SUPPLY | A | 0.00 | 0.00 | 0.00 | 0.00 | 885.00 | 885.00 |
| 327747 | GOLDEN WEST REFINING COMPANY | A | 0.00 | 0.00 | 0.00 | 0.00 | 200.77 | 200.77 |
| 330105 | G.P. RESOURCES | A | 0.00 | 0.00 | 0.00 | 0.00 | 7,323.11 | 7,323.11 |
| 331426 | GRAPHIC CONTROLS CORPORATION | A | 0.00 | 0.00 | 0.00 | 122.71 | 432.06 | 432.06 |
| 332747 | GRASEBY S/I | A | 0.00 | 0.00 | 0.00 | 0.00 | 184.60 | 307.31 |
| 332904 | GRAVES SERVICE CO. | A | 0.00 | 0.00 | 0.00 | 0.00 | 35,839.49 | 35,839.49 |
| 335955 | GREENE, KENNETH C/O G. HYDEN | A | 0.00 | 0.00 | 0.00 | 19,505.59 | 7,179.95 | 7,179.95 |
| 337063 | GREENE, KENNETH C/O G. HYDEN | A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 19,505.59 |
| 337064 | GTE | A | 3,535.27 | 289.12 | 0.00 | 0.00 | 3,823.39 | 3,823.39 |
| 339441 | GTE CALIFORNIA | A | 0.00 | 0.00 | 0.00 | 0.00 | 1,760.00 | 1,760.00 |
| 359861 | GUTIERREZ, ALEJANDRO | A | 212.68 | 0.00 | 0.00 | 0.00 | 0.00 | 212.68 |
| 359861 | HAARMANN/HENKEL/GATH & PARTNER | A | 0.00 | 0.00 | 0.00 | 0.00 | 5,899.00 | 5,899.00 |
| 351523 | HARCOURT BRACE & COMPANY | A | 0.00 | 0.00 | 0.00 | 0.00 | 744.83 | 744.83 |

NOV. 21. 2006  10:00AM    MANAGEMENT GROUP 389    NO. 965    P. 15
NOV. 21. 2006  10:00AM    MANAGEMENT GROUP 389    NO. 965    P. 15

Date 07/16/98 09:10am
05-98-184

Powerine Oil Company
Aged AP - Summary
Aging Date: 06/30/98

Page 4
Rept 09.680

| Vendor | Name | Vendor Status | Days Past Due | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Current | 1 To 30 | 31 To 60 | 61 To 90 | Over 90 | Balance |
| 351542 | HARDING LAWSON ASSOCIATES | A | 0.00 | 0.00 | 0.00 | 0.00 | 15,000.00 | 15,000.00 |
| 351859 | HAZCO SERVICES, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 1,586.31 | 1,586.31 |
| 360578 | H.F. DRILLING | A | 0.00 | 0.00 | 0.00 | 0.00 | 6,675.00 | 6,675.00 |
| 363426 | HIGHTECH SIGNS | A | 0.00 | 0.00 | 0.00 | 0.00 | 309.60 | 309.60 |
| 377291 | SIEGFRIED C HOBAPP | A | 0.00 | 8,534.55 | 0.00 | 0.00 | 0.00 | 8,534.55 |
| 377345 | HOERBIGER SERVICE INC | A | 0.00 | 0.00 | 0.00 | 0.00 | 51,869.20 | 51,869.20 |
| 397315 | HYPROTECH LTD. | A | 0.00 | 0.00 | 0.00 | 0.00 | 6,315.00 | 6,315.00 |
| 425678 | INGERSOLL-DRESSER PUMP COMPANY | A | 0.00 | 0.00 | 0.00 | 0.00 | 21,310.26 | 21,310.26 |
| 426259 | INSPECTORATE AMERICA CORP. | A | 0.00 | 0.00 | 0.00 | 0.00 | 3,169.22 | 3,169.22 |
| 433012 | IRELL & MANELLA | A | 0.00 | 0.00 | 0.00 | 0.00 | 65,432.40 | 65,432.40 |
| 433028 | IRENE COHEN TEMPS, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 1,014.75 | 1,014.75 |
| 433654 | IRON MOUNTAIN | A | 1,051.72 | 0.00 | 0.00 | 0.00 | 0.00 | 1,051.72 |
| 450264 | JACOBS ENGINEERING GROUP INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 32,169.61 | 32,169.61 |
| 454329 | JENNER & BLOCK | A | 0.00 | 0.00 | 0.00 | 0.00 | 45,865.65 | 45,865.65 |
| 459401 | J.J. KELLER & ASSOCIATES, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 290.99 | 290.99 |
| 464247 | JOHN CRANE INC | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,491.40 | 2,491.40 |
| 464268 | JOHN LISEE PUMP INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,098.24 | 2,098.24 |
| 464331 | JOHNSON YOKOGAWA CORP | A | 0.00 | 0.00 | 0.00 | 0.00 | 217,359.10 | 217,359.10 |
| 464405 | JOHN ZINK CO. | A | 0.00 | 0.00 | 0.00 | 0.00 | 217,359.10 | 217,359.10 |
| 464664 | JONES ENVIRONMENTAL | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,923.68 | 2,923.68 |
| 479754 | KEYSTONE VALVES AND CONTROLS, | A | 0.00 | 0.00 | 0.00 | 0.00 | 5,470.00 | 5,470.00 |
| 483242 | KIS COMPUTER CENTER | A | 0.00 | 0.00 | 0.00 | 0.00 | 6,533.20 | 6,533.20 |
| 488949 | KOCH ENG. - TRUE TECH DIVISION | A | 0.00 | 0.00 | 0.00 | 0.00 | 210.47 | 210.47 |
| 500873 | LAKELAND FENCE CO. | A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 500951 | LANG ROOFING, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 250.00 | 250.00 |
| 501208 | LANIER WORLDWIDE, INC. | A | 139.80 | 0.00 | 0.00 | 0.00 | 1,855.00 | 1,855.00 |
| 501565 | LASER NETWORK, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 36,076.63 | 36,216.83 |
| 501856 | LAYNE CHRISTENSEN COMPANY | A | 0.00 | 0.00 | 0.00 | 0.00 | 597.96 | 597.96 |
| 501889 | LAZERPERFECT INTL | A | 1,054.65 | 0.00 | 0.00 | 0.00 | 21,160.95 | 21,160.95 |
| 509768 | LFC CORPORATION | A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,054.65 |
| 515472 | LIBERTY TECHNOLOGIES, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 450.00 | 450.00 |
| 516792 | LITTLEJOHN-REULAND CORP | A | 0.00 | 0.00 | 0.00 | 0.00 | 9,219.42 | 9,219.42 |
| 527226 | LOEB AND LOEB | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,033.53 | 2,033.53 |
| 526294 | LOS ANGELES COUNTY DEPT OF | A | 0.00 | 0.00 | 0.00 | 0.00 | 58,704.68 | 58,704.68 |
| 528348 | LOS ANGELES COUNTY - | A | 0.00 | 0.00 | 0.00 | 0.00 | 180.00 | 180.00 |
| 528404 | LOS ANGELES HARBOR DEPARTMENT | A | 0.00 | 0.00 | 0.00 | 0.00 | 14,623.59 | 14,623.59 |
| 538587 | LUBRIZOL CORP | A | 0.00 | (14,532.12) | 97.63 | 3,411.66 | 11,152.82 | 129.99 |
| 547264 | LYONS SAFETY | A | 0.00 | 0.00 | 0.00 | 0.00 | 12,852.50 | 12,852.50 |
| 550157 | MAC ADAM INTERNATIONAL INC | A | 0.00 | 0.00 | 0.00 | 0.00 | 911.54 | 911.54 |
| 560379 | MaComCo | A | 0.00 | 0.00 | 0.00 | 0.00 | 661.00 | 661.00 |
| 551460 | MARSH & MCLENNAN, INC | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,315.19 | 2,315.19 |
| 551682 | MASTER FAN CORP. | A | 0.00 | 0.00 | 0.00 | 0.00 | 4,500.00 | 4,500.00 |
| 551756 | MATTHEW BENDER & CO., INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 973.25 | 973.25 |
| 554029 | McCLINTOCK, WESTON, BENSHOOF | A | 0.00 | 0.00 | 0.00 | 0.00 | (110.42) | (110.42) |
| 554165 | MCDERMOTT, WILL & EMERY | A | 0.00 | 293.54 | 0.00 | 23,020.02 | 276,723.74 | 300,037.30 |
| | | | 0.00 | 0.00 | 0.00 | 0.00 | 2,150.26 | 2,150.26 |

Date 07/16/98 09:10am
06-98-184

Powerline Oil Company
Aged AP - Summary
Aging Date: 06/30/98

Page  5
Rept 03.680

| Vendor | Name | Vendor Status | Current | 1 To 30 | 31 To 60 | 61 To 90 | Over 90 | Balance |
|--------|------|---------------|---------|---------|----------|----------|---------|---------|
| | | | | | Days Past Due | | | |
| 554301 | THE MCGRAW-HILL COMPANIES | A | 0.00 | 0.00 | 0.00 | 0.00 | 117.45 | 117.45 |
| 554437 | McGUIRE & WALKER | A | 0.00 | 0.00 | 0.00 | 0.00 | 370.50 | 370.50 |
| 554736 | McMASTER-CARR SUPPLY CO | A | 0.00 | 0.00 | 0.00 | 0.00 | 589.71 | 589.71 |
| 559026 | MESA SERVICES, INC | A | 0.00 | 0.00 | 0.00 | 0.00 | 18,638.92 | 18,638.92 |
| 559373 | METROPOLITAN TOWER CONDOMINIUM | A | 1,133.80 | 0.00 | 0.00 | 0.00 | 0.00 | 1,133.80 |
| 562452 | MGM INC | A | 0.00 | 0.00 | 0.00 | 0.00 | 38,385.13 | 38,385.13 |
| 565662 | ARTHUR R. MICHAELIAN | A | 0.00 | 0.00 | 0.00 | 1,000.00 | 3,000.00 | 4,000.00 |
| 565756 | MIDTOWN PLUMBING & MECHANICAL | A | 0.00 | 0.00 | 0.00 | 0.00 | 4,191.29 | 4,191.29 |
| 566348 | MILLER BROOKS ENVIROMENTAL,INC | A | 0.00 | 0.00 | 0.00 | 0.00 | 3,867.74 | 3,867.74 |
| 576555 | M & N VALVE CORPORATION | A | 0.00 | 0.00 | 0.00 | 0.00 | 29,791.42 | 29,791.42 |
| 576998 | MOBILE NATURAL GAS INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 39,405.76 | 39,405.76 |
| 578254 | MOORE PRODUCTS COMPANY | A | 0.00 | 0.00 | 0.00 | 0.00 | 832.60 | 832.60 |
| 578520 | MOTOROLA, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 122.50 | 122.50 |
| 601776 | NATIONAL SANITARY CO. | A | 0.00 | 0.00 | 0.00 | 0.00 | 1,001.64 | 1,001.64 |
| 628102 | NORTEL COMMUNICATIONS SYSTEMS | A | 3,852.59 | 0.00 | 0.00 | 0.00 | 17,949.63 | 21,802.46 |
| 647126 | NYNEX | A | 0.00 | 0.00 | 0.00 | 0.00 | (11.98) | (11.98) |
| 669578 | OFFICIAL COMMITTEE-BP | A | 0.00 | 5,880.00 | 0.00 | 0.00 | 0.00 | 5,880.00 |
| 674064 | OMNI COMPUTER PRODUCTS | A | 0.00 | 0.00 | 0.00 | 0.00 | (200.00) | (200.00) |
| 682933 | ORANGE COUNTY REGISTER | A | 295.39 | 0.00 | 0.00 | 0.00 | 0.00 | 295.39 |
| 682938 | ORANGE COUNTY TAX COLLECTOR | A | 114.82 | 0.00 | 0.00 | 0.00 | 0.00 | 114.82 |
| 682961 | ORANGE COUNTY WHOLESALE | A | 0.00 | 0.00 | 0.00 | 0.00 | 3,363.92 | 3,363.92 |
| 683063 | ORBIT VALVE COMPANY | A | 0.00 | 0.00 | 0.00 | 0.00 | 17,844.75 | 17,844.75 |
| 700087 | PACHULSKI,STANG,ZIEHL & YOUNG | A | 0.00 | 0.00 | 0.00 | 0.00 | 22,007.66 | 22,007.66 |
| 700174 | PACIFIC BELL | A | 1.84 | 0.00 | 0.00 | 0.00 | 0.00 | 1.84 |
| 700169 | PACIFIC COAST ENGINEERING INC | A | 0.00 | 0.00 | 0.00 | 0.00 | 403.20 | 403.20 |
| 700203 | PACIFIC ENVIROSYSTEMS, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 28,677.80 | 28,677.80 |
| 701184 | PAN PACIFIC SURVEYORS, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 11,235.50 | 11,235.50 |
| 701266 | PARAMOUNT PETROLEUM CORP | A | 0.00 | 0.00 | 0.00 | 0.00 | 3,180.30 | 3,180.30 |
| 701776 | PAUL, HASTINGS, JANOFSKY | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,396.37 | 2,396.37 |
| 707177 | PDQ EQUIPMENT RENTAL CENTER | A | 16.33 | 0.00 | 0.00 | 0.00 | 0.00 | 16.33 |
| 709248 | PETROCHEM INSULATION, INC. | A | 0.00 | 0.00 | 2,410.02 | 0.00 | 145,320.71 | 147,730.73 |
| 716644 | PIONEER BUSINESS FORMS, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 546.39 | 546.39 |
| 716792 | PIPE FABRICATING & SUPPLY | A | 0.00 | 0.00 | 0.00 | 0.00 | 14,383.99 | 14,383.99 |
| 728256 | PORT OF LONG BEACH | A | 0.00 | (35,996.84) | 0.00 | 0.00 | 63,938.60 | 27,941.76 |
| 728626 | POWELL-ESCO COMPANY | A | 0.00 | 0.00 | 0.00 | 0.00 | 12,185.63 | 12,185.63 |
| 728700 | POWER MAINTENANCE | A | 0.00 | 0.00 | 0.00 | 0.00 | 1,122.75 | 1,122.75 |
| 730807 | POWER & TELEPHONE | A | 0.00 | 0.00 | 0.00 | 0.00 | 101.48 | 101.48 |
| 732915 | PRAXAIR,INC. | A | 1,774.68 | 2,993.64 | 5,025.44 | 2,952.42 | 21,384.25 | 34,130.63 |
| 732916 | PRAXAIR DISTRIBUTION, INC. | A | 423.00 | 423.00 | 0.00 | 0.00 | 0.00 | 846.00 |
| 735285 | PRESSURE VESSEL SERVICE, INC. | A | 0.00 | 2,052.19 | 0.00 | 0.00 | 7,185.09 | 9,238.18 |
| 733581 | PRICE COSTCO | A | 0.00 | 0.00 | 0.00 | 0.00 | 277.99 | 277.99 |
| 733694 | PRINDLE, DECKER & AMARO | A | 0.00 | 0.00 | 0.00 | 0.00 | 7,623.14 | 7,623.14 |
| 733735 | PROCESS CHEMICALS, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,025.00 | 2,025.00 |
| 739054 | PUGET SOUND PIPE AND SUPPLY CO | A | 0.00 | 0.00 | 0.00 | 0.00 | 763.22 | 763.22 |
| 739783 | PURVIN & GERTZ, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 4,320.00 | 4,320.00 |



Date 07/16/98 09;10am
06-98-184

Powerline Oil Company
Aged AP - Summary
Aging Date: 06/30/98

Page   7
Rept 03.680

| Vendor | Name | Vendor Status | Current | 1 To 30 | 31 To 60 | 61 To 90 | Over 90 | Balance |
|--------|------|---------------|---------|---------|----------|----------|---------|---------|
| | | | | | Days Past Due | | | |
| 878330 | TOTAL WESTERN, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 885528 | TRIHYDRO CORPORATION | A | 0.00 | 0.00 | 0.00 | 0.00 | 5,619.13 | 5,619.13 |
| 902220 | UCISCO, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 30,359.42 | 30,359.42 |
| 912718 | UNION PACIFIC RAILROAD | A | 0.00 | 0.00 | 0.00 | 0.00 | 30,359.42 | 30,359.42 |
| 912895 | UNITED COMMUNICATIONS GROUP | A | 0.00 | 0.00 | 0.00 | 1,438.84 | 0.00 | 1,438.84 |
| 912913 | UNITED CORPORATE SERVICES,INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 1,295.00 | 1,295.00 |
| 913001 | UNIVERSITY OF S. CALIFORNIA | A | 0.00 | 0.00 | 0.00 | 0.00 | 135.41 | 135.41 |
| 913006 | UNOCAL -76 | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,260.00 | 2,260.00 |
| 914134 | UOP | A | 0.00 | 0.00 | 0.00 | 0.00 | 53,220.39 | 53,220.39 |
| 925518 | VALLEN SAFETY SUPPLY COMPANY | A | 0.00 | 0.00 | 0.00 | 0.00 | 133,511.55 | 133,511.55 |
| 925553 | VALLEY X-RAY SERVICES | A | 0.00 | 521.30 | 0.00 | 0.00 | 667.14 | 667.14 |
| 925592 | VALTEK | A | 0.00 | 0.00 | 0.00 | 0.00 | 6,575.72 | 7,097.02 |
| 925703 | VALVETECHNOLOGIES, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 19,347.58 | 19,347.58 |
| 929014 | VECTOR ASSOCIATES | A | 0.00 | 0.00 | 0.00 | 0.00 | 28,171.17 | 28,171.17 |
| 933481 | VIVITAR SECURITY SYSTEMS | A | 0.00 | 0.00 | 0.00 | 0.00 | 24,514.03 | 24,514.03 |
| 946793 | VWR SCIENTIFIC | A | 0.00 | 0.00 | 0.00 | 0.00 | 10,414.57 | 10,414.57 |
| 950648 | WARREN, GORHAM & LAMONT | A | 0.00 | 0.00 | 0.00 | 0.00 | 132.48 | 132.48 |
| 950835 | WASTE WATER TECHNOLOGY SERVICE | A | 0.00 | 0.00 | 0.00 | 0.00 | 351.00 | 351.00 |
| 954551 | RANDALL W. WENKER, AS TRUSTEE | A | 0.00 | 0.00 | 0.00 | 0.00 | 2,145.00 | 2,145.00 |
| 954615 | WESTERN FEDERAL, INC. | A | 0.00 | 0.00 | 0.00 | 0.00 | 21,089.23 | 21,089.23 |
| 954625 | WESTERN INDEPENDENT REFINERS | A | 0.00 | 0.00 | 0.00 | 0.00 | 629.32 | 629.32 |
| 957780 | WICKLAND INTERNATIONAL | A | 0.00 | 0.00 | 0.00 | 650.00 | 51,496.15 | 52,346.15 |
| 958290 | WITTENBERG & WITTENBERG | A | 0.00 | 0.00 | 0.00 | 0.00 | 4,026.62 | 4,026.62 |
| | | | 0.00 | 0.00 | 3,000.00 | 0.00 | 0.00 | 3,000.00 |
| | | Report Total | 98,543.53 | 202,692.26 | 11,359.33 | 203,221.43 | 5,212,199.07 | 5,728,015.62 |

(as of June 30, 1998)

Accounts Payable Trade
    A/P Trade Accrual
        City of Long Beach                               55,440.00
        ~~Los Angeles County~~                         ~~41,475.34~~
        Bechtel                                     117,855.44
        Castle Energy Corp.                        330,000.00
    A/P - Accrual CENCO                        160,097.32
    A/P Trade Disputed                          67,915.19

Accrued Accounts Payable
    Accrued Property Taxes
        ~~Secured~~                                ~~999,172.32~~
        ~~Other Lien~~                            ~~8,553.12~~
        Unsecured:                             15,361.51
    ~~Accrued Motor Vehicle Tax - FET~~              ~~1,588.29~~
    Acc Taxes - Lead Poisoning                  99,705.14
        ~~State Board of Equalization Lien~~         ~~270,106.97~~
    Accrued Payroll
        ~~Severance:~~                            ~~852,229.19~~
        ~~Payroll:~~                              ~~102,170.99~~
    Accrued Vacation
        Powerine Employees                     73,533.59
        ~~EMC Employees~~                      ~~60,153.44~~
    Accrued Comptime                           5,809.75
    ACC P/R Taxes - FICA                      5,578.90
    ACC P/R Taxes - FUTA                       25.30
    ACC P/R Taxes - CA SUI                     81.20
    ACC P/R Taxes - NY SDI                   89.82
    ACC P/R Taxes - NY SDI                   (51.89)
    Accrued Utilities                           4,636.58
    Accrued Insurance                        65,563.35
    Accrued Licenses & Permits                150,759.26
    ACC Royalties - HF Alkylation             15,691.80
    ACC Royalties - Platforming              15,827.16
    ACC Royalties - FCC                     7,677.66
    ACC Royalties - Merox                   1,650.79
    ACC Royalties - Isom                    9,185.50
    A/P A/R Credit Balances                  1,869.76

Current Portion - L.T. Liabilities
    Est. Claims Payable - Current               1,700,000
    ~~EMC Loan~~                            ~~1,715,493.03~~
    ~~EMC Management Fees~~                  ~~1,785,000.00~~
    ~~EMC Management Fees-Contra~~        ~~(1,712,437.98)~~
    NMB - Contra                         (1,719.95)
    ~~Notes Payable - Kenyen~~               ~~2,000,000.00~~

Liabilities - Non-Current
    Est. Claims Payables - Non-Current        21,289,907.04

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

300 South Grand Avenue, 22nd Floor, Los Angeles, CA 90071

A true and correct copy of the foregoing document entitled (*specify*): MOTION FOR ORDER APPROVING SETTLEMENT
RE INSURANCE POLICIES AND TO DISMISS ADVERSARY PROCEEDING; MEMORANDUM OF POINTS AND
AUTHORITIES AND DECLARATIONS OF VINCENT PAPA AND JASON M. RUND IN SUPPORT THEREOF
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in
the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On
06/22/2018, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the
following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

SEE ATTACHED SERVICE LIST

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) 06/22/2018, I served the following persons and/or entities at the last known addresses in this bankruptcy case
or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first
class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge
will be completed no later than 24 hours after the document is filed.

SEE ATTACHED SERVICE LIST

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) 06/22/2018, I served the
following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to
such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration
that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is
filed. (SEE ATTACHED SERVICE LIST FOR E-MAIL RECIPIENTS)

(VIA COURIER TO:)
Hon. Barry Russell
U.S. Bankruptcy Court - Roybal Building
255 E. Temple Street
Los Angeles, CA 90012

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 06/22/2018 | Christine Duncan | *[signature]* |
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

*In Re LAKELAND DEVELOPMENT COMPANY*

United States Bankruptcy Court (C.D. Cal. – Los Angeles Div.) Case No. 2:12-bk-25842-RN

**SERVICE LIST**

<u>**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**</u>

| ATTORNEY | E-MAIL |
|---|---|
| Richard T Baum<br>Law Offices of Richard T. Baum<br>11500 W Olympic Blvd, Ste.400<br>Los Angeles, CA 90064<br>310-277-2040<br>Fax : 310-286-9525 | rickbaum@hotmail.com |
| Lawrence M Jacobson<br>Glickfeld, Fields & Jacobson LLP<br>8383 Wilshire Blvd., Ste 341<br>Beverly Hills, CA 90211<br>310-550-7222<br>Fax : 310-550-6222 | lmj@gfjlawfirm.com |
| Christopher F Wilson<br>21515 Hawthorne Blvd<br>Torrance, CA 90503<br>310-316-2500<br>Fax : 310-543-2526 | cfw.cwanda@gmail.com |
| Steve Burnell<br>Law Office of Thomas H. Casey<br>22342 Avenida Empresa Suite 200<br>Rancho Santa Margarita, CA 92688<br>949-766-8787<br>Fax : 949-766-9896 | kdriggers@tomcaseylaw.com |
| Thomas H Casey<br>Law Office of Thomas H. Casey<br>22342 Avenida Empresa Ste 200<br>Rancho Santa Margarita, CA 92688<br>949-766-8787 | kdriggers@tomcaseylaw.com |
| Richard W Esterkin<br>Morgan, Lewis & Bockius LLP<br>300 S Grand Ave 22nd Fl<br>Los Angeles, CA 90071-3132<br>213-612-2500<br>Fax : 213-612-2501 | richard.esterkin@morganlewis.com |
| Kathleen J McCarthy<br>22342 Avenida Empresa Ste 200<br>Rancho Santa Margarita, CA 92688<br>949-766-8787<br>Fax : 949-766-9896 | kdriggers@tomcaseylaw.com |

1

*In Re LAKELAND DEVELOPMENT COMPANY*

United States Bankruptcy Court (C.D. Cal. – Los Angeles Div.) Case No. 2:12-bk-25842-RN

**SERVICE LIST**

| | |
|---|---|
| Kenneth G Lau<br>Office of the United States Trustee<br>915 Wilshire Blvd, Suite 1850<br>Los Angeles, CA 90017<br>213-894-4480<br>Fax : 213-894-2603 | kenneth.g.lau@usdoj.gov |

**TO BE SERVED BY E-MAIL**

| ATTORNEY | E-MAIL |
|---|---|
| Lorie A. Ball | lball@robinskaplan.com |
| Richard T. Baum | rickbaum@ecf.inforuptcy.com |
| Ronald K. Brown | ron@rkbrownlaw.com |
| Steve Burnell | sburnell@tomcaseylaw.com |
| Thomas H. Casey | lmiller@tomcaseylaw.com,<br>msilva@tomcaseylaw.com |
| Joseph Corrigan | bankruptcy2@ironmountain.com |
| Steven M. Crane | scrane@bcrslaw.com;<br>sgill@bcrslaw.com |
| Richard W. Esterkin | richard.esterkin@morganlewis.com,<br>gloria.moonesinghe@morganlewis.com |
| Donald T. Fife | gusmars@aol.com |
| Scott D. Friedberg | sfriedberg@theseaportgroup.com,<br>sdfriedberg@gmail.com |
| Robert S. Gebhard | robert.gebhard@clydeco.us |
| Barry S. Glaser | bglaser@swesq.com,<br>erhee@swesq.com |
| Matthew A. Gold | courts@argopartners.net |
| Matthew H. Kagan | kagan@thriftyoil.com |
| Noah M. Golden-Krasner | noah.goldenkrasner@doj.ca.gov,<br>gwen.blanchard@doj.ca.gov |

*In Re LAKELAND DEVELOPMENT COMPANY*

United States Bankruptcy Court (C.D. Cal. – Los Angeles Div.) Case No. 2:12-bk-25842-RN

### SERVICE LIST

| ATTORNEY | E-MAIL |
|---|---|
| Richard H. Golubow | rgolubow@winthropcouchot.com, pj@winthropcouchot.com, vcorbin@winthropcouchot.com, mconour@winthropcouchot.com |
| David R. Isola | disola@isolalaw.com, mrodriguez@isolalaw.com |
| Lawrence M. Jacobson | lmj@gflawfirm.com |
| Lance N. Jurich | ljurich@loeb.com, kamote@loeb.com, ladocket@loeb.com |
| Jeff D. Kahane | jkahane@duanemorris.com |
| Louis E. Kempinsky | lek@kempinskylaw.com |
| John G. McCarthy | jmccarthy@sgrlaw.com, nyoecf@sgrlaw.com |
| Kathleen J. McCarthy | lmiller@tomcaseylaw.com, msilva@tomcaseylaw.com |
| Randy P. Orlik | rorlik@coxcastle.com |
| Ronald E. Ostrin | ron@ostrinlaw.com |
| Jeffrey S. Raskin | jeffrey.raskin@morganlewis.com |
| Jason M. Rund (TR) | trustee@srlawyers.com, jrund@ecf.epiqsystems.com |
| Lillian G. Stenfeldt | lillian.stenfeldt@rimonlaw.com |
| United States Trustee (LA) | ustpregion16.la.ecf@usdoj.gov |
| Howard J. Weg | hweg@robinskaplan.com |
| Christopher F. Wilson | cfw.cwanda@gmail.com cindy.c.wilson@gmail.com |
| Stephen Wong | swong@spcclaw.com |

*In Re LAKELAND DEVELOPMENT COMPANY*

United States Bankruptcy Court (C.D. Cal. – Los Angeles Div.) Case No. 2:12-bk-25842-RN

**SERVICE LIST**

**TO BE SERVED BY FIRST CLASS MAIL**

| ATTORNEY | TEL/FAX/E-MAIL |
|---|---|
| **Debtor**<br>Lakeland Development Company<br>P.O. Box 4406<br>Santa Fe Springs, CA 90670 | |
| **Interested Parties**<br>H. Henry Eshraghian<br>Expert Accounting & Tax Firm<br>112 West 9th Street, Suite 325<br>Los Angeles, CA 90015 | |
| Donald T. Fife, CPA<br>Hahn Fife & Company<br>790 E. Colorado Blvd., 9th Floor<br>Pasadena, CA 91101 | |
| **Request for Special Notice**<br>Rafael Bernardino<br>Hobson Bernardino + Davis LLP<br>725 S. Figueroa Street, Suite 3230<br>Los Angeles, CA 90017 | |
| Jeanne C. Wanlass, Esq.<br>Loeb & Loeb LLP<br>10100 Santa Monica Blvd.,#2200<br>Los Angeles, CA 90067-4120 | |
| **Participants in State Court Matter**<br>Deborah A. Aiwasian, Esq.<br>Bruce N. Telles, Esq.<br>AIW ASIAN & ASSOCIATES<br>725 South Figueroa Street, Suite 1050<br>Los Angeles, CA 90017 | Tel.: (213) 233-9650<br>Fax. (213) 233-9651 |
| Steven M. Crane, Esq.<br>Jasmin V. Lombardi, Esq.<br>BERKES CRANE ROBINSON & SEAL<br>515 S. Figueroa Street, Suite 1500<br>Los Angeles, CA 90071 | Tel: 213-955-1150<br>Fax: 213-955-1155<br>scrane@bcrslaw.com<br>jlombardi@bcrslaw.com |
| Cyndie M. Chang, Esq.<br>Russell W. Roten, Esq.<br>Andrew K. Gordon, Esq.<br>Audra L. Thompson, Esq.<br>Dan Terzian, Esq.<br>DUANE MORRIS LLP<br>865 S. Figueroa Street, Suite 3100 | Tel.: (213) 689-7400<br>Fax: (213) 689-7401<br>rwroten@duanemorris.com<br>akgordon@duanemorris.com<br>athompson@duanemorris.com<br>dterzian@duanemorris.com |

*In Re LAKELAND DEVELOPMENT COMPANY*

United States Bankruptcy Court (C.D. Cal. – Los Angeles Div.) Case No. 2:12-bk-25842-RN

### SERVICE LIST

| ATTORNEY | TEL/FAX/E-MAIL |
|---|---|
| Los Angeles, CA 90017-5450 | |
| David R. Isola, Esq.<br>ISOLA LAW GROUP, LLP<br>405 West Pine Street<br>Lodi, CA 95240 | Tel.: (209) 367-7055<br>Fax: (209) 367-7056<br>disola@isolalaw.com |
| Martin R. Baach, Esq.<br>Joseph L. Ruby, Esq.<br>LEWIS BAACH KAUFMANN<br>MIDDLEMISS PLLC<br>1899 Pennsylvania Avenue, Suite 600<br>Washington, DC 20006 | Tel: 202-833-8900<br>Fax: 202-466-5738<br>martin.baach@lbkmlaw.com<br>joseph.ruby@lbkmlaw.com |
| Susan J. Field, Esq.<br>Barbora Pulmanova, Esq.<br>MUSICK PEELER & GARRETT LLP<br>One Wilshire Boulevard , Suite 2000<br>Los Angeles, CA 90017 | Tel: (213) 629-7600<br>Fax: (213) 624-1376<br>s.field@mpglaw.com<br>b.pulmanova@mpglaw.com |
| W. David Campagne, Esq.<br>Stephen R. Wong, Esq.<br>SINNOTT, PUEBLA, CAMPAGNE &<br>CURET<br>2 Embarcadero Center, Suite 1410<br>San Francisco, CA 94111 | Tel. (415) 352-6200<br>Fax. (415) 352-6224 |
| Philip E. Smith, Esq.<br>Michael W. Ellison, Esq.<br>SMITH + ELLISON<br>18881 Von Karman, Suite 960<br>Irvine, CA 92612 | Tel.: (949) 442-1500<br>Fax: (949) 442-1515<br>psmith@sehlaw.com |

SFACTIVE-904580054.1